1

2

3

4

5

6

7

8

9          **IN THE UNITED STATES DISTRICT COURT**

10         **FOR THE EASTERN DISTRICT OF CALIFORNIA**

11

12   CHRIS WILLIS, et al.,                          CASE NO. CV F 09-1766 LJO DLB

13              Plaintiff,                          **SUMMARY JUDGMENT DECISION**
           vs.                                      (Doc. 73.)
14
     CITY OF FRESNO, et al.,
15
                Defendants.
16   _____/

17                          **INTRODUCTION**

18          Defendants City of Fresno ("City") and three of its peace officers seek summary judgment on

19   plaintiffs' excessive force, *Monell*, and tort claims arising from the fatal shooting of Stephen Willis

20   ("Stephen").  Plaintiffs argue that "facts remain in serious dispute" regarding the shooting to bar

21   summary judgment on most claims.  This Court considered defendants' summary judgment motion on

22   the record without a hearing, pursuant to Local Rule 230(g).[1]  For the reasons discussed below, this

23   Court GRANTS defendants summary judgment.

24   _____

25         [1]        This Court carefully reviewed and considered the record, including all evidence, arguments, points and
     authorities, declarations, testimony, statements of undisputed facts and responses thereto, objections and other papers filed
26   by the parties.  Omission of reference to evidence, an argument, document, objection or paper is not to be construed to the
     effect that this Court did not consider the evidence, argument, document, objection or paper. This Court thoroughly reviewed,
27   considered and applied the evidence it deemed admissible, material and appropriate for summary judgment. This Court does
     not rule on objections in a summary judgment context, unless otherwise noted.
28

1

## BACKGROUND[2]

2

### Summary

3       During the early morning of March 28, 2009, Stephen, a 23-year-old trade school student, was

4  fatally shot after defendant City police officers Greg Catton ("Officer Catton") and Daniel Astacio

5  ("Officer Astacio") encountered Stephen who possessed a .38 caliber revolver ("revolver").  Plaintiffs

6  Chris Willis ("Mr. Willis") and Mary Willis ("Ms. Willis") are Stephen's natural parents and pursue

7  wrongful death, excessive force and inadequate training claims against the City, its police chief Jerry

8  Dyer ("Chief Dyer"), and Officers Canton and Astacio (collectively "defendants").  Plaintiff Jennafer

9  Uribe ("Ms. Uribe") was Stephen's live-in partner and present in the vicinity of Stephen's fatal shooting.

10  Ms. Uribe has pursued assault, intentional infliction of emotional distress ("IIED"), and negligent

11  training claims against defendants but has sought to dismiss them in exchange for a waiver of costs.[3]

12  Defendants appear to reject such offer.

13

### Target Shooting

14       On March 27, 2009, Stephen used a six-shot revolver loaned by Mr. Willis for target shooting.

15  Stephen transported the revolver in a holster within a black laptop computer bag.  When Stephen

16  departed from target shooting, no .38 caliber ammunition remained in the revolver.  Several of Stephen's

17  friends were unable to fire the revolver because Stephen was out of .38 caliber ammunition.

18

### Dinner And Drinking

19       After target shooting, Stephen, Ms. Uribe and a friend had dinner at a restaurant during 5:30 to

20  7 p.m.  Stephen and Ms. Uribe shared a quesadilla with rice and beans.  Stephen consumed half of a

21  Sierra Nevada beer, and Ms. Uribe consumed a margarita.  Stephen and Ms. Uribe left the restaurant and

22  purchased a bottle of tequila from a grocery store.

23       Stephen and Ms. Uribe returned to their apartment to prepare to meet friends at a night club.

24

25       [2]      This Court derived the following factual recitation by combing through the record.  The parties' factual
    statements and responses thereto provide little assistance in that they are disjointed, lack sequence and supporting evidence
26  for purported facts, meander at counsel's whim, and are packed with irrelevant information and argument.  This Court
    ADMONISHES the parties' counsel that factual statements must distill clearly "facts," not argument or speculation, and must
27  be coherent, succinct, and well-organized sequentially by the events or claims at issue.  This admonishment serves as a
    predicate to impose sanctions on the parties and their counsel in other actions.

28       [3]      Mr. and Ms. Willis and Ms. Uribe will be referred to collectively as "plaintiffs."

Stephen and Ms. Uribe consumed shots of tequila before leaving for the night club.

At the night club, a bouncer told Ms. Uribe that she had reached her limit and would be served no more alcohol. Stephen and Ms. Uribe decided to meet their friends at their apartment during the late evening, and Stephen drove them from the night club in his dark-colored Infiniti sedan. Ms. Uribe became nauseous from her drinking and asked Stephen to speed up.

### Erratic Driving

At around that time, Officers Canton and Astacio and several other City Police Department ("Department") officers responded to a call regarding a possible gang disturbance near Stephen and Ms. Uribe's southeast Fresno apartment complex. Parked near the apartment complex' entrance were three or four marked Department vehicles, including Officer Astacio's vehicle with overhead lights illuminated. Officer Canton wore his Department uniform with a duty belt, metal badge on his left breast, and two white Department stars on each shoulder. Officer Astacio wore a Department Class C uniform with lo-bearing vest and white Department stars on his left chest and each shoulder, and "Police" on his back.

Stephen and Ms. Uribe's vehicle traveled past the officers and turned into the apartment complex. Officers perceived what they believed was a vehicle colliding with the entrance gate to the apartment complex. Officers heard an engine revving, screeching tires, and the striking of an unknown object. Officers Catton and Astacio walked into the apartment complex following the path of Stephen and Ms. Uribe's vehicle to investigate a hit and run and possible driving under the influence.

After Stephen parked the vehicle in front of their apartment unit, Ms. Uribe exited the vehicle and ran to the apartment unit's front door because she felt she would vomit. Ms. Uribe's mother did not answer her knock to allow her to enter the apartment unit.

### Initial Encounter With Stephen

Officers Catton and Astacio observed Stephen stand at the rear of his vehicle which they believed had been involved in a hit and run or possible driving under the influence. Officers Catton and Astacio note that they identified themselves as police officers and asked to speak to Stephen. Officer Catton illuminated Stephen with his large flashlight, and Officer Astacio notes he was 20-25 feet from Stephen at that point. When Stephen turned to face Officers Catton and Astacio, they observed that Stephen held

1   a firearm in a holster.

2        Officers Canton and Astacio note that they again identified themselves as police officers, drew

3   their firearms, and commanded Stephen to drop his firearm.  In his deposition, Officer Canton testified

4   that "I reached for the gun when I saw the gun in the holster . . . it was see gun, grab my gun."  Officer

5   Astacio testified: "I think I simultaneously pulled out my firearm when I noticed that he was holding a

6   firearm in the holster."  Officers Catton and Astacio note that Stephen drew the firearm from its holster,

7   pointed it in their direction, and ignored their commands to drop the gun.

8   **Initial Firing On Stephen**

9        In his deposition, Officer Astacio testified as to his initial firing on Stephen from ten feet away:

10    Q.    So when you first were approaching him and you identified yourself as a police
    officer and he turned from the trunk you saw he was holding a holster with a gun
11       in it, your first reaction was to yell "Drop the gun" and reach for your own gun?

12    A.    Correct.

13    Q.    And as you were doing that you saw him withdraw his gun from his holster and
    then point it at you in a straight arm position?
14

15    A.    Correct.

      Q.    And that's when you fired at him?
16

17    A.    Correct.

      Q.    Okay.  He never got off a shot at you?
18

19    A.    I remember seeing a muzzle flash at that time, but it was after I had already
    initially fired the first couple of rounds.

20  Officer Astacio also testified:

21    Q.    What was it that caused you to fire first?

22    A.    Just fearing for my safety because . . . the suspect had pulled out the firearm from
    a holster and it was pointed at us.
23

24    Q.    So your memory is that he was actually pointing the firearm at you when you
    fired?

25    A.    Yes.

26  Officer Catton testified:

27    Q.    When you pulled your gun you were keeping your light on what you've called the
    subject and you were raising your own gun and you felt he was going to point his
28       gun at you, correct?

A.   When I saw his gun, I drew my gun.  As I was drawing my gun he reached for his gun, started to pull it out and started to extend towards me.

Q.   And before he extended towards you you discharged your gun?

A.   Before it was fully extended, yes, I did.

Officer Astacio initially fired three to five rounds at Stephen and recalled a muzzle flash from Stephen's firearm.  Officer Astacio thought he had hit Stephen in his chest.  Officer Catton claims he fired once or twice and does not know if he hit Stephen.  Defense expert Vincent Di Maio, M.D. ("Dr. Di Maio"), testified that three bullets entered Stephen, including one in his neck area, but could not say "which ones occurred at the initial shooting."

### Continued Firing On Stephen

Officer Catton claims that Stephen ran between his vehicle and a mini van while he continued to point his firearm toward Officer Canton.  Officer Catton recalled seeing a muzzle flash from Stephen's firearm near the time Stephen started to run from his vehicle toward the mini van.  Officer Canton continued to fire at Stephen until he lost visual contact.

