Walter H. Walker, III  (CA SBN 63117)
Peter J. Koenig  (CA SBN 132437)
Beau R. Burbidge (CA SBN 267267)
WALKER, HAMILTON & KOENIG LLP
50 Francisco Street, Suite 460
San Francisco, CA 94133-2100
Phone: (415) 986-3339
Fax: (415) 986-1618

Richard P. Berman  (CA SBN 55462)
LAW OFFICES OF RICHARD P. BERMAN
2333 Merced Street
Fresno, CA 93721
Phone: (559) 233-2333
Fax: (559) 233-6947

Eric H. Schweitzer (CA SBN 179776)
SCHWEITZER & DAVIDIAN
620 DeWitt Ave., Suite 102
Clovis, CA 93612
Tel: (559) 322-1500
Fax: (559) 322-1551

Attorneys for Plaintiffs

### UNITED STATES DISTRICT COURT

### EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| Chris Willis, Mary Willis, individually and successors in interest to Stephen Willis, | Case No. 1:09-cv-01766-BAM |
| Plaintiffs, | **PLAINTIFFS' MOTIONS IN LIMINE** |
| v. | Trial:          November 19, 2013<br>Time:          9:00 a.m.<br>Courtroom:  8<br>Judge:        Barbara A. McAuliffe<br>                   U.S. Magistrate Judge |
| City of Fresno, Officer Greg Catton, Officer Daniel Astacio, Chief Jerry Dyer, and DOES 1 through 50 inclusive, | |
| Defendants. | |

Plaintiffs make the following Motions *In Limine* to preclude certain evidence at trial:

**1.      TO PRECLUDE EXPERT TESTIMONY BY DEFENSE WITNESS JOSEPH CALLANAN.**

Plaintiffs move this Court for an order precluding defense expert Joseph Callanan from offering opinion testimony which he is not qualified to provide, which is speculative, and which would be unhelpful to the jury and unfairly prejudicial to the plaintiffs.  This includes Callanan's baseless opinions regarding the shooting, his conveyance of inadmissible hearsay to recount the facts of the shooting, and his unreliable opinions based on a selective adoption of favorable facts and disregard of unfavorable facts.

**A.      Callanan's Speculative, Foundationless Opinions.**

Callanan was retained by the defense as an expert witness to opine on the propriety of the actions of Officers Catton and Astacio on the night of the shooting.  Yet his opinions reach far beyond this limited scope into areas in which he has no expertise and on subjects for which he has no factual basis.  These speculative opinions must be excluded.  (*See* Fed. R. Evid. 702, Adv. Comm. Notes (2000) ("The trial judge in all cases of proffered expert testimony must find that it is properly grounded, well-reasoned, and not speculative before it can be admitted.").)

Callanan is a retained expert on police practices.  He is not an investigator or a reconstructionist.  He readily admits this:  "I am not a fact-finder as to what transpired in that parking lot that night.  I wasn't there.  I have not conducted an investigation."  (Walker Decl., Exh. A (Callanan Depo, 15:8-11).)  Yet Callanan repeatedly provides opinions on the truth of highly disputed facts regarding what happened on the night of the shooting.  These are speculations, unfounded in fact and without any methodological application of expertise.

Callanan's expert report is rife with such baseless opinions.  For example, he opines that Stephen shot at Officer Catton, attributing a dent in a responding police vehicle to "the subject's east-to-west field of fire while attempting to shoot Officer Catton."  (*Id.* at p. 13.)  Callanan's report repeatedly states that that Stephen fired his gun at Catton.  (*See id.*, pp. 15, 17, 18.) Callanan then goes even farther out on a limb, speculating that "subject Willis selected Officer

1  Catton as the primary target opportunity and this selection may have been simply influenced by

2  that officer's prior use of a handheld flashlight."  (Walker Decl., Exh. B (Callanan Report, p. 16).)

3          Callanan apparently bases his opinion that Catton was targeted by Stephen on Catton's

4  perceptions of a muzzle flash.  But at his deposition Callanan admitted that it was equally possible

5  that Catton's perceptions were of Officer Astacio firing his weapon.  (Walker Decl., Exh. A

6  (Callanan Depo, 135:5-9).)  Callanan has no factual basis to determine that Stephen was targeting

7  Catton, much less Stephen's reasons for doing so.

8          Despite acknowledging that Catton may have not seen Stephen fire his weapon, Callanan

9  continues to assume that that Stephen did fire his weapon and then he speculates at length as to

10  why Stephen did not fire more:  "It is likely that the revolver was maladjusted (double action) or

11  mishandled by the subject as a consequence of his intoxication, strong-arm injury (GSW),

12  substandard firearms training, or some combination of these identifiable factors."  (*Id.* at p. 15*; see*

13  *also* p. 18.)  Yet Callanan admitted at his deposition that this opinion was baseless: "I'm not

14  totally clear on that, because I have not examined the weapon and I don't want to represent myself

15  as a firearms expert."  (Walker Decl., Exh. A (Callanan Depo 134:11-13).)

16          Callanan even goes so far as to opine on Stephen's mindset and why the shooting occurred

17  in the first place:  "[Stephen's] described actions might have represented an intentional assault on

18  the police officers or something less, such as an intoxicated miscalculation in which the subject

19  intended to merely intimidate, perhaps even thinking that the two police officers were unarmed

20  security guards commonly assigned to the property."  (*Id.* at p. 16).)

21          These are merely a few examples of Callanan's numerous speculative opinions as to what

22  occurred that night.  Such opinions are entirely improper for Callanan to provide.  They have no

23  factual support, are outside his area of expertise, and they are largely based on his determination of

24  the credibility of the various accounts of the shooting.  These statements demonstrate Callanan's

25  purpose at trial is solely to convey to the jury an account of the shooting unsupported by the actual

26  facts in order to validate the officers' actions.