Officer Catton backed up between Chevrolet and Pontiac vehicles and observed Stephen crouched behind the nearby mini van "pointing his gun at me."  Officer Catton believed Stephen prepared to fire on Officer Astacio or him and that "there was a muzzle flash."  Officer Catton fired upon Stephen in that Stephen still pointed a gun at Officer Catton.

Officer Astacio's version of events at that this point differs.  After the "first burst of rounds," Officer Astacio suspected Stephen "had been hit," "was falling on the ground," but did not know "if he was going to stay on the ground."  Officer Astacio testified that after Stephen appeared to fall to the ground, Stephen did not attempt to run.[4]  Officer Astacio testified: "In my mind it looked like he was in a position where he was going to fall to the ground.  So in my mind I just believed that he was going to be on the ground."

### Officer Catton's Attempt At A Better Shot

Officer Catton desired a better shot and testified: "I came out of cover so that I could get a full

---

[4]   Plaintiffs surmise that Stephen was seriously wounded and tried to crawl to protection from an onslaught of bullets.  Plaintiffs point out that 18 bullets were fired into the mini van, Stephen's vehicle and the apartment dwelling.

view and a good shot or a good angle.  And at that point I started to fire and I felt . . . like I had been hit in the leg by something in the left thigh and I yelled out."  Officer Catton retreated toward the rear of the Pontiac to check for injuries and discovered he was unharmed.  Officer Catton does not know if he was hit by a bullet from Officer Astacio.

Officer Catton returned toward the front of the Pontiac and resumed firing.  He testified:

Q.   And you began firing again?

A.   Just a few, just maybe two or three times more.

Q.   Was Mr. Willis still in a crouched position pointing his gun at you?

A.   Yes.

. . .

Q.   His face was turned in your direction and he was pointing the gun at you?

A.   When I went back I remember him crouching down.  The last time I went back after I checked my leg I don't remember him pointing the gun at me at that point, but I do remember him still crouched and leaning up against the back of the van.

Officer Catton further testified: "I just didn't know if I had hit him based on the way that he was reacting to what I thought I had done.  He wasn't acting in a manner that I felt like I had effectively hit him."

### Officer Astacio's Final Shots

Officer Astacio had taken cover behind a truck's front tire and had heard Officer Catton grunt during gunfire.  Officer Astacio observed Stephen kneel behind the mini van and point his firearm west.  Officer Astacio testified: "To me it looked like, it looked like he was shooting at Officer Catton in the back."  Officer Astacio further testified: "I then looked out from the cover of the car and noticed that Mr. Willis, that's when I noticed Mr. Willis was pointing the firearm in the western direction and also discharging the firearm."  Officer Astacio testified that he saw at least two muzzle flashes from Stephen's firearm.  Officer Astacio fired three to five rounds at Stephen, hitting him in the back, as Stephen knelt by the mini van.

Officer Catton retreated from the Pontiac's cover and proceeded to Officer Astacio and his cover behind a truck.  Officer Astacio radioed their location to other officers.  Officer Astacio believed he was the last to discharge his weapon at Stephen and testified that he did not hear Officer Catton fire after Officer Astacio's last shots.

6

After Officer Catton joined Officer Astacio, they observed Stephen lying on his side and stopped firing because they believed Stephen was no longer a threat although Officer Catton noted that he feared that Stephen had the ability to reach for his firearm.  Department Officer Derek Jacobo ("Officer Jacobo") attributes Officer Catton as saying he "put that hole in his [Stephen's] back."

Defense expert Dr. Di Maio testified: "There was only one wound that was lethal."

In their declarations, Officers Catton and Astacio both state: "Under the tense, rapidly changing circumstances, and the immediate threat that was presented, I did not believe I had the time or luxury to delay taking action.  I firmly believed that my life and the life of Officer [Catton/Astacio] was in jeopardy if I did not use deadly force at the moment I did."

### Ms. Uribe's Status During The Shooting

Ms. Uribe did not observe the events involving Stephen and Officers Catton and Astacio during which she stood in front of her apartment door or near a neighbor's apartment door.  The patio of Stephen and Ms. Uribe's apartment blocked Ms. Uribe's view of the parking area.  Ms. Uribe heard what she thought were firecrackers or fireworks and looked to the sky.  Ms. Uribe has neither given a statement nor testified as to bullets flying by or near her to endanger her.

Officers Catton and Astacio did not observe Ms. Uribe in the apartment complex parking lot or immediate vicinity when they approached Stephen and his vehicle or during the shooting.  When Officers Catton and Astacio contacted Stephen and discharged their weapons, they were unaware that anyone other than Stephen was present in the parking lot and lacked information that anyone else was present or in the near vicinity.

### Post-Shooting Results

Investigating Department officers found that Stephen's revolver contained five live rounds and one spent cartridge two slots over from where it would have been had it been fired.  On March 28, 2009, a box of Ultramax .38 caliber ammunition was recovered from Stephen's apartment with six cartridges missing from the box of 50.  The box of Ultramax .38 caliber ammunition recovered from the apartment is consistent with the ammunition Stephen used for target shooting.

Officers Catton and Astacio had fired 41 rounds with Officer Catton reloading twice and Officer Astacio reloading once.  Plaintiffs note that Officers Catton and Astacio were no more than 25 feet from

Stephen when they fired and took up shooting positions in which they were in line with each other from a distance of no more than 36 feet to render Stephen halfway between Officers Catton and Astacio.

Department Officer Rafael Villalvazo ("Officer Villalvazo") headed the Department's investigation into Stephen's shooting. He determined that Stephen had fired once at Officers Catton and Astacio based on the empty casing inside the revolver. Officer Villalvazo issued a report to exonerate Officers Catton and Astacio.

Toxicology testing indicates that Stephen's blood alcohol content was .29 and that THC (marijuana) was present in his system. Plaintiffs dispute the results based on the compromised condition of Stephen's body.

**Department Accreditation**

The Department is accredited with minimum standards set by the Peace Officer Standards and Training ("POST"), which govern California police officer training. The Department is also accredited by the Commission on Accreditation for Law Enforcement ("CALEA"), which delineates law enforcement practices.

Department officers must attend a POST-certified academy, receive ongoing training, and participate every two years in 24 hours of perishable skills training identified by POST. Department training regarding use of force complies with POST standards. Officers Catton and Astacio attended a POST-certified academy and received basic level POST certification. Officer Astacio also received intermediate level POST certification.

**Department Use Of Force And Related Policies And Practices**

Department Deputy Police Chief Robert Nevarez ("Deputy Chief Nevarez") declares: "Consistent with its policy regarding the use of force, the Fresno Police Department trains its officers that they can use reasonable force to defend themselves or others, affect an arrest or detention, prevent escape and/or overcome resistance. Officers are trained to assess the situation and use that amount of force that is reasonable under the circumstances."

Department administrative staff review incidents involving force to determine whether the force used was reasonable and take necessary corrective action. Deputy Chief Nevarez declares that the Department's policy and practice is "to conduct thorough investigations into allegations of misconduct

8

on the part of its police officers." Deputy Chief Nevarez further notes that officers "must report crimes, suspicious incidents and incidents in which they use force, resulting in injury or a complaint of pain. It has never been the policy of the Fresno Police Department to allow its officers to falsify reports for any reason."

At the time of Stephen's shooting, the Department's practice was to await the results of the Fresno County District Attorney's Office investigation of an officer involved shooting prior to a Department Internal Affairs investigation. Chief Dyer opines that an outside independent agency investigation ensures that "the investigation is complete and thorough before Internal Affairs completes [its] investigation." After an officer involved shooting, the officer is placed on administrative leave during an initial criminal investigation to determine whether there is obvious criminal misconduct. The officer undergoes a psychological assessment to determine suitability to return to duty and a separate threat assessment by a Department firearms instructor. The officer returns to duty only after satisfactory completion of the psychological and threat assessments.

In his declaration, Chief Dyer states that at no time relevant to this action did the Department have a policy, custom or practice to allow officers to: (1) "undertake unreasonable searches and seizures"; (2) "detain or arrest citizens without reasonable cause of lawful justification"; (3) "file false police reports"; (4) "fabricate evidence"; (5) "subject innocent citizens to unlawful shootings and/or excessive force"; or (6) maliciously arrest citizens for crimes they did not commit." Chief Dyer further notes the absence of a Department policy, custom or practice to provide "inadequate training, supervision, instruction, oversight or discipline" or to "conspire to violate a person's constitutional rights."

### Department Supervision

As of March 2009, Department officers were supervised through a chain of command – sergeant, lieutenant, captain, deputy chief and chief. Officers were supervised on a daily basis by a sergeant and received annual written evaluations through the chain of command. Deputy Chief Nevarez declares that Department officers "are expected to comply with Fresno Police Department policies, practices, procedures, and training requirements, and are subject to disciplinary action if they fail to do so." Deputy Chief Nevarez notes that "[a]t no time has the Fresno Police Department had a policy, practice,

1  or custom of improperly supervising its police officers."

2  **Absence of Chief Dyer's Participation In Stephen's Shooting**

3  Chief Dyer did not participate in Stephen's shooting, was not present during the shooting, and

4  gave no direction to officers involved in the shooting.