27  ///

28  ///

**B.      Facts Based on Inadmissible Hearsay from Callanan's Tactical Debriefing.**

At the times in his testimony and report when Callanan did base his opinions on a factual account of the shooting, the factual account he relied upon was a "tactical debriefing" he conducted in March 2011.  This "tactical debriefing" with Officers Catton and Astacio and their counsel, was an unrecorded, undocumented walk-through of the shooting in which Callanan developed, through inadmissible hearsay statements, his understanding of the facts of the incident.  (Walker Decl., Exh. A (Callanan Depo, 34:7-24, 47:9-48:5.)

For example, when asked for the basis of his understanding of the officers' movements during the shooting, he testified, "I'm not sure if I read it or I got it during the tactical debriefing or some combination thereof."  (*Id.* at 109:4-19.)  When asked for the basis of his understanding that Stephen reached for his gun at the end of the incident, before he was shot in the back by Catton, he testified, "I clearly remember him telling me that during the tactical debriefing."  (*Id.* at 115:12-18.)  When asked about the basis for his understanding that Catton had lost track of his partner, he testified "It's either in the readings or in the tactical debriefing or both."  (*Id.* at 126:3-6.)  Callanan relies on this tactical briefing for his understanding of a significant portion of the facts of the shooting.  (*See, e.g., Id.* at 60:17-22, 120:25-121:5; Walker Decl., Exh. B (Callanan Report, p. 14).)

When confronted on his reliance on this "tactical debriefing" over sworn deposition testimony or the formal investigatory interview completed hours after the shooting, he confirmed it:

> Q.     So you're relying on what you say Officer Catton told you in March of 2011, after he had given sworn deposition testimony and after he had given a statement to Detective Villalvazo, in neither of which did he ever use the word "reach"?
>
> A.     I'll accept that, yes.

(Walker Decl., Exh. A (Callanan Depo, 115:24-116:4).)

While an expert is allowed to rely on inadmissible hearsay in forming an opinion, it must be of the kind on which experts in the particular field would reasonably rely.  (*See* Fed. R. Evid.

703.) Further, an expert may not simply be used as a conduit to get otherwise inadmissible hearsay into evidence.  An expert relying on hearsay may not "simply transmit that hearsay to the jury.  Instead, the expert must form his own opinions by applying his extensive experience and a reliable methodology to the inadmissible materials."  (*United States v. Mejia*, 545 F.3d 179, 197 (2d Cir. 2008) (citations omitted).)

Here, Callanan has provided no reasonable explanation as to why he chose to rely on inadmissible hearsay statements made in his "tactical debriefing" over near-contemporaneous investigative interview statements or sworn deposition testimony.  Instead, all reasonable implications point to the unreliability of this "tactical debriefing": it was conducted two years after the shooting while both officers were defendants in this lawsuit, only the officers and their counsel were present, and it was unrecorded and undocumented.  It is reasonable to infer that the statements made at this "tactical debriefing" had been crafted and conditioned by two years of investigations and litigation in order to be conveyed to an expert who was hired to validate the officers' actions.  It is further reasonable to infer that these statements are less likely to reflect the actual facts of the incident than either the officers' sworn deposition testimony or their statements made hours after the shooting as part of the department investigation.

Further, Callanan's report and deposition largely consists of nothing but regurgitations of the facts as stated by the officers in this "tactical debriefing."  In this way, Callanan's testimony is merely a conduit for these self-serving hearsay statements to be transmitted to the jury.  This is entirely improper.  Callanan should be prohibited from testifying to opinions based on this "tactical debriefing" and from relaying any facts learned at this "tactical debriefing" to the jury.

**C.      Callanan's Selective Reliance On Favorable Testimony And Dismissiveness of Unfavorable Testimony.**

While Callanan has no problem relying on self-serving statements made in his "tactical debriefing," when he has been confronted with unfavorable statements made by Officers Catton and Astacio he has discounted those statements as inaccurate and made in the fog of war.  This selective reliance exposes a logical gap in Callanan's methodology, demonstrates the unreliability of his opinions, and proves him to be a biased advocate for the officers.

1    "Rule 702 embodies the twin concerns of reliability . . . and helpfulness," and a court "may

2    exclude testimony that falls short of achieving either end." (*Stillwell v. Smith & Nephew, Inc.*, 482

3    F.3d 1187, 1192 (9th Cir. 2007).)  With regard to reliability, "[a] court must examine the expert's

4    conclusions in order to determine whether they could reliably flow from the facts known to the

5    expert and the methodology used.  A court may conclude that there is simply too great a gap

6    between the data and the opinion proffered." (*Oddi v. Ford Motor Co.*, 234 F.3d 136, 146 (3d Cir.

7    2000) (citations omitted).)  Here, Callanan's selective use of favorable testimony and dismissal of

8    unfavorable testimony demonstrates that his opinions are unreliable.

9    Callanan justifies ignoring certain unhelpful statements by Officers Catton and Astacio by

10   classifying them as "perceptual distortions" or "tunnel vision" occurring during a "peak-stress

11   event." (Walker Decl., Exh. A (Callanan Depo, 74:7-15, 81:22-82:4).)  For example, he discounts

12   Astacio's observation that Willis was getting ready to close the trunk of his vehicle when the

13   officers approached, stating "I have to consider that there's been a peak-stress even that's

14   interfering with his recall of the event or his ability to account for the event." (*Id.* at 99:24-

15   100:22.)  He further discounts the officers' recollection of their positions once the shooting began,

16   stating, "I don't think their clear in their minds" as to where they maneuvered. (*Id.* at 82:1-4.)  He

17   also discounts the officers' recollection of their relative positions after Stephen had retreated

18   behind the blue van, stating, "My only knowledge is their recollection of the event, and their

19   recollection of the event may be distorted." (*Id.* at 136:3-5.)

20   Yet when Callanan encounters testimony that is favorable to the officers, he is somehow

21   able to conclude that such testimony is clear and accurate:

22       Q.    And would you agree that their recollection of the events may be distorted
              in every aspect of this shooting?