5  **Plaintiffs' Claims**

6  Plaintiffs proceed on their First Amended Complaint for Damages ("FAC").  The FAC alleges

7  for Mr. and Ms. Willis a wrongful death-negligence claim and 42 U.S.C. § 1983 ("section 1983") claims

8  for Fourth and Fourteenth Amendment violations and *Monell* liability. Through and for Mr. and Ms.

9  Willis, the FAC seeks recovery for Stephen's funeral and burial expenses, personal injury prior to death,

10  and loss of care and companionship.  The FAC alleges for Ms. Uribe assault, IIED and *Monell* claims

11  to which plaintiffs agree to dismiss in exchange for a waiver of costs.  Plaintiffs offer no opposition to

12  summary judgment on Ms. Uribe's claims.  As such, this Court GRANTS defendants summary judgment

13  on Ms. Uribe's assault, IIED and *Monell* claims and turns to Mr. and Ms. Willis' claims.

14  **DISCUSSION**

15  Defendants seeks summary judgment in that Officers Catton and Astacio's use of force was

16  reasonable and plaintiffs lack facts to support the City's *Monell* liability.

17  F.R.Civ.P. 56(a) permits a party to seek summary judgment "identifying each claim or defense

18  – or the part of each claim or defense – on which summary judgment is sought."  "A district court may

19  dispose of a particular claim or defense by summary judgment when one of the parties is entitled to

20  judgment as a matter of law on that claim or defense." *Beal Bank, SSB v. Pittorino*, 177 F.3d 65, 68 (1st

21  Cir. 1999).

22  Summary judgment is appropriate when the movant shows "there is no genuine dispute as to any

23  material fact and the movant is entitled to judgment as a matter of law." F.R.Civ.P. 56(a); *Matsushita*

24  *Elec. Indus. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 1356 (1986); *T.W. Elec. Serv.,*

25  *Inc. v. Pacific Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987). The purpose of summary

26  judgment is to "pierce the pleadings and assess the proof in order to see whether there is a genuine need

27  for trial." *Matsushita Elec.,* 475 U.S. at 586, n. 11, 106 S.Ct. 1348; *International Union of Bricklayers*

28  *v. Martin Jaska, Inc.*, 752 F.2d 1401, 1405 (9th Cir. 1985).

On summary judgment, a court must decide whether there is a "genuine issue as to any material fact," not weigh the evidence or determine the truth of contested matters.  F.R.Civ.P. 56(a), (c); *Covey v. Hollydale Mobilehome Estates*, 116 F.3d 830, 834 (9th Cir. 1997); *see Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157, 90 S.Ct. 1598 (1970); *Poller v. Columbia Broadcast System*, 368 U.S. 464, 467, 82 S.Ct. 486 (1962); *Loehr v. Ventura County Community College Dist.*, 743 F.2d 1310, 1313 (9th Cir. 1984).  "Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge, whether he is ruling on a motion for summary judgment or for a directed verdict."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255, 106 S.Ct. 2505 (1986)

The evidence of the party opposing summary judgment is to be believed and all reasonable inferences that may be drawn from the facts before the court must be drawn in favor of the opposing party.  *Anderson*, 477 U.S. at 255, 106 S.Ct. 2505; *Matsushita*, 475 U.S. at 587, 106 S.Ct. 1348.  The inquiry is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law."  *Anderson*, 477 U.S. at 251-252, 106 S.Ct. 2505.

To carry its burden of production on summary judgment, a moving party "must either produce evidence negating an essential element of the nonmoving party's claim or defense or show that the nonmoving party does not have enough evidence of an essential element to carry its ultimate burden of persuasion at trial."  *Nissan Fire & Marine Ins. Co. v. Fritz Companies, Inc.*, 210 F.3d 1099, 1102 (9th Cir. 2000); *see Soremekun v. Thrifty Payless, Inc.*, 509 F.3d 978, 984 (2007) (moving party is able to prevail "by pointing out that there is an absence of evidence to support the nonmoving party's case"); *High Tech Gays v. Defense Indus. Sec. Clearance Office*, 895 F.2d 563, 574 (9th Cir. 1990).  A "complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial" to entitle the moving party to summary judgment.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548 (1986).

"[T]o carry its ultimate burden of persuasion on the motion, the moving party must persuade the court that there is no genuine issue of material fact."  *Nissan Fire*, 210 F.3d at 1102; *see High Tech Gays*, 895 F.2d at 574.  "As to materiality, the substantive law will identify which facts are material.

11

1  Only disputes over facts that might affect the outcome of the suit under the governing law will properly

2  preclude the entry of summary judgment." *Anderson*, 477 U.S. at 248, 106 S.Ct. 2505.

3      "If a moving party fails to carry its initial burden of production, the nonmoving party has no

4  obligation to produce anything, even if the nonmoving party would have the ultimate burden of

5  persuasion at trial." *Nissan Fire*, 210 F.3d at 1102-1103; *see Adickes*, 398 U.S. at 160, 90 S.Ct. 1598.

6  "If, however, a moving party carries its burden of production, the nonmoving party must produce

7  evidence to support its claim or defense." *Nissan Fire*, 210 F.3d at 1103; *see High Tech Gays*, 895 F.2d

8  at 574.  "If the nonmoving party fails to produce enough evidence to create a genuine issue of material

9  fact, the moving party wins the motion for summary judgment." *Nissan Fire*, 210 F.3d at 1103; *see*

10  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548 (1986) (F.R.Civ.P. 56 "mandates the entry

11  of summary judgment, after adequate time for discovery and upon motion, against a party who fails to

12  make the showing sufficient to establish the existence of an element essential to that party's case, and

13  on which that party will bear the burden of proof at trial.")

14      "But if the nonmoving party produces enough evidence to create a genuine issue of material fact,

15  the nonmoving party defeats the motion." *Nissan Fire*, 210 F.3d at 1103; *see Celotex*, 477 U.S. at 322,

16  106 S.Ct. 2548.  "The amount of evidence necessary to raise a genuine issue of material fact is enough

17  'to require a jury or judge to resolve the parties' differing versions of the truth at trial.'" *Aydin Corp.*

18  *v. Loral Corp.*, 718 F.2d 897, 902 (quoting *First Nat'l Bank v. Cities Service Co.*, 391 U.S. 253, 288-

19  289, 88 S.Ct. 1575, 1592 (1968)).  "The mere existence of a scintilla of evidence in support of the

20  plaintiff's position will be insufficient." *Anderson*, 477 U.S. at 252, 106 S.Ct. 2505.

21      As discussed below, plaintiffs fail to produce enough evidence to create genuine issues of

22  material fact to avoid summary judgment on their claims.

23              **Excessive Force**

24      The FAC's second claim alleges for Mr. and Ms. Willis as successors in interest to Stephen a

25  section 1983 excessive force claim.  Defendants argue that Officers Catton and Astacio used reasonable

26  force at all times.

27              ***Section 1983 Requirements***

28      "Section 1983 imposes two essential proof requirements upon a claimant:  (1) that a person

acting under color of state law committed the conduct at issue, and (2) that the conduct deprived the claimant of some right, privilege, or immunity protected by the Constitution or laws of the United States." *Leer v. Murphy*, 844 F.2d 628, 632-633 (9th Cir. 1988).

"Section 1983 'is not itself a source of substantive rights,' but merely provides 'a method for vindicating federal rights elsewhere conferred.'" *Albright v. Oliver*, 510 U.S. 266, 271, 114 S.Ct. 807, 811 (1994) (quoting *Baker v. McCollan*, 443 U.S. 137, 144, n. 3, 99 S.Ct. 2689, 2694, n. 3 (1979)). Section 1983 and other federal civil rights statutes address liability "in favor of persons who are deprived of 'rights, privileges, or immunities secured' to them by the Constitution." *Carey v. Piphus*, 435 U.S. 247, 253, 98 S.Ct. 1042 (1978) (quoting *Imbler v. Pachtman*, 424 U.S. 409, 417, 96 S.Ct. 984, 996 (1976)). "The first inquiry in any § 1983 suit, therefore, is whether the plaintiff has been deprived of a right 'secured by the Constitution and laws.'" *Baker,* 443 U.S. at 140, 99 S.Ct. 2689 (1979). Stated differently, the first step in a section 1983 claim is to identify the specific constitutional right allegedly infringed. *Albright v. Oliver*, 510 U.S. 266, 271, 114 S.Ct. 807, 813 (1994). "Section 1983 imposes liability for violations of rights protected by the Constitution, not for violations of duties of care arising out of tort law." *Baker*, 443 U.S. at 146, 99 S.Ct. 2689.

***Reasonableness Standard***

In *Graham v. Connor*, 490 U.S. 386, 395, 109 S.Ct. 1865 (1989), the U.S. Supreme Court determined that section 1983 excessive force claims are addressed under the Fourth Amendment's reasonableness standard, not the Fourteenth Amendment's substantive due process standard:

> [A]ll claims that law enforcement officers have used excessive force – deadly or not – in the course of an arrest, investigatory stop, or other "seizure" of a free citizen should be analyzed under the Fourth Amendment and its "reasonableness" standard, rather than under a "substantive due process" approach. Because the Fourth Amendment provides an explicit textual source of constitutional protection against this sort of physically intrusive governmental conduct, that Amendment, not the more generalized notion of "substantive due process," must be the guide for analyzing these claims.