23

24       A.    No.  I don't think every aspect.  They're pretty clear about seeing the gun,
              seeing the gun pointed, seeing the gun coming out of the holster.  They're
              pretty clear about watching the subject maneuver.  They're pretty clear
25            about taking aimed shots towards or at and sometimes through a car at the
              subject.  And when you get to the last round fired, Catton seems very clear
26            about this subject not being totally down but propped and appearing to
              reach for the gun."

27

28   (*Id.* at 136:15-137:2.)

1    Callanan describes no methodology by which he has determined what aspects of the

2  officers' accounts are accurate and what aspects are compromised by "perceptual distortion."  He

3  in fact testifies that he is not qualified to make this determination:  "I don't think I'm competent to

4  answer that question as to degrees of distortion or accuracy.  That's beyond my field."  (*Id.* at

5  117:2-4.)  Thus, his reference to "perceptual distortions" is merely a convenient method for

6  discounting unfavorable testimony by the officers.  Without any expertise in the area, sound

7  methodology, or basis for opinions discounting certain testimony to "perceptual distortion," such

8  testimony cannot be found reliable and it should therefore be excluded.

9  **2.    TO PRECLUDE EXPERT TESTIMONY BY DEFENSE WITNESS KRIS
        MOHANDIE, Ph.D.**

10

11    Plaintiffs move this Court for an order precluding defense expert Kris Mohandie, Ph.D.

12  from offering opinions on the following subjects:

13    (a)    The officers' perception that Stephen Willis posed and immediate danger, on the

14          ground that this opinion is not based on any reliable methodology and will be

15          unhelpful to the jury;

16    (b)    The officers' fear and psychophysiological reaction to the shooting, on the ground

17          that this opinion is not based on reliable methodology and will be unhelpful to the

18          jury; and

19    (c)    The factors that precipitated Stephen's death and made him have a likely to have a

20          "shorter lifespan," on the ground that this opinion is purely speculative, without a

21          factual basis, lacks any reliable methodology, and would be unfairly prejudicial

22          while having no probative value whatsoever.

23    **A.    Mohandie's Opinions On The Officers' Perceptions.**

24    Dr. Mohandie's first opinion, as stated in his expert report, is that Officers Catton and

25  Astacio "perceived . . . that Mr. Willis posed an immediate danger to them."  (Walker Decl., Exh.

26  C (Mohandie Report, pp. 6-8).)  This is an easily-comprehended conclusion that forms the very

27  foundation of the officers' defense, and the officers have repeatedly stated in investigations,

28  discovery responses, and depositions that they perceived that Stephen posed a danger to them.

7

1    This conclusion is also one that the jurors could draw themselves from hearing the testimony of

2    these officers.  There is absolutely no need for Dr. Mohandie to provide his opinion on this point.

3         Expert testimony "is not helpful if it draws inferences or reaches conclusions within the

4    jury's competence or within an exclusive function of the jury." (*Nichols v. Am. Nat'l Ins. Co.*, 154

5    F.3d 875, 883 (8th Cir. 1998).)  "When the normal experiences and qualifications of laymen jurors

6    are sufficient for them to draw a proper conclusion from given facts and circumstances, an expert

7    witness is not necessary and *is improper*." (*Wilson v. Muckala*, 303 F.3d 1207, 1219 (10th Cir.

8    2002) (emphasis added).)  This is because the risk of unfair prejudice is high where an expert

9    merely puts "his stamp of approval" on the defendant's case theory, because "such testimony

10   might unduly influence the jury's own assessment of the inference that is being urged." (*United*

11   *States v. Gonzalez-Maldonado*, 115 F.3d 9, 17-18 (1st Cir. 1997).)

12        Here, Dr. Mohandie's opinion is clearly within the competence of the jury to reach.  Any

13   juror hearing the officers' proffered version of the facts could draw the conclusion that they

14   perceived Stephen to be a danger.  Dr. Mohandie's opinion stating the same is therefore

15   superfluous and unhelpful.  Further, allowing Dr. Mohandie to provide this opinion would have

16   the effect of improperly influencing the jury's own assessment of the officers' perception of

17   Stephen, the type of prejudicial effect noted in *Gonzalez-Maldonado*.  This prejudicial effect

18   would be very real, as a law juror would be likely to accept Dr. Mohandie's opinion based solely

19   on the fact that he is an "expert" and a licensed psychologist and the juror is not.

20        Even more unfairly prejudicial to plaintiffs is Dr. Mohandie's purported factual basis for

21   this opinion.  Dr. Mohandie's opinion is founded upon a blind acceptance of the facts of the

22   shooting that favor the officers and it ignores any disputed or unfavorable evidence.  (*See* Walker

23   Decl., Exh. C (Mohandie Report, pp. 6-8).)  Thus, when Dr. Mohandie renders this opinion at trial

24   he will naturally convey this skewed factual summary to the jury, lending an expert's credibility to

25   the defendants' preferred set of facts.  His testimony on the basis of this opinion would also

26   impermissibly allow for the introduction of inadmissible hearsay, as most of the facts on which he

27   relies are based upon hearsay or double hearsay.  (*See* Fed. R. Evid. 703.)  For these reasons Dr.

28   Mohandie should be precluded from offering this opinion at trial.

**B.      Opinions Regarding The Officers' Fear And Psychophysiological Reaction.**

Dr. Mohandie's next opinion covers the psychophysiological reactions Officers Catton and Astacio could have experienced during the shooting.  (Walker Decl., Exh. C (Mohandie Report, pp. 9-13).)  These opinions are based on scientific knowledge, Dr. Mohandie's psychological expertise, yet Dr. Mohandie does not explain his methodology for coming to these opinions, nor does he provide any information to show this methodology to be reliable.  Instead, Dr. Mohandie cites as the basis for each opinion the conclusory statement: "my knowledge and experience."