In *Graham*, 490 U.S. at 396-397, 109 S.Ct. 1865, the U.S. Supreme Court provided guidance on reasonableness of use of force:

> . . . the right to make an arrest or investigatory stop necessarily carries with it the right to use some degree of physical coercion or threat thereof to effect it. . . . Because "[t]he test of reasonableness under the Fourth Amendment is not capable of precise definition

13

1    or mechanical application . . . however, its proper application requires careful attention to the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight. . . .

    The "reasonableness" of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with 20/20 vision of hindsight. . . . The calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments – in circumstances that are tense, uncertain, and rapidly evolving – about the amount of force that is necessary in a particular situation.

    As in other Fourth Amendment contexts, however, the "reasonableness" inquiry in an excessive force case is an objective one: the question is whether the officers' actions are "objectively reasonable" in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation.  (Citations omitted.)

A section 1983 excessive force plaintiff must establish, as part of his affirmative case, the unreasonableness of the force used. *Miller v. Taylor,* 877 F.2d 469, 471-472 (6th Cir.1989) ("Plaintiff here was required to show that [defendant] Officer Taylor's use of force was unjustified in order to state a constitutional deprivation.").

To determine whether a plaintiff's Fourth Amendment rights were violated, a court must consider whether the defendant officers had probable cause to believe that the plaintiff posed a significant threat of death or serious physical injury to themselves or others, and used reasonable force to alleviate that threat.  *Herrera v. Las Vegas Metropolitan Police Dept.,* 298 F.Supp.2d 1043, 1049-1050 (D. Nev. 2004).  "[A]s the text of the Fourth Amendment indicates, the appropriate inquiry is whether the officers acted reasonably, not whether they had less intrusive alternatives available to them." *Scott v. Henrich*, 39 F.3d 913, 915 (9th Cir. 1994), *cert. denied*, 515 U.S. 1159, 115 S.Ct. 2612 (1995).  "An officer cannot be expected to accurately anticipate all of the possible responses a subject may have to his commands and then tailor his actions accordingly in order for his conduct to fall into the category of what is considered reasonable." *Reynolds v. County of San Diego*, 84 F.3d 1162, 1169 (9th Cir. 1996), *overruled on other grounds, Acri v. Varian Assocs., Inc.*, 114 F.3d 999 (9th Cir. 1997).  The Ninth Circuit Court of Appeals has further explained:

    Police officers, however, are not required to use the least intrusive degree of force possible. Rather, as stated above, the inquiry is whether the force that was used to effect a particular seizure was reasonable, viewing the facts from the perspective of a

14

reasonable officer on the scene. . . . Whether officers hypothetically could have used less painful, less injurious, or more effective force in executing an arrest is simply not the issue.  (Citation omitted.)

*Forrester v. City of San Diego*, 25 F.3d 804, 807-808 (9th Cir. 1994), *cert. denied*, 513 U.S. 1152, 115 S.Ct. 1104 (1995).

"However, a simple statement by an officer that he fears for his safety or the safety of others is not enough; there must be objective factors to justify such a concern."  *Deorle v. Rutherford*, 272 F.3d 1272, 1281 (9th Cir. 2001), *cert. denied*, 536 U.S. 958, 122 S.Ct. 2660 (2002). The Ninth Circuit has admonished that "a court may not simply accept what may be a self-serving account by the police officer.  It must also look at the circumstantial evidence that, if believed, would tend to discredit the police officer's story, and consider whether this evidence could convince a rational factfinder that the officer acted reasonably."  *Scott*, 39 F.3d at 915; *see Ting v. United States*, 927 F.2d 1504, 1510 (9th Cir. 1991) ("We need not decide whether the shooting of [plaintiff] Ting would be objectively reasonable under [officer] Burns' version of the facts because material questions exist regarding the circumstances of the shooting.")

Defendants argue that Officer Catton and Astacio's use of force was reasonable in that:

1.  Stephen escalated the situation by drawing the revolver from its holster and ignoring commands to drop his revolver after initial contact with Officers Catton and Astacio;

2.  Stephen positioned himself between his vehicle and a mini van from which Officers Catton and Astacio claim they observed a muzzle flash;

3.  Stephen continued to attempt to evade Officers Catton and Astacio and continued to point the revolver toward them;

4.  Stephen kneeled behind the mini van and continued to point the revolver at Officer Catton;

5.  Officer Catton believed he had been struck by Stephen's bullet and Officer Astacio heard Officer Catton's grunt;

6.  Officers Catton and Astacio faced "tense, rapidly changing circumstances" and feared for their and others' safety to require "split-second decisions about the amount of force that was necessary"; and

15

7.      Stephen posed a continuing threat until Officers Catton and Astacio were assured that he was down and unable to use the revolver.

Defendants conclude that under the totality of circumstances under which Officers Catton and Astacio were aware, their use of force was reasonable at all times.

Plaintiffs respond that Officers Catton and Astacio unreasonably fired too many bullets. Plaintiffs accuse Officers Catton and Astacio of overreacting "to the fact that a man was transporting a gun from his car to his house in location of known gang activity." Plaintiffs claim that Officers Catton and Astacio "lost track of one another and began firing at each other, panicked and "killed a helpless man by firing bullets into his back as he lay on the ground." Plaintiffs focus on whether the degree of force was greater than reasonable under the circumstances. Plaintiffs conclude that the evidence "is so garbled that a finder of fact is going to have to weigh the various versions to determine what more than likely happened."

In their reply papers, defendants note plaintiffs' failure "to cite to the deposition testimony of any individual who contradicts the observations or beliefs" of Officers Catton and Astacio. Defendants contend that plaintiffs present merely "theories, arguments, metaphysical doubts, and alleged factual disputes."

Despite the parties' failure to provide clarity of the events, this Court's review of the record reveals that:

1.      Stephen had been drinking and apparently heavily;

2.      Officers Catton and Astacio responded to apparent erratic driving;

3.      Officers Catton and Astacio were dressed in Department uniforms and clearly presented as police officers;

4.      Stephen removed his loaded revolver from his vehicle's trunk;

5.      Stephen removed the revolver from its holster;

6.      Stephen did not drop or discard the revolver despite Officer Catton and Astacio's

/ / /

/ / /

/ / /

1    commands to do so;[5]

2    7.    Officers Catton and Astacio perceived that Stephen had the ability to fire the revolver

3          until at or near his death;

4    8.    Stephen took action to remain a threat by positioning himself between his vehicle and

5          the mini van and thus evade Officers Catton and Astacio or no less than prevent their

6          further advance toward him;

7    9.    Stephen did not take action to surrender and did not indicate he was willing to do so.

8    Despite plaintiffs' claim of "garbled" evidence,[6] the record reveals that Stephen resisted Officer

9    Catton and Astacio's initial directives and took action to prevent their further approach of Stephen.  The

10   record further reveals that Stephen removed the revolver and posed a threat in that he manipulated and

11   pointed, according to Officers Catton and Astacio, a deadly weapon and failed to discard it.   The only

12   reasonable inferences from the evidence are that Stephen was intoxicated and did not want to encounter

13   law enforcement about potential driving under the influence.

14   There is no evidence that Officers Catton and Astacio unreasonably drew their firearms and

15   initially fired on Stephen in response to his pulling his revolver.  At that point, the use of deadly force

16   was reasonable.  Plaintiffs raise an issue whether Officers Catton and Astacio should have stopped firing

17   and if so, when they should have stopped.  They appear to argue that if Officers Catton and Astacio had

18   not fired so many times, Stephen may have been apprehended alive.  Plaintiffs offer neither evidence

19   for such speculation nor legal authority.  Moreover, had Officers Catton and Astacio stopped firing

20   sooner, there is no evidence that Stephen would have survived Officers Catton and Astacio's initial

21   reasonable firing.  There is no definitive evidence of an unreasonable lethal round.  Officers Catton and

22   Astacio were not required to use the least intrusive degree of force possible.

23   Plaintiffs misinterpret the record to criticize Officer Catton and Astacio's tactics during the

24   events.  Such unsupported criticism fails to raise factual issues as to the reasonableness of Officers

25   _____

26       [5]    This Court finds unavailing plaintiffs' claim that no witnesses heard the commands given the lack of
     evidence that witnesses were in a position or had ability to hear commands.

27

28       [6]    "Garbled evidence" is attributable to plaintiffs' unwillingness or inability to distill the evidence. This Court
     surmises that plaintiffs garbled the evidence to attempt unsuccessfully to create factual issues.

1   Catton and Astacio's use of force during the entire course of events they faced.  In the absence of direct

2   evidence of unreasonable force, plaintiffs must support their claim with circumstantial evidence.

3   Plaintiffs fail to point to sufficient circumstantial evidence to suggest that Officers Catton and Astacio

4   unreasonably used and continued to use deadly force.

5   **Fourteenth Amendment Familial Claim**

6       The FAC's third claim alleges for Mr. and Ms. Willis a Fourteenth Amendment claim arising

7   out of loss of familial relationship with Stephen.