For example, Dr. Mohandie opines, based on "knowledge and experience," that:

> "both officers perceived more muzzle flashes than could have been fired by the subject (likely one).  This is accounted for by the officers likely perceiving-under conditions of trauma, stress, position and perspective, tunnel vision, and lighting conditions-the muzzle flashes of their own guns or their partner's gun as having originated from the suspect.  Thus under the circumstances they ***naturally and expectedly*** attributed the flashes they were seeing to the subject . . . ."  (*Id.* at p. 10 (emphasis added).)

What is natural about them attributing their own muzzle flashes to Stephen Willis?  Why is that expected?  Dr. Mohandie fails to explain the basis for this opinion, the methodology used in forming this opinion, or whether that methodology has any validity.

Dr. Mohandie further opines that the officers were experiencing tunnel vision during the shooting and that this tunnel vision contributed "to the attribution that the suspect was firing additional rounds beyond that which he likely fired."  (*Id.* at p. 11.)  But Dr. Mohandie fails to explain ***how*** tunnel vision contributes to the officers' mistaken attribution of their own gun fire to Stephen Willis.  He again makes a logical jump without explaining how he got there.

These opinions continue:  "The number of rounds fired by officers is accounted for by the behavior of the subject . . . as well as the trauma of the incident.  Officers often fire more rounds under conditions of threat . . . ."  (*Id.* at p. 11.)  "Inability to recall how many rounds were fired is common in officer involved shootings and stems from the trauma and fear of the incident, as it did here."  (*Id.* at p. 12.)  "[T]he shooting unfolded more quickly than," as was perceived by witness Chris Zimmerman.  (*Id.* at p. 13.)  None of these opinions has any basis or methodology other than Dr. Mohandie's "knowledge and experience."

1    Of course knowledge and experience can form a sufficient basis for an expert opinion.

2 However, "if the witness is relying solely or primarily on experience, then the witness must

3 explain how that experience leads to the conclusion reached, why that experience is a sufficient

4 basis for the opinion, and how that experience is reliably applied to the facts. The trial court's

5 gatekeeping function requires more than simply 'taking the expert's word for it.'" (Fed. R. Evid.

6 702, Adv. Comm. Notes (2000).)

7    Here, by summarily citing his "knowledge and experience" as the basis for his opinions,

8 Dr. Mohandie asks us to take his word for it. He fails to take any of the steps to show the

9 reliability of his "knowledge and experience" or the conclusions derived therefrom. He merely

10 recounts the facts that best serve the defense's version of the shooting and then jumps to his

11 opinions on the psychophysiological effects of these facts. These conclusory opinions do not

12 come close to clearing the hurdle established by Rule 702 and *Daubert v. Merrell Dow*

13 *Pharmaceuticals*, 509 U.S. 579 (1993). They should therefore be excluded.

14    **C.    Opinions Regarding Stephen's Aggressive Behavior, Alcohol Abuse, And
        Expected Shorter Lifespan.**

15

16    Dr. Mohandie next opines that Stephen Willis was intoxicated on the night of the incident,

17 that he had a history of aggressiveness while under the influence, that he had an alcohol abuse or

18 dependency problem, and that these factors, along with weapons possession, are direct causes of

19 his death. (Walker Decl., Exh. C (Mohandie Report, pp. 13-18).) He further opines that even if

20 Stephen had not died the night of the incident, these factors would have contributed sooner or later

21 to his premature death. (*Id.*) These opinions are patently excluded by Federal Rule of Evidence

22 404, as will be discussed in the plaintiffs' motion in limine number 7. But aside from their

23 excludability on this ground, these are improper expert opinions, unreliable, unhelpful to the jury's

24 determination of the issues, and unfairly prejudicial to the plaintiffs.

25    Dr. Mohandie bases these opinions on a few isolated events: an argument with a

26 neighborhood watch commander, an altercation with apartment security officers, and a

27 confrontation with local gang members. These anecdotal accounts are in turn based almost

28 universally on unreliable hearsay statements and witness speculation.

1    Dr. Mohandie never met Stephen, he never interviewed his friends, family, coworkers, or

2    classmates, and he never spoke to any of his doctors or psychologists.  Yet he feels comfortable

3    pronouncing that Stephen suffered from myriad issues, including a mental disorder, which led to

4    his death, and he feels comfortable pronouncing that Stephen's life would have been cut short

5    even if the shooting did not occur.  Not only are these opinions without any reliable foundation,

6    they are preposterous and offensive.

7    For example, Dr. Mohandie opines, "it seems likely that in the current incident, Mr. Willis-

8    due to his extreme level of intoxication and with the unfortunate immediate availability of his

9    firearm-may have mistaken the FPD officers for apartment security and sought to make good on

10   this earlier threats."  Dr. Mohandie bases this conclusion on his "knowledge and experience."  (*Id.*

11   at 15.)  What knowledge and experience has led him to this conclusion?  As Stephen is not alive to

12   be interviewed there are absolutely no facts that support it.  No amount of knowledge or

13   experience could reasonably lead Dr. Mohandie to this conclusion.

14   Dr. Mohandie goes on further to conclude that Stephen's "pattern of drinking is indicative

15   of a qualifying mental disorder, namely alcohol abuse or dependence."  (*Id.* at p. 16.)  Dr.

16   Mohandie once again cites his "knowledge and experience" to support this pronouncement.  But

17   he has no reliable facts on which to draw this conclusion.  He bases this diagnosis not on an

18   examination of Stephen or review of his medical or psychological records, as might be expected of

19   a licensed psychologist.  Instead, he relies on unverified observations by Stephen's neighbor who

20   saw him acting "belligerent" and believes he drove drunk, on a statement by a security guard who

21   could smell alcohol on Stephen's breath, and on double hearsay statements Stephen's girlfriend

22   made to police.  (*Id.* at pp. 15-16.)

23   "The trial judge in all cases of proffered expert testimony must find that it is properly

24   grounded, well-reasoned, and not speculative before it can be admitted."  (Fed. R. Evid. 702, Adv.