8       "The concept of 'substantive due process,' semantically awkward as it may be, forbids the

9   government from depriving a person of life, liberty, or property in such a way that 'shocks the

10  conscience' or 'interferes with rights implicit in the concept of ordered liberty.'" *Nunez v. City of Los*

11  *Angeles*, 147 F.3d 867, 871 (9th Cir. 1998).  The substantive component of the Due Process Clause is

12  violated by executive action only when it "can properly be characterized as arbitrary, or conscience

13  shocking, in a constitutional sense." *Collins v. City of Harker Heights*, 503 U.S. 115, 128, 112 S.Ct.

14  1061, 1070 (1992).

15      "The protections of substantive due process have for the most part been accorded to matters

16  relating to marriage, family, procreation, and the right to bodily integrity." *Albright*, 510 U.S. at 272,

17  114 S.Ct. at 812.   The Fourteenth Amendment's due process clause "provides heightened protection

18  against government interference with certain fundamental rights and liberty interests." *Washington v.*

19  *Glucksberg*, 521 U.S. 702, 721, 117 S.Ct. 2258 (1997).  "[R]ecent jurisprudence restricts the reach of

20  the protections of substantive due process primarily to liberties 'deeply rooted in this Nation's history

21  and tradition.'" *Armendariz v. Penman*, 75 F.3d 1311, 1319 (9th Cir. 1996) (quoting *Moore v. City of*

22  *East Cleveland, Oh.*, 431 U.S. 494, 503, 97 S.Ct. 1932, 1937 (1977)).  "Thus, the Fourteenth

23  Amendment protects against a State's interferences with 'personal decisions relating to marriage,

24  procreation, contraception, family relationships, child rearing, and education,' as well as with an

25  individual's bodily integrity." *Armendariz*, 75 F.3d at 1319 (quoting *Planned Parenthood v. Casey*, 505

26  U.S. 833, 851, 112 S.Ct. 2791, 2807 (1992)).

27      "[P]arents have a Fourteenth Amendment liberty interest in the companionship and society of

28  their children.  Official conduct that "shocks the conscience" in depriving parents of that interest is

18

cognizable as a violation of due process." *Wilkinson v. Torres*, 610 F.3d 546, 554 (9ᵗʰ Cir. 2010). "To prevail on a Fourteenth Amendment claim arising out of the loss of a familial relationship, a plaintiff must show that the Defendant's conduct shocks the conscience. . . . What state of mind shocks the conscience depends on the circumstances of a particular case." *Provencio v. Vazquez*, 258 F.R.D. 626, 640 (E.D. Cal. 2009) (citation omitted).

As to conscience shocking in an excessive force context, the Ninth Circuit has explained:

> In determining whether excessive force shocks the conscience, the court must first ask "whether the circumstances are such that actual deliberation [by the officer] is practical." . . .Where actual deliberation is practical, then an officer's "deliberate indifference" may suffice to shock the conscience. . . . On the other hand, where a law enforcement officer makes a snap judgment because of an escalating situation, his conduct may only be found to shock the conscience if he acts with a purpose to harm unrelated to legitimate law enforcement objectives.

*Wilkinson*, 610 F.3d at 554 (citations omitted).

"'[D]eliberation' should not be interpreted in the narrow, technical sense." *Wilkinson*, 610 F.3d at 554.

Defendants argue that under the "rapidly escalating circumstances" requiring "repeated split-second decisions," the "purpose-to-harm" standard applies since "actual deliberation was impossible." Plaintiffs respond that Officer Catton need not have shot Stephen in the back in that Officer Astacio "had already withdrawn from the firing line." Plaintiffs continue that an "officer cannot bootstrap his/her way into an escalating situation by doing all the escalating him or herself."

This Court agrees with defendants that the "purpose-to-harm" standard applies in the absence of facts to support Officers Catton and Astacio's opportunity for actual deliberation. Plaintiffs point to no facts that actual deliberation was practical for Officers Catton and Astacio. Plaintiffs' unsupported claims that Officer Catton panicked fail to substantiate conscience shocking under the circumstances. The record reveals that Officers Catton and Astacio faced a series of snap judgments under which they acted reasonably to negate factual issues as to conscience shocking. As such, Mr. and Ms. Willis familial relationship claims fail.

## **Qualified Immunity**

Defendants further contend that Officers Catton and Astacio are entitled to qualified immunity because the law at the time did not clearly establish that their conduct would violate Stephen or

1    plaintiffs' constitutional rights.

2                              ***Purpose And Elements***

3           Qualified immunity protects section 1983 defendants "from liability for civil damages insofar

4    as their conduct does not violate clearly established statutory or constitutional rights of which a

5    reasonable person would have known."  *Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S.Ct. 2727

6    (1982).  The "heart of qualified immunity is that it spares the defendant from having to go forward with

7    an inquiry into the merits of the case.  Instead, the threshold inquiry is whether, assuming that what the

8    plaintiff asserts the facts to be is true, any allegedly violated right was clearly established."  *Kelley v.*

9    *Borg*, 60 F.3d 664, 666 (9th Cir. 1995).

10          The issue of qualified immunity is "a pure question of law."  *Elder v. Holloway*, 510 U.S. 510,

11   514, 114 S.Ct. 1019 (1994); *Romero v. Kitsap County*, 931 F.2d 624, 627-628 (9th Cir. 1991).  To

12   analyze qualified immunity, a court determines: (1) what right has been violated; (2) whether that right

13   was so "clearly established" at the time of the incident that a reasonable officer would have been aware

14   of its constitutionality; and (3) whether a reasonable public officer could have believed that the alleged

15   conduct was lawful.  *Jensen v. City of Oxnard*, 145 F.3d 1078, 1085 (9th Cir. 1998), *cert. denied*, 525

16   U.S. 1016, 119 S.Ct. 540 (1988).  In *Skoog v. County of Clackamas*, 469 F.3d 1221, 1229 (9th Cir. 2006),

17   the Ninth Circuit Court explained in greater detail:

18               Determining whether an official is entitled to summary judgment based on the
         affirmative defense of qualified immunity requires applying a three-part test.  First, the
19       court must ask whether "[t]aken in the light most favorable to the party asserting the
         injury, [ ] the facts alleged show the officer's conduct violated a constitutional right?"
20       If the answer is no, the officer is entitled to qualified immunity. If the answer is yes, the
         court must proceed to the next question: whether the right was clearly established at the
21       time the officer acted.  That is, "whether it would be clear to a reasonable officer that his
         conduct was unlawful in the situation he confronted."  If the answer is no, the officer is
22       entitled to qualified immunity. If the answer is yes, the court must answer the final
         question: whether the officer could have believed, "reasonably but mistakenly . . . that
23       his or her conduct did not violate a clearly established constitutional right." If the answer
         is yes, the officer is entitled to qualified immunity. If the answer is no, he is not.
24       (Footnotes omitted.)

25          "The judges of the district courts and the courts of appeals should be permitted to exercise their

26   sound discretion in deciding which of the [] prongs of the qualified immunity analysis should be

27   addressed first in light of the circumstances in the particular case at hand."  *Pearson v. Callahan*, 555

28   U.S. 223, 129 S.Ct. 808, 818 (2009).  In discussing *Pearson*, the Ninth Circuit recently explained that

1  "lower courts are no longer required to consider whether a constitutional violation occurred before

2  considering whether the right in question was 'clearly established.'"  *Moss v. U.S. Secret Service*, 572

3  F.3d 962, 968, n. 5 (9th Cir. 2009).

4                                      ***Clearly Established Right***

5           The "contours" of the allegedly violated right "must be sufficiently clear that a reasonable official

6  would understand that what he is doing violates that right. . . . [I]n the light of preexisting law the

7  unlawfulness must be apparent."  *Anderson v. Creighton*, 483 U.S. 635, 107 S.Ct. 3034, 3039 (1987).

8  "The question is what the officer reasonably understood his powers and responsibilities to be, when he

9  acted under clearly established standards."  *Saucier v. Katz*, 533 U.S. 194, 208, 121 S.Ct. 2151 (2001).

10          "To determine that the law was clearly established, we need not look to a case with identical or

11 even 'materially similar' facts."  *Serrano v. Francis*, 345 F.3d 1071, 1077 (9th Cir. 2003), *cert. denied*,

12 543 U.S. 825, 125 S.Ct. 43 (2004).  "Rather, the 'standard is one of fair warning: where the contours of

13 the right have been defined with sufficient specificity that a state official had fair warning that [his]

14 conduct deprived a victim of his rights, [he] is not entitled to qualified immunity.'"  *Serrano*, 345 F.3d

15 at 1077 (quoting *Haugen v. Brosseau*, 339 F.3d 857, 873 (9th Cir. 2003)).  "[O]fficials can still be on

16 notice that their conduct violates established law even in novel factual circumstances."  *Hope v. Pelzer*,

17 536 U.S. 730, 741, 122 S.Ct. 2508 (2002).

18          Defendants note that the law was clearly established that an officer may use deadly force if he/she

19 reasonably believes that a suspect poses an immediate risk of causing death or serious bodily injury to

20 the officer or others.  Plaintiffs attribute Officer Catton to admit to shooting Stephen in the back while

21 Stephen remained alive and that the unlawfulness of such act was apparent.

22          As noted above, persons enjoy a right to be free from excessive force.  However, Stephen did

23 not enjoy a right to pull a revolver on peace officers responding to perceived erratic driving and initiate

24 a series of events to require peace officers to draw their weapons and fire.  Under the circumstances at

25 issue, plaintiffs fail to identify a clearly established violated right.