25   Comm. Notes (2000).)  "A court must examine the expert's conclusions in order to determine

26   whether they could reliably flow from the facts known to the expert and the methodology used.  A

27   court may conclude that there is simply too great a gap between the data and the opinion

28   proffered."  (*Oddi v. Ford Motor Co.*, 234 F.3d 136, 146 (3d Cir. 2000) (citations omitted).)

1    Here, Dr. Mohandie takes three incidents, bolsters them with speculation and hearsay, and

2   then leaps to outrageous conclusions about how Stephen lived his life.  He concludes that Stephen

3   wanted to "make good on his threats to harm using a weapon."  (Walker Decl., Exh. C (Mohandie

4   Report, p. 18).)  He concludes that Stephen was an aggressive and abusive alcoholic.  (*Id.* at p.

5   16.)  And he concludes that these factors "resulted in the unfortunate but not unexpected situation

6   that escalated by his conduct into this officer involved shooting."  (*Id.* at p. 18.)  It is an

7   understatement to say there is too great a gap between Dr. Mohandie's data and the opinions he

8   states.

9    Under Rule 702 a court must serve as a gatekeeper to ensure that expert testimony is both

10   reliable and helpful to a jury, and a court must exclude "testimony that falls short of achieving

11   either end."  (*Stillwell v. Smith & Nephew, Inc.*, 482 F.3d 1187, 1192 (9th Cir. 2007).)  Dr.

12   Mohandie's opinions will absolutely be unhelpful, unfairly prejudicing the jury against Stephen

13   and misleading them on the issues to be tried.  And because they are baseless and incorrect

14   fictions, they have absolutely no probative value.  They therefore must be excluded.

15   **3.    TO PRECLUDE REFERENCE BY ANY WITNESS OTHER THAN RETAINED
16        EXPERT TOXICOLOGISTS TO DECEDENT'S POST-MORTEM BLOOD
        ALCOHOL LEVEL.**

17    Stephen Willis's blood alcohol level was not measured by anyone at the time of his death.

18   Stephen's blood was not tested for alcohol until 32 hours after he died, and at that time of testing,

19   it was measured at 0.29%.  Blood is subject to fermentation after death, with consequent

20   production of alcohol.  (Walker Decl., Exh. D (Barbour Report, p. 3).)  Fermentation is much

21   more rapid in cases of trauma involving rupture of internal organs.  (*Id.*)  Here, 14 bullets entered

22   Stephen's body 16 times, perforating the left lung, stomach, spleen, chest cavity, heart, small

23   intestine, liver and scrotum in addition to various muscles, bones and other tissues.  (*Id.*)

24

25    If Stephen truly had a blood alcohol level of 0.29% just before his death, he would have

26   been on the verge of coma, unable to drive, unable to walk, and falling down if he dared to try.

27   (Walker Decl., Exh. D (Barbour Report, p. 3).)  Given that Stephen was able to drive on the night

28

1  of the incident, park his vehicle, exit his vehicle, walk to its rear and retrieve items from the trunk,

2  designated expert toxicologists for both sides have testified that Stephen's blood alcohol level

3  could have been below 0.29% at the time of his death.

4      Plaintiffs' expert toxicologist, Alan Barbour, Ph.D., has opined that Stephen's blood

5  alcohol was "surely below 0.25 percent and at least as likely as not below 0.20 percent" (Walker

6  Decl., Exh. D (Barbour Report, p. 3).)  Likewise, Defendants' expert toxicologist, Vincent Di

7  Maio, M.D., testified that if Stephen had not had a drink during the two hours before his death,

8  "then his blood alcohol level would . . . have been in the order of . . . .15."   (Walker Decl., Exh. E

9  (Di Maio Depo, 80:3-14).)

10

11      Permitting anyone other than Drs. Barbour and Di Maio to testify to Stephen's blood

12  alcohol level on the day of the shooting would mislead the jury, confuse the issues, and cause

13  unfair prejudice to plaintiffs.  (Fed. R. Evid. 401, 402, 403.)

14  **4.**   **TO PRECLUDE EXPERT TESTIMONY BY DEFENSE WITNESS VINCENT DI**
**MAIO.**

15

16      Plaintiffs move this Court for an order precluding defense expert Vincent Di Maio, M.D.

17  from offering opinion testimony which he is not qualified to provide, which is speculative, and

18  which would be unhelpful to the jury and unfairly prejudicial to the plaintiffs.  This includes Di

19  Maio's baseless opinions regarding Stephen Willis' actions during the shooting, Di Miao's

20  reliance on inadmissible hearsay, and Di Maio's foundationless and speculative discussion of

21  blood testing.

22      In his expert report, Di Maio improperly speculated regarding actions Stephen may have

23  taken during the shooting.  For example, Di Maio stated in his report that based on the fact that

24  Stephen had a wound in his right forearm, that arm "could have been extended ahead of him

25  pointing a gun."  (Walker Decl., Exh. P (Di Maio Report), p. 4.)  Yet he admitted at his deposition,

26  that his arm could have been anywhere when it received the wound: "I mean the arm could be in

27  front of him, to the side of him, to the back, what I'm essentially saying, that you cannot tell."

28  (Walker Decl., Exh. E (Di Maio Depo, 12:6-13).)  He further stated that Stephen's high blood

13

1   alcohol level would have "caused him to do [sic] engage in foolish actions."  (Walker Decl., Exh.

2   P (Di Maio Report, p. 7).)  Obviously, Di Maio was not present at the shooting.  Nor are these

3   opinions based on any eyewitness accounts of the shooting.  They have no foundation whatsoever.

4        Di Maio's statement that Stephen could have been pointing his gun at the time is entirely

5   baseless, as admitted by Di Maio himself.  The same goes for any other speculations Di Maio

6   makes regarding Stephen's actions during the shooting.  They therefore must be excluded.  (*See*

7   Fed. R. Evid. 702, Adv. Comm. Notes (2000) ("The trial judge in all cases of proffered expert

8   testimony must find that it is properly grounded, well-reasoned, and not speculative before it can

9   be admitted.").)