26                                        ***Reasonable Belief***

27          "An officer might correctly perceive all of the relevant facts but have a mistaken understanding

28 as to whether a particular amount of force is legal in those circumstances.  If the officer's mistake as to

1  what the law requires is reasonable, however, the officer is entitled to the immunity defense." *Saucier*,

2  533 U.S. at 205, 121 S.Ct. 2151.  "The question is what the officer reasonably understood his powers

3  and responsibilities to be, when he acted under clearly established standards." *Saucier*, 533 U.S. at 208,

4  121 S.Ct. 2151.  "Qualified immunity shields an officer from suit when she makes a decision that, even

5  if constitutionally deficient, reasonably misapprehends the law governing the circumstances she

6  confronted." *Brosseau v. Haugen*, 543 U.S. 194, 198, 125 S.Ct. 596, 599 (2004).  "Officers can have

7  reasonable, but mistaken, beliefs as to the facts establishing the existence of probable cause or exigent

8  circumstances, for example, and in those situations courts will not hold that they have violated the

9  Constitution." *Saucier*, 533 U.S. 194, 121 S.Ct. at 2158.  Peace officers in "tense situations" are

10  afforded "broad discretion" and "immunity even when officers make mistakes." *See Jeffers v. Gomez*,

11  267 F.3d 895, 909 (9th Cir. 2001).

12  "If the law did not put the officer on notice that his conduct would be clearly unlawful, summary

13  judgment based on qualified immunity is appropriate." *Saucier*, 533 U.S. at 202, 121 S.Ct. at 2156-

14  2157.  However, determination of qualified immunity on summary judgment is improper if there are

15  disputes "as to the facts and circumstances." *See Acosta v. City and County of San Francisco*, 83 F.3d

16  1143, 1147, n. 10 (9th Cir.), *cert. denied*, 519 U.S. 1009, 117 S.Ct. 514 (1996).  When "there is a material

17  dispute as to the facts regarding what the officer or the plaintiff actually did, the case must proceed to

18  trial." *Lalonde v. County of Riverside*, 204 F.3d 947, 953 (9th Cir. 2000).

19  A defendant "carries the burden of proving that his 'conduct was reasonable under the applicable

20  standards even though it might have violated [plaintiff's] constitutional rights.'" *Houghton v. South*, 965

21  F.2d 1532, 1534 (1992) (quoting *Benigni v. City of Hemet*, 879 F.2d 473, 480 (9th Cir.1988)).

22  Turning to an excessive force claim, the qualified immunity analysis inquires "whether it would

23  be objectively reasonable for the officer to believe that the amount of force employed was required by

24  the situation he confronted. . . . That is, the first step in the analysis is an inquiry into the objective

25  reasonableness of the officer's belief in the *necessity* of his actions, and there is no Fourth Amendment

26  violation if the officer can satisfy this standard." *Wilkins v. City of Oakland*, 350 F.3d 949, 954 (9th Cir.

27  2003), *cert. denied*, 125 S.Ct. 43 (2004) (italics in original).

28  Although "reasonableness traditionally is a question of fact for the jury," a defendant can prevail

22

1    on summary judgment if the court "concludes, after resolving all factual disputes in favor of the plaintiff,

2    that the officer's use of force was objectively reasonable under the circumstances." *Scott*, 39 F.3d at

3    915.

4          Defendants argue that Officer Catton and Astacio's belief that Stephen posed a significant threat

5    justified their deadly force as "constitutionally reasonable."  Plaintiffs respond that Officer Catton's

6    "rambling" immediately after the shooting indicates that he did not act reasonably.  Plaintiffs argue that

7    differing versions of events preclude qualified immunity.

8          As discussed above, there are no factual issues as to the reasonableness of Officer Catton and

9    Astacio's actions.  Plaintiffs fail to dispute that Officers Catton and Astacio reasonably drew their

10   weapons and fired after Stephen drew the revolver.  As distilled above, the record reveals that Officers

11   Catton and Astacio faced rapidly evolving events with no signs of surrender by Stephen.  Plaintiffs

12   attempt to impose on Officers Catton and Astacio a reasonableness standard to ascertain when to stop

13   shooting despite evolving, uncertain events.  Such standard evades human ability, especially under the

14   circumstances which Officers Catton and Astacio faced.  Moreover, Officer Catton's purported rambling

15   fails to establish his unreasonable beliefs in the correctness of his actions.  Plaintiffs attempt to

16   manufacture factual issues by misinterpreting or distorting the record.  Officers Catton and Astacio are

17   entitled to qualified immunity.

18                                    ***Monell* Liability**

19         The FAC attempts to impose *Monell* liability on the City for purported Department policies to

20   violate civil rights and to provide inadequate and reckless training to police officers.

21         A local government unit may not be held liable for the acts of its employees under a respondeat

22   superior theory.  *Monell v. New York City Dept. of Social Servs.*, 436 U.S. 658, 691, 98 S.Ct. 2018

23   (1978); *Davis v. Mason County*, 927 F.2d 1473, 1480 (9th Cir.), *cert. denied*, 502 U.S. 899, 112 S.Ct.

24   275 (1991); *Thompson v. City of Los Angeles*, 885 F.2d 1439, 1443 (9th Cir. 1989).  "Federal case law

25   has long barred respondeat superior liability against state actors in suits brought under 42 U.S.C. §

26   1983."  *Fed. of African American Contractors v. City of Oakland*, 96 F.3d 1204, 1214 (9th Cir. 1996).

27   Claimants suing state actors under 42 U.S.C. § 1983 "must establish that their alleged injury was the

28   result of a 'policy or custom' of that state actor."  *African American Contractors*, 96 F.3d at 1215.

                                           23

"[A] municipality cannot be held liable *solely* because it employs a tortfeasor." *Monell*, 436 U.S. at 691, 98 S.Ct. at 2018. The local government unit "itself must cause the constitutional deprivation." *Gilette v. Delmore*, 979 F.2d 1342, 1346 (9th Cir. 1992), *cert. denied*, 510 U.S. 932, 114 S.Ct. 345 (1993). Because liability of a local governmental unit must rest on its actions, not the actions of its employees, a plaintiff must go beyond the respondeat superior theory and demonstrate that the alleged constitutional violation was the product of a policy or custom of the local governmental unit. *City of Canton, Ohio v. Harris*, 489 U.S. 378, 385, 109 S.Ct. 1197 (1989); *Pembaur v. City of Cincinnati*, 475 U.S. 469, 478-480, 106 S.Ct. 1292 (1986). To maintain a civil rights claim against a local government, a plaintiff must establish the requisite culpability (a "policy or custom" attributable to municipal policymakers) and the requisite causation (the policy or custom as the "moving force" behind the constitutional deprivation). *Monell*, 436 U.S. at 691-694, 98 S.Ct. 2018; *Gable v. City of Chicago*, 296 F.3d 531, 537 (7th Cir. 2002).

"In addition, a local governmental entity may be liable if it has a 'policy of inaction and such inaction amounts to a failure to protect constitutional rights.'" *Lee v. City of Los Angeles*, 250 F.3d 668, 681 (9th Cir. 2001) (quoting *Oviatt v. Pearce*, 954 F.2d 1470, 1474 (9th Cir. 1992)). A local government entity may be liable under section 1983 "if its deliberate policy caused the constitutional violation alleged." *Blankenhorn v. City of Orange*, 485 F.3d 463, 484 (9th Cir. 2007). However, "[l]iability for improper custom may not be predicated on isolated or sporadic incidents; it must be founded upon practices of sufficient duration, frequency and consistency that the conduct has become a traditional method of carrying out policy." *Trevino v. Gates,* 99 F.3d 911, 918 (9th Cir. 1995), *cert. denied*, 520 U.S. 1117, 117 S.Ct. 1249 (1997).

A municipal policy or custom is established by showing: (1)"a longstanding practice or custom which constitutes the 'standard operating procedure' of the local government entity;" (2) "that the decision-making official was, as a matter of state law, a final policymaking authority whose edicts or acts may fairly be said to represent official policy in the area of decision;" or (3) "that an official with final policymaking authority either delegated that authority to, or ratified the decision of, a subordinate." *Ulrich v. City and County of San Francisco*, 308 F.3d 968, 984-985 (9th Cir. 2002) (internal quotation marks and citations omitted).

24

*Inadequate Training*

The FAC's sixth claim accuses the City and Chief Dyer of "customs, policies, patterns or practices . . . of deliberate indifference in the training, retraining, supervision and/or discipline" of police officers.