10       Similarly, Di Maio should be precluded from conveying to the jury facts regarding the

11  shooting which are based purely on hearsay.  Di Maio recounts a skewed, defense-oriented version

12  of the facts in his expert report.  (Walker Decl., Exh. P (Di Maio Report, p. 2).)  While an expert is

13  allowed to rely on inadmissible hearsay in forming an opinion, an expert may not simply be used

14  as a conduit to get otherwise inadmissible hearsay into evidence.  An expert relying on hearsay

15  may not "simply transmit that hearsay to the jury.  Instead, the expert must form his own opinions

16  by applying his extensive experience and a reliable methodology to the inadmissible materials."

17  (*United States v. Mejia*, 545 F.3d 179, 197 (2d Cir. 2008) (citations omitted).)  Here, any attempt

18  by Di Maio to relay these hearsay statements to the jury would be improper, putting an "expert's"

19  stamp on the version of the facts promoted by the defense and unfairly prejudicing the plaintiffs.

20  Di Maio should therefore be precluded from providing such testimony.

21       Finally, Di Maio testified at length to the underlying methods and validity of the blood

22  alcohol tests performed on Stephen by the Fresno Coroner's office.  For example, he testified in

23  detail regarding the methods undertaken by the Coroner to extract Stephen's blood for testing.

24  (Walker Decl., Exh. E (Di Maio Depo, 76:21-77:21).)  He further testified that this methodology

25  was proper and that the testing of Stephen's blood alcohol "was done correctly."  (*Id.* at 77:19-21,

26  78:12-18).)

27       Di Maio was not present to observe the Coroner's methods; instead, he is relying on the

28  descriptions stated in the Coroner's report.  Nor has Di Maio tested or even examined any of the

materials, fluids or tissues taken from Stephen, including Stephen's blood.  (*Id.* at 75:2-10.)  Di Maio's testimony regarding the correctness of the testing or the state of Stephen's blood therefore has no reasonable or reliable basis.  His testimony on the Coroner's methods, the state of Stephen's body, and the condition of Stephen's blood is all based on inadmissible hearsay.  As discussed above, Di Maio should not be permitted to act as a conduit to admit into evidence the hearsay statements made in the Coroner's report.  Nor should he be able to offer opinions in these areas as his knowledge on the subject is not one on which an expert should reasonably rely.  (*See* Fed. R. Evid. 702, 703.)

**5.    TO PRECLUDE REFERENCE TO DECEDENT'S PRIOR DRUG OR ALCOHOL USE.**

Any prior drug or alcohol use by Stephen Willis, which was unknown to the officers who shot him, is irrelevant.  In addition, whether Stephen was actually under the influence of drugs or alcohol on the day he was killed is also irrelevant.  Moreover, any relevance would be substantially outweighed by the probability that such evidence would mislead the jury, confuse the issues, and cause unfair prejudice to plaintiffs.  (Fed. R. Evid. 401, 402, 403, 602.)

**6.    TO PRECLUDE TESTIMONY FROM LAY WITNESSES AS TO THEIR BELIEF THAT DECEDENT WAS INTOXICATED ON MARCH 27, 2009.**

Several witnesses have expressed speculative lay opinions that Stephen Willis was intoxicated on the night of the shooting.  For example, witness Chris Zimmerman testified in his deposition that he believed that Stephen was acting intoxicated on the night of the incident.  (*See* Walker Decl., Exh. F (Zimmerman Depo, 31:6-10, 49:12-23, 54:5-11.)  Zimmerman's statements are admitted assumptions.  So are all other witness statements as to Stephen's alleged intoxication that night.  They are not based on personal knowledge (*see* Fed. R. Evid. 602), they are not permissible lay opinions (*see* Fed. R. Evid. 701), they are not relevant to any issue to be tried (*see* Fed. R. Evid. 401), and they are highly likely to cause unfair prejudice without having any probative value.  (See Fed. R. Evid. 403.)  These baseless speculations should therefore be excluded at trial.

///

///

**7.     TO PRECLUDE REFERENCE TO DECEDENT'S PRIOR INCIDENTS WITH LAW ENFORCEMENT, CONFRONTATIONS WITH OTHERS, AND "BAD" CHARACTER.**

Plaintiffs move this Court for an order precluding any evidence on prior incidents involving Stephen Willis or his character traits, and further excluding any reference to or opinions on these prior incidents or character traits.  Defense counsel has elicited much testimony and evidence regarding Stephen's prior run-ins with the law, other confrontations in which he was involved, and several "bad" character traits: aggression, a dislike of authority, and drinking.

This evidence would only be presented at trial for one purpose only: to show that Stephen acted in accordance with those prior incidents and bad character traits to instigate the shooting.  In fact, defense expert Kris Mohandie, Ph.D., explicitly opines that Stephen's bad character, established by these prior incidents, led to his death.  Evidence of these prior incidents for this purpose is of course in direct contravention of Federal Rule of Evidence 404.  It is also irrelevant and prejudicial, and the presentation of such evidence would be inordinate waste of time requiring several mini-trials on each prior incidents.

In discovery, the defense elicited testimony from witnesses on several prior incidents involving Stephen that had nothing to do with his shooting.  These incidents include:

- An argument with a neighborhood watch captain over the volume of his music.  (Walker Decl. Exh. G (Hoskins Depo, 37:2-38:19.)
- An altercation with an apartment complex security guard.  (*Id.* at 55:3-57:7.)
- Brandishing a shotgun in a confrontation with local gang members.  (Walker Decl., Exh. H (02/09/08 Police Report).)
- Any incidents contained in Stephen's juvenile criminal record, which has been obtained by the defense.