"[I]nadequacy of police training may serve as the basis for § 1983 liability only where the failure to train amounts to deliberate indifference to the rights of persons with whom the police come in contact." *City of Canton v. Harris*, 489 U.S. 378, 388, 109 S.Ct. 1197 (1989). "Only where a municipality's failure to train its employees in a relevant respect evidences a 'deliberate indifference' to the rights of its inhabitants can such a shortcoming be properly thought of as a city 'policy or custom' that is actionable under § 1983." *Harris*, 489 U.S. at 389, 109 S.Ct. 1197. Moreover, "it is therefore difficult in one sense even to accept the submission that someone pursues a 'policy' of 'inadequate training,' unless evidence be adduced which proves that the inadequacies resulted from conscious choice – that is, proof that the policymakers deliberately chose a training program which would prove inadequate. And in the second place, some limitation must be placed on establishing municipal liability through policies that are not themselves unconstitutional . . ." *City of Oklahoma City v. Tuttle*, 471 U.S. 808, 823, 105 S.Ct. 2427 (1985).

The U.S. Supreme Court has elaborated on an inadequate training claim:

But it may happen that in light of the duties assigned to specific officers or employees the need for more or different training is so obvious, and the inadequacy so likely to result in the violation of constitutional rights, that the policymakers of the city can reasonably be said to have been deliberately indifferent to the need. In that event, the failure to provide proper training may fairly be said to represent a policy for which the city is responsible, and for which the city may be held liable if it actually causes injury.

In resolving the issue of a city's liability, the focus must be on adequacy of the training program in relation to the tasks the particular officers must perform. That a particular officer may be unsatisfactorily trained will not alone suffice to fasten liability on the city, for the officer's shortcomings may have resulted from factors other than a faulty training program.

*Harris*, 489 U.S. at 390-391, 109 S.Ct. 1197 (footnotes omitted).

As to failure to train employees, the Ninth Circuit has explained:

The custom or policy of inaction, however, must be the result of a "conscious," . . . or "'deliberate choice to follow a course of action . . . made from among various alternatives by the official or officials responsible for establishing final policy with

1   respect to the subject matter in question.'"

2           . . .

3           A local governmental entity's failure to train its employees can also create § 1983
        liability where the failure to train "amounts to deliberate indifference to the rights of
4       persons" with whom those employees are likely to come into contact. . . . "[F]or liability
        to attach in this circumstance the identified deficiency in a [local governmental entity's]
5       training program must be closely related to the ultimate injury." . . .  In other words, a
        plaintiff must show that his or her constitutional "injury would have been avoided" had
6       the governmental entity properly trained its employees. . . .

7   *Lee*, 250 F.3d at 681 (citations omitted.)

8           A section 1983 plaintiff alleging a policy of failure to train peace officers must show: (1) he/she

9   was deprived of a constitutional right; (2) the local government entity had a training policy that amounts

10  to deliberate indifference to constitutional rights of persons' with whom its peace officers are likely to

11  come into contact; and (3) his/her constitutional injury would have been avoided had the local

12  government unit properly trained those officers. *Blankenhorn*, 485 F.3d at 463. "[A]bsent evidence of

13  a 'program-wide inadequacy in training,' any shortfall in a single officer's training 'can only be

14  classified as negligence on the part of the municipal defendant – a much lower standard of fault than

15  deliberate indifference.'" *Blankenhorn*, 485 F.3d at 484-485 (quoting *Alexander v. City and County of*

16  *San Francisco,* 29 F.3d 1355, 1367 (9th Cir. 1994)).

17          In short, "the identified deficiency in a city's training program must be closely related to the

18  ultimate injury." *Harris*, 489 U.S. at 391, 109 S.Ct. 1197.

19          Defendants point to the absence of evidence of an unconstitutional policy, practice or custom as

20  to training Department officers.  Defendants note the Department's POST compliance, officers'

21  graduation (including Officers Catton and Astacio) from a POST-certified academy, and ongoing officer

22  training on use of force pursuant to POST standards.  Defendants point out that the Department is

23  certified by CALEA which "delineates best practices for law enforcement agencies, ensures agencies

24  seeking accreditation have adopted these written practices and have proven their members' conduct is

25  consistent with stated practices."

26          Plaintiffs fail to challenge meaningfully defendants' points on Department training of police

27  officers.  Plaintiffs offer nothing to suggest that an adequate training policy or practice contributed to

28  alleged constitutional violations.  In fact, plaintiffs appear to abandon their claim of inadequate officer

1  training.  As such, the City is entitled to summary judgment on the FAC's inadequate training claim.

2  ***Permitting Excessive Force***

3  The FAC alleges that the Department maintained customs, policies and/or practices to subject

4  "innocent citizens to unlawful shooting, excessive force."

5  Defendants point to no policy or procedure to permit inappropriate or excessive force in that the

6  Department "trains its officers that they can use reasonable force to defend themselves or others to affect

7  an arrest or detention, prevent escape and/or overcome resistance."  Defendants continue that the

8  Department trains officers "to assess the situation and use the amount of force that is reasonable under

9  the circumstances."

10  Plaintiffs identify no specific Department policy or custom to permit excessive force.  Plaintiffs

11  claim "numerous officer-involved shootings" during Chief Dyer's tenure and "lawsuits."  Plaintiffs

12  criticize the limited administrative investigation into Stephen's shooting which Chief Dyer "has never

13  seen."  Plaintiffs further criticize Officer Villalvazo's investigation based on its delay and his coaching

14  of Officers Catton and Astacio.  Plaintiffs conclude that the City and Chief Dyer "have allowed, fostered,

15  and perpetuated an atmosphere of condolence of officer-involved shootings."

16  A claim based on a policy to allow excessive force fails in the absence of a policy or custom

17  attributable to City or Department policymakers and the requisite causation of such policy or custom as

18  a moving force behind a constitutional deprivation.  Plaintiffs' criticisms of the investigation of

19  Stephen's shooting fail to raise inferences of a policy or custom to permit excessive force, especially in

20  light of the record of the reasonableness of Officers Catton and Astacio's actions.  Plaintiffs offer only

21  speculation of a policy or practice to permit excessive force.

22  ***Supervision And Discipline***

23  Plaintiffs appear to fault the City for the Department's failure to supervise and discipline properly

24  officers, including Officers Catton and Astacio.

25  To refute such a claim, defendants point to the Department's chain of command supervision,

26  daily supervision of officers, annual officer evaluations, and officer discipline for failure to comply with

27  Department policies, practices and training requirements.  Defendants point to the Department's

28  administrative review of officer use of force and placing officers involved in shootings on administrative

1  leave pending an initial criminal investigation and successful psychological and threat assessments.

2  Plaintiffs offer nothing meaningful to challenge defendants' points regarding Department

3  supervision and discipline.  Plaintiffs merely criticize investigation into Stephen's shooting to attempt

4  to equate a policy of deliberate indifference.  As noted above, plaintiffs' criticism fails to raise factual

5  issues as to a Department policy or practice of deliberate indifference.

6  **Chief Dyer**

7  Defendants challenge Chief Dyer's liability under section 1983 in the absence of evidence of his

8  participation in the events surrounding Stephen's shooting and implementation of constitutionally

9  deficient policies or practices.

10  "Section 1983 creates a cause of action based on personal liability and predicated upon fault;

11  thus, liability does not attach unless the individual defendant caused or participated in a constitutional

12  deprivation." *Vance v. Peters*, 97 F.3d 987, 991 (7th Cir. 1996), *cert. denied*, 520 U.S. 1230, 117 S.Ct.

13  1822 (1997); *see Taylor v. List*, 880 F.2d 1040, 1045 (9th Cir. 1989) ("Liability under section 1983 arises

14  only upon a showing of personal participation by the defendant.")  "The inquiry into causation must be

15  individualized and focus on the duties and responsibilities of each individual defendant whose acts or

16  omissions are alleged to have caused the constitutional deprivation." *Leer*, 844 F.2d at 633.  Section

17  1983 requires that there be an actual connection or link between the defendant's actions and the

18  deprivation allegedly suffered. *See Monell*, 436 U.S. at, 98 S.Ct. 2018; *Rizzo v. Goode*, 423 U.S. 362,

19  96 S.Ct. 598 (1976).

20  A plaintiff cannot hold an officer liable "because of his membership in a group without a

21  showing of individual participation in the unlawful conduct." *Jones v. Williams*, 297 F.3d 930, 935 (9th

22  Cir. 2002) (citing *Chuman v. Wright*, 76 F.3d 292, 294 (9th Cir. 1996)).  A plaintiff must "establish the

23  'integral participation' of the officers in the alleged constitutional violation." *Jones*, 297 F.3d at 935.

24  "'[I]ntegral participation' does not require that each officer's actions themselves rise to the level of a

25  constitutional violation." *Boyd v. Benton County*, 374 F.3d 773, 780 (9th Cir. 2004).  Integral

26  participation requires "some fundamental involvement in the conduct that allegedly caused the

27  violation." *Blankenhorn*, 485 F.3d at 481, n. 12.  "A person 'subjects' another to the deprivation of a

28  constitutional right, within the meaning of section 1983, if he does an affirmative act, participates in

1   another's affirmative acts, or omits to perform an act which he is legally required to do that causes the

2   deprivation of which complaint is made." *Johnson v. Duffy*, 588 F.2d 740, 743 (9th Cir. 1978).

3       In addition, Congress did not intend to "impose liability vicariously on [employers or

4   supervisors] solely on the basis of the existence of an employer-employee relationship with a tortfeasor."