In conjunction with these incidents, the defense elicited testimony on Stephen's character traits, such as:

- His dislike of authority, namely police officers or security guards.  (Walker Decl., Exh. I (Cruz Depo, 44:18-25.)
- His aggressive behavior when drinking.  (*Id.* at 88:17-25.)

- Violent behavior toward his girlfriend.  (Walker Decl., Exh. G (Hoskins Depo, 92:4-93:23).)

- His consumption of alcohol.  (Walker Decl., Exh. J (Willis Depo, 30:10-16).)

These prior incidents and character traits are entirely irrelevant to the issues to be tried here.  (*See* Fed. R. Evid. 401.)  They have no bearing on what transpired on the night of the shooting.  Instead, their only use at trial would be to show Stephen's "bad" character and to imply that it precipitated the events that led to the shooting.  This use of prior incidents and character evidence for this purpose is clearly prohibited under Federal Rule of Evidence 404.

Further, the testimonial basis of these prior incidents and character traits is primarily, if not entirely, inadmissible hearsay.  (*See* Fed. R. Evid. 802.)  Finally, admission of this evidence would be severely prejudicial and unfair to plaintiffs and would mislead the jury while having no probative value to the issues to be tried.  (*See* Fed. R. Evid. 403.)  Admission of this evidence would also be an excessive waste of time.  Every one of these prior incidents and character traits will have to be introduced by the defense through one or several witnesses.  Plaintiffs will then be forced to call their own witnesses to rebut this testimony, resulting in a mini-trial for each of these issues and a waste of the Court's and jury's time.

However, perhaps the most significant and dangerous consequence of allowing evidence of these prior incidents and character traits is that defense expert Kris Mohandie, Ph.D. uses them to impermissibly opine that Stephen's bad character traits resulted in the shooting.  In fact, Dr. Mohandie dedicates an entire section of his expert report to this very conclusion.  (Walker Dec., Exh. C (Mohandie Report, pp. 13-18).)  Dr. Mohandie recounts Stephen's prior incidents in detail in his report to conclude that Stephen was an alcoholic with aggression issues and a problem with authority.  (*Id.*)  Dr. Mohandie then impermissibly opines that these personality traits "resulted in this unfortunate but not unexpected situation that escalated by his conduct into this officer involved shooting."  (*Id.* at p. 18.)  Dr. Mohandie even goes so far as to prescribe a motive for Stephen's actions on the night of the shooting, stating that based on Stephen's prior confrontation in which apartment security flashed a light in his face, it is "likely that in the current incident, Mr.

1   Willis . . . may have mistaken the FPD officers for apartment security and sought to make good on

2   his earlier threats."  (*Id.* at p. 15).)

3        Not only are these opinions foundationless, based on anecdotes, hearsay, and Dr.

4   Mohandie's "knowledge and experience," but they are in direct contravention of Rule 404.  Any

5   evidence of prior incidents involving Stephen or of his "bad" character traits must be excluded.

6   Further, any reference to or opinions based on them must be excluded as well.

7   **8.**     **TO PRECLUDE REFERENCE TO FRESNO POLICE RADIO BROADCAST**
       **REGARDING RECKLESS DRIVER.**

8

9        Plaintiffs move this Court for an order precluding any reference to a police radio call about

10  a reckless driver in a black two-door Nissan on the night of the shooting.  The radio call has

11  nothing to do with the shooting and does not describe Stephen Willis' car, yet several officers

12  have associated it with Stephen and the events leading up to the shooting.  This is factually

13  incorrect, lacks and foundation, and is irrelevant, inflammatory, misleading, and prejudicial.  The

14  only conceivable purpose of this evidence would be to mislead the jury into believing that Stephen

15  was the reckless driver, had been smashing into parked cars, and set in motion the events leading

    to his shooting.

16       In his deposition, Officer Steve Taylor testified that on the night of the shooting he had

17  received a radio call to be in the lookout for a reckless driver in a black two door Nissan sedan,

18  license plate number 3XYM747, "hitting cars, driving erratically."  (Walker Decl., Exh. K (Taylor

19  Depo, 40:1-17).)  He further testified that when a car hit the entry gate of an apartment complex

20  where he was located, he believed that car could be the one referenced in the radio call.  (*Id.* at

21  40:18-22.)  Another officer, Greg Jouroyan, also testified at his deposition regarding the same

22  radio call, and he ***mistakenly*** believed that the black Nissan referenced in the call was Stephen's

23  car and that he saw it at the scene of the shooting.  (Walker Decl., Exh. L (Jouroyan Depo, 18:1-

24  19:19; 22:14-18).)

25       This testimony is simply factually incorrect.  Office Taylor believed the black Nissan was

26  the car that crashed into the gate and Officer Jouroyan believed that it was Stephen's car.  Yet the

27  black Nissan was not the car that crashed into the gate and it was not Stephen's car.  Stephen

28

1  drove a four door Infinity, license plate number 3SVD070, a different make, model and type of

2  car, with different plates.

3          In addition to being flatly wrong, this testimony is irrelevant to any issue to be tried and is

4  therefore inadmissible.  (*See* Fed. R. Evid. 402.)  The radio call had no connection to what any of

5  the officers were doing in the area of the shooting that night or why they were there. The only

6  purpose this testimony could have would be to mislead the jury into believing that it was Stephen

7  Willis driving erratically and hitting other cars.  This would result in unfair prejudice to plaintiffs

8  and a confusion of the issues, and these dangers substantially outweigh the non-existent probative

9  value of such evidence.  (*See* Fed. R. Evid. 403.)