5   *Monell*, 436 U.S. at 692, 98 S.Ct. at 2036. Generally, supervisory personnel are not liable under section

6   1983 for actions of their employees under a respondeat superior theory, and thus, when a named

7   defendant holds a supervisory position, the causal link between him and the claimed constitutional

8   violation must be specifically alleged and proved. *See Jeffers v. Gomez*, 267 F.3d 895, 915 (9th Cir.

9   2001); *Fayle v. Stapley*, 607 F.2d 858, 862 (9th Cir. 1979); *Mosher v. Saalfeld*, 589 F.2d 438, 441 (9th

10  Cir. 1978), *cert. denied*, 442 U.S. 941, 99 S.Ct. 2883 (1979).

11      To establish a prima facie case of supervisor liability, a plaintiff must show facts to indicate that

12  the supervisor defendant either: (1) personally participated in the alleged deprivation of constitutional

13  rights; (2) knew of the violations and failed to act to prevent them; or (3) promulgated or implemented

14  a policy "so deficient that the policy itself 'is a repudiation of constitutional rights' and is 'the moving

15  force of the constitutional violation.'" *Hansen v. Black*, 885 F.2d 642, 646 (9th Cir. 1989); *Taylor*, 880

16  F.2d at 1045. A supervising official is liable in his individual capacity if he "set[ ] in motion a series

17  of acts by others, or knowingly refused to terminate a series of acts by others, which he kn[e]w or

18  reasonably should [have] know[n], would cause others to inflict the constitutional injury." *Larez v. City

19  of Los Angeles*, 946 F.2d 630, 646 (9th Cir. 1991) (ratification, poor investigation, or failure to terminate

20  series of events may make supervisor liable).[7]

21      The record is clear that Chief Dyer lacked direct involvement in Stephen's shooting. He was

22  neither present at the shooting nor directed officers during the shooting. Chief Dyer is not subject to

23  section 1983 liability based on his direct participation in a constitutional wrong. As such, attention turns

24  to whether Chief Dyer is subject to section 1983 supervisory liability.

25      Defendants note that Chief Dyer did not establish or ratify policies or customs to allow

26

27      [7]     The Ninth Circuit offered alternative elements to impose section 1983 liability on a supervisor: "'(1) his
or her personal involvement in the constitutional deprivation, *or* (2) a sufficient causal connection between the supervisor's
wrongful conduct and the constitutional violation.'" *Jeffers*, 267 F.3d at 915 (quoting *Redman v. County of San Diego*, 942

28  F.2d 1435, 1446 (9th Cir. 1991)).

Department officers "to undertake unreasonable searches and seizures, detain or arrest citizens without reasonable cause or lawful justification, allow the filing of false or fabricated reports, permit use of excessive force or maliciously arrest citizens."  Defendants conclude "there is no evidence that Chief Dyer violated plaintiffs' constitutional rights."

Defendants are correct.  Nothing in the record suggests that Chief Dyer knew of the constitutional violations and failed to act to prevent them or promulgated or implemented a constitutionally deficient policy.  Plaintiffs' criticisms of Chief Dyer's media conferences fail to raise inferences of deliberate indifference to constitutional rights to support claims against him.  Plaintiffs rely on irrelevant deposition testimony and related information to attempt to manufacture a claim that Chief Dyer fostered "an atmosphere of condolence of officer-involved shootings."  Chief Dyer is not subject to liability on plaintiffs' claims.

### **Wrongful Death – Negligence**

The FAC alleges a (first) wrongful death – negligence claim for Mr. and Ms. Willis as Stephen's survivors.  The claim alleges that shooting numerous rounds was "in conscious and reckless disregard of the risk of injury and death and under the circumstances there was no objectively reasonable basis for the defendants' actions."

Plaintiffs note that they do not allege that Officers Catton and Astacio were negligent prior to drawing their firearms.  Plaintiff focus their wrongful death – negligence claim on "shooting Stephen, shooting him as often as they did, and shooting him in the manner they did."

Defendants point to California Penal Code section 196 which governs justifiable homicide by public officers and provides in pertinent part: "Homicide is justifiable when committed by public officers . . . [w]hen necessarily committed in overcoming actual resistence to the execution of some legal process, or in discharge of any other legal duty" or "when necessarily committed in arresting persons charged with a felony, and who are fleeing from justice or resisting such arrest."

"There can be no civil liability under California law as the result of justifiable homicide." *Martinez v. County of Los Angeles*, 47 Cal.App.4th 334, 349, 54 Cal.Rptr.2d 772 (1996).  In *Martinez*, 47 Cal.App.4th at 349-350, 54 Cal.Rptr.2d 772, the California Court of Appeal further explained:

The test for determining whether a homicide was justifiable under Penal Code

30

section 196 is whether the circumstances "reasonably create[d] a fear of death or serious bodily harm to the officer or to another." (*Kortum v. Alkire* (1977) 69 Cal.App.3d 325, 333, 138 Cal.Rptr. 26; *accord Reynolds, supra*, 858 F.Supp. at pp. 1074-1075; *People v. Rivera* (1992) 8 Cal.App.4th 1000, 1007, 10 Cal.Rptr.2d 785 [using Fourth Amendment "reasonableness" analysis to determine existence of probable cause for arrest, held that use of attack dog by police officer was justified because the officer "reasonably feared for his safety, and that of others in the area"].) The same is true of Government Code section 820.2, which provides immunity from liability to public employees for their discretionary acts. (*Reynolds, supra*, 858 F.Supp. at pp. 1074-1075.)[8]

Since we have already determined that Deputies Gibson and Gleason acted reasonably in shooting Martinez, his death was justified under Penal Code section 196 and appellants' state law wrongful death claim is therefore barred as to them. Because the deputies cannot be liable, there is no basis for respondeat superior liability against the county defendants. (Gov.Code, § 815.2 [public entity not liable for acts of employee if the employee is immune from liability]; *Thomas v. City of Richmond* (1995) 9 Cal.4th 1154, 1157-1158, 40 Cal.Rptr.2d 442, 892 P.2d 1185; *Perez v. City of Huntington Park* (1992) 7 Cal.App.4th 817, 819-820, 9 Cal.Rptr.2d 258; *Collins v. City and County of San Francisco* (1975) 50 Cal.App.3d 671, 673-674, 123 Cal.Rptr. 525.)

As explained above, the circumstances objectively and reasonably created fear of death or serious bodily injury to Officers Catton and Astacio. Since shooting Stephen was justifiable, Officers Catton and Astacio are not subject to California wrongful death liability.

The wrongful death – negligence claim alleges that the City is "vicariously responsible." A "governmental entity can be held vicariously liable when a police officer acting in the course and scope of employment uses excessive force or engages in assaultive conduct." *Mary M. v. City of Los Angeles*, 54 Cal.3d 202, 215, 814 P.2d 1341 (1991). However, California Government Code section 815.2(b), provides that "public entity is not liable for an injury resulting from an act or omission of an employee of the public entity where the employee is immune from liability." In the absence of Officers Catton and Astacio's liability, the City is not subject to respondeat superior liability for Stephen's shooting.

**Further Discovery**

At this late date in this action, plaintiffs pursue motions to seek discovery of Department Internal Affairs reports for five years preceding Stephen's shooting and unidentified Fresno County District Attorney records. Plaintiffs appear to argue that the need for such additional discovery warrants denial

---

[8]     California Government Code section 820.2 states: "Except as otherwise provided by statute, a public employee is not liable for an injury resulting from his act or omission where the act or omission was the result of the exercise of the discretion vested in him, whether or not such discretion be abused." A public employee's liability is "subject to any defenses that would be available to the public employee if he were a private person." Cal. Gov. Code, § 820(b).

1   of summary judgment.  Plaintiffs appear to rely on this Court's Local Rule 260(b) which provides: "If

2   a need for discovery is asserted as a basis for denial of the motion, the party opposing such motion shall

3   provide a specification of the particular facts on which the discovery is to be had or the issues on which

4   discovery is necessary."

5          Plaintiffs fail to specify particular facts or issues or how their requested discovery may assist

6   them.  Defendants are correct to criticize plaintiffs' delay to seek such discovery at such late date.

7   Plaintiffs fail to support summary judgment denial based on their pending discovery motions.

8                                  **CONCLUSION AND ORDER**

9          For the reasons discussed above, this Court:

10  1.       GRANTS defendants summary judgment;

11  2.       DIRECTS the clerk to enter judgment in favor of defendants Greg Catton, Daniel

12           Astacio, Jerry Dyer and the City of Fresno and against plaintiffs Chris Willis, Mary

13           Willis and Jennafer Uribe and to close this action; and[9]

14  3.       VACATES the July 26, 2011 pretrial conference and September 12, 2011 trial.

15         IT IS SO ORDERED.

16  **Dated:    July 12, 2011**              _____/s/ Lawrence J. O'Neill_____
                                                    UNITED STATES DISTRICT JUDGE

17

18

19

20

21

22

23

24

25

26

27        [9]        Although defendants are granted summary judgment, this Court is not prepared to conclude that plaintiffs'
    claims are unreasonable, frivolous, meritless or vexatious.  As such, this Court would not well receive a defense motion for
28  attorney fees under 42 U.S.C. § 1988(b) or related authority.