10  **9.        TO PRECLUDE REFERENCE TO MARCH 16, 2011 FIREARM VIDEO.**

11          Defendants' expert armorer, Ronnie Rackley, testified that he was able to replicate two

12  short strokes in a controlled setting while using the Smith & Wesson revolver recovered from

13  Stephen Willis's body.  (Walker Decl., Exh. M (Rackley Depo, 53:25-54:2).)  Mr. Rackley,

14  however, did not videotape himself while performing the replication.  (*Id.* at 54:18-19.)  Yet,

15  Defendants produced a video, dated 3/16/11 that depicts an unidentified person wearing a latex

16  glove who repeatedly shoots a revolver.  Neither the video, nor the individual or revolver it

17  depicts, has been authenticated.  The video lacks foundation, and any relevance would be

18  substantially outweighed by the probability that the jury would be confused and prejudiced.  (Fed.

19  R. Evid. 402, 403, 602, 901.)

20  **10.       TO PRECLUDE TESTIMONY BY RAYMOND VILLALVAZO BASED ON
             HEARSAY.**

21          Officer Raymond Villalvazo, who initially investigated the shooting, testified at his

22  deposition to several different opinions he had formed based on hearsay statements from Officers

23  Catton and Astacio.  For example, Villalvazo opined that Stephen Willis fired a shot at Officers

24  Catton and Astacio.  (Walker Decl., Exh. N (Villalvazo Depo, 41:2-15, 43:25-44:10).)  He based

25  this opinion on the statements made by those officers.  (*Id.*)  He further opined that Stephen had

26  his arms extended and was pointing the gun at Officer Catton.  (*Id.* at 108:4-19.)  He based this

27  opinion on statements by Officer Catton and the Fresno forensic pathologist.  (*Id.*)

28

These opinions are improper because Villalvazo is not an expert witness in this matter and his opinions are not rationally based on anything he perceived.  They are instead based entirely on unreliable hearsay statements.  In stating these opinions Villalvazo is simply regurgitating statements made by other witnesses.  He has no personal knowledge of the facts supporting the opinions nor is he permitted to give these opinions as a non-expert.  Therefore, his opinions must be excluded pursuant to Rules of Evidence 602, 701, 802 and 403.

**11.     TO PRECLUDE REFERENCE TO JENNIFER URIBE MEDICAL RECORDS, MEDICAL TREATMENT, OR DEFENSE NEUROPSYCHOLOGICAL EVALUATION.**

Jennifer Uribe has been dismissed as a Plaintiff.  Thus, any opinions or conclusions of defense neuropsychologist Harold Seymour, Ph.D., are irrelevant.  Specifically, his report contains summaries of Ms. Uribe's medical, psychological and substance use history (Walker Decl., Exh. O (Dr. Seymour's "Independent Neuropsychological Report", pp. 3, 5-7).), as well as multiple examples of hearsay, including, but not limited to:

- "Officers were at the apartment complex on an unrelated call (doc. #7, pg. 2), and they noticed a vehicle traveling at a high rate of speed.  They thought the vehicle might have struck the apartment entrance gate, and this was confirmed at a later time (pg. 6)."  (*Id.* at p. 3.)

- "Officer Cerda reported he heard Officer Astacio give a "drop the gun" command (pg. 11)."  (*Id.* at p. 4.)

Clearly, any relevance would be substantially outweighed by the probability that the jury would be prejudiced.  (Fed. R. Evid. 401, 402, 403, 802.)

Similarly, any testimony regarding Ms. Uribe's medical history at Planned Parenthood or her treatment by Dr. Guzetta is irrelevant.  Moreover, any relevance would be substantially outweighed by the probability that such testimony would confuse the issues and unfairly prejudice plaintiffs.  (Fed. R. Evid. 401, 402, 403.)

**12.     TO PRECLUDE ANY OPINION TESTIMONY OF EXPERTS NOT PROPERLY DESIGNATED BY DEFENDANTS.**

Under Rule 26(a)(2), parties "must" disclose specific opinions that they intend to elicit

20

from purported experts, along with a written report.   The defendants disclosed six experts and subsequently provided expert reports for them.  However, the defendants also listed three persons and "Medical Providers (to be identified)," as "non-retained experts" without identifying what opinions those purported experts, and "to be identified" experts, would offer.  Even if some of the defendants' purported "non-retained expert witnesses" were not required to provide a written report, the defendants must at least have provided for each of those witnesses: "(i) the subject matter on which the witness is expected to present evidence under Federal Rule of Evidence 702, 703, or 705; and (ii) a summary of the facts and opinions to which the witness is expected to testify."  (Fed. R. Civ. P. 26(a)(2)(C).)  Because the defendants failed to disclose the subject matter, facts, and opinions these witnesses would address, and failed to provide expert reports, any expert testimony from these three named witnesses and the "to be identified" Planned Parenthood medical providers, should be excluded.

**13.    TO PRECLUDE ANY TESTIMONY OR STATEMENT REGARDING THE CITY OF FRESNO'S FINANCIAL STATUS OR THAT A VERDICT FOR PLAINTIFFS WILL BE PAID BY TAXPAYER DOLLARS.**

Any statements about the City of Fresno's finances, or about taxpayers paying a judgment, are irrelevant.  Moreover, any relevance would be substantially outweighed by the probability that such evidence would confuse the issues and cause unfair prejudice to the plaintiffs.  (Fed. R. Evid. 401, 402, 403.)

**14.    TO PRECLUDE ANY REFERENCE TO PLAINTIFFS' REPRESENTATION BY SAN FRANCISCO ATTORNEYS.**

The lawyers for Plaintiffs who will be trying this case are from San Francisco and have sued police before.  Any reference with respect to who the plaintiffs' lawyers are, and what type of cases they litigate, is irrelevant.  Moreover, any relevance would be substantially outweighed by the probability that such evidence would confuse the issues and cause unfair prejudice to the plaintiffs.  (Fed. R. Evid. 401, 402, 403.)

///

///

///

DATED: October 21, 2013                    WALKER, HAMILTON & KOENIG LLP


                                           By:   */s/  Walter H. Walker, III*
                                                 Walter H. Walker, III
                                                 Attorneys for Plaintiffs

PLAINTIFFS' MOTIONS IN LIMINE (Case No. 1:09-cv-01766-BAM)