Walter H. Walker, III  (CA SBN 63117)
Peter J. Koenig  (CA SBN 132437)
Beau R. Burbidge (CA SBN 267267)
WALKER, HAMILTON & KOENIG LLP
50 Francisco Street, Suite 460
San Francisco, CA 94133-2100
Phone: (415) 986-3339
Fax: (415) 986-1618

Richard P. Berman  (CA SBN 55462)
LAW OFFICES OF RICHARD P. BERMAN
2333 Merced Street
Fresno, CA 93721
Phone: (559) 233-2333
Fax: (559) 233-6947

Eric H. Schweitzer (CA SBN 179776)
SCHWEITZER & DAVIDIAN
620 DeWitt Ave., Suite 102
Clovis, CA 93612
Tel: (559) 322-1500
Fax: (559) 322-1551

Attorneys for Plaintiffs

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| Chris Willis, Mary Willis, individually and successors in interest to Stephen Willis,<br><br>       Plaintiffs,<br><br>v.<br><br>City of Fresno, Officer Greg Catton, Officer Daniel Astacio, Chief Jerry Dyer, and DOES 1 through 50 inclusive,<br><br>       Defendants. | Case No. 1:09-cv-01766-BAM<br><br>**DECLARATION OF WALTER H. WALKER, III IN SUPPORT OF PLAINTIFFS' MOTIONS IN LIMINE**<br><br>Trial:      November 19, 2013<br>Time:     9:00 a.m.<br>Courtroom: 8<br>Judge:    Barbara A. McAuliffe<br>           U.S. Magistrate Judge |

DECLARATION OF WALTER H. WALKER, III IN SUPPORT OF PLAINTIFFS' MOTIONS IN LIMINE
(Case No. 1:09-cv-01766-BAM)

1    I, Walter H. Walker, III, declare:

2         1.    I am an attorney duly licensed to practice law in the State of California and am

3    admitted to practice before this Court. I am counsel of record for the plaintiffs in this case, Chris

4    and Mary Willis, individually and as successors in interest to Stephen Willis. I have personal

5    knowledge of the matters stated in this declaration. I could and would testify competently to the

6    matters stated herein if called to do so.

7         2.    Attached hereto as **Exhibit A** is a true and correct copy of relevant excerpts from

8    the transcript of the deposition of defense expert Joseph Callanan, taken on June 1, 2011.

9         3.    Attached hereto as **Exhibit B** is a true and correct copy of the report of defense

10   expert Joseph Callanan, dated March 30, 2011, and disclosed by counsel for defendants pursuant

11   to Federal Rule of Civil Procedure 26.

12        4.    Attached hereto as **Exhibit C** is a true and correct copy of the report of defense

13   expert Kris Mohandie, Ph.D., dated March 29, 2011, and disclosed by counsel for defendants

14   pursuant to Federal Rule of Civil Procedure 26.

15        5.    Attached hereto as **Exhibit D** is a true and correct copy of the report of plaintiffs'

16   expert Alan Barbour, Ph.D., dated May 3, 2011.

17        6.    Attached hereto as **Exhibit E** is a true and correct copy of relevant excerpts from

18   the transcript of the deposition of Vincent J. M. Di Maio, M.D., taken on June 10, 2011.

19        7.    Attached hereto as **Exhibit F** is a true and correct copy of relevant excerpts from

20   the transcript of the deposition of witness Chris Zimmerman, taken on January 27, 2011.

21        8.    Attached hereto as **Exhibit G** is a true and correct copy of relevant excerpts from

22   the transcript of the deposition of witness Dorothy Hoskins, taken on January 26, 2011.

23        9.    Attached hereto as **Exhibit H** is a true and correct copy of a Fresno Police

24   Department Law Enforcement Report Form, dated February 9, 2008, Event: 08AF2307, Case: 08-

25   011866, which was produced by the defendants in this litigation.

26        10.   Attached hereto as **Exhibit I** is a true and correct copy of relevant excerpts from

27   the transcript of the deposition of Fresno Police Officer Hugo Cruz, taken on March 2, 2011.

28

2

DECLARATION OF WALTER H. WALKER, III IN SUPPORT OF PLAINTIFFS' MOTIONS IN LIMINE
(Case No. 1:09-cv-01766-BAM)

1       11.     Attached hereto as **Exhibit J** is a true and correct copy of relevant excerpts from

2   the transcript of the deposition of plaintiff Mary Willis, taken on October 28, 2010.

3       12.     Attached hereto as **Exhibit K** is a true and correct copy of relevant excerpts from

4   the transcript of the deposition of Fresno Police Officer Steve Taylor, taken on January 11, 2011.

5       13.     Attached hereto as **Exhibit L** is a true and correct copy of relevant excerpts from

6   the transcript of the deposition of Fresno Police Officer Greg Jouroyan, taken on January 11,

7   2011.

8       14.     Attached hereto as **Exhibit M** is a true and correct copy of relevant excerpts from

9   the transcript of the deposition of defense expert Ronnie Rackley, taken on June 7, 2011.

10      15.     Attached hereto as **Exhibit N** is a true and correct copy of relevant excerpts from

11  the transcript of the deposition of Fresno Police Officer Raymond Villalvazo, taken on November

12  17, 2010.

13      16.     Attached hereto as **Exhibit O** is a true and correct copy of the "Independent

14  Neuropsychological Report" of Jennifer Uribe, prepared by defense neuropsychologist Harold

15  Seymour, Ph.D.

16      17.     Attached hereto as **Exhibit P** is a true and correct copy of the report of defense

17  expert Vincent Di Maio, M.D., dated March 23, 2011, and disclosed by counsel for defendants

18  pursuant to Federal Rule of Civil Procedure 26.

19      I declare under penalty of perjury that the foregoing is true and correct.  Executed this 21st

20  day of October, 2013 at San Francisco, California.

21

22

23                              By:   */s/  Walter H. Walker, III*
                                      Walter H. Walker, III
24                                    Attorneys for Plaintiffs

25

26

27

28
                                                3
DECLARATION OF WALTER H. WALKER, III IN SUPPORT OF PLAINTIFFS' MOTIONS IN LIMINE
(Case No. 1:09-cv-01766-BAM)

# EXHIBIT A

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA - FRESNO DIVISION


CHRIS WILLIS, MARY WILLIS,
individually and successors
in interest to STEPHEN WILLIS;
JENNAFER URIBE,

        Plaintiffs,

    vs.                    CASE NO.
                            1:09-CV-01766-LJO-DLB
CITY OF FRESNO, OFFICER GREG
CATTON, OFFICER DANIEL ASTACIO,
CHIEF JERRY DYER, and DOES 1
through 50, inclusive,

        Defendants.
_____/


DEPOSITION OF JOSEPH J. CALLANAN

June 1, 2011


Reported by:
DAWN E. HOWARD
C.S.R. NO. 13201


PATRICIA CALLAHAN REPORTING
Certified Shorthand Reporters
(510) 885-2371    (415) 788-3993
Facsimile (510) 247-9775

1    the shooting, no.  These are my understandings of the

2    facts, and the facts are obviously in dispute between

3    the two parties.  So if one side presents one set of

4    facts to me, I would evaluate that against these knowns.

5    And if the other side presents a different set of facts,

6    then I might have a different opinion, based on a set of

7    knowns.

8            But let's be clear early in this deposition.  I

9    am not a fact-finder as to what transpired in that

10   parking lot that night.  I wasn't there.  I have not

11   conducted an investigation.  I'm assuming that the

12   materials presented by both parties is your presentation

13   of facts, the proof of which is not my responsibility.

14       Q.   But you state opinions based on your

15   understanding of facts, correct?

16       A.   Yes.

17       Q.   And when you do so, you will be able to trace

18   those facts to the record; is that correct?

19       A.   Yes.

20       Q.   Okay.  So each time I ask you where a fact

21   comes from, you'll be able to point to some place in the

22   record to substantiate that fact or that presentation of

23   fact?

24       A.   I will, but I wouldn't be able to factually

25   convince anyone that that's true.  It's just true that

1      A.   Well, again, sir, I was looking for citations.

2   I don't think you've permitted me to continue.

3      Q.   No, I am.  You have all the time you want to

4   find the citations for this statement that you've made.

5      A.   And if I found more, which I expect to, I still

6   couldn't put this in a timeline for you.

7      Q.   Well, no.  I want you to be able to

8   substantiate this statement that you've made on page 15

9   that I think isn't true, and I want you to find the

10   basis for it.  I want you to find where in the record

11   Willis was seen to fire his revolver westbound at

12   Officer Catton while both men were still on the south

13   side of the parked vehicles in the early stage of the

14   combat.

15      A.   I think my earlier testimony would indicate

16   that there are other sources of that information,

17   including my understanding, having conducted a tactical

18   debriefing and a site survey, where I walked through

19   this event in this parking lot and tried to position the

20   officers, have them recreate for me their positions when

21   they saw different events.  The conclusion, the totality

22   of the information, tells me that Catton, right or

23   wrong, believed he saw the subject fire a round in his

24   direction.  I think he says two rounds.

25      Q.   But we have his sworn testimony in deposition,

1   you need to do is ask me questions relative to, if I

2   understand A, B, and C, what is the proper police

3   procedure.  Don't put me in the position, sir, of being

4   an investigator or a fact-finder or a percipient

5   witness.  I wasn't any of those things.  If your

6   understanding of the shooting is different than mine or

7   than anybody else's, ask me questions relative to fact

8   patterns.

9       Q.    But you were an investigator, weren't you?  You

10  told us you went out there to the scene with the

11  officers and you walked them through?

12      A.    I told you more than once in this deposition I

13  am not an investigator.  I did what is called a

14  "tactical debriefing."  I also did a site survey to

15  educate myself as to the officers and the scene and the

16  dynamics as they understand them, which may or may not

17  be true.  And you certainly are challenging them.

18      Q.    What is a tactical debriefing?

19      A.    It's an opportunity to evaluate the officers in

20  terms of maturity, professional development, their

21  understanding of the rules of engagement relative to

22  force, particularly deadly force, to understand their

23  tactics, in this case their nontactics on approaching a

24  man with a gun.  It's an opportunity for them, as best

25  they can recount, recall, show me where they were and

1  what they saw and what they thought in their reliance on

2  training, the reliance on policy, and make some

3  determination if their reasoning is consistent with law

4  enforcement.  Not necessarily is it right, wrong, or

5  lawful, but is it consistent with training.

6      Q.   What you've just described for me is part of an

7  investigation on your part, wasn't it?

8      A.   No.  An investigation, in my mind, is to go out

9  to a scene and gather as many facts as you possibly can

10  and record those facts, whether they're pro, con,

11  positive, negative, because you don't know at that stage

12  as to how these facts may interrelate or may be

13  inconsistent or may be critical or noncritical.

14      Q.   Were you attempting to gather facts when you

15  did this tactical debriefing with Officers Astacio and

16  Catton?

17      A.   No.  I think it's important for you to

18  appreciate I'm more interested in what their perception

19  and their mind function, their intellectual processes

20  and calculations are than, say, an investigator who

21  might be more interested in how many feet, distance, or

22  passage of minutes of time are.

23          So I'm trying to understand the human judgment

24  being exercised by these officers, particularly as it

25  relates to the decision to deploy deadly force.

1    have a wide array of evidentiary markings on them.

2         It was my attempt to break this into various

3    phases of conduct, because it is not a single event.

4    It's a series of events.

5         So I started with, I think, "A," which was the

6    two officers standing, void of any cover or concealment,

7    addressing or engaging the subject relative to the

8    parked cars and the buildings.  Then the next one, "B,"

9    attempts to capture the movement of Catton to the left,

10   or the west, and Astacio to the right, or the east.

11   And, ultimately, "C," the third rendering, is to capture

12   the final engagement wherein the subject is on the north

13   plane of the parked cars and Catton is firing the last

14   or close to the last of the police rounds.

15        So it was just landmarking the stage and the

16   maneuvers attributed to all the parties.

17   Q.   Where did you get the information to place the

18   officers and Mr. Willis in these A, B and C scenarios

19   that you've just referenced?

20   A.   From the totality of the readings and from

21   their recall of being out there that day during the site

22   survey.  And it's not to represent exact measurements,

23   but to conceptually see that what began as a triangular

24   formation evolved into a linear formation and then

25   evolved again into the subject on the north plane of the

1    that there was somewhat of a triangulation or a triangle

2    formation.  And we know that everything is moving, so

3    this is, perhaps, an instant in time.

4        Q.   Well, what's your basis for saying, "quite

5    possibly" when Officer Catton was fired at by

6    Mr. Willis?

7        A.   Well, my rationale for using the term "quite

8    possibly" is that Catton and Astacio are involved in

9    this particular incident.  And we know from all kinds of

10   studies and experiences that officers in these

11   conditions have what are called perceptual distortions.

12   So this is their best recall.  This is also assuming

13   that the subject is exactly in the same place as was

14   depicted in the drawing marked No. 1.  I don't believe

15   that to be true either.

16         This was simply to capture the fact that we

17   were in a triangular position.  It's going to now

18   stretch out in a more of a linear position.  I think

19   I've described that in six different phases of the

20   shooting, which may or may not be in correct

21   chronological order.

22       Q.   Well, we haven't gotten to the triangular

23   position yet in my questioning.  My question is, what's

24   your basis for saying this is when Mr. Willis quite

25   possibly fired at Mr. Catton?

1    A.   Agreed.

2    Q.   And you would agree they could not find any

3  such evidence?

4    A.   They did not.

5    Q.   At this point, when you have drawn -- or on the

6  computer-assisted drawing that you've marked No. "2,"

7  are you representing that the position that is marked

8  "C," with a circle around it, is the initial position

9  taken up by Officer Catton when the confrontation

10  occurred with Mr. Willis?

11    A.   No.

12    Q.   In fact, Officers Catton and Astacio were

13  standing about one arm's length apart when they first

14  came face to face with Mr. Willis, weren't they?

15    A.   Yes.

16    Q.   And they were no more than 10 feet away,

17  correct?

18    A.   I think you're right.

19    Q.   And it was only after the shooting started that

20  Officer Astacio moved to his right, or to the west,

21  correct?

22    A.   I can't give you that answer yes or no.  And

23  the reason is that both of these officers accounted for

24  maneuver, drawing, and fire.  And, again, looking at a

25  peak-stress event, perceptual distortion, tunnel vision,

1   et cetera, et cetera, I don't think they're clear in

2   their minds -- they certainly have not convinced me --

3   that they were in any exact particular position as they

4   maneuvered.

5           In fact, Astacio convinced me that he's

6   drawing -- firing from a straight-on to the opponent,

7   the subject, to a radius to his right, and he's unclear

8   about whether he's getting closer or further as that

9   radius or pie, if you will -- he's focused on stopping

10  the subject, but also finding cover to his right.  And

11  he in fact loses perception as to where Catton might be,

12  because Catton was last to his left.

13      Q.   From that initial position of firing by Officer

14  Astacio when he was 10 feet away from Mr. Willis, how

15  many bullets did he fire?

16      A.   I tried to count those for you, and I tried to

17  report those to you.  I think, if you turn to page 20 of

18  my report, under Item 15, it refers to deadly force

19  encounter, phase analysis.  And I broke that down into

20  my perceptions of six separate phases.  And this is

21  distinct events, but they may be so compacted in time

22  that they're happening right on top of each other

23  simultaneously, the order of which, the sequence of

24  which, can't be scientifically determined.

25          And now if you ask me your question, I should

1    trunk of his car and bring it into his apartment for the

2    night?

3        A.    Agreed.

4        Q.    You would agree that when the officers

5    approached Mr. Willis, he was either in the process of

6    extracting that loaded gun from the trunk of his car or

7    he had just extracted that loaded gun from the truck of

8    his car and had not yet closed the trunk of the car?

9        A.    I don't know that.

10       Q.    Did you read that anywhere in your review of

11   officer Astacio's testimony?

12       A.    I clearly read that the trunk was open, the

13   subject was outside the car, and I believe over more

14   towards the passenger's side, and that he was then in

15   possession of a holstered weapon.  I can't give you any

16   testimony as to what he had just done or was about to do

17   or was thinking.

18       Q.    Page 41 of Officer Astacio's testimony -- by

19   the way, earlier you referred to Officer Astacio not

20   convincing you of something.  Do you feel that it's your

21   role to be convinced by one or more of the participants

22   in this event as to what happened?

23       A.    No, it isn't -- it isn't important, other than

24   the fact that if the officer is unclear, then I have to

25   consider that there's been a peak-stress event that's

1   interfering with his recall of the event or his ability

2   to account for the event, and that's not uncommon in

3   officer-involved shootings.

4       Q.   Beginning at page 40 of his deposition, line

5   23, I asked Officer Astacio, "What was the suspect --

6   or, I'm sorry, the subject doing at the rear of the

7   vehicle when you first noticed him?"

8           And he answered, beginning at line 1 on page

9   41, "It looked like he was reaching in the vehicle and

10  getting ready to close the trunk of the vehicle."

11          I then asked, "So you saw the trunk was

12  opened."

13          He answered, "Yeah."

14          Do you have any reason to disbelieve the truth

15  of what Officer Astacio stated there?

16      A.   I don't have any trouble with the truthfulness

17  of it.  I have questions about the logic of it.  You're

18  seeing a man, an open trunk, something apparently being

19  recovered, but I don't know how he would come to

20  conclude that it looked like he was about to close the

21  trunk.  That's an interpretation; it's not per se a

22  fact.

23      Q.   Then I went on at page 41, line 10, and I said,

24  "So you saw him, he was facing the trunk, and he was

25  appearing to close or getting ready to close the trunk

1    testified that he was receiving coverage from any

2    further maneuver of the suspect?

3        A.    I don't understand your question.

4        Q.    I'm just picking up on your last answer.

5              You said he was able to retreat to the south

6    side of the pickup truck with the knowledge that Catton

7    was there to provide him cover from my other further

8    movement or action of the suspect?

9        A.    And I think, if we reread the transcript here,

10   I told you that I believe he retreated to the east side

11   of that pickup, not necessarily the south side, and that

12   he did that with the knowledge that Catton was up at the

13   front or the north plane of that car and therefore could

14   protect the officers if the subject maneuvered along the

15   north plane towards the officers.

16       Q.    And I'm asking if you found that testimony

17   anywhere supporting that statement.

18       A.    I'm not sure if I read it or I got it during

19   the tactical debriefing or some combination thereof.

20       Q.    At page 67 of his deposition I asked Officer

21   Astacio, "You hit him in the back?"

22              This is at line 2.  He answered, "Correct."

23              I said, "How many times?"

24              He said, "I fired three to five rounds.  I

25   don't know how many times I hit him."

1          "QUESTION:  And then he stopped moving?"

2          "ANSWER:  Yes."

3          Continuing onto page 104, line 5, "Question:

4     Why did you stop shooting?"

5          Answer:  Because I felt like the threat was

6     stopped."

7          "QUESTION:  What caused you to feel the threat

8     was stopped?"

9          Answer:  He slumped down from where he was

10    propped up on his elbow to a laying position."

11         So there's a citation for you.

12    Q.   Okay.  My question was, where was it that

13    Officer Catton said Mr. Willis was reaching for his gun?

14    A.   I clearly remember him telling me that during

15    the tactical debriefing, that the gun was beyond the

16    body, the body rolled, and he took that to be moving

17    back, reaching, rearming, and he decided to shoot based

18    on that threat.

19    Q.   He told you the body rolled?

20    A.   He's talking about some animation of a down

21    man, and I -- I may be using the wrong word, but the

22    amination is towards the gun, somewhat away from the

23    officers.

24    Q.   So you're relying on what you say Officer

25    Catton told you in March of 2011, after he had given

1   sworn deposition testimony and after he had given a

2   statement to Detective Villalvazo, in neither of which

3   did he ever use the word "reach"?

4       A.   I'll accept that, yes.

5       Q.   But you're going to rely on it?

6       A.   I will until one of you changes the

7   hypothetical.  If you're suggesting something completely

8   different than that, I would answer your questions,

9   then.

10      Q.   You talked about perceptual distortion that

11  officers have in these high-stressed movements.  Could

12  this have been a perceptual distortion on the part of

13  Officer Catton?

14      A.   I have to say it could have been, but I don't

15  want you to think I have expertise to give you that

16  answer.  Officers testify to things that didn't happen,

17  and they fail to testify to things that do happen.  The

18  best book on that is published by Dr. Roger Solomon,

19  referring to perceptual distortions are routine and to

20  be expected in officer-involved shootings.

21      Q.   Now, you also read the deposition testimony of

22  Officer Jacobo.  And you would agree that Officer Jacobo

23  would be expected to have less of this perceptual

24  distortion than the person who had actually been

25  involved in shooting his gun at another human being,

1    correct?

2        A.    I don't think I'm competent to answer that

3    question as to degrees of distortion or accuracy.

4    That's beyond my field.

5        Q.    Did Officer Jacobo say anything at all about

6    seeing Mr. Willis reach for a gun?

7        A.    I don't know, as I sit here.

8        Q.    Did he say anything about Mr. Willis rolling

9    toward a gun?

10       A.    I don't recall that.

11       Q.    In fact, Officer Jacobo, who was there at the

12   scene when Officer Catton shot him in the back,

13   described Mr. Willis' movement as twitching, didn't he?

14       A.    There is such a descriptor.  I'm not sure of

15   when and which witness says that.

16       Q.    How far away was the gun from Mr. Willis when

17   Officer Catton began to shoot him in the back?

18       A.    I don't know.

19       Q.    Did you see that in the evidence anywhere?

20       A.    I'm not sure if I did or if the gun is relative

21   to some other intervention, like an officer moving it,

22   kicking it, that sort of thing.  I really don't know,

23   other than Catton's testimony that the gun was beyond

24   the down body.

25       Q.    And did you see where Officer Jacobo said he

 1           I said, "So his head was away from you?"

 2           And he answered, "He was facing away from me,

 3   yes.  His head was south and his feet were north."

 4           And over on page 100, I said, "But he was

 5   looking in the opposite direction from you?"

 6           He answered, "That's correct."

 7           And I said, "And you resumed firing at him when

 8   he was in that position?"

 9           And he said, "Yes."

10           Now, any reason to dispute the accuracy of that

11   testimony?

12      A.   No, sir.

13      Q.   Okay.  And then he went on to say -- after

14   saying, "Yes," he said, "Yes, he was lying on his left."

15   It's supposed to be left side.  "But he had his left arm

16   under him, like he was laying down watching TV or

17   something."

18           Do you remember that testimony?

19      A.   Yes.

20      Q.   He says, "And beyond Mr. Willis, within an area

21   that he could have reached, was his handgun laying there

22   on the ground.  And I was giving him commands to stop

23   moving and to lay down and to not go for the gun, and he

24   was propped up and he was moving."

25           So is that what you're relying upon when you

Page 121

1   say that Mr. Willis was reaching for a gun and was

2   rolling toward the gun?

3      A.   That and the officer's representation during

4   the tactical debriefing and the site survey, and I

5   remember the term "propped," that his body was up.   It

6   wasn't down.   He wasn't prone or supine.   And the

7   movement that was described to me -- and I used the word

8   "rolling," but -- the momentum, the movement of the

9   body, was away from the officer and towards the gun, and

10  that Catton concluded that the subject was closing to

11  rearm.

12     Q.   And you felt, under all of the circumstances,

13  that that was appropriate police procedure on Catton's

14  part, to shoot him in the back twice at that point?

15     A.   Yes.

16     Q.   Okay.   And you will testify to that at trial?

17     A.   I presume so.

18     Q.   Let's turn to page 21 of your report.

19     A.   I'm with you.

20     Q.   There's a heading 17.00, called "Escalation of

21  Force."   I'm sorry, let's go to the top of that page,

22  16.00, "Attached charts," and it refers to those three

23  charts that we've just been making reference to.   And

24  here, Chart No. 1, you've described as, "Depicting

25  officer's approach and subject positioning."

1    might be.  The imperative here is to stop the subject

2    from shooting at you.

3        Q.   What evidence do you have that Officer Catton

4    had lost track of where his partner might be?

5        A.   It's either in the readings or in the tactical

6    debriefing or both.

7        Q.   So, once again, you're relying on something

8    that Officer Catton told you but is not otherwise in the

9    record?

10       A.   Well, I'm relying on the totality of the

11   information put before me.  You are certainly welcome to

12   challenge that, change that, and then I'll give you an

13   opinion.  If I understand this shooting correctly, you

14   have an intoxicated man with a gun, and he draws the

15   gun, and he's perceived to be pointing the gun.  And two

16   police officers, independent of each other, separate and

17   begin initiating deadly force applications, one moving

18   to the right, one moving to the left.  And if in the

19   course of that they lose track of each other's

20   positions, I understand that.  If in the course of that

21   one of them has a target of opportunity to stop this

22   subject and to fire through glass, is an appropriate use

23   of force.

24       Q.   And if any of those factual predicates are

25   wrong that you have just listed, then your opinions are

1   other officer is doing.

2       Q.   Isn't it a fact that the officers were in

3   positions where they were firing at each other?

4       A.   I think that's quite possibly true.

5       Q.   You have found no evidence that Mr. Willis ever

6   fired more than one shot, correct?

7       A.   Yes, that's true.

8       Q.   And the only evidence you have that Mr. Willis

9   even fired one shot is the fact that there was one

10  expended cartridge in his six-shot revolver?

11      A.   I'm not clear totally on that, because I have

12  not examined the weapon and I don't want to represent

13  myself as a firearms expert.  But he could have operated

14  that weapon multiple times and only gotten one round

15  off.  There's explanations why a revolver fires one time

16  and not the next time and gets out of sequence.

17           In fact, this case -- this spent casing is not

18  in the expected position in terms of the rotation.  And

19  in this case you have a subject who at some point, at

20  least, is wounded.  That may affect his ability to use

21  his gun hand.  So I don't know that he fired once.  It

22  would appear that one round was successfully discharged.

23  Now, that projectile is not recovered.

24      Q.   So the only evidence you have that one round

25  was fired out of his gun is that there's a spent

1    cartridge in the six-shot revolver?

2        A.    Correct.  I'm sorry, that's correct, in

3    conjunction with Catton's human perception of rounds

4    being fired in his direction.

5        Q.    And you would agree that what Catton was seeing

6    in all likelihood was Officer Astacio firing?

7        A.    I can't say all likelihood.  Those two

8    possibilities probably have equal value.

9        Q.    Okay.  You do know that Officer Astacio and

10   Officer Catton were in a linear position where one was

11   firing to the east and one was firing to the west on the

12   same plane?

13       A.    Agreed.

14       Q.    Could you please show me on --

15             First, Ms. Reporter, would you mark this

16   photograph of the bullet holes in the van as Exhibit 3.

17   And then as Exhibit 4, I'm going to show you a copy of

18   the computer-assisted drawing that you used to mark your

19   exhibit 3.

20             (PLAINTIFFS' EXHIBIT NOS. 3-4

21             WERE MARKED FOR IDENTIFICATION.)

22             MR. WALKER:    Q.    And I would like you, if you

23   would, to take a pen and mark the positions that

24   Officers Astacio and Catton were in when they were

25   firing at Mr. Willis when he was behind the blue van.

Page 136

1      A.   I can't do that.

2      Q.   Why is that?

3      A.   Because my only knowledge is their recollection

4   of the event, and their recollection of the event may be

5   distorted.   And I drew those drawings, or I used those

6   drawings only to show you their general positions.   I've

7   given you word descriptors of the shootings.   But

8   there's no way I could create for you, sir, an exhibit

9   that says, right here at this moment this officer fired

10  X number of rounds.   The fluidity and the time

11  compression is such that I can't do that.

12     Q.   You said their recollection of the events may

13  be distorted.   Do you recall saying that?

14     A.   Yes.

15     Q.   And would you agree that their recollection of

16  the events may be distorted in every aspect of this

17  shooting?

18     A.   No.   I don't think every aspect.   They're

19  pretty clear about seeing the gun, seeing the gun

20  pointed, seeing the gun coming out of the holster.

21  They're pretty clear about watching the subject

22  maneuver.   They're pretty clear about taking aimed shots

23  towards or at and sometimes through a car at the

24  subject.   And then when you get to the last round fired,

25  Catton seems very clear about this subject not being

1   totally down but propped and appearing to reach for the

2   gun.  He's very clear about saying, "Don't reach for the

3   gun" or "Don't go for the gun."  And that's the

4   causation for the last bit of firing.

5          But perceptions of peripheral issues where the

6   other officer was, which is a friendly element, is not

7   as important and it's not as focused as where the man

8   with the gun is.  So I expect some distortions about

9   where each officer was exactly, and I don't imagine --

10  and I know for certain, having interviewed Astacio, he

11  can tell you exactly where he was as he stepped off and

12  radiused right and how that relates to each round fired.

13  I'm not sure they're capable of giving you that

14  information.

15      Q.   So your testimony is going to be that in some

16  instances your opinion is that the officers' perceptions

17  were distorted and in other instances your opinion is

18  the officers' perceptions were accurate?

19      A.   No.  You're changing the theory completely.

20  The perception of peripheral issues, like exactly where

21  geometrically they're placed on a plot is unimportant to

22  the human that's involved in facing and combating a man

23  with a gun.  And we talked about this being, quote,

24  "tunnel vision."  We talk about it being focused

25  attention.  And the human body dismisses the periphery

# <u>EXHIBIT B</u>

Joe Callanan and Associates
Specialized Training Consultants
2900 N. Government Way - PMB 324
Coeur d'Alene, Idaho   83815

## Expert Declaration

1.00   My full name is Joseph John Callanan, Jr. and I was born in Los Angeles, CA. I am a retired law enforcement officer with full credentials. My professional experience includes local, State and Federal law enforcement activities while serving as a member of the LA County Sheriff's Department [1967-1989]. I presently remain active in the law enforcement field as a consultant, trainer and author. I maintain professional affiliations, subscriptions and teaching credentials.

2.00   Over the years, I have published many technical articles and assisted in the production of several training films, all concerning police practices and procedures. I have designed and delivered professional law enforcement training on several hundred of occasions and have been repeatedly designated as a "subject matter expert" by the CA Commission on Peace Officers Standards and Training, commonly referred to as the POST Commission.

3.00   I have gained considerable experience as a Court recognized expert witness throughout the United States and the Provinces of Australia and Canada. As a consultant and expert witness, my opinions have not always been favorable to the police position. I have given expert opinions and testimony supporting criminal prosecutions, administrative sanctions and civil liability concerning police personnel. My private consulting now exceeds thirty-five years and includes more than three thousand case evaluations; only a fraction of which have produced courtroom testimony. Records for calendar years 1991 to 2009 indicate that I have offered competent expert testimony on more than 616 occasions including 240 Deposition sessions, 355 Courtroom presentations, and 21 other venues.

4.00   I have been retained as a consultant and qualified expert in the matter known to me as:

CHRIS WILLIS vs. CITY OF FRESNO, *et al*
U. S District [Eastern] Court case number 1:09-CV-01766-LJO-DLB
[O/C date: 06/04/10]  [STC file: 10-041]  [Attorney James D. Weakley]

5.00   I have accepted the assignment to independently review and evaluate the circumstances and police procedures that give rise to the litigation at hand. As a consultant and expert witness, I clearly recognize that it is inappropriate for me to offer legal opinions or attempt to make factual determinations. However, professional law enforcement training and practice does rely on certain legal understandings and theories to such a degree that they often frame police responses and affect police decision-making. It is essential to recognize and distinguish the police standard of care from a proper legal determination, the latter being a higher standard.

1

6.00   As a consultant and expert witness, I am frequently presented with cases that contain obvious factual disputes or detectable fact pattern discrepancies. I clearly understand that it is not the proper role of the police practices expert to resolve or reconcile such issues or to attempt to validate any particular fact pattern. Observed factual disputes and discrepancies are often the innocent result of human perception and recall, particularly if the dynamic is highly unusual or stressful. In such cases, competent expert analysis may reveal a common fact pattern or a series of fact patterns. While the fact patterns may vary, it is important to note that the tasks and standards remain constant.

7.00   In the case at hand, I reviewed and considered the following documents, records, exhibits and informational sources:

7.01   ATTY LTR of Retention and RMR Transmittal dated 10/27/10 and 11/18/10

7.02   Fresno PD Policy Statement #300    USE OF FORCE                          [04/01/08]

7.03   Fresno PD Policy Statement #300    USE OF FORCE                          [12/01/07]

7.04   Fresno PD Policy Statement #304    SHOOTING POLICY                       [12/11/07]

7.05   Fresno PD Policy Statement #304    SHOOTING POLICY                       [04/01/08]

7.06   Fresno PD Policy Statement #308    FORCE OPTIONS                         [12/01/07]

7.07   Fresno PD Policy Statement #308    FORCE OPTIONS                         [12/01/07]

7.08   Fresno PD Policy Statement #310    OFFICER INVOLVED SHOOTING             [12/01/07]

7.09   Fresno PD Policy Statement #310    OFFICER INVOLVED SHOOTING             [02/27/09]

7.10   Fresno PD Policy Statement #310    OFFICER INVOLVED SHOOTING             [06/14/10]

7.11   Fresno PD Policy Statement #312    FIREARMS                             [12/01/07]

7.12   Fresno PD Policy Statement #312    FIREARMS                             [12/01/07]

7.13   Fresno PD Policy Statement #315    OFFICER RESPONSE TO CALLS            [12/01/07]

7.14   Fresno PD Policy Statement #315    OFFICER RESPONSE TO CALLS            [02/27/09]

7.15   Fresno PD Policy Statement #315    OFFICER RESPONSE TO CALLS            [10/16/09]

7.16   Fresno PD Policy Statement #321    FIELD CONTACTS                       [12/01/07]

7.17   Fresno PD Policy Statement #321    FIELD CONTACTS                       [12/01/07]

| 7.18 | Fresno PD Policy Statement #341 | PERFORMANCE STANDARDS | [not dated] |
| 7.19 | Fresno PD Policy Statement #400 | PATROL FUNCTION | [12/01/07] |
| 7.20 | Fresno PD Policy Statement #400 | PATROL FUNCTION | [12/01/07] |
| 7.21 | Fresno PD Policy Statement #448 | RADIO & MOBILE DATA SYSTEM USE | [12/01/07] |
| 7.22 | Fresno PD Policy Statement #448 | RADIO & MOBILE DATA SYSTEM USE | [02/27/09] |
| 7.23 | Fresno PD Policy Statement #448 | RADIO & MOBILE DATA SYSTEM USE | [09/11/09] |

7.24   USDC Complaint For Damages
and Demand For Jury Trial
- ~ wrongful death and civil rights
- ~ P's ... Chris & Mary Willis ... parents of deceased subject Stephen Willis
- ~ P's ... Jennafer Uribe ... described as "live in partner" and "cohabitant" re: deceased subject Stephen Willis ... reportedly present at officer involved shooting (OIS) incident
- ~ named FPD Officers Greg Catton and Daniel Asticio ... named FPD Chief of Police and un-named FPD officers (1 to 40)
- ~ incident occurred on or about 03/28/09 at the "Stoneybrook Apartment" complex located at Winery and Balch in the City of Fresno (CA) ... subject was parking his vehicle legally in front of his apartment ... witness Jennafer Uribe "emerged" from the vehicle and "ran to the front door" (toilet) ... subject Stephen Willis also "emerged" from the vehicle and "strolled to the trunk of his vehicle so that he could remove his belongings, including a **firearm** that was enclosed in a case, etc.
- ~ without warning or identifying themselves, Officers Greg Catton and Daniel Asticio (and Does 1 to 8) **"began shooting at Stephen Willis"** ... "shot him until he fell or dove to the ground" ... "and continued shooting until they had put 14 bullets into him" ... "including several in his back, out of at least 35 bullets fired at him" ... "and he was dead"

7.25   [D]'s   Officer Greg Catton's Response to [P]'s Special Interrogatories      [Set One]
- ~ attempted DUI vehicle stop
- ~ subject produced firearm
- ~ subject ignored verbal commands

7.26   [D]'s   Officer Daniel Astacio's Response to [P]'s Special Interrogatories      [Set One]
- ~ attempted DUI vehicle stop
- ~ subject produced firearm
- ~ subject ignored verbal commands

7.27   [D]'s   City of Fresno's Response to [P]'s Special Interrogatories      [Set One]

7.28   [D]'s   City of Fresno's Response to [P]'s Request For Production          [Set One]
     ~   large volume of police documents and witness statements
       ... 42 responses
     ~   transcribed interview of:    Ofc. Daniel Astacio
       => "I thought he was going to shoot me.  I thought he, I thought I was
       going to die.  At that point.  Because I didn't know what was going
       happen.  I've never had a gun pointed at me before.  And uh, I thought
       he was going to shoot me.  So, I mean fearing for my safety, also my
       partner, I, I shot at him.  And I engaged, I engaged him to make sure
       that he didn't kill me, and or my partner."          {p.12
     ~   transcribed interview of:    Ofc. Greg Catton
       => "I thought he was going to shoot us."          {p.7
     ~   transcribed interview of:    Ofc. Steve Taylor
     ~   transcribed interview of:    Ofc. Derek Jocobo
     ~   transcribed interview of:    Ofc. Jesus Cerda
     ~   transcribed interview of:    Sgt. Israel Reyes
     ~   transcribed interview of:    Christopher Zimmerman
       ... witness on patio
     ~   transcribed interview of:    Jennifer Uribe (sic)          [plaintiff]
       ... live in girl friend
     ~   FPD Event Report of:    #09-AL3429
       (03/28/09 at 00:16:43)    ... street disturbance ("Bulldogs")
       ... dispatch and OIS responses
     ~   collection of aerial photographs of apartment buildings
       ... Balch and Winery
     ~   Coroner's Reports of:    #09-03.278
       =>   subject:    STEPHEN ADAM WILLIS
       =>   GSW's    14 noted   (entry + re-entry)   [chart A-O]
       =>   COD    multiple GSW's   (homicide)
       =>   TOX    B/A at 0.29%   (ETOH)
                   THC positive   (marijuana)

7.29   Large Collection of Crime Scene Photographs          [bates 0156-0399]

7.30   FPD OIS Investigative Work Products          [case #09-24725]
     ~   incident occurred on SAT 03/28/09 at 00:16 hours
     ~   incident occurred at 4925 East Balch Avenue
     ~   subject's weapon described as 6-shot S&W revolver
       containing 5 live rounds and 1 spent casing
     ~   officer's duty weapons (2) described as FPD Beretta .40 caliber autoloaders
     ~   41 expended .40 caliber casings collected in crime scene
     ~   evidence log, charting, projectile impacts, etc.
     ~   crime scene, witnesses, involved officers, etc.
     ~   evidence, photographs, search warrant, etc.

7.31   Deposition Transcript dated 10/28/10 of:   CHRIS WILLIS          [plaintiff]
~       father of deceased subject
~       non-witness (OIS)
~       79 pages, no exhibits

7.32   Deposition Transcript dated 10/28/10 of:   MARY WILLIS          [plaintiff]
~       mother of deceased subject
~       non-witness (OIS)
~       43 pages, exhibit re: interrogatories

7.33   Deposition Transcript dated 11/04/10 of:   JENNAFER URIBE       [plaintiff]
~       live in girl friend of deceased subject
~       134 pages, multiple exhibits re: notes, interview and drawing
        => "We each had a few shots."                                    {p.77
        => "You've had a little too much to drink, so that's your limit."  {p.82
        => recalls speeding up at gate and "tires squealing"            {p.84

7.34   FPD Report attributed to Detective Villalvazo and bearing case number 09-24725
~       homicide investigator ... outlines call out to OIS and duty assignments
        ... recovery of subject's S&W revolver (5 live rounds and 1 spent casing)
        ... contact with subject's father and acknowledgment of subject being armed
        ... contact with subject's girl friend Jennafer Uribe (summarized statement)
        ... interview of on-scene police officers (including field supervisor)
        ... interview of Ofc. Astacio   (4 ½ years L/E experience)        <= shooter
        ... interview of Ofc. Catton    (1 ½ years L/E experience)        <= shooter
~       autopsy findings (GSW's) consistent with police account
        of subject's arms/hands extended forward during shooting          <= shooter
        ... toxicology findings indicate ETOH (positive) at 0.29 B/A
~       41 spent casings recovered from crime scene (.40 caliber)
~       uniform damage and bruising (Catton) ... lower left leg

7.35   FPD Report attributed to Detective Marcus Grey and bearing case number 09-24725
~       autopsy protocol (GSW's)
~       recovered projectiles (10)

7.36   FPD Report attributed to Detective C. Fern and bearing case number 09-24725
~       first responders and attending support personnel
~       crime scene description and involved vehicles
~       physical evidence and position of subject
~       firearms evidence and bullet impact damage

7.37   FPD Report attributed to Detective A. Rivera and bearing case number 09-24725
~       crime scene description and processing and search warrant protocol
~       recovered box of .38 ammunition from subject's apartment (less six rounds)
~       additional firearms recovered and MJ plants seized (search warrant)

5

7.38   Collection of FPD Supplemental Reports                    {case number 09-24725
　　　　~      Villalvazo          re:     witnesses
　　　　~      Iriye              re:     photographs
　　　　~      Pap                re:     witnesses interviewed
　　　　~      Hernandez          re:     response to OIS scene
　　　　~      Wilson             re:     photographs
　　　　~      Wilson             re:     fingerprints & evidence
　　　　~      Salinas-Barba      re:     response to OIS scene
　　　　~      Turner             re:     response to OIS scene
　　　　~      Overstreet         re:     witness interviewed
　　　　~      Diaz               re:     witness interviewed
　　　　~      Mendoza            re:     crime scene log
　　　　~      Jouroyan           re:     contact with Jennafer Uribe
　　　　~      Kim                re:     crime scene log
　　　　~      Desoto-Cooper      re:     autopsy photographs
　　　　~      Barbery            re:     crime scene evidence (placards)
　　　　~      Barbery            re:     crime scene evidence (photographs)
　　　　                                  and involved vehicles
　　　　~      Ens                re:     aerial photographs

7.39   Collection of FPD Forensic Reports                       {case number 09-24725
　　　　~      crime scene measurements and drawings with evidence legends
　　　　~      physical evidence collected and analyzed
　　　　~      firearms evidence collected and charted

7.40   FPD Vehicle Impounded Report                             {case number 09-24725
　　　　~      Infinity G20        (1996)      (black)
　　　　~      Plymouth Voyager    (1996)      (blue)

7.41   CA DOJ Forensic Services Report - Firearms Evidence Analysis
　　　　~      14 spent casings attributed to:     Ofc. Astacio    Beretta    (BER334712)
　　　　~      24 spent casings attributed to:     Ofc. Catton     Beretta    (BER334710)

7.42   Search Warrant Documents re:            4925 E. Balch Avenue      (Apt. #103)

7.43   Deposition Transcript dated 11/16/10 of:    OFC. JESUS CERDA
　　　　~      72 pages, no attachments
　　　　~      assisting unit, heard SHOTS FIRED, did not fire

7.44   Deposition Transcript dated 11/16/10 of:    OFC. GREGORY CATTON
　　　　~      121 pages, no attachments          ... shooter

7.45   Deposition Transcript dated 11/16/10 of:    OFC. DANIEL ASTACIO
　　　　~      105 pages, no attachments          ... shooter

6

7.46    Deposition Transcript dated 11/16/10 of:    C/S TECH. SPRING LANGSTON
        ~       71 pages, no attachments
        ~       crime scene processing

7.47    Deposition Transcript dated 11/16/10 of:    SGT. ISRAEL REYES
        ~       76 pages, no attachments
        ~       observed vehicle enter Stoney Brook Apartment compound
        ~       responded to sound of SHOTS FIRED                               {p.30
                                                                                {p.32

7.48    Deposition Transcript dated 11/16/10 of:    DET. RAY VILLLALVAZO
        ~       133 pages, no attachments
        ~       OIS investigation

7.49    Deposition Transcript dated 11/18/10 of:    OFC. DERECK JACOBO
        ~       91 pages, no attachments
        ~       heard sergeant broadcast re: hit & run T/C
        ~       heard "several" SHOTS FIRED                                     {p.33
                                                                                {p.34

7.50    DVD Exhibits:         Deposition of:         DET. RAY VILLLALVAZO
                              (2 disks)

7.51    DVD Exhibits:         Deposition of:         OFC. DANIEL ASTACIO
                              (2 disks)

7.52    DVD Exhibits:         Deposition of:         OFC. GREGORY CATTON
                              (2 disks)

7.53    ATTY LTRS of additional RMR Transmittal dated 01/28/11 and 01/31/11

7.54    Deposition Transcript dated 01/11/11 of:    SGT. CURTIS CHASTAIN
        ~       73 pages, scene drawing attached
        ~       call out and OIS investigation

7.55    Deposition Transcript dated 01/11/11 of:    OFC. GREG JOUROYAN
        ~       63 pages, report and drawing attached
        ~       responded to call for assistance re: OIS

7.56    Deposition Transcript dated 01/11/11 of:    OFC. STEVE TAYLOR
        ~       74 pages, interview and drawing attached
        ~       recalls responding to possible gang related disturbance         {22

7.57    Deposition (rough) Transcript of:            DR. VENU GOPAL
        ~       Fresno County Coroner
        ~       post-mortem GSW analysis             ... subject's right hand extended

7.58   DVD Exhibit #1 - Deposition of:        DR. VENU GOPAL

7.59   DVD Exhibit #2 - Deposition of:        DR. VENU GOPAL

7.60   DVD Exhibit #3 - Deposition of:        DR. VENU GOPAL

7.61   DVD Exhibit #4 - Deposition of:        DR. VENU GOPAL

7.58   CD Exhibit - Collection of Photographs            <= PROTECTIVE ORDER
    ~    uniformed FPD officers
    ~    crime scene and vehicles
    ~    subject at scene and at autopsy
    ~    .38 S&W, holster, firearms evidence

7.59   Stipulation and Protective Order                <= PROTECTIVE ORDER
    ~    FPD Orders and Policies
    ~    Recordings of 911 Dispatch
    ~    Photographs of Subject

7.60   ATTY LTR of additional RMR Transmittal dated 02/09/11

7.61   ATTY LTR of additional RMR Transmittal dated 03/04/11

7.62   Deposition Transcript dated 01/27/11 of:   CHRIS ZIMMERMAN
    ~    127 pages, exhibits attached
    ~    R/P on 911 Emergency Call
    ~    civilian witness on patio #105

7.63   Deposition Transcript dated 01/27/11 of:   KUE XIONG
    ~    82 pages, exhibit attached
    ~    security guard on property

7.64   Deposition Testimony dated 01/27/11 of:   DEBBIE DER TOROSIAN
    ~    53 pages, no exhibits
    ~    property manager

7.65   Training History of:        DETECTIVE VILLALVAZO        {1992-2010

7.66   Training History of:        DETECTIVE GRAY             {1991-2010

7.67   Training History of:        OFFICER GREG CATTON        {1.5 yrs L/E

7.68   Training History of:        OFFICER DAN ASTACIO        {4.5 yrs L/E

| | | | | |
|---|---|---|---|---|
| 7.69 | Tactical Debriefing | | | {03/24/11 |
| | ~ | involved<br>officers: | CATTON<br>ASTACIO | |
| | ~ | attorney: | Mr. Weakley | |
| 7.70 | Site Survey | | | {03/24/11 |
| | ~ | involved<br>officers: | CATTON<br>ASTACIO | |
| | ~ | attorney: | Mr. Weakley | |
| 7.71 | Pathological Report | DI MAIO, MD | | {03/23/11 |
| | ~ | GSW analysis | | |
| | ~ | toxicology | | |
| | ~ | animation | | |
| 7.72 | Deposition Transcript (rough) of: | | NANCY MC COMBS | {03/23/11 |
| | ~ | CA DOJ firearms examiner | | |

---

## Continued Case Review

It is understood that a continued litigation discovery processes may produce additional information concerning the police procedures and/or fact patterns that give rise to the case at hand. Therefore, I reserve the right to review any such additional information as it becomes available and consequently revise or amend the expert opinions expressed in this initial declaration.

---

## 8.00   COMPLAINT PARAMETERS

The plaintiffs' formal complaint contends that subject Stephen Willis was unaware that he was being pursued by Fresno City police officers at or about the time that he "lawfully" parked his vehicle and "strolled to the trunk of his vehicle." Such a representation seems more crafted than accurate. The available case readings[1] certainly indicate that subject Willis was intoxicated[2] and was driving in a rushed and reckless manner as he attempted to rapidly enter a security gate and deliver his nauseous girl friend to their apartment so that she might vomit. The sounds of his vehicle being recklessly driven appear substantiated in the police accounts, witness statements and even the sworn testimony of plaintiff Uribe.

The case readings clearly indicate that the sights and sounds of the recklessly driven vehicle alerted a police supervisor[3] and other police officers that were gathered nearby and engaged in a street gang related disturbance investigation. At the direction of the field supervisor, and as consistent with expected police procedures, some of the police officers deployed to investigate a possible "hit and run" event with some expectation that an intoxicated driver (DUI) was involved. This fact presentation seems indisputable and fails to establish that the responding police officers were somehow engaged in a pursuit that was "unbeknownst" to subject Willis.

Note: *Nothing presented in the case readings offers any insight or evidence of what subject Willis knew or did not know in the moments leading up to the on-foot approach of the two uniformed police officers.*[4]

The plaintiffs' formal complaint contends that subject Willis "lawfully" parked his vehicle and that he "strolled to the trunk of his vehicle." If one accepts the statements and testimony of plaintiff Uribe, particularly in light of the subsequent 0.29% B/A toxicological findings, it is simply incredible to accept the notion that such an impaired driver was operating the motor vehicle in a lawful or safe manner.

If one accepts the notion that subject Willis moved from the driver's seat position to the trunk of his vehicle and there withdrew a holstered revolver, it is rather disingenuous to suggest that such a dynamic was simply a "stroll" on the part of the subject, especially when viewed from the perspective of a professionally trained and experienced law enforcement officer.

The plaintiffs' assertion that the displayed handgun was "enclosed in a case" also appears misrepresentative of the actual holster involved while at the same time masking the notion that subject Willis withdrew the handgun from the holster and displayed it in a life-threatening manner in the immediate presence of the uniformed police officers and did so while reportedly ignoring a series of verbal commands instructing the subject to DROP THE GUN.

---

[1] police accounts, witness statements, testimony of [P] Jennafer Uribe, post-mortem toxicology, etc.
[2] positive findings of marijuana residuals and 0.29% blood-alcohol, etc.
[3] Sergeant Reyes
[4] Officer Catton and Officer Astacio

*continued . . .*

The imperfections noted above may or may not stem from earnest advocacy. The absence of supporting factual references might be the expected consequence of a highly unusual event that occurred in the nighttime darkness. Plaintiffs Chris and Mary Willis[5] were not present at the scene and plaintiff Jennafer Uribe[6] was admittedly distracted and peripherally positioned when the violent encounter took place. Hence, there is no real information presented to establish or support the plaintiffs' expressed contentions. Within the totality of the available case readings, it is clear that the police approach to and encounter with subject Willis took place in a darkened parking lot at nighttime and under circumstances that were *tense, uncertain, and rapidly evolving.*[7]

9.00   COMMON FACT PATTERN OBSERVED

Within the available case readings, a common fact pattern is apparent.. It seems undisputed that subject Willis and his girl friend (Uribe) had consumed a measurable amount of alcohol in the hours preceding the police response. This observation is based on the sworn deposition testimony of plaintiff Uribe and the post-mortem toxicological findings concerning the subject's body fluids.[8]

Police records, reports, post-incident statements and sworn deposition testimony indicates that Sgt. Reyes and Officers Astacio, Taylor, Catton and Jacobo were on-duty Fresno City Police Officers in the early morning hours of 03/29/09 and were then engaged in a street gang related disturbance investigation that was separate and distinct from any previous activity attributed to subject Willis or plaintiff Uribe.

The police account describes a loud and reckless operation of a motor vehicle driven by subject Willis with plaintiff Uribe as a passenger. Non-police witnesses, including the statements and testimony attributed to plaintiff Uribe, seemingly support this fact pattern.

The sights and sounds of the recklessly operated vehicle reportedly drew the attention of the police officers, some of which approached the vehicle in the parking lot area of the "Stoney Brook" apartment complex. The stated reason for the police response was to investigate a possible "hit and run" vehicle collision and with the expectation that the involved driver was impaired (DUI).

Note: *While then only a reasonable suspicion, the rationale of the responding officers was subsequently validated by the statements and testimony of plaintiff Uribe as well as the post-mortem toxicological findings.*

---

[5] Plaintiffs Chris and Mary Willis are identified as the parents of the deceased subject.
[6] Plaintiff Jennafer Uribe is identified as the cohabitating girl friend of the deceased subject.
[7] Graham vs. Connor (1989)
[8] positive findings of marijuana residuals and 0.29% blood-alcohol, etc.

continued . . .

Within the available case readings, it seems undisputed that plaintiff Uribe emerged from the passenger side of the parked vehicle and moved directly towards the apartment building. By her own statements and deposition testimony, plaintiff Uribe acknowledges that her movements were driven by the urgency to vomit after consuming a measurable amount of alcohol over the course of several hours. At some point prior to entering her apartment, plaintiff Uribe observed the approach of two police officers on foot in the vicinity of the parked vehicles.

By most accounts, it seems undisputed that Officer Catton and Officer Astacio entered the apartment complex on foot to investigate the recklessly driven vehicle based on their belief that the vehicle had possibly collided with a fence or gate structure and then continued on without stopping. The responding officers also considered that the recklessly driven vehicle was being operated by an impaired driver (DUI). The officers located the suspicious vehicle parked in front of 4925 E. Balch Avenue. The officers then observed subject Willis on foot at the trunk area of the suspicious vehicle. Of great importance, the officers reportedly observed subject Willis to be carrying a holstered GUN in his left hand. As expected, the officers drew their .40 caliber duty weapons, illuminated subject Willis with a flashlight and issued a series of loud verbal commands instructing subject Willis to DROP THE GUN.

Note: *Police accounts and witness statements seemingly support the notion that verbal commands were issued, although the sequence and content of the verbal commands is uncertain.*

## 10.00  APPARENT DISPUTE OF FACTS

The plaintiffs' account of the actual shooting incident appears to be inconsistent with the police reports and investigative work products. As expressed earlier in this Declaration, such factual disputes cannot be resolved by a police practices expert. Furthermore, the complexity of the described shooting incident might confound even expert analysis. It is certain that the two primary police officers fired multiple handgun rounds from various positions while either barricaded or while maneuvering. In total, the officers discharged 41 rounds of .40 caliber ammunition from their Department issued Beretta duty weapons. This assessment is based on part on the fact that 41 spent casings now attributed to the police weapons were recovered in the shooting scene and were scientifically analyzed at the CA Department of Justice Forensic Services Laboratory independent of the Fresno Police Department.

Note: *The CA DOJ findings established that at least 14 of the spent casings were attributed to Officer Astacio's firearm and at least 24 of the spent casings were attributed to Officer Catton's firearm. The remaining 3 spent casings did not provide sufficient evidence to scientifically identify the originating Beretta.*

continued . . .

> *The shooting environment and the assembled vehicles sustained multiple projectile impacts, some penetrating and some deflected. The ammunition used by the officers was of a modern "controlled expansion" type (jacketed) known to minimize ricochets and "over-penetration." The charted and photographed shooting environment offered many opportunities for projectile fragmentation and non-bullet (shards) defects. The described continuous maneuvers of the officers and subject Willis complicate any single "position of fire" or "target acquisition" assessment. In short, the entirety of the encounter was both fluid and dynamic.*
>
> *At some point, a .38 caliber S&W revolver was recovered in the shooting environment and attributed to subject Willis. Matching .38 caliber ammunition was later discovered in the subject's apartment pursuant to a post-incident search warrant. (ref: ammo box short six rounds) Of interest, the subject's revolver was fully loaded with six rounds of ammunition, 1 round spent and 5 rounds live. Statements attributed to the involved police officers and the reported condition of the subject's revolver strongly suggest that the revolver was fired during the encounter. Statements attributed to the involved police officers and a defect to the uniform trousers of Officer Catton might further suggest that subject Willis engaged the officer(s) in a firefight. More interestingly, a projectile strike caused a defect in a lower body panel of police vehicle that was just arriving on scene. This particular defect can be reasonable associated with the subject's east-to-west field of fire while attempting to shoot Officer Catton.*

Ultimately, subject Willis sustained multiple gunshot wounds (GSW's) and died at the scene. The post-mortem autopsy examination identified a total of 14 described and charted GSW's, some presenting as ENTRY wounds, some presenting as EXIT wounds, and some presenting as RE-ENTRY wounds, and one presenting as non-penetrating GRAZING wounds.[9] Within the totality of the available case readings, it is clear that the armed encounter with subject Willis and the resulting firefight took place in circumstances that were **tense, uncertain, and rapidly evolving.**

## 11.00  COMBAT ANALYSIS

Properly trained law enforcement officers appreciate the dangers of their chosen profession. The case at hand clearly illustrates the non-predictability of an officer involved shooting (OIS) event. Officers Catton and Astacio reportedly "cleared" from a prior assignment and walked into a apartment complex to investigate a traffic enforcement matter that was essentially a "routine" and non-threatening duty. To their surprise, the officers came upon an ARMED subject in a darkened parking lot positioned in and amongst parked vehicles. Hence, the tactical element of surprise rested with subject Willis. The information previously available to the two officers did not foretell the HIGH RISKS yet to be observed.

---

[9]  Autopsy by Dr. Gopal (RMR 7.57 to 7.61) and Pathology Review by Dr. Di Maio (RMR 7.71)

continued . . .

During their initial approach, the two officers walked together in the middle ground of the parking lot traveling eastbound. The ambient lighting was sparse and irregular being generally attributed to low light fixtures on the buildings and some of the parking structures. The subject was positioned some distance to the east, seemingly more that 100 feet from the patio at apartment #105 (ref: civilian witness Zimmerman). The subject was moving about and among parked vehicles on the north side of the parking lot (ref: 4925 E. Balch) as the officers moved eastbound searching for a suspected intoxicated driver. The officer's approach was deliberate, straight and non-tactical. The irregular lighting conditions and clusters of multiple parked vehicles complicated the environment as did two concrete block trash dumpster stations. From a tactical perspective, the subject's position was somewhat concealed from the officers' view and their approach left the two officers rather exposed.[10]

Reportedly, neither officer had a GUN out and at the ready as they moved eastbound searching for a suspected intoxicated driver. Officer Catton deployed a handheld flashlight intermittently and ultimately illuminated the subject standing at the rear of his parked vehicle. The trunk of the vehicle was then open. Both officers observed subject Willis to be holding a leather holster close to his body. Both officers observed the holster to contain a large frame handgun that appeared to be a revolver. Both officers observed subject Willis use his RIGHT HAND to draw the revolver out of the holster and bring the weapon forward of his body in a SHOOTING position. In spite of their slightly varied positions, both officers concluded that subject Willis was moving to SHOOT.[11]

Note: *Of particular interest, Officer Catton maintained a visual perception that the subject's gun was incredibly oversized and a physical perception of a very slow reaction to a life-threatening event. Officer Astacio also maintained a vivid recall of the subject's gun as being a large revolver and not a more modern autoloader.[12]*

Reportedly, Officers Catton and Astacio responded rapidly to the discovery of subject Willis outside of his vehicle and initially holding the holstered GUN in his left hand. As trained, the two officers attempted to re-position for COVER while simultaneously drawing and presenting their service weapons. Reportedly, the officers issued verbal commands instructing the subject to DROP THE GUN.

Note: *By all accounts, subject Willis was positioned at the rear of his parked vehicle and to the north of the two police officers. Officer Astacio was slightly east of Officer Catton, meaning that the three men stood in a triangular formation and at rather close range prior to any gunfire occurring. As measured, each parking place was 9 feet in width.[13]*

---

[10] ref: attached exhibit "Scene Drawing Marked: #1"
[11] ref: attached exhibit "Scene Drawing Marked: #2"
[12] ref: tactical debriefing conducted on 03/24/11
[13] ref: site survey conducted on 03/24/11

*continued...*

For whatever reason, subject Willis was unwilling or unable to comply with the verbal commands repeatedly issued by the officers. Instead of disarming as instructed, the subject reportedly reached with his right hand and removed the large frame revolver from the leather holster then still held in his left hand. Reportedly, the officers then observed subject Willis also maneuver while bringing the un-holstered GUN up into a position of targeting on the officers.

In response, Officer Astacio moved to his right as trained (eastbound) and closer to the adjacent parked vehicles (northbound), again as trained. Officer Astacio's maneuver was generally a right-forward radius resulting in his gaining some COVER. Officer Catton's maneuver was more direct as he moved closer (northbound) to the parked vehicles while immediately facing the ARMED AGGRESSOR.

Note: *The dynamic was highly fluid with all three participants rapidly re-positioning to the point that the previous triangular formation evolved into a more-linier arrangement with Officer Catton to the west, subject Willis in the center, and Officer Astacio to the east. The timing of the dynamic cannot be determined with any certainty other than to note that such events occur in remarkably compressed time frames that are expressed in fractions of a second.*

Note: *The observed dynamic does present a very significant point of analysis. Subject Willis was seen to fire his revolver westbound at Officer Catton while both men were still on the south side of the parked vehicles in the early stage of the combat. When recovered, the subject's revolver contained ONE SPENT CASING (out of order) consistent with the single shot being fired. Officer Catton was not struck by the projectile in spite of the close quarters and the subject's tactical advantage. However, an arriving patrol car to the west of the combat sustained a projectile strike on a lower body panel. Given the totality of the information presently available and analyzed within the confines of the physical environment, it appears very likely that the single shot fired by subject Willis in a westerly direction struck the arriving patrol car.*

Note: *The subject's inability to discharge additional rounds during the course of the combat is also a significant point of analysis, particularly in light of the ONE SPENT CASING being found out of order relative to the revolver's mechanical design and expected cylinder rotation. It is now known that the subject was intoxicated at the time and that he sustained a potentially incapacitating gunshot wound ("H") to his right forearm. It is likely that the revolver was maladjusted (double action) or mishandled by the subject as a consequence of his intoxication, strong-arm injury (GSW), substandard firearms training, or some combination of these identifiable factors. The subject's inability to discharge additional rounds was not perceived by the involved officers, both of which reacted to the totality of sights and sounds of continued discharges in the belief that the subject remained an active shooter.*

15

## 12.00  DEADLY FORCE DECISIONS

Officers Catton and Astacio simultaneously observed and reacted to the subject's drawing of the large revolver from the holster with his right hand.  Both officers reached the very same conclusion that the subject represented an immediate and extreme threat.  Both officers quickly drew their .40 caliber duty weapons while attempting to maneuver and while issuing a series of verbal commands instructing the subject to DROP THE GUN.

Officer Catton was to the west of the subject and was initially illuminating the subject with a handheld flashlight while yelling for the subject to DROP THE GUN.

Note:  *The subject's failure or inability to comply cannot be determined with any degree of certainty.  His described actions might have represented an intentional assault on the police officers or something less, such as an intoxicated miscalculation in which the subject intended to merely intimidate, perhaps even thinking that the two police officers were unarmed security guards commonly assigned to the property.  Regardless of the subject's underlying motivation, professional law enforcement officers are specifically trained and tested to recognize, assess and respond to the aggressor's CONDUCT and not the aggressor's underlying intent, degree of intoxication, psycho-psychiatric state or any other immeasurable factor.*

Note:  *Seemingly, subject Willis selected Officer Catton as the primary target opportunity and this selection may have been simply influenced by that officer's prior use of a handheld flashlight.  Another factor possibly influencing the subject's target selection was the rapid re-positioning of Officer Astacio flanking to the right and towards COVER.*

Officer Astacio was standing point on to the subject on a north-south axis.  From this position, Officer Astacio clearly observed the subject draw the revolver from the holster and begin to bring the revolver to a combat shooting position in complete disregard for the ongoing verbal commands.  Concerned for his safety and that of his partner, Officer Astacio quickly drew his duty weapon and initiated a "rapid fire" counter-measure while simultaneously performing a tactical re-positioning maneuver.

Note:  *Officer Astacio's described handgun draw, multiple-round discharge and movement to his right are recognized practical police procedures that are predicated on lessons learned over many years concerning actual law enforcement encounters with ARMED VIOLENT RESISTORS.*

Officer Astacio was aware that Officer Catton was to the west, or LEFT of Officer Astacio.  At the same time, Officer Catton was aware that Officer Astacio was to the east, or to the RIGHT of Officer Catton.  Again, the initial positioning of the three men was triangular.

Officer Catton clearly observed subject Willis draw the revolver from the holster and begin to bring the revolver to a combat shooting position in complete disregard for the ongoing verbal commands.  Concerned for his safety and that of his partner, Officer Catton quickly drew his duty weapon and initiated a "rapid fire" counter-measure.

16

*continued* . . .

Upon careful review, it is abundantly clear that **each officer independently viewed and assessed the subject's conduct and that each officer independently concluded that the subject was ARMED and NON-COMPLIANT and ASSAULTIVE.** This was a critical life or death decision point for all three of the participants. Subject Willis then had the option to comply with the DROP THE GUN commands and thereby avoid the expected consequences. In stark contrast, **Officers Catton and Astacio were without any viable alternatives other than deploy DEADLY FORCE as they were trained.**

13.00   DEADLY FORCE ENCOUNTER - ASTACIO

It is abundantly clear that subject Willis presented himself as ARMED and DANGEROUS in the immediate presence of two uniformed police officers. His body movements convinced the two officers that he was drawing and pointing a large revolver at the officers. This conviction was validated when the subject actually FIRED the revolver in a westbound direction towards Officer Catton.

Within the same compressed time frame, Officers Catton and Astacio initiated a "rapid fire" technique calculated to STOP subject Willis' apparent deadly assault. Each officer made independent judgments predicated on SELF-DEFENSE and PARTNER DEFENSE. Thus began a series of shootings and maneuvers that eventually resulted in the death of subject Willis.

With regards to Officer Astacio, it seems likely that he FIRED immediately before Officer Catton FIRED. This observation is based on Officer Catton's perception of a "muzzle flash" (bright light) occurring to his right where Officer Astacio had been standing. This observation is also based on Officer Astacio's expressed positioning, maneuvering and perceptions. That Officer Astacio FIRED first is not necessarily relevant in terms of applying the *objectively reasonable* standard of care, particularly in light of the apparent compressed time element and the limits of human performance during a "peak stress" event. That said, Officer Astacio wisely maneuvered to his right and sought the limited COVER of a parked vehicle while still attempting to track the subject's movements within the darkened cluster of parked vehicles.

Officer Astacio FIRED multiple rounds at subject Willis while the subject was in view and appeared to be moving northbound from the rear to the front of the parked vehicles. Officer Astacio also moved northbound in an attempt to monitor the subject's re-positioning. In the chaos of the combat, Officer Astacio was unable to continuously monitor Officer Catton's positions while focusing on the subject's re-positioning. Ultimately, Officer Astacio's position was immediately east of subject Willis at a distance less than 20 feet. Officer Astacio relocated and re-engaged the subject on the north plane of the parked vehicles. The officer FIRED multiple rounds in a westerly direction towards the subject while observing muzzle flashes thought to be hostile fire by subject Willis.

17

*continued . . .*

Note: *While in a position east of subject Willis and at the north plane of the parked vehicles, Officer Astacio was aware that gunfire was still underway and considered that subject Willis remained an active shooter.  Officer Astacio FIRED multiple rounds in a westerly direction hoping to STOP the subject's apparent deadly assault on Officer Catton.*

Note: *At one moment in the combat, Officer Astacio heard a sound made by Officer Catton that caused Officer Astacio to consider that subject Willis had shot Officer Catton.  At some point later in the combat, Officer Astacio was able to radio for assistance.*

## 14.00  DEADLY FORCE ENCOUNTER - CATTON

It is abundantly clear that subject Willis presented himself as ARMED and DANGEROUS in the immediate presence of two uniformed police officers. His body movements convinced the two officers that he was drawing and pointing a large revolver at the officers. This conviction was validated when the subject actually FIRED the revolver in a westbound direction towards Officer Catton.

Within the same compressed time frame, Officers Catton and Astacio initiated a "rapid fire" technique calculated to STOP subject Willis' apparent deadly assault. Each officer made independent judgments predicated on SELF-DEFENSE and PARTNER DEFENSE. Thus began a series of shootings and maneuvers that eventually resulted in the death of subject Willis. Whereas Officer Astacio moved rapidly to the east of the subject, Officer Catton moved somewhat to the west.

With regards to Officer Catton, it seems likely that he FIRED multiple rounds at subject Willis immediately after, if not simultaneously, to Officer Astacio's initial discharges. In the early stages, Officer Catton was face to face with subject Willis and engaged in a mortal handgun confrontation.. At one point, Officer Catton observed subject Willis FIRE directly at him.

Note: *It is very likely that the single round successfully fired by subject Willis traveled in a westbound direction, missing its intended target (Catton), passing south of the concrete trash bin structure and continuing westbound until it struck an arriving police vehicle. Thereafter, it appears that subject Willis experienced a weapons malfunction (revolver) or an incapacitating injury to his shooting arm or some combination of both conditions.*

At some point, subject Willis moved northbound from the rear of the parked vehicles and towards the apartment buildings and open yard areas. His northbound transition was semi-concealed by virtue of his lowered body position, his swift movement and his being channeled between the parked vehicles. Consequently, neither of the two police officers was able to maintain a clear and constant visual on the subject.

18

*continued . . .*

Note: *The subject moved northbound swiftly between the parked cars. An open grassy field lay directly ahead of the subject affording him an unfettered escape route with multiple positions of COVER and CONCEALMENT. For whatever reason, subject Willis* **did not avail himself of this obvious escape route,** *but rather elected to stop his movement at the front of the parked vehicles. He was then seen in a lowered body position using the parked vehicles for COVER and CONCEALMENT. Subject Willis then appeared and withdrew and reappeared in a series of body movements indicating that he was attempting to target and engage the police officers. In tactical terms, the subject's described FLIGHT evolved into FIGHT.*

With regards to Officer Catton, he withstood the direct face-to-face GUN confrontation and was miraculously not struck by the subject's close-quarters gunfire. Officer Catton returned fire towards the subject's initial position and continued to fire at the subject as the subject moved northbound between the cluster of parked vehicles. Officer Catton deliberately placed multiple shots through a parked van vehicle in a south to north pattern following the subject's movements. At some point, Officer Catton lost visual contact with the subject and feared that the subject would suddenly reappear among the vehicles and re-engage with gunfire.

Officer Catton believed that he fired 2 to 3 rounds at the subject during the initial encounter and then fired possibly 6 to 7 rounds at the subject then running northbound between the parked vehicles. As trained, Officer Catton continued to move in an attempt to gain some COVER and maintain visual contact of the subject. At some point, Officer Catton relocated subject Willis in a semi-concealed position on the north plane of the parked vehicles. Officer Catton observed the subject's body movements and thought that the subject was targeting and positioning to shoot. Officer Catton FIRED multiple rounds in an easterly direction in an effort to STOP the subject's deadly assault.

In the chaos, Officer Catton had the presence of mind to perform a "tactical reload" of his duty weapon as trained. Fearing that the subject knew the officer's position and possibly might suddenly re-appear and re-engage in gunfire, Officer Catton moved south and eastbound traversing several parking spaces until he located Officer Astacio. The two officers joined and Officer Catton assumed a defensive point position permitting Officer Astacio to then radio for immediate assistance.

Officer Catton moved northbound between the parked vehicles and positioned himself defensively with a view to the west. Officer Canton detected the subject's presence low to the ground and partially protected by one of the parked vehicles. Officer Canton watched the subject's animation and concluded that the subject was attempting to locate and target the police officers. Officer Catton again FIRED at subject Willis. As described, the subject was down low to the ground with his back towards Officer Catton. The subject was seen to be animated and moving his body as if to retrieve the large framed revolver lying nearby. Officer Catton feared that the subject was attempting to re-arm and re-engage. Officer Catton then directed FIRE at the subject to prevent any further assault. These were the last shots FIRED by the police officers.

19

## 15.00  DEADLY FORCE ENCOUNTER - PHASE ANALYSIS

Upon review, there appears to be **six distinct** shooting events (or phases) attributable to the involved police officers, to wit:

①     ASTACIO ... fired in response to the subject's drawing, presenting and refusal to comply with verbal commands to DROP THE GUN. This shooting event began from a standing stationary open position and may have continued as the officer maneuvered to his right side to seek cover. This shooting event involved 3 to 5 shots initially FIRED at the subject.

②     CATTON ... fired in response to the subject's drawing, presenting and refusal to comply with verbal commands to DROP THE GUN. This shooting event began from a standing stationary open position and may have continued as the officer moved towards and between the parked vehicles. This shooting event possibly involved 2 to 3 rounds initially FIRED at the subject.

③     CATTON ... fired multiple rounds while attempting to track the subject's movement northbound between the parked vehicles. Some of these rounds were placed through a parked van and others were delivered across the hood of a parked car. This shooting event possibly involved 6 to 7 rounds FIRED at the subject followed by a rapid tactical reload and a re-positioning.

④     ASTACIO ... fired multiple rounds from east to west while positioned at or near the north plane of the parked vehicles. At the time, the officer heard and saw continued gun discharges emanating to his west and thought that subject Willis was actively engaged and shooting at Officer Catton.

⑤     CATTON ... after rejoining Officer Astacio between the parked vehicle east of the subject's position, Officer Catton moved closer to the north plane of the parked vehicles and re-established visual contact with the subject. Officer Catton then observed the body movements of the subject and concluded that the subject was still attempting to locate and target the police officers. Officer Catton FIRED multiple rounds in a westerly direction at the still animated subject.

⑥     CATTON ... fired multiple rounds from east to west from a fixed barricaded position on north plane of the parked vehicles and towards the low-lying, still animated subject as the subject rolled westbound appearing to retrieve the large revolver lying nearby.

Note:    *In total, 41 police rounds were fired during the violent encounter. Analysis of the spent casing found in the crime scen established that Officer Catton fired at least 24 rounds and Officer Astacio fired at least 14 rounds. The post-shooting locations of the spent casings were varied, consistent with the officers' individual maneuvers. Subject Willis apparently fired a single shot from his .38 caliber six-shot revolver.*

16.00   ATTACHED CHARTS

For purposes of clarity, three selected crime scene drawings are marked in sequential order and attached to this expert declaration (R26 RPT), to wit:

①     MARKED #1        depicting officer's approach and subject's positioning

②     MARKED #2        depicting initial shooting positions

③     MARKED #3        depicting final shooting positions

S = subject Willis
C = Officer Catton
A = Officer Astacio

17.00   ESCALATION OF FORCE

Within the case readings, it seems indisputable that subject Willis was ARMED with a large frame revolver and that he was significantly intoxicated (0.29% B/A) at the time when Officers Catton and Astacio approached him. There is no information to refute the officers' account that subject Willis withdrew the revolver from the holster, moved the revolver into a shooting position, and even discharged the revolver at least once in the direction of Officer Catton. Upon review, there are facts and evidence supporting the officers' account including the impact damage to the approaching radio car, the spent casing found in the revolver, the matching box of ammunition recovered from the apartment and the location of the revolver and holster after the shooting had concluded.

Accepting the above information as being accurate, it is seemingly clear that subject Willis presented a DEADLY FORCE scenario regardless of his motivation or comprehension. When viewed through the perspective of a professionally trained and well-seasoned law enforcement officer, the subject's display of the revolver, his failure to heed multiple verbal commands and his observed ASSAULTIVE BEHAVIOR dictated a rapid DEFENSIVE USE OF DEADLY FORCE. **Upon review, the involved officers were completely without viable alternatives.**

As to the seriousness of the level and the amount of force deployed by Officers Catton and Astacio, it was subject Willis' selection of weaponry and steadfast recalcitrance that dictated both the initial and the continued police application of DEADLY FORCE. Both officers possessed sufficient training and field experience to permit a SAFE apprehension of such a subject, but only if the subject to be detained projects COMPLIANT BEHAVIOR and surrenders as is required by State law. Any display of NON-COMPLIANT BEHAVIOR or ASSAULTIVE BEHAVIOR on the part of such a subject will necessarily increase the risks of injury or death to the participants. The escalation of force observed in the case at hand was driven by the subject and the police response was the expected consequence regardless of the agency or the jurisdiction.

21

18.00   USE OF FORCE STANDARDS

Regardless of their agency or jurisdiction, professionally trained law enforcement officers understand that the use of force or deadly force is limited to certain specific police duties. The so-called "rules of engagement" are well-settled and practical concepts that clearly identify the following five conditions under which the police use of force may be appropriate:

① self defense                        [Right]
② defense of others                   [Duty]
③ effect an arrest or detention       [special authority]
④ prevent an escape                   [special authority]
⑤ overcome resistance                 [special authority]

In police terms, the so-called "rules of engagement" incorporate an advanced evolution of legal authorities, scholarly research, practical field experience, accepted police policies, and highly defined Constitutional guidelines. Regardless of their agency or jurisdiction, professional law enforcement officers rely on various training standards and policy guidelines in their exercise of *objectively reasonable* force.

Note:  *In addition to the above rules of engagement, professionally trained law enforcement officers understand that citizens to be detained or arrested are specifically prohibited from using force or threat of force to actively resist or assault the arresting officers.*

Applying the "rules of engagement" to the case at hand, and being cautious not to offer an unqualified legal opinion, the observed independent judgments and in-field reasoning attributed to Officers Catton and Astacio appear *objectively reasonable* to the prevailing circumstances.

The basis for the above expressed opinion rests on the professional standards of care currently recognized by the law enforcement community. The case at hand demonstrates the expected police escalation of force ranging from LOW FORCE options to DEADLY FORCE options. Ultimately, two trained police officers deployed DEADLY FORCE based on their individual and independent reasoning during a rather protracted *peak stress* event that was *tense, uncertain, and rapidly evolving.* (ref: Graham vs. Connor)


19.00   TACTICAL ACTOR

In the case at hand, it is significant to note that subject Willis was the ACTOR who selected the time and place and magnitude of the shooting incident. Unlike the responding police officers, subject Willis possessed several opportunities to employ non-violent alternatives. From a tactical analysis perspective, subject Willis had multiple opportunities to surrender while, at the same time, the responding police officers had no opportunity to either disengage or abandon their public safety duties.

22

## 20.00  NON-COMPLIANT BEHAVIOR

The case at hand is remarkably unique in several ways, including the less-than-desirable outcome. In stark contrast, most contacts between law enforcement and citizens are essentially non-violent and non-injurious simply because the citizen being contacted is typically compliant with and non-threatening to the involved law enforcement officer(s).

"Non-compliant behavior" is an established statistical anomaly in terms of the overall general police experience. When presented, it typically appears as FLIGHT or FIGHT. In either presentation, "non-compliant behavior" has certain measurable and sometimes tragic consequences that far exceed any other typical law enforcement experience, to wit:

①      Simply stated, 98% to 99% of persons to be detained or arrested are COMPLIANT in the presence of law enforcement officers. In these typical encounters, the risk of injury or death to the participants is actually <u>too low</u> to accurately measure; meaning that the officer and the subject are interacting SAFELY.

②      In stark contrast, less than 2% of such encounters present "non-compliant behavior" in which an <u>escalation of force</u> is expected. In these statistically rare events, the risk of injury or death to the participants is significantly increased and the outcome may be tragic.

③      In any police event, the manifestation of "non-compliant behavior" immediately increases the risk to both the officer and the subject. An incident that involves only FLIGHT presents certain measurable risks. An incident that involves FIGHT presents even increased risks. Incidents that involve both FLIGHT and FIGHT present the greatest risks to the participants.

     ref:      Michigan State University, Joint Centers for Justice Studies,
              <u>"GARNER - MAXWELL STUDY"</u> , published in 1996
              (ref: Rutgers University research in major U.S. cities)

     ref:      Bureau of Justice Statistics (US DOJ), 1999 Report,
              <u>"CONTACTS BETWEEN POLICE AND THE PUBLIC"</u>

              ⊕      21%     of U.S. residents had contact with police
              ⊕      52%     of contacts involved traffic stops
              ⊕      19%     of contacts were to report crime
              ⊕      01%     of police contacts involved FORCE

     ref:      Office of Justice Statistics (US DOJ), 2006 Publication,
              <u>"VIOLENT ENCOUNTERS"</u> ... study of felonious assaults
              on American law enforcement officers ... 800 case studies, etc.

ref:   Police Executive Research Forum, 1992 Publication,
       "DEADLY FORCE ... WHAT DO WE KNOW" ... compendium
       and analysis of police involved shooting incidents, etc.

ref:   International Association of Chiefs of Police (IACP), continued
       national research studies, grant programs, and periodic publications, etc.

ref:   University of Wisconsin – Milwaukee, 2010 Published Research,
       "MILWAUKEE POLICE USED FORCE IN JUST 1% OF ARRESTS"
       ... Report To The Police Commission (Brandl)

## 21.00   AGENCY ISSUES

The City of Fresno Police Department is recognized within the professional law enforcement community. It is a significant police and public safety agency and is known to maintain compliance with established professional standards.

The City of Fresno Police Department is a fully certified law enforcement agency in compliance with the minimum standards set forth by the CA P.O.S.T. Commission. These are statewide standards that effectively govern the hiring, training and supervision of police personnel. Such professional standards are similar to other States across the nation.

The policies and procedures of the City of Fresno Police Department are consistent with other law enforcement agencies be they local, state or federal. The policies applicable to the case at hand appear consistent with modern law enforcement standards.

## 22.00   SCOPE OF EMPLOYMENT

Upon careful review, it is clear that the involved police officers were acting well within the common scope of their special employment as CA State certified PEACE OFFICERS. That said, each such public safety employee is uniquely empowered with various lawful authorities and responsibilities. The authority to effectuate an arrest and to deploy *objectively reasonable* force is clearly vested. Conversely, subject Willis was specifically prohibited from the use or threat of force to either resist or assault the involved officers.

## 23.00   OFFICER QUALIFICATIONS

In addition to their accumulated professional training, their in-field law enforcement experience, and their personal achievements, Officers Catton and Astacio clearly demonstrated their unique abilities and qualifications to perform extraordinarily difficult tasks within a hostile and life-threatening scenario. It is significant to note how rapidly and effectively the two police officers transitioned from a "routine" DUI matter to a life-or-death violent encounter with an ARMED and DANGEROUS aggressor.

## 24.00   PRECIPITOUS ACTS

In police terms, "Precipitous Acts" refers to acts or omissions that predictably increase the probability of a law enforcement contact and/or the likelihood of a police intervention. This recognized concept also addresses the statistical probability and even the practical likelihood that the encounter will include an escalation of force.

Note: *Factually, the majority of the American population enjoys their individual and collective freedoms without any significant law enforcement interactions. Studies published periodically by the U.S. Department of Justice indicate that only 21% of the general population experiences a reportable police contact in any given year, meaning that 79% do not. Of those persons having such contacts, more than one half simply involve traffic enforcement matters and another one fifth involve either witnessing or reporting criminal activity.*

By a wide variety of measurements, the use of significant force options by law enforcement officers occurs in less than 2% of all police encounters. In those very rare occasions in which police personnel actually deploy reportable or injurious levels of force, three common factors remain constant:

①      the officer is attempting to arrest
②      the subject is resisting the arrest
③      the incident involves drugs, alcohol and/or mental illness

In the case at hand, it seems indisputable that subject Willis drew the attention of nearby law enforcement officers and some civilians as he drove recklessly into the security gate and onto the apartment complex property. At the time, he was significantly intoxicated. When first approached by Officers Catton and Astacio, subject Willis was ARMED with a leather holster containing a large frame six-shot .38 caliber revolver. When ordered to DROP THE GUN by the officers, subject Willis ignored the commands and chose to instead withdraw the weapon from the holster and present it in a threatening manner. At an early stage of the encounter, the subject successfully FIRED the weapon at Officer Catton. Assessed either as separate acts or as an accumulation of acts presented in series, the conduct attributed to subject Willis clearly precipitated the police presence and the police application of DEADLY FORCE.

The point to be observed here is that it was subject Willis who was the ACTOR in the dynamic, thereby relegating Officers Catton and Astacio to the role of REACTORS. It was subject Willis who had viable alternatives, whereas the responding police officers were DUTY bound and duly authorized to protect themselves, each other and the community at large.

As to the ***objectively reasonable*** standard of care, any professionally trained law enforcement officer responding to the exact same circumstances as faced by Officers Catton and Astacio in the darkened parking lot of 4925 East Balch on 03/28/09 would and should respond defensively and expeditiously with a trained USE OF DEADLY FORCE. No other alternative would be considered consistent with recognized police procedures or prudent behavior.

25

## 25.00  POST-SHOOTING POLICE PROCEDURES

The officer involved shooting (OIS) incident that left subject Willis mortally wounded was an extremely unusual tactical incident.  As reported earlier, some 98% of all police detentions or arrest activities are accomplished without the use of reportable force and very few of the remaining 2% involve DEADLY FORCE incidents.  Beyond that, the case at hand consists of two officers firing multiple rounds from various positions at a dynamic hostile target.  The amount of rounds fired and the resulting physical evidence presented an enormous crime scene challenge for the OIS investigators and medical examiners.

In terms of an after-action critique, the causal factors to this highly unusual incident include:

①     The officers approached in a non-tactical manner based on their assumption that they were simply searching for a misdemeanor drunk driver.  Their exposed and clustered approach route and their subsequent exposed (low-profile) interrogation positioning clearly illustrates that the officers were surprised and almost overwhelmed by the sudden and unexpected GUN threat presented by subject Willis.  Such is the nature of police work.

②     The subject was significantly intoxicated, perhaps to the point that he experienced diminished perception, judgment, reasoning and/or logic.  There is no innocent rationale for his described behavior.

③     The subject was ARMED with a very impressive firearm that was first seen holstered and then seen being drawn and then seen being pointed in a life-threatening manner.

④     The subject demonstrated NON-COMPLIANT BEHAVIOR whether intentionally or inadvertently.

⑤     The subject demonstrated ASSAULTIVE BEHAVIOR in the presentation of the large frame revolver and in actually FIRING the weapon in the immediate presence of two recognizable police officers.

⑥     The incident included the factors known to cause death and injury to both the subjects to be detained and the police officers attempting to detain or arrest.  These documented factors are listed in sub-section 24.00 on page 25 of this report.

Upon careful review, the post-shooting investigative procedures and resulting work products are really quite remarkable considering the complexity of the shooting event.  The documents, exhibits, forensic analysis and administrative controls all appear consistent with modern police and public safety standards.

## 26.00  POST-SHOOTING SECURITY

One very interesting post-shooting procedure observed was the treatment of the subject's girl friend, Jennafer Uribe. In her deposition[14] testimony, this witness described hearing the sounds of gunfire, rushing out of the apartment in response, and being rushed and pushed back into a neighbor's apartment.  While not necessarily germane to the litigation at hand, the described police procedure includes the notion that a force application occurred under exigent circumstances and that a police intrusion into the neighbor's apartment occurred.  That said, the information presented illustrates the police concern for public safety and preservation of a very serious investigative circumstance.   There is no real information to suggest that either procedure was substandard or improper, particularly in light of the prevailing circumstances.

Another post-shooting procedure apparent in the case at hand was the discovery of physical evidence[15] from within the subject's apartment. The evidence seized was located and preserved as the consequence of a Search Warrant.  Among the items seized was a box of ammunition later determined to match the ammunition in subject's loaded revolver recovered from outside of the apartment.

As to the security of the subject's apartment, some police intrusion would be expected.  In light of the number of rounds fired during the shooting itself, it would be reasonable for the on scene police officers to enter the apartment under the "exigent circumstances" authority if that entry was calculated to search for any additional injured persons or potential criminal accomplices.

Properly trained law enforcement officers, particularly in California, are well aware that there are established understandings and recognized citations concerning the legal definition of "exigent circumstances."  The police level understanding of "exigent circumstances" rests on the following:

①  **"warrantless entries are presumptively illegal"**
   [ref: Katz vs. United States, 390 U.S. 347 (1967)]

②  "those circumstances that would cause a reasonable person to believe that ENTRY or some other PROMPT ACTION . . . was necessary to prevent physical harm to other officers or persons, the destruction of relevant evidence, the escape of a suspect, or some other consequence improperly frustrating legitimate law enforcement efforts."
   [ref: U.S. vs. McConney (1984), US Supreme Crt. & Ninth Circuit Crt.]

③  practical police formula for **"exigent circumstances"** . . .
   ♦ to prevent physical harm
   ♦ to prevent destruction of evidence
   ♦ to prevent escape
   ♦ to prevent "frustrating" law enforcement

---

[14] Deposition of Jennafer Uribe dated 11/04/10, RMR #7.33 ref: page 89
[15] Search Warrant execution by Detective Rivera, RMR #7.37 and RMR #7.42

## 27.00  SUMMARY OF OPINIONS

27.01   Officers Catton and Astacio were on duty certified Peace Officers and were acting well within the common scope and understanding of their employment as Fresno Police Officers when they entered the "Stoney Brook Apartment" in search of a suspected intoxicated driver.  The officers were distinctively attired and equipped with recognizable police uniforms.   The officers approach to subject Willis was non-tactical, "low profile" and completely appropriate to the nature of the intended contact.

27.02   Subject Willis participated in certain "precipitous acts" that drew the legitimate attention of nearby police officers.  When contacted by Officers Catton and Astacio, subject Willis acted in a very dangerous and reckless manner.  He presented a large frame revolver and proceeded to AIM and FIRE at the officers.

27.03   Officers Catton and Astacio were essentially compromised by the sudden and unexpected ARMED aggression displayed by subject Willis.  Nonetheless, both police officers responded as trained and did so in a tactically astute and ultimately effective manner.

27.04   Officers Catton and Astacio correctly selected a DEADLY FORCE option in the face of the subject's assault.   The instant and independent judgment of the two officers was exactly consistent with taught, trained and accepted police procedures.  Upon review, the officers were without a viable alternative to their DEFENSIVE USE OF DEADLY FORCE.

27.05   In addition to the subject's sudden and unexpected ARMED aggression, Officers Catton and Astacio were further challenged by the darkened environment and the clustered vehicles that affected their ability to maneuver or maintain visual contact with subject Willis.

27.06   It is now clear that the instant perceptions affecting Officer Catton and Astacio were fully reasonable given the prevailing conditions during the ARMED encounter.  The officers were required to make *split-second judgments in conditions that were tense, uncertain, and rapidly evolving*.

27.07   Nothing in the case at hand suggest the use of excessive force or unreasonable force.  It was subject Willis to established the DEADLY FORCE nature of the encounter and effectively protracted the violence by his maneuvers and actual GUN use.

27.08   Nothing in the case at hand suggests substandard professional qualifications and/or training concerning the Fresno Police Department or Officers Catton and Astacio.  To the contrary, the officers' demonstrated ability to recover from a sudden and unexpected ARMED assault and perform extraordinarily difficult tasks under hostile conditions to the point of effectively surviving the initial onslaught, repel the attacker and effectively overcome a DEADLY level of resistance serves as the best evidence of their proper selection, training and supervision.

27.09   The formal policies of the Fresno Police Department appear consistent with recognized models used by other professionally managed law enforcement agencies.

28

28.00   SIGNATURE and AFFIRMATION

I, Joseph John Callanan, Jr. do hereby state and affirm under penalty of perjury that the above expressed expert opinions are well considered and solidly based on recognized police standards and that I will so testify under oath in a Court of Law, if so called.

SIGNED:

at San Luis Obispo County, CA on March 30, 2011.  [10-041.2]

ATTACHED
EXHIBITS:

    ①      Scene Drawing Marked: #1

    ②      Scene Drawing Marked: #2

    ③      Scene Drawing Marked: #3

    ④      Professional Resume

    ⑤      Current Fee Schedule

    ⑥      Testimonial Records

# **EXHIBIT C**

KRIS MOHANDIE, PH.D.
LICENSED PSYCHOLOGIST
LICENSE NO. PSY12105
P.O. BOX 88
PASADENA, CALIFORNIA 91102-0088
(626) 666-6139

March 29, 2011

James Weakley
Weakley & Arendt, LLP
1630 East Shaw Avenue, Suite 176
Fresno, CA 93710

## Re:  Willis v. City of Fresno et al.

Dear Mr. Weakley,

Pursuant to your request, this is a report of my initial findings and opinions in the matter of Willis v. City of Fresno et al. It is noted that any information not available at the time of this report might alter the opinions included herein.

## EXPERTISE AND QUALIFICATIONS

I am a California licensed psychologist (PSY12105) trained in clinical, police, and forensic psychology. I have earned a Diplomate in police psychology issued by the Society for Police and Criminal Psychology. The following experience, training, and skills qualify me to offer testimony in this particular case (Please see a copy of my curriculum vitae which has been attached):

a. Research and Publication Pertaining to Officer Involved Shootings, Uses of Force, and Subject-Precipitated Death and Injury Cases
- have authored or co-authored several publications and a pending publication pertaining to officer involved shootings, including subject precipitated death and suicide by cop, including *Forensic Issues in Officer Involved Shootings, Use of Force, and Suicide by Cop Cases (2008), Suicide by Cop Among Officer Involved Shooting Cases (2009), Hostage and Barricade Incidents Within An Officer Involved Shooting Sample: Suicide by Cop, Intervention Efficacy, and Descriptive Characteristics (2010), and Suicide by Cop Among Female Subjects in Officer Involved Shooting Cases (In Press).*
- Primary researcher of a large empirical North American study of officer involved shooting cases with an emphasis upon investigating suicide by cop. One important aspect of this research is the factor of subject precipitated injury or death related to police use of deadly force encounters.

1

b. Reviews of Shooting and Use of Force Incidents
- Dozens of pre- and post-conviction interviews and reviews of individuals and witnesses to shooting, suicide by cop, use of force, and subject precipitated events in a variety of police intervention situations.

c. Demonstrated Crisis Management Expertise in Consultation and Training Activities
- LAPD crisis/hostage negotiation and SWAT team from 1990-2003- On-site response to hostage and barricade incidents, assessing hostage taker/hostages/victims, assessing for high risk, including violence and suicide by cop potential, interviewing and assessing witnesses to these events and crimes, and offering input to reduce risk and lead to safe apprehension/capture of suspects.
- Consultation with other domestic and federal law enforcement agencies to present day.
- Pre-event consultation regarding strategy and threat assessment for potentially high risk law enforcement interventions, including pending arrests of armed individuals.
- Hostage negotiation and SWAT teams nationwide since 1993- Training to police departments nationwide in the arena of crisis/hostage negotiation, teaching blocks of instruction on crisis management and negotiation theory and practice, communication skills, psychological aspects of negotiation and first responder issues, and suspect behavior in these situations, including suspect aggression, subject-precipitated aggression, and suicide by cop.
- Contributed as expert on panel to 1999 Police Officer Standards and Training (POST) Suicide By Cop curriculum and law enforcement training video.
- Contributed as an invited subject matter expert to a national symposium and task force on suicide by cop: Suicide by Cop: Averting the Crisis held at the University of Virginia December 7th-9th, 2008.
- Forensic consultation and review of numerous cases involving police shootings, use of force, suicide by cop, subject-precipitation, and victimology issues.
- Professional presentations to the California Association of Hostage Negotiators Annual conferences in 1993, 1994, 1996, 2001-2003, 2005-2007, and 2009.
- Professional presentations in the arena of suspect aggression, mental disorders and behavior among subjects, suicide by cop, hostage and barricade incidents, and victim-perpetrator dynamics for the National Tactical Officers Association.
- Editorial board of the International Journal of Police Crisis Negotiations since 1995.

d. Clinical Work Related to Officer Involved Shootings and Uses of Force
- Counseling of hundreds of officer victims of shootings, suicide by cop events, assaults, use of force, other traumatic events.

e. General Clinical Work and Assessment of Individuals
   - Assessment of, and intervention to, hundreds of individuals related to lifestyle choices, substance abuse and dependency, anger issues, weapon accessibility, and other issues that can lead to high risk circumstances.

f. Threat Assessment Expertise in Consultation and Training Activities
   - Editorial board of the Journal of Threat Assessment since 1999.
   - Invited guest reviewer to various peer reviewed journals including Journal of Police and Criminal Psychology, Criminal Justice and Behavior, Behavioral Sciences and the Law, Journal of Interpersonal Violence, Psychological Medicine, and Health Policy.
   - LAPD Threat Management Unit 1994 thru 2003.
   - Professional presentations pertaining to threat assessment in many venues including the annual Association of Threat Assessment Professional Training Conferences (1997-2010), California District Attorney's Association, International Criminal Investigative Analysis Fellowship Seminar, California Homicide Investigators' Conference (2002), National Center for the Analysis of Violent Crime Seminar (2001, 2002), Alberta Crown Attorney's Association Annual Conference (1999).
   - Have researched, studied, and interviewed numerous violent offenders, including those who have committed domestic violence homicides, murder-suicides, family annihilations, police murders, and mass murder.
   - Regular consultation on ongoing threat cases in a variety of arenas.

g. Relevant Training
   - Attendance to Association of Threat Assessment Professionals training conferences from 1997 through 2010.
   - LAPD Crisis Negotiation Training in 1989.
   - FBI two-week Crisis Negotiation Training in 1994.
   - Attendance to California Association of Hostage Negotiator's training conference in 1992-1999, 2001, 2007, and 2009.

h. Membership in Relevant Professional Organizations
   - American Psychological Association since 1989.
   - Member of Society of Police and Criminal Psychology since 1995.
   - Association of Threat Assessment Professionals since 1995. Distinguished Achievement Award 2010.
   - California Association of Hostage Negotiators since 1992, Honorary Lifetime Member since 2008.

i. Forensic consultation/testimony in other police use of force cases including:
   - Alvaro Dominguez-Martinez v. County of Los Angeles.
   - Defendis v. the City of Fresno.
   - Neville v. City of Fresno.
   - Martinez v. City of Downey, et al.
   - Ellis v. County of Los Angeles, et al.

- Tovar v. Baca et al.
- Schmitz v. City of Hemet
- People v. Walker
- DJ Allen v. City of Chula Vista
- Aguilar v. County of Fresno

**DATABASE**
*Court Documents*
- Plaintiff's First Amended Complaint, dated 12/30/09
- Officer Daniel Astacio's Response to Chris Willis' Special Interrogatories, Set 1, dated 3/29/10
- Officer Greg Catton's Response to Mary Willis' Special Interrogatories, Set 1, dated 5/12/10
- City of Fresno's Response to Chris Willis' Special Interrogatories, Set 1, dated 3/30/10
- City of Fresno's Response to Plaintiff's First Request for Production of Documents, dated 3/30/10
- Stipulation and Protective Order, dated 4/15/10
- Addendum to Stipulation and Protective Order, dated 1/27/11

*Police Reports*
- FPD Follow-up Report, dated 3/28/09
- FPD Supplemental by Officer Pap, dated 3/28/09
    o interview of Munoz Jenkins, dated 3/28/09
- FPD Supplemental by Officer Overstreet, dated 3/28/09
    o interview of Ubaldo Marquez, dated 3/28/09
- FPD Miscellaneous Supplemental Reports
- FPD Property Reports
- DMV Checks on Suspect Vehicle
- FPD Vehicle Inventory Report, dated 3/28/09
- FPD CDOJ Firearm and Tool Mark letter, undated

*Other Reports*
- FPD Law Enforcement Report, dated 2/9/08
- FPD Event Report, dated 2/19/09 @ 1:01am
- FPD Incident Report, dated 3/28/09
- CA DOJ Forensic Services Report, dated 10/15/09
- Search Warrant and Affidavit, dated 3/28/09 by Officer Antonio Rivera
- Coroner's Report, dated 4/8/09
- Autopsy Report, dated 3/29/09

*Photographs*
- Color laser photographs
- CD

*DVD's*
- Cartton, Greg, dated 11/16/10, 1-2
- Gopal, Venu, dated 11/16/10, 1-4
- Villalvazo, Ray, dated 11/17/10, 1-2

*Audio*
- Radio traffic

*Depositions*
- Astacio, Daniel Officer, dated 11/16/10
- Catton, Greg Officer, dated 11/16/10
- Cerda, Jesus Officer, dated 11/16/10
- Cruz, Hugo, dated 3/2/11
- Gopal, Venu Dr., dated 1/25/11
- Hoskins, Dorothy, aka Ms. Del, dated 1/26/11
- Jacobo, Derek Officer, dated 11/18/10
- Langston, Spring Crime Scene Tech, dated 11/16/10
- Reyes, Israel Sergeant, dated 11/16/10
- Torosian, Debbie, dated 1/27/11
- Uribe, Jennafer, dated 11/4/10
- Villalvazo, Ray Detective, dated 11/16/10
- Willis, Chris, dated 10/28/10
- Willis, Mary, dated 10/28/10
- Xiong, Kue, dated 1/27/11
- Zimmerman, Chris, dated 1/27/11
  - Exhibit 2, Transcript of Interview dated 4/1/09

*Site Visit, dated 3/15/11*

*References*

American Psychiatric Association. (2000). *Diagnostic and statistical manual of mental disorders, fourth edition, text revision (DSM-IV-TR).* American Psychiatric Association: Washington, DC.

Honig, A. & Sultan, S. (2005). *Reactions and resilience under fire: What an officer can expect.* The Police Chief,

Honig, A. & Roland, J. (1998). *Shots fired: Officer Involved.* The Police Chief, 65, 116-120.

Kellerman, A.L., Rivara, F.P., Rushforth, N.B., Banton, J.G., Reay, D.T., Francisco, J., Locci, A.B., Prodzinski, J., Hackman, B.B., and Somes, G. (1993). Gun ownership as a risk factor for homicide in the home. *New England Journal of Medicine*, 329, 1084–1091.

Kellerman, A.L., Rivara, F.P., Somes, G., Reay, D.T., Francisco, J., Banton, J.G., Prodinsky, J., Fligner, C., and Hackman, B.B. (1992). Suicide in the home in relation to gun ownership. *New England Journal of Medicine*, 327, 467-472.

5

Lewinsky, W. (2000). *Why is the suspect shot in the back: Finally hard data about how fast the suspect can be in eleven different shooting scenarios.* The Police Marksman, November/December, 20-28.

Lewinsky, W. (2002). *Stress reactions related to lethal force encounters.* The Police Marksman, May/June, 23-28.

Mohandie, K. (2008). *Forensic Psychological Issues in Officer Involved Shooting, Use of Force, and Suicide by Cop Cases.* In H. Hall (Ed.), <u>Forensic Psychology and Neuropsychology for Criminal and Civil Cases</u> (pp. 239-262). Boca Raton, FL: CRC Press.

**FINDINGS AND OPINIONS**

   1. **Officers perceived-as any trained officers in their position should have-that Mr. Willis posed an immediate danger to them.**

Foundation for Opinion

   a. Mr. Willis was armed with a loaded revolver (initially in the holster) when officers approached him to investigate him for driving under the influence.

      1) As Officer Catton approached he noticed a person that was near the back seat of car- "Hello Fresno Police Department. Can we talk to you?" "I had my light on the subject's body and I could see him holding a large framed revolver or a large framed gun in a holster on to his chest with his left hand." Catton depo, 52, 60

         i. Note, both officers recalled the initial encounter on their part being in a conversational tone, which would preclude other witnesses who were not close by from hearing it. Site visit

      2) I asked Chris Willis (father) if he owned an S&W revolver and he said he did but his son Stephen has it in his possession." FPD Follow-up Report, dated 3/28/09, 4

      3) Gun registered to Clifton Bill Willis, Jr. DOB 11/2/40. FPD Follow-up Report, dated 3/28/09, 17

      4) Photograph 84100020 depict gun near left of foot of decedent while 8410023 shows holster to left of head of decedent.

      5) Both officers observed him to be in possession of the revolver as noted below.

   b. Upon encountering the officers, he held the revolver and holster then pulled the gun out of the holster instead of dropping it.

      1) Officer Astacio was 20-25 feet away, they identified themselves, Officer Catton illuminated him with his flashlight, they saw him holding gun holster in left hand, he then reaches grips of gun with right. They yelled to drop it "We're Fresno Police." He steps back and away from them with gun pointed at officers and they fired at him. FPD Follow-up Report, dated 3/28/09, 13

      2) The gun was at about the decedent's waist: "I then yelled Fresno Police drop the gun and I started to pull out my firearm....at this point he reached down with his right hand and then took the firearm out of the

6

holster....I just then yelled again Fresno Police Drop the gun." Astacio depo, 44-45

   3) Officer Catton heard Officer Astacio yell "drop the gun. And then I said drop the gun." "It was very quick, but it was see the gun, grab my gun, Astacio says drop the gun, I said drop the gun.." Catton depo, 62

   4) "He took his right hand from his side, he reached up to his chest and he grabbed the handle of the gun and pulled it out...he pulled the way out and then he began to point it at us. And he got it halfway extended before Officer Astacio fired the first shot." Catton depo, 62

      i. Note: both officers recall yelling something to the effect of "drop the gun" at the outset of the incident. Whether this happened prior to, concurrently, or moments after their initial shots (or all of the above) is unclear because in my experience timing on issues like this can get jumbled under the trauma of the incident. If it had occurred concurrently it would have made it hard for other witnesses in particular to have heard, given their location, and the overpowering salience of the gunfire. My knowledge and experience

   5) Photograph 84100020 depict gun near left of foot of decedent while 8410023 shows holster to left of head of decedent.

 c. He pointed the loaded weapon at the officers.

   1) The officers identified themselves as officers, he refused repeated commands to drop the gun, instead removing it from the holster and pointing it at "Officer Catton and myself." Officer Daniel Astacio's Response to Chris Willis' Special Interrogatories, Set 1, dated 3/29/10, 2

   2) "I feared for my life and the life of Officer Catton." Officer Daniel Astacio's Response to Chris Willis' Special Interrogatories, Set 1, dated 3/29/10, 4

   3) "Officer Astacio and I identified ourselves as police officers and gave repeated verbal commands to him to drop the gun. Instead of dropping the gun Willis withdrew it from the holster and pointed it at Officer Astacio and myself." Officer Greg Catton's Response to Mary Willis' Special Interrogatories, Set 1, dated 5/12/10, 2

 d. More likely than not he fired one round at the officers during the initial confrontation.

   1) Both officers reported an initial muzzle flash at the beginning of the encounter when Mr. Willis pulled the gun out of the holster and pointed it at them.

      i. "I remember seeing a muzzle flash at that time, but it was after I had already initially fired the first couple rounds." He thinks it was from suspect's gun. Astacio depo, 56-57

      ii. "I do believe there was a muzzle flash" from the subject's gun. Catton depo, 86

   2) When the gun was examined, "I opened the cylinder and noted six ammunition casings in the cylinder. There were five live rounds and one expended casing in the cylinder. The expended casing position was over

two slots counter clockwise from the barrel position." FPD Follow-up Report, dated 3/28/09, 3

3) DOJ ballistic report "The examination of Willis firearm revealed the weapon had been fired." FPD Follow-up Report, dated 3/28/09, 19

4) Detective Villalvazo believes that Willis fired a round and the fact that it was two slots from the firing slot could mean Willis manipulated it, he attempted to fire it and didn't fire, etc. Villalvaza depo, 43-44

5) Whether Mr. Willis fired a round or not, given the totality of the circumstances, it would be consistent with the effects of trauma during police shooting situations for an officer to perceive that he had been fired upon by the subject. My knowledge and experience

e. Instead of dropping the weapon after being told repeatedly to do so by both officers, Mr. Willis continued to wield it as he moved and repositioned himself between the van and the driver's side of his car.

1) Officer Catton "had been yelling at Willis the entire time to "stop, put it down, don't do that, stop shooting." FPD Follow-up Report, dated 3/28/09, 16

f. Upon reaching the back of the van (backed into parking spot), and in the vicinity of the back of that van and the red car on the driver's side, he again appeared to be pointing the weapon at Officer Catton while kneeling. Site visit

g. After falling to the ground, he continued moving with the gun nearby while apparently attempting to prop himself up, in a manner which would be perceived-under the totality of the situation-as continuing in his threatening behavior. Site visit

h. He had been told repeatedly at different points during the incident to drop the gun, yet continued to wield it in a manner perceived as threatening.

1) Officer Cerda saw the muzzle flashes and heard shots, then heard "a police officer voice yell out, drop the gun...." Later realizes its Asatacio. As he approached closer he heard both Astacio and Catton yelling at the suspect "don't go for your gun. Don't reach for the gun." FPD Follow-up Report, dated 3/28/09, 11

2) FPD Supplemental by Officer Pap, dated 3/28/09 reported that Darlene Jenkins heard a male voice yell "move, move, move," and "drop the gun!" while the shots were being fired. interview of Dalene Jenkins, dated 3/28/09

3) FPD Supplemental by Officer Overstreet, dated 3/28/09 reported that Ubaldo Marquez first heard gunshots, like a "roll of firecrackers" then heard a male voice yell out clearly and loudly "drop it, drop it, drop it!" then three to four more gunshots right afterwards. 63

i. Mr. Willis was very intoxicated, and had a history positive for aggressive behavior and threats involving a firearm. On multiple occasions, he demonstrated that being challenged and in conflict with authority would escalate him into threats or other intimidating behavior (apartment security and neighborhood watch block captain). His girlfriend apparently told at least two individuals that he has aggression issues while drinking, and has confrontational issues with authority.

2. **Mr. Willis' behavior-as noted under Opinion 1-was sufficient to create significant fear in the responding officers, and thus trigger a profound psychophysiological reaction that accounts for a number of occurrences and issues, not the least of which is the number of rounds fired. Traumatic events, such as police shootings like this one, have well-documented physiological, psychological, perceptual, cognitive, behavioral, and emotional effects upon involved officers. It is my intent to address the psychophysiological processes involved with these changes, including the scientifically documented changes in the manner in which the sensory system (vision and hearing) operate under such conditions. I would also plan to address the issue of lag time as it might be relevant to certain facts of the case. It is my intent to address these issues as they apply to this case including as noted below.**

Foundation for Opinion

a. As noted above, there were at least four phases or components of this incident: 1) the initial encounter when Mr. Willis pulled the loaded handgun out of its holster, pointed it at the officers, then likely shot at responding officers despite their orders to drop the gun; 2) Mr. Willis moving while still armed between the van and his car; 3) the point where he reportedly stopped, still had his weapon apparently pointing in the direction of Officer Catton while kneeling; and 4) the final point where he was on the ground, on his left side, appearing to prop himself up, in a position perceived as threatening by Officer Catton because he was still moving, and the gun was within reach, and he was not complying with commands to stop.

   i. Supplemental by Officer Pap, dated 3/28/09 reported that Darlene Jenkins heard three different groups of shots, approximately 3-4 seconds apart. Interview of Darlene Jenkins, dated 3/28/09, 50

   ii. FPD Supplemental by Officer Overstreet, dated 3/28/09 reported that Ubaldo Marquez first heard gunshots, like a "roll of firecrackers" then heard a male voice yell out clearly and loudly "drop it, drop it, drop it!" Then three to four more gunshots right afterwards. 63

   iii. Sergeant Reyes heard at least three volleys of shots. Heard Officer Astacio yelling "get on the ground, get on the ground." Just prior to another volley of shots. Reyes depo, 44

   iv. Officer Catton approached at some point, the subject was lying on his left side and "he was propped up...could have reached was his handgun laying there on the ground. And I was giving him commands to stop moving and to lay down and to not go for the gun and he was propped up and he was moving." This is when he resumed firing. Catton depo, 100

      1. The cumulative affect of having been involved in the first three phases of this incident under the totality of the

circumstances ultimately led Officer Catton to continue to perceive the danger posed by Mr. Willis in this fourth phase of the incident. My knowledge and experience

b.  Both officers experienced significant feelings of fear and vulnerability from the point of the initial encounter with Mr. Willis when he produced and pointed the loaded gun until the conclusion of the incident.

    i.  "I feared for my life and the life of Officer Catton." Officer Daniel Astacio's Response to Chris Willis' Special Interrogatories, Set 1, dated 3/29/10, 4; Site Visit

    ii.  Officer Astacio thinks he fired first because "just fearing for my safety because Mr., the suspect had pulled out the firearm from a holster and it was pointed at us....I think I simultaneously pulled out my firearm when I noticed that he was holding a firearm in the holster." Astacio depo, 18

    iii.  "I removed my gun from my holster and when he started to raise it and point it at us is when I started to fear for myself and my partner at that time." Astacio depo, 20

    iv.  When Officer Astacio gave his statement that even six hours subsequent to the incident when he gave his statement at about 6:15am, "I had adrenaline started rushing, but my memory was still pretty good." Astacio depo, 13, 16

    v.  "He escalated his threatening behavior from mere possession of a firearm to taking it out of the holster and then actively pointing it at Officer Astacio and me; and he presented an immediate threat of death and serious bodily injury to Officer Astacio and me." Officer Greg Catton's Response to Mary Willis' Special Interrogatories, Set 1, dated 5/12/10, 8; Site Visit

    vi.  When Officer Jacobo saw Officer Catton after the shooting had just finished he "was extremely shaken. He looked very emotionally disturbed...like he was about to cry, like he was sort of in disbelief that he could have done that." Jacobo depo, 61-62

    vii.  Radio traffic of involved officers.

c.  Both officers perceived more muzzle flashes than could have been fired by the subject (likely one). This is accounted for by the officers likely perceiving-under conditions of trauma, stress, position and perspective, tunnel vision, and lighting conditions-the muzzle flashes of their own guns or their partner's gun as having originated from the suspect, Mr. Willis. Thus under these circumstances they naturally and expectedly attributed the flashes they were seeing to the subject, when it very well could have been their own or their partners' firearm. My knowledge and experience

    i.  "Officer Catton realized his firearm was empty due to the slide of his weapon being in the rear lock position...reloaded his firearm which allowed him to fire his firearm at Willis several

10

times.....said he recalled seeing two muzzle flashes coming from Willis weapon." FPD Follow-up Report, dated 3/28/09, 16

    1. Officer Catton remembers seeing two muzzle flashes. Catton depo, 102

    ii. Officer Astacio testified at deposition: "He was by his blue van and he was kneeling down...to me I saw him pointing the firearm west and I observed several muzzle flashes...I thought I saw at least two....to me it looked like he was shooting at Officer Catton in the back." Astacio depo, 63-64

d. Both officers reported tunnel vision and tunnel hearing. Officer Catton for example did not hear his some of his own rounds, nor Officer Astacio's rounds, and Officer Astacio reported he did not hear the final volley fired by Officer Catton at the conclusion of the incident. Site visit

    i. Officer Astacio observed that the suspect was "holding it out, up and away from his body," but doesn't recall if he was holding the gun in one hand. Astacio depo, 55-56

    ii. Regarding whether any other officer was firing also: "I heard gun shots. I didn't know who was firing." Astacio depo, 62

    iii. "I heard a gun being fired." He didn't know if it was coming from his partner or the subject. Catton depo, 76

    iv. The above are prime examples of tunnel vision under stress. They also contribute to the attribution that the suspect was firing additional rounds beyond that which he likely fired. My knowledge and experience

e. The number of rounds fired by officers is accounted for by the behavior of the subject-the four phases of threatening behavior noted above-as well as the trauma of the incident. Officers often fire more rounds under conditions of threat, and if the subject continues to appear or be perceived as posing a threat, this will result in additional rounds being fired. Thus, in this incident, there are three or four separate volleys which were responsive to the four behavioral phases created by Mr. Willis' conduct. Complicating this, is the fact that Mr. Willis continued possess and point his weapon during phase 3, despite Officer Catton firing multiple rounds. This heightened Officer Catton's sense of vulnerability and perception that he needed to continue to engage in self-defense. This particularly was important to the final phase while Mr. Willis is on the ground, moving, gun perceived as within reach, and apparently not complying. My knowledge and experience

    i. Officer Catton "was firing over the hood of the red Pontiac at Mr. Willis and the thought was in my head that I was firing a lot of rounds but he was still pointing his gun at me still a threat. I didn't think that I was being effective in hitting Mr. Willis." Catton depo, 89-91

f. Given the totality of information as this event unfolded, officers experienced fear based perceptions. For example, while down on his

11

knees behind a truck's passenger tire, he (Officer Astacio) looked around front to see what was occurring and saw muzzle flashes and believes he was being fired at....he saw Willis on his knees facing west bound. He heard Officer Catton make a grunting sound and believed he was hit by gunfire. Reloaded and fired three to four rounds. He believed Catton had been hit by gunfire or killed by Willis. FPD Follow-up Report, dated 3/28/09, 14

g. Officers did not recall everything they said to the subject during the incident, yet other officers heard them. This is normal and expected memory loss for issues less central to their immediate survival during the incident. My knowledge and experience

    i. Officer Cerda saw the muzzle flashes and heard shots, then heard "a police officer voice yell out, drop the gun...." Later realizes its Asatacio. As he approached closer he heard both Astacio and Catton yelling at the suspect "don't go for your gun. Don't reach for the gun." FPD Follow-up Report, dated 3/28/09, 11



h. Inability to recall how many rounds were fired is common in officer involved shootings and stems from the trauma and fear of the incident, as it did here. For example, Officer Catton estimated he fired about 25 rounds during the incident but "I'm not sure." Officer Greg Catton's Response to Mary Willis' Special Interrogatories, Set I, dated 5/12/10, 6

    i. "Officer Catton realized his firearm was empty due to the slide of his weapon being in the rear lock position...reloaded his firearm which allowed him to fire his firearm at Willis several times.....said he recalled seeing two muzzle flashes coming from Willis weapon." FPD Follow-up Report, dated 3/28/09, 16

    ii. Officer Astacio performed a tactical reload at some point-something that reflects the continued profound fear response, as well as the inability to track the number of rounds fired. Astacio depo, 65; my knowledge and experience

i. Officer Catton was so traumatized during the incident that he was not even sure if he'd been shot or not.

    i. "Officer Catton thought he had been shot because he had a hole in his pants...Officer Catton was found to be grazed by a bullet." FPD Follow-up Report, dated 3/28/09, 7

        1. Officer Catton felt he was hit by gunfire and he retreated south to the rear of the vehicles to check himself...felt sick to his stomach and felt the pressure on the lower portion of his body and was startled by what he felt....after checking himself for his injury, he reloaded his firearm and reengaged Willis." FPD Follow-up Report, dated 3/28/09, 16

        2. "I felt above and beyond the adrenaline and fear that I was already in I felt like I had been hit in the leg by something

12

in the left thigh and I yelled out." He had a hole in his
pants. Catton depo, 91-92

   ii. When Sergeant Reyes encountered Catton, he appeared "maybe a
little frightened and surprised at that point....he was just
rambling...we just triangulate on him...from my memory he had
said 'Sarge you know I thought I was shot, I screamed.'  "I
remember to this day watching him do it, he's doing this, he's
patting his chest, he's patting his leg, and he goes, 'okay I'm not,
I'm not dead." Reyes depo, 55

j.   The duration of this psychophysiological process lasts from moments to
minutes-something which is impacted by any ongoing stimuli (such as
suspect continuing to have a gun) for feelings of fear and vulnerability,
among other factors. My knowledge and experience

k.   It is noted that Officer Cerda as he approached the scene as it was
occurring perceived that bullets were impacting near him. There is a
strong probability this was in fact not happening as he perceived it,
which indicates that his own trauma response, namely fear and various
sounds through the lens of tunnel vision and tunnel hearing, and the
natural and expected attributions that occur within that context, was
likely influencing these misperceptions. Cerda depo, 21, 27

l.   Eyewitness estimates of the duration of the actual event appear to be
off, as they often are, particularly when the event is stressful and
traumatic in nature. Mr. Zimmerman noticed two police officers in
uniform approach the car within a minute or so of the subject parking.
A minute or so later he said he heard shots. It is more likely that the
shooting unfolded more quickly than that once the officers encountered
Mr. Zimmerman as noted in his deposition. FPD Follow-up Report,
dated 3/28/09,  18;  Zimmerman depo My knowledge and experience

**3.** **Mr. Willis' intoxication, noted history of becoming aggressive while under
the influence, likely alcohol abuse or dependency problem, and weapon
possession were not only the direct causes of his subject precipitated death,
but also factors that are associated with a shorter lifespan and other
significant negative life events.**

Foundation for Opinion:

a.   A subject precipitated death occurs when the decedent somehow
contributes to his/her death at the hands of another. The constellation of
Mr. Willis' issues as noted here and elsewhere, squarely place this case
within what would be considered a subject precipitated death.
(Mohandie, 2008)

b.   He behaved aggressively as noted above while under the influence of
alcohol on this occasion and prior occasions.

   i. Ms. Hoskins noted that her first interaction with Mr. Willis was
after she was a block captain and he and his girlfriend first moved
in. She told him to turn down the music and he said "I'll play the

13

music as loud as I want," she said "no you won't...I'll call the police." He said "I don't care nothing about the police...they don't scare me." He was drunk and they got in a debate over the neighborhood watch sticker on his window-he said, "It's going to stay on there and if you bring your ass back over here again, I'll show you." Hoskins depo, 37-38

    1. The day Ms. Hoskins told him to turn down music, he balled up his fist and mocked like he was going to hit her. Hoskins depo, 98, 105

ii. "Christopher (Zimmerman) was aware of Willis from an incident a month to a month and a half ago in the complex. Willis tried to fight the apartment complex security and Christopher had called the police. He had heard a lot of yelling near his apartment and saw Willis threatening the security officers. A female neighbor who is a neighborhood block captain was with security at the time of the incident. Willis was trying to fight security personnel and tried hitting the lady who was an older black female....the incident was in the evening time because the security guards had flashed their flashlight on Willis. Willis was yelling who the fuck are you to do that to me. Willis was also yelling 'I'll beat your ass, fuck yeah." FPD Follow-up Report, dated 3/28/09, 19

iii. On this prior occasion, when Mr. Willis was confronted by apartment security for driving dangerously, he got out of his car and approached the officers aggressively. "cussing to my partner...wanted to fight him." Mr. Willis rushed Officer Kue who backed up and go this pepper spray out. Mr. Willis advanced on him two to three times. Finally, Officer Kue said before removing his pepper spray, "if you keep confronting me or coming forward to me, I am going to mace you." He advanced on Officer Cruz when he started trying to talk to him. He advanced on him twice and he retreated both times. He withdrew his baton. Officer Cruz then said "stop...you are approaching to getting close to me." He stopped advancing. Mr. Willis then stated: "you think you are all bad with your baton. Just wait until I go to my apartment and get my pistol." "I think he said his gun." Cruz depo, 24, 26-31

    1. Security Officer Xiong testified that the plaintiff tried to calm down Mr. Willis, he pulled away from her, the guard threatened to use pepper spray if he didn't back off and he told someone to call the police... "That's when he made a threat saying, I'm going to get my, I'm going to get my gun and I'm going to come kill you guys." Xiong depo, 42-44

    2. When they showed the baton, "Willis also replied, you think you are tough with your baton, wait until I get my gun." Xiong depo, 52, 75

14

3. During this incident, Ms. Hoskins witnessed Mr. Willis bring his fists up twice at one of the security guards. Hoskins depo, 56

4. Neighbor Chris Zimmerman watched this encounter between two security and decedent who "was apparently belligerently drunk and was trying to start a fight...he wanted to fight this guy." A few months prior to the shooting. Zimmerman depo, 31

5. Mr. Willis appeared to have difficulty operating his car that night, including his parking skills (similar to the night of the shooting). Including going over parking bump and hearing him scrape his car, and taking multiple times to park straight. Squealed his tires coming in. Pretty fast over speed bumps. Slurred speech and appeared uncoordinated. Cruz depo, 36-39, 43

6. Security Officer Cruz smelled alcohol on Mr. Willis when he was about four inches away. Cruz depo, 35-36

7. Security Officer Cruz feared Mr. Willis would attack either he or his partner Kue. Cruz depo, 113-114

8. Note: Apartment Manager Debbie Torosian testified that she wrote Mr. Willis up and gave him a three day notice to perform "that he could not harass or threaten anybody that had to do with the property or the security guards." Torosian depo, 29

9. It is interesting and revealing to note this strikingly similar earlier incident in which Mr. Willis threatened security guards who had shined a light at him after he was driving drunk and erratically. It seems likely that in the current incident, Mr. Willis-due to his extreme level of intoxication and with the unfortunate immediate availability of his firearm-may have mistaken the FPD officers for apartment security and sought to make good on his earlier threats. My knowledge and experience

c. Reportedly, he was described as aggressive when drinking. He appears to have a particularly strong negative reaction to authority figures and individuals in uniform.

    i. Officer Cruz indicated that Mr. Willis' girlfriend said to him "her boyfriend always gets aggressive....he just doesn't like any police officers or security guards....when he was young I guess a security guard did something to him or something. That's what she said." "I remember his wife said he gets aggressive when he drinks alcohol." 44, 88

    ii. Ms. Hoskins was told by Mr. Willis' girlfriend that. "Its something about the badge. He don't like people with badges." Hoskins depo, 56

15

     iii.  When he was taken into his apartment, Ms. Hoskins could hear him fighting or breaking things in the house with his mouth going. She saw him hit his girlfriend prior to going inside. That is when she told security to call the police. "he took a swing at her." Hoskins depo, 92-93



  d.  His pattern of drinking is indicative of a qualifying mental disorder, namely alcohol abuse or dependence (APA, 2000); my knowledge and experience

  e.  Individuals with alcohol abuse or dependency problems are high risk for a variety of problems that affect their longevity, health, and functionality (APA, 2000):

     i.  Significant increase in the risk of accidents, violence, and suicide.

     ii.  Alcohol use accounts for up to 55% of fatal driving events.

       1.  Mr. Willis repeatedly drove while intoxicated, including that evening. And on at least one prior occasion nearly struck a person while driving in this manner in the apartment complex.

         a.  Radio traffic

         b.  Security Officer Cruz noted subject on prior occasion (2/28/09) driving aggressively-that is speeding-in the complex and almost hitting Ms. Del (Ms. Hoskins). Driving erratically. Cruz depo, 19-20

         c.  Sgt. Reyes was investigating disturbance with other officers when he saw the Nissan with engine revving, and then scraping on the gate as it went in as the gate was opening. Sounded to him like it had struck something, possibly drunk, and driving reckless through the complex. He wanted a patrol officer to check on it. FPD Follow-up Report, dated 3/28/09, 6

         d.  Statement of neighbor Christopher Zimmerman who saw Willis speeding, going fast over speed bumps, and having trouble getting vehicle in gear due to the vehicle engine revving. Assumed he was drunk because it took him three times to park...driving into the stall and backing out. FPD Follow-up Report, dated 3/28/09, 18

     iii.  More than one half of all murderers and their victims are believed to have been intoxicated at the time of the murder.

     iv.  Severe Alcohol Intoxication also contributes to disinhibition and feelings of sadness and irritability, which contribute to suicide attempts and completed suicide.

     v.  Alcohol Related Disorders contribute to absenteeism from work, job related accidents, and low employee productivity.

1. Ms. Willis testified that her son Mr. Willis was
   unemployed, his family was helping him, and she had at
   least one conversation with him about buying booze instead
   of paying his insurance or vehicle registration.· Mary Willis
   depo, 30

vi. Repeated intake of high doses of alcohol can affect nearly every
organ system and problems include gastritis, stomach or duodenal
ulcers, and in about 15% of those who use heavily, liver cirrhosis
and pancreatitis. There is also an increased rate of cancer of the
esophogas, stomach and other parts of the gastrointestinal tract. It
can also contribute to heart disease and hypertension. Overdoses of
alcohol can lead to death.

vii. Mr. Willis' behavior and noted issues resulted in multiple likely
criminal code violations, had he survived the encounter.

1. "I believe Willis may have....violated Vehicle Code 13200,
   reckless driving....hit and run....resisting, obstructing, and
   delaying an officer in the performance of his duties, assault
   on an officer, drawing and exhibiting a firearm in the
   presence of a peace officer, drawing and exhibiting a
   firearm with the intent to resist an officer...." Officer
   Daniel Astacio's Response to Chris Willis' Special
   Interrogatories, Set 1, dated 3/29/10, 5

2. Officer Catton suspected he was reckless driving, and
   driving under the influence. Also, he was suspected of
   assault on an officer, exhibiting a firearm in presence of
   peace officer, resisting, drawing a weapon while resisting,
   etc." Officer Greg Catton's Response to Mary Willis'
   Special Interrogatories, Set 1, dated 5/12/10 4-5

3. Decedent was negligent because "decedent consumed
   alcohol (BA.29%) and marijuana prior to getting into a
   vehicle and driving. He drove recklessly and while under
   the influence, which initiated a police investigation. He
   was in possession of a firearm. When approached by
   Officer Catton and Astacio, Willis turned towards them
   holding a firearm and holster in his left hand. Officers
   Catton and Astacio identified themselves as police officers
   and gave repeated commands to him to drop the gun.
   Instead of dropping the gun, Willis withdrew it from the
   holster and pointed it at Officer Catton and Officer Astacio
   and fired at the officers...Willis was shot." City of
   Fresno's Response to Chris Willis' Special Interrogatories,
   Set 1, dated 3/30/10, 4-5

f. The presence of firearms in the home is a significant risk factor for
homicide and suicide-a factor that is exacerbated in this case by Mr.
Willis alcohol abuse and aggressive personality shift while drinking.

17

    i. He had at least two prior police contacts that involved either the threat of, or actual use of a firearm. It appears that on this occasion-unfortunately-the availability of that firearm coupled with his personality and intoxication led to him try to make good on his threats to harm using a weapon.

        1. Stephen Willis brandished a shotgun on a prior occasion during a confrontation. During a disturbance involved him displaying his shotgun in response to possible Bulldog gang members. FPD Law Enforcement Report, dated 2/9/08, 2, 4

g. Overall, Mr. Willis' constellation of the above factors resulted in this unfortunate but not unexpected situation that escalated by his conduct into this officer involved shooting. My knowledge and experience

Thank you for the opportunity to review this case.

Sincerely,

Kris Mohandie, Ph.D.
Licensed Psychologist

18

# **EXHIBIT D**



**ALAN D BARBOUR, Ph.D., C.L.B., FACFE**
*Fellow of the Forensic Science Society*

*Consulting Forensic Toxicologist*
*Forensic Toxicology • Blood Alcohols • Mass Spectrometry*



**Inspection and evaluation of clinical and toxicology laboratory records, including chain of possession, analytical methods, and quality control**

**Testimony, specializing in drug and alcohol tests and their interpretation**

**Analysis of hypothetical drinking histories**

May 3rd, 2011
Page 1 of 10

Walter, Hamilton & Koenig
50 Francisco Street, Suite 460
San Francisco, CA 94113-2100

BY ELECTRONIC MAIL TO rana@whk-law.com;  TO FOLLOW BY U.S. MAIL

IN RE:  *Willis, et al. vs. City of Fresno, et al.*
        Case No. 1:09 CV 01766 LJO DLB

Dear Sirs et Mesdames:

I have reviewed the documents related to the case of the late Mr. Willis which you sent to me, to wit:

      1. Coroner's report including toxicology lab reports;
      2. Opinion of Vincent J. M. Di Maio, M.D.;
      3. Deposition of Venu Gopal, M.D.;
      4. Handwritten statement of Jennifer Uribe (AKA Exhibit A to her deposition);  and
      5. Transcript of Ms Uribe's interview with Detective Villalvazo.
      6. Photographs (3) of an empty bottle of *Patrón* tequila, 375 ml, 40% alcohol.

I have also had recourse to certain other references as cited below.

I hereby declare that the following is my considered professional opinion in the above-cited matter, based on my education, training, experience, the documents cited above and the references cited below.  If called upon to do so I will unhesitatingly so testify under oath and subject to the penalties of perjury,  reserving, however, the  right to reconsider my opinion in the light of further information should such be forthcoming.

*Please continue to second page.*

Telephone & Fax: (559) 435-8259
P.O. Box 14084 • Fresno, CA 93650
abarbour@lightspeed.net• http://www.abarbour.net

**ALAN D BARBOUR, Ph.D., C.L.B., FACFE**
*Fellow of the Forensic Science Society*

### Summary of Events

Mr. Steven Willis had dinner with his companion, Ms Jennifer Uribe, beginning at about 6:00 PM on March 27th, 2009.  During dinner he consumed part of one glass of beer.  After dinner they went shopping and among other things purchased a small bottle of tequila, which they jointly consumed at their apartment, I estimate between 8:00 and 9:30 PM.  Later they went to a club which serves liquor, arriving approximately 10:00 PM.  Ms Uribe's statements are not completely clear about whether Mr. Willis did or did not partake of any alcohol at the club;  once she said they did drink, and twice she said they did not.  She reports being told that they would not be served more alcohol because she was unsteady on her feet.  They left the club at about midnight and Mr. Willis drove them to their apartment complex, parking in the appropriate parking stall.  Accounts differ, but something about Mr. Willis' driving attracted the attention of police officers in the vicinity responding to a reported gang disturbance.  Police officers walked into the parking area of the apartment complex, saw Mr. Willis removing a holstered pistol from the trunk of his car and had an interaction with him that left him dead from numerous gunshot wounds at about 1:00 AM on March 28th.  An autopsy was performed on Mr. Willis beginning at 9:00 AM on March 29th, approximately 32 hours post mortem.  Fourteen bullets entered the body sixteen times, perforating the left lung, stomach, spleen, chest cavity, heart, small intestine, liver, and scrotum in addition to various muscles, bones and other tissues.

Peripheral blood (collected most likely from the subclavian vein but possibly from a femoral vein), vitreous humor, gastric contents and urine were collected at autopsy.  The blood was divided between a larger bottle without preservative and a smaller vial with preservative.  Blood, vitreous humor and gastric contents were forwarded to the laboratory for drug and alcohol analysis, and the urine sample was retained and frozen.  I am informed and reasonably believe that between that time and now the frozen urine sample retained by the coroner's office has disappeared.

Laboratory tests found ethyl alcohol [hereafter "alcohol"], Δ⁹-tetrahydrocannabinol [hereafter "THC," the principal active ingredient of marijuana] and 11-nor-9-carboxy-tetrahydrocannabinol [hereafter "THC-COOH," the principal and totally inactive metabolite of THC] as follows:

    Peripheral blood with preservative:  alcohol 0.29%
    Peripheral blood without preservative:  THC 16 ng/ml and THC-COOH 216 ng/ml
    Vitreous humor:  alcohol 0.21%
    Gastric contents:  alcohol 0.84%

### Interpretation of Toxicology Laboratory Test Results:  General Principles

There are several general principles in the interpretation of postmortem alcohol and drug tests which can be ignored only at the risk of seriously misunderstanding or misrepresenting the tests' significance:

> **The test results show findings at the time of testing, not at the time of death.**
> The differences can be substantial;  the postmortem tests can certainly aid understanding of the decedent's condition just before death, but cannot legitimately be considered in isolation.  Many changes take place after death, some very quickly.

*Please continue to third page.*

**ALAN D BARBOUR, Ph.D., C.L.B., FACFE**
*Fellow of the Forensic Science Society*

*Willis, et al. vs. City of Fresno, et al.,* Page 3 of 10

**One must beware of over-interpreting the test results.**
In addition to postmortem changes in the composition of body fluids and tissues, the tests themselves have limitations in sensitivity and accuracy that must be considered. Understandings of the significance of the tests continue to develop. Specific behaviors cannot reliably be predicted from particular blood test results for the living, much less for the dead. If there is a fair understanding of what blood levels were before death, a range of possible or perhaps even probable behaviors or conditions may be considered and compared with other evidence.

**History is often more important than any lab test.**
Among physicians there is an old saw that the best lab test is a carefully obtained history; the principle holds true for the dead just as for the living.

**If the lab tests don't make sense in view of the history, something is wrong.**
It might be the specimens, the testing, the [alleged] history, the interpretation, or some combination of them; but the lab tests and other evidence need to agree to the extent possible before one can have any degree of confidence in the conclusions.

In the words of Irving Sunshine, one of the preëminent forensic toxicologists of the 20th Century, ***"Caveat interpretor."*** [Sunshine (1975)]

### Incongruities in the Willis Case

The major problem in evaluating the toxicology test results in this case is that Mr. Willis successfully drove his automobile home, a distance of about four miles with multiple turns and traffic controls, parked it in its assigned place, turned off the engine, got out of the car, walked to the rear, opened the trunk and took out an item. [Presumably he also closed the trunk; the records I have do not say.] If he truly had a blood alcohol level of 0.29% just before his death, that should have been impossible. There are chronic alcoholics who might be able to do that, but much more likely than not a person with that high a blood alcohol level could not; he would be on the verge of coma, running off the road, driving through red lights, not just stumbling but falling down if he dared to try walking, etc. That is considering the alcohol alone; if he truly had THC in his blood as well he should have been thoroughly incapable of driving:

"The combination of THC with alcohol sufficient for attaining a BAC of about 0.04 g/dl has very severe effects on driving performance." [Robbe (1999)]

### Estimating Mr. Willis's Blood Alcohol Level

Given Mr. Willis's performance and ignoring for the moment the possibility of THC in his blood, one would expect that his blood alcohol was surely below 0.25% and at least as likely as not below 0.20%. Blood is subject to fermentation after death, with consequent production of alcohol. Fermentation is much more rapid in cases of trauma involving rupture of internal organs [Kugelberg (2007)], which was pronounced in this case, and 32 hours is abundant time for significant amounts of alcohol to be produced by microörganisms spreading from the gut to the blood; even without rupture of the gut, heart, and liver as in this case, gut bacteria begin to spread into the blood within six hours [Rockerbie (2010)]. The degree of postmortem alcohol formation is not related to the degree of decomposition [Rockerbie (2010); Zumwalt (1982)].

*Please continue to fourth page.*

Telephone & Fax: (559) 435-8259
P.O. Box 14084 • Fresno, CA 93650
abarbour@lightspeed.net• http://www.abarbour.net

**ALAN D BARBOUR, Ph.D., C.L.B., FACFE**
*Fellow of the Forensic Science Society*

*Willis, et al. vs. City of Fresno, et al.,* Page 4 of 10

The unusually large difference between the measured blood and vitreous humor alcohol levels (0.29% vs. 0.21%) is unlikely to be due to lag in the exchange of alcohol between the two fluids, as Dr. Di Maio assumes, because (unlike Dr. Di Maio states without giving any authority), "The time required for ethanol to enter the bloodstream and penetrate the fluid of the eye seems to be fairly short" [Kugelberg (2007)]. More likely than not it is due to formation of alcohol in the blood after death. Vitreous humor is less susceptible to this because it is sterile, encapsulated, and distant from the gut and its fermentative microörganisms. It is very unfortunate that the urine specimen was not tested and has evidently disappeared; this is one of the unusual cases where urine testing might have clarified the question of the subject's blood alcohol level and whether it was rising or falling at the time of death.

Dr. Gopal indicates in his deposition that the "peripheral" blood was most likely collected from the subclavian vein, which is rather close to the heart and therefore more prone to contamination (especially when the heart is perforated, as here) unless it is clamped off (which I understand is rarely done) than blood collected from the femoral vein, which is the generally preferred site of collection [Rockerbie (2010); Kugelberg (2007)]. I do not presume to find fault with Dr. Gopal's choice of sampling site; one must choose the best site available, and I have no idea if using the femoral vein was either practical or reasonable in this case. In this case the drug and alcohol tests are in any event incidental findings for Dr. Gopal's purposes; they are unrelated to the cause and manner of death, which are the province of the coroner.

An alternative approach would be to estimate the blood alcohol level from the vitreous alcohol level, as Dr. Di Maio has done (again without giving any reference for the particular factor he used). Dividing the vitreous humor alcohol level by 1.75 [Kugelberg (2007); Jones (2001)] gives a very conservative estimate of 0.12% blood alcohol at the time of death. Another large study found an average factor of 1.24, which in this case (assuming fermentation of the blood) would indicate a blood alcohol level of 0.17% [Kugelberg (2007); Honey (2005)]. This range (0.12% to 0.17%) would reasonably correspond to the evident driving pattern.

One remaining method of estimating Mr. Willis's blood alcohol level at his time of death is based upon his reported pattern of alcohol consumption. It is an unusual case where the drinking pattern is actually known; as is usually the case, here the drinking pattern is not clear. From the documents in hand and personal communication I gather that the reported drinking history was approximately as follows:

> One glass of beer, not finished, during dinner starting about 6:00 PM
> 375 ml 80 proof tequila consumed by Mr. Willis and Ms Uribe between 8:00 and 9:30 PM.
>> I assume on the basis of prejudice that Mr. Willis drank more than Ms Uribe, two thirds of the bottle.
> No alcohol consumed at the club (Ms Uribe seems unclear on this point)

Using the mathematical model of Widmark [Widmark (1932/1981)] and estimating the Widmark reduced body mass factor by the method of Forrest [Barbour (2001)] gives an estimated blood alcohol level at 1:00 AM of 0.07%. If we assume that Mr. Willis additionally partook of two pints of regular beer at the club around 10:30 and 11:30 PM the estimated blood alcohol level at 1:00 AM becomes 0.14% [Appendix A], midway between the conservative and average values estimated above from the vitreous alcohol level, and not clearly inconsistent with the subject's driving skill and ability to walk.

*Please continue to fifth page.*

**ALAN D BARBOUR, Ph.D., C.L.B., FACFE**
*Fellow of the Forensic Science Society*

*Willis, et al. vs. City of Fresno, et al.,* Page 5 of 10

### Did Mr. Willis Have THC in his Blood at the Time of Death?

Dr. Di Maio in his opinion makes a statement about serum THC levels after smoking marijuana falling to undetectable levels within several hours, without citing his reference or putting it in context. The clear implication is that Mr.Willis had smoked marijuana shortly before his death, probably while at the club. [Note: the postmortem THC blood level of 16 ng/ml reported for Mr. Willis would correspond to a serum value of about 30 ng/ml.] The reference Dr. DiMaio relies upon is an early study [Heustis (1992)] on THC levels observed in the blood (serum) of six young THC-free male volunteers smoking what many now consider low-dose marijuana cigarettes under strictly controlled laboratory conditions. Not only does it not deal with postmortem THC values, the lead author of that paper was more recently co-author of a paper reporting that regular marijuana users can have readily measurable amounts of THC in their blood after a week's assured abstinence in a locked medical facility [Karschner (2009)], which makes absolute sense in view of the long observed fact that formerly regular marijuana users may have detectable amounts of THC-COOH in their urine for months after quitting. This is explained by the fact that THC is stored in the fatty tissue of the body and during life slowly leaks out into the blood as the fat is metabolized.

It has long been suspected that THC might pass out of the fat into the blood and other body fluids after death. It is now well established that this happens [Collins (1997); Brunet (2010)]; what surprised many people was the speed with which such postmortem redistribution happens--it seems to be complete within a few hours, well before an autopsy can normally be performed.

Another factor long suspected but only recently proven [Gunasekaran (2009)] is the rapid redistribution of THC from fat during life as a result of shock (caused by loss of blood and falling blood pressure, among other things). Standard college and medical school textbooks [e.g., Vander (1975); Sircar (2007)] discuss how during episodes of shock adrenaline levels increase, which among other things causes fat to break down, which provides rapid energy (and incidentally frees into the blood anything stored in the fatty tissue).

Thus the THC found in Mr. Willis's blood sample collected at autopsy, some 32 hours after his death, could very well be from shock due to massive bleeding from multiple gunshot wounds combined with postmortem redistribution from stores in the fatty tissue of the body. Given his estimated blood alcohol level, if Mr. Willis had had more than inconsequential traces of THC in his blood shortly before death it is virtually inconceivable that he could have driven as he did [Robbe (1999) plus my personal knowledge of such THC plus alcohol cases].

Again it is regrettable that Mr. Willis's urine specimen was not tested; although THC is not found in urine, THC-COOH is, and the levels may indicate the probability of recent marijuana use.

### Anticipated Effects of Alcohol on Mr. Willis' Behavior

Dr. Di Maio states that "The high alcohol level in Mr. Willis **would** have impaired his judgment and caused him to engage in foolish actions." [Emphasis added.] Leaving aside the fact that Dr. Di Maio jumped to the conclusion that the postmortem blood alcohol and THC levels were identical to the levels at the time of Mr. Willis' encounter with the policemen, and also leaving aside that such levels would almost certainly have incapacitated him, it is my professional opinion that only a forensic psychiatrist could legitimately give such an opinion, and would be most unlikely to do so. I see nothing in Dr. Di Maio's *curriculum vitae* indicating that he is a qualified forensic psychiatrist.

*Please continue to sixth page.*

**ALAN D BARBOUR, Ph.D., C.L.B., FACFE**
*Fellow of the Forensic Science Society*

*Willis, et al. vs. City of Fresno, et al.,* Page 6 of 10

Elsewhere in his opinion Dr. Di Maio states that "At levels between 0.20-0.30% as in this case, the individual is grossly impaired and may be lethargic and sleepy or hostile and aggressive." Again this ignores the effects of the THC that Dr. DiMaio assumes was present at the time, but in any event experience teaches that a person with a blood alcohol level so high as to be bordering on coma is most unlikely to be hostile and aggressive; s/he is most likely to be in a stupor.   Granted that someone *may* be a "mean drunk" at a blood alcohol level of 0.29%, it is very unlikely. Individual differences in behavior typically begin to disappear at blood alcohol levels of about 0.15% and above.

As a Clinical Laboratory Bioanalyst licensed by the California Department of Health Services it is within my scope of practice to interpret the results of clinical laboratory tests; as a Forensic Alcohol Supervisor approved by the California Department of Health Services it is within my scope of practice to interpret alcohol tests in the service of the courts.  I currently review about 2500 coroner's toxicology reports per year (250 autopsies per year is considered a very substantial workload for a pathologist) and about 12,000 police toxicology reports per year.  I personally perform testing in a substantial proportion of those cases, both coroner's and police.  I have been actively employed in forensic toxicology for nearly thirty-five years.

Hoping that this is of some assistance, I remain very

Sincerely yours,

*Alan D Barbour*

*Please continue to seventh page.*

**ALAN D BARBOUR, Ph.D., C.L.B., FACFE**
*Fellow of the Forensic Science Society*

## References

Barbour AD, Simplified estimation of Widmark "r" values by the method of Forrest. *Science & Justice* 41, 53-54 (2001)

Brunet B et al., Postmortem redistribution of THC in the pig. *International Journal of Legal Medicine* 124, 543-549 (2010)

Collins M et al., GC-MS-MS Confirmation of Unusually High Δ⁹-Tetrahydrocannabinol Levels in Two Postmortem Blood Samples. *Journal of Analytical Toxicology* 21, 538-542 (1997)

Gunasekaran N et al., Reintoxication: the release of fat-stored Δ⁹-tetrahydrocannabinol (THC) into blood is enhanced by food deprivation or ACTH exposure. *British Journal of Pharmacology* 158(5), 1330-1337 (2009)

Huestis MA et al., Blood Cannabinoids. I. Absorption of THC and Formation of 11-OH-THC and THCCOOH During and After Smoking Marijuana. *Journal of Analytical Toxicology* 16 276-282 (1992)

Honey D et al., Comparative alcohol concentrations in blood and vitreous humor with illustrative case studies. *Journal of Analytical Toxicology* 29, 365-369 (2005).

Jones AW and Holmgren P, Uncertainty in estimating blood ethanol concentrations by analysis of vitreous humor. *Journal of Clinical Pathology* 54 699-702 (2001)

Karschner EL et al., Implications of Plasma Delta-9-Tetrahydrocannabinol, 11-Hydroxy-THC, and 11-nor-9-Carboxy-THC Concentrations in Chronic Cannabis Smokers. *Journal of Analytical Toxicology* 33(8) 469-77 (2009)

Kugelberg FC and Jones AW, Interpreting results of ethanol analysis in postmortem specimens: A review of the literature. *Forensic Science International* 165 10-29 (2007)

Robbe HWJ and O'Hanlon JF, *Marijuana, Alcohol and Actual Driving Performance.* U.S. Department of Transportation National Highway Traffic Safety Administration, DOT HS 808 939 (1999)

Rockerbie R, *Alcohol and Drug Intoxication,* AlcoTrace Publications, Victoria BC (2010)

Sircar S, *Medical Physiology.* Thieme Publishing Group (2007)

Sunshine I, *Methodology for Analytical Toxicology,* CRC Press, West Palm Beach FL (1975)

Vander AJ et al., *Human Physiology: The Mechanisms of Body Function.* McGraw-Hill, Inc., NYC (1970)

Widmark, EMP, *Principles and Applications of Medicolegal Alcohol Determination,* translation of the 1932 German version, Biomedical Publications, Davis CA (1981)

Zumwalt RE et al., Evaluation of Ethanol Concentrations in Decomposed Bodies. *Journal of Forensic Sciences* 27(3) 549-554 (1982)

Attachments:

Appendix A:  Blood Alcohol Computer Simulation for Steven Willis, Deceased (2 pages)
*Curriculum vitae* Alan D Barbour (1 page)

## APPENDIX A
## BLOOD ALCOHOL COMPUTER SIMULATION FOR STEVEN WILLIS, DECEASED
### By Alan D Barbour PhD, FFSSoc 2nd May 2011
### Model: 8.5 oz (5-6 shots) tequila plus 2 pints regular beer

```
⬤◯◯    DOSBox 0.72, Cpu Cycles:  3000, Frameskip 0, Program:  EZ20
┌───────────────── EZ-ALC  Ver 2.0 - DataScreen ─────────────────┐
│ Subject Name :Steven Willis              : I.D.# :SW11A:        │
│ Body Weight  :171: Pounds.    Initial BAC :.0000:              │
│ Widmark Beta :.017: % per hour.                                │
│ Widmark r    :.71:                                             │
│                                                                │
│ Drink   FlOz   Start   Absorb     Drink   FlOz   Start   Absorb│
│ Number  EtOH   Time    Time       Number  EtOH   Time    Time  │
│   1     1.13   8:15    045          13     0.00   0:00    060   │
│   2     1.13   8:45    045          14     0.00   0:00    060   │
│   3     1.13   9:15    045          15     0.00   0:00    060   │
│   4     0.80  10:30    030          16     0.00   0:00    060   │
│   5     0.80  11:15    030          17     0.00   0:00    060   │
│   6     0.00   0:00    060          18     0.00   0:00    060   │
│   7     0.00   0:00    060          19     0.00   0:00    060   │
│   8     0.00   0:00    060          20     0.00   0:00    060   │
│   9     0.00   0:00    060          21     0.00   0:00    060   │
│  10     0.00   0:00    060          22     0.00   0:00    060   │
│  11     0.00   0:00    060          23     0.00   0:00    060   │
│  12     0.00   0:00    060          24     0.00   0:00    060   │
└────────────────────────────────────────────────────────────────┘

                          ┤ Main Menu ├
┌────────────────────────────────────────────────────────────────┐
│ ? Help   DATA: Del File Edit List + -   BAC: View Screen Print DBA   QUIT │
└────────────────────────────────────────────────────────────────┘


⬤◯◯    DOSBox 0.72, Cpu Cycles:  3000, Frameskip 0, Program:  EZ20
┌───────────────── EZ-ALC  Ver 2.0 - ScreenPrint ────────────────┐
│    Absorb         . . . .   . . . .   . . . .   . . . .   . . . │
│ EtOH  Time        0 0 0 0 0 0 0 0 0 0 1 1 1 1 1 1 1 1 1 1 2 2 2 2 2 2 2 2 2│
│(FlOz)(Min) BAC Time 0 1 2 3 4 5 6 7 8 9 0 1 2 3 4 5 6 7 8 9 0 1 2 3 4 5 6 7 8│
│1.13  45 .0000  8:15 *        .         .         .         .   │
│         .0042  8:20 ─*       .         .         .         .   │
│         .0084  8:25 ──*      .         .         .         .   │
│         .0126  8:30 ───*     .         .         .         .   │
│         .0168  8:35 ───*     .         .         .         .   │
│         .0210  8:40 ────*    .         .         .         .   │
│1.13  45 .0252  8:45 ─────*   .         .         .         .   │
│         .0350  8:50 ───────* .         .         .         .   │
│         .0448  8:55 ─────────*.        .         .         .   │
│         .0546  9:00 ──────────.*       .         .         .   │
│         .0588  9:05 ──────────.─*      .         .         .   │
│         .0630  9:10 ──────────.──*     .         .         .   │
│1.13  45 .0672  9:15 ──────────.──*     .         .         .   │
│         .0770  9:20 ──────────.────*   .         .         .   │
│         .0868  9:25 ──────────.──────* .         .         .   │
│         .0966  9:30 ──────────.────────*         .         .   │
│         .1008  9:35 ──────────.─────────*        .         .   │
│         .1050  9:40 ──────────.──────────.*      .         .   │
│         .1092  9:45 ──────────.──────────.─*     .         .   │
└────────────────────────────────────────────────────────────────┘

HOME for DataScreen, ANY OTHER KEY for next ScreenPrint Screen.
```

## APPENDIX A
## BLOOD ALCOHOL COMPUTER SIMULATION FOR STEVEN WILLIS, DECEASED
### By Alan D Barbour PhD, FFSSoc 2nd May 2011
### Model: 8.5 oz (5-6 shots) tequila plus 2 pints regular beer

```
  ⬤ ◯ ◯      DOSBox 0.72, Cpu Cycles:   3000, Frameskip  0, Program:  EZ20
 ┌──────────────┤ EZ-ALC  Ver 2.0 - ScreenPrint ├────────────────┐
 │    Absorb              . . . . . . . . . . . . . . . . . . . . . . . . . . .
 │  EtOH Time        0 0 0 0 0 0 0 0 0 0 1 1 1 1 1 1 1 1 1 1 2 2 2 2 2 2 2 2 2
 │ (FlOz)(Min) BAC Time  0 1 2 3 4 5 6 7 8 9 0 1 2 3 4 5 6 7 8 9 0 1 2 3 4 5 6 7 8
 │          .1134  9:50  ------------.------------.----*      .         .
 │          .1176  9:55  ------------.------------.----*      .         .
 │          .1218 10:00  ------------.------------.----*      .         .
 │          .1204 10:05  ------------.------------.----*      .         .
 │          .1189 10:10  ------------.------------.----*      .         .
 │          .1175 10:15  ------------.------------.----*      .         .
 │          .1161 10:20  ------------.------------.----*      .         .
 │          .1147 10:25  ------------.------------.----*      .         .
 │ 0.80  30 .1133 10:30  ------------.------------.---*       .         .
 │          .1178 10:35  ------------.------------.----*      .         .
 │          .1224 10:40  ------------.------------.----*      .         .
 │          .1269 10:45  ------------.------------.-----*     .         .
 │          .1315 10:50  ------------.------------.------*    .         .
 │          .1360 10:55  ------------.------------.-------*   .         .
 │          .1405 11:00  ------------.------------.--------*  .         .
 │          .1391 11:05  ------------.------------.--------*  .         .
 │          .1377 11:10  ------------.------------.-------*   .         .
 │ 0.80  30 .1363 11:15  ------------.------------.-------*   .         .
 │          .1408 11:20  ------------.------------.--------*  .         .
 └────────────────────────────────────────────────────────────────────┘
```

HOME for DataScreen, ANY OTHER KEY for next ScreenPrint Screen.

```
  ⬤ ◯ ◯      DOSBox 0.72, Cpu Cycles:   3000, Frameskip  0, Program:  EZ20
 ┌──────────────┤ EZ-ALC  Ver 2.0 - ScreenPrint ├────────────────┐
 │    Absorb              . . . . . . . . . . . . . . . . . . . . . . . . . . .
 │  EtOH Time        0 0 0 0 0 0 0 0 0 0 1 1 1 1 1 1 1 1 1 1 2 2 2 2 2 2 2 2 2
 │ (FlOz)(Min) BAC Time  0 1 2 3 4 5 6 7 8 9 0 1 2 3 4 5 6 7 8 9 0 1 2 3 4 5 6 7 8
 │          .1454 11:25  ------------.------------.----------*. .         .
 │          .1499 11:30  ------------.------------.-----------* .         .
 │          .1545 11:35  ------------.------------.-----------.*          .
 │          .1590 11:40  ------------.------------.-----------.-*         .
 │          .1635 11:45  ------------.------------.-----------.--*        .
 │          .1621 11:50  ------------.------------.-----------.-*         .
 │          .1607 11:55  ------------.------------.-----------.-*         .
 │          .1593 12:00  ------------.------------.-----------.*          .
 │          .1579 12:05  ------------.------------.-----------.*          .
 │          .1565 12:10  ------------.------------.-----------.*          .
 │          .1550 12:15  ------------.------------.-----------.*          .
 │          .1536 12:20  ------------.------------.-----------.*          .
 │          .1522 12:25  ------------.------------.-----------*           .
 │          .1508 12:30  ------------.------------.----------*            .
 │          .1494 12:35  ------------.------------.----------*            .
 │          .1480 12:40  ------------.------------.----------*            .
 │          .1465 12:45  ------------.------------.---------*.            .
 │          .1451 12:50  ------------.------------.--------*.             .
 │          .1437 12:55  ------------.------------.--------*.             .
 └────────────────────────────────────────────────────────────────────┘
```

HOME for DataScreen, ANY OTHER KEY for next ScreenPrint Screen.




## ALAN D BARBOUR, Ph.D., C.L.B., FACFE
*Fellow of the Forensic Science Society*

*Consulting Forensic Toxicologist*
*Forensic Toxicology • Blood Alcohols • Mass Spectrometry*

**Inspection and evaluation of clinical and toxicology laboratory records, including chain of possession, analytical methods, and quality control**

**Testimony, specializing in drug and alcohol tests and their interpretation**

**Analysis of hypothetical drinking histories**

More than thirty years' experience in forensic toxicology and clinical laboratory science. Fully qualified to direct clinical laboratories, forensic toxicology laboratories, and SAMHSA certified employment drug screening laboratories. Recognized as an expert in more than three hundred Justice, Municipal, Superior and U.S. District Court cases to date. Wide-ranging experience in developing new tests, writing procedure manuals, troubleshooting existing procedures, demographic studies, quality assurance and record keeping in both clinical and forensic laboratories. International consulting practice.

### PROFESSIONAL CREDENTIALS

B.S. With Distinction and honors in chemistry, San Jose State College
Ph.D. in physical organic chemistry, University of California at Santa Cruz
Clinical Laboratory Director (U.S. Department of Health, Education & Welfare)
Clinical Chemist (National Registry in Clinical Chemistry)
Forensic Alcohol Supervisor (State of California)
Clinical Laboratory Bioanalyst (State of California, CLIA Laboratory Director)
Breath Alcohol Technician, Instructor (U.S. Department of Transportation)
Diplomate, American Board of Forensic Examiners
Fellow, American College of Forensic Examiners
Fellow, Forensic Science Society

### PUBLICATIONS

"Another Case of Postmortem Electrolytic Synthesis of Methamphetamine." *Bulletin of the International Association of Forensic Toxicologists* **XXXVII** (3), 47 (2007).
"Industrial Accident: *In Morte* Electrolytic Synthesis of Methamphetamine." *Bulletin of the International Association of Forensic Toxicologists* **XXXIII** (2), 28 (2003).
"Simplified Estimation of Widmark "r" Values by the Method of Forrest." *Science & Justice* **41**(1): 53-54 (2001).
"Death After Extraordinary Methamphetamine Overdose Following Apparent Cocaine Binge." *Bulletin of the International Association of Forensic Toxicologists* **XXXI** (1), 8-9 (2001).
"Phencyclidine, Alcohol, and Driving Under the Influence." *Bulletin of the International Association of Forensic Toxicologists* **XXX** (1), 15-17 (2000).
"Simultaneous Extraction of Cocaine and its Metabolites With Diatomaceous Earth Columns and Derivatisation with DMF Dialkyl Acetals." *Bulletin of the International Association of Forensic Toxicologists* **XXX** (1), 13-15 (2000).
"Suicidal Overdose of Doxylamine." *Bulletin of the International Association of Forensic Toxicologists* **XXIX** (3), 5 (1999).
"Toxicology and Drug Screening." Laboratory Procedures for Medical Office Personnel, C.A. Stepp and M.A. Woods, eds., W.B. Saunders, (1998).
"GC/MS Analysis of Propylated Barbiturates." *Journal of Analytical Toxicology* **15** (4), 214-215 (1991).
"California Association of Toxicologists Home Page." http://www.Cal-Tox.org, 1997-2004
"WWW Virtual Library: Forensic Toxicology." http://www.abarbour.net/vlibft.html
"Alan Barbour's Forensic Toxicology Page." http://www.abarbour.net

### PROFESSIONAL ASSOCIATIONS

Forensic Science Society • The International Association of Forensic Toxicologists
American College of Forensic Examiners • National Association of Medical Examiners
California Association of Toxicologists

Telephone & Fax: (559) 435-8259
P.O. Box 14084 • Fresno, CA 93650
abarbour@lightspeed.net • http://www.abarbour.net

# EXHIBIT E

1

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF CALIFORNIA
FRESNO DIVISION

```
CHRIS WILLIS, MARY WILLIS,    §
INDIVIDUALLY AND SUCCESSORS   §
IN THE INTEREST TO STEPHEN    §
WILLIS; JENNAFER URIBE        §
                              §
VS.                           §  NO. 1:09-CV-01766-LJO-DLB
                              §
CITY OF FRESNO, OFFICER       §
GREG CATTON, OFFICER DANIEL   §
ASTACIO, CHIEF JERRY DYER,    §
AND DOES 1 THROUGH 50         §
INCLUSIVE                     §
```
--------------------------------------------------------
VIDEO TELECONFERENCE DEPOSITION OF
VINCENT DI MAIO, M.D.
JUNE 10, 2011
--------------------------------------------------------

APPEARANCES:
    FOR THE PLAINTIFFS:
        BY:  MR. WALTER H. WALKER, III
        WALKER, HAMILTON & KOENIG, LLP
        50 Francisco Street, Suite 460
        San Francisco, California 94133-2100
        (415)986-3339

    FOR THE DEFENDANTS:
        BY:  MR. JAMES DARVIN WEAKLEY
        WEAKLEY & ARENDT, LLP
        1630 East Shaw Avenue, Suite 176
        Fresno, California 93710
        (559)221-5256
        VINCENT DI MAIO, M.D.,
            The Witness;

        RENA ANSARI,
            Also Present; and
        DANDY ELLIS,
            Certified Shorthand Reporter in
            and for the State of Texas


ESQUIRE
an Alexander Gallo Company

Toll Free: 800.977.1415
Facsimile: 559.222.7922

Suite 201
155 East Shaw Avenue
Fresno, CA 93710
www.esquiresolutions.com

Vincent Di Maio, M.D.                            June 10, 2011

11

1    sure, do you know note that you're not sure?

2        A.   Yes, sir.  What I usually say are things like

3    "it's probable" or "one possibility is," and so it would

4    be in the phraseology.

5        Q.   Excuse me.  What do you understand the

6    difference to be between probable, a word you've just

7    used, and possible.

8        A.   Virtually anything is possible.  Probability is

9    what, in all likelihood, occurred.

10       Q.   You mean more likely than not?

11       A.   To -- Yeah, to an extent, yes, sir, more likely

12   than not.

13       Q.   Okay.  Now, I'd like you to turn then to page

14   four of your report.  The fifth paragraph begins

15   wound "H".

16       A.   Yes, sir.

17       Q.   Do you have that in front of you?

18       A.   Right.

19       Q.   I read it to say wound "H" was in the right

20   forearm and only injured muscle.

21       A.   That's correct, sir.

22       Q.   The forearm had to be away from the body at the

23   time the bullet perforated the arm.  It could have been

24   extended ahead of him pointing a gun.  Because of the

25   mobility of the arm, the shooter could have been in



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.977.1415
Facsimile: 559.222.7922

Suite 201
155 East Shaw Avenue
Fresno, CA 93710
www.esquiresolutions.com

Vincent Di Maio, M.D.                    June 10, 2011

12

1    front of him, behind him, or to his right.  This wound

2    may have prevented him from completely pulling the

3    trigger of the gun.

4              Were you speculating when you wrote that,

5    Doctor?

6        A.   No, I'm giving possibilities.  But what I say

7    is, obviously -- when I say that the gun could be in

8    front of him, to the side or -- I mean the arm could be

9    in front of him, to the side of him, to the back, what

10   I'm essentially saying, that you cannot tell that.  So

11   these are all possibilities.  But at this point there's

12   insufficient information, and there always will be

13   insufficient information to give that.

14             The other thing was -- is it may have

15   prevented him or it may not have prevented him.  It's

16   just a possibility.  But that's why it was phrased in

17   that way, that it's not a -- it's not a definite

18   conclusion.

19        Q.   Why did you include that section in your

20   report?

21        A.   Because there was question of could he have

22   continued firing after getting that wound.  I believe

23   that was asked of the autopsy pathologist at the time.

24   And the answer to that is, it may have prevented him

25   from pulling the trigger, sure.  But you can't say for



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.977.1415
Facsimile: 559.222.7922

Suite 201
155 East Shaw Avenue
Fresno, CA 93710
www.esquiresolutions.com

Vincent Di Maio, M.D.                              June 10, 2011

75

1   turning, that could be.

2        Q.    Just to verify -- In our last segment of this

3   deposition now I'm going to switch subjects a little

4   bit.  And I want to verify you, yourself, have performed

5   no testing of any materials, fluids, or tissues,

6   correct?

7        A.    That is correct, sir.

8        Q.    And you've not examined, yourself, any

9   materials, fluids or tissues?

10       A.    That is correct, sir.

11       Q.    What do you know about the contents of

12   Mr. Willis' stomach at the time of the shooting?

13       A.    It would only be -- I'm going to get my

14   glasses -- what it says in the autopsy report.

15       Q.    That's the sole source of your information,

16   correct?

17       A.    Right.  Just says 8-ounces of tan/brown fluid.

18       Q.    Did you read the report of plaintiff's expert,

19   Dr. Alan Barbour?

20       A.    Yes, sir.

21       Q.    Did you read where he had done any testing on

22   the contents of Mr. Willis' stomach?

23       A.    I don't recall that part of his -- of his

24   report, honestly.

25       Q.    At this point, as you give your deposition on



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.977.1415
Facsimile: 559.222.7922

Suite 201
155 East Shaw Avenue
Fresno, CA 93710
www.esquiresolutions.com

Vincent Di Maio, M.D.                          June 10, 2011

76

1    June, where are we, 11th -- June 10th of 2011, do you

2    know whether there were any chunks of food in

3    Stephen Willis' stomach at the time of his death?

4         A.   No.

5         Q.   Do you take issue with any of the findings of

6    Dr. Barbour's report?

7         A.   Yes.  He goes on --

8         Q.   Where do you take issue?

9         A.   Okay.  Oh, I'm not -- Okay.  About the

10   marijuana, I'm not really sure what he's saying, but he

11   seems to be for it in one place and be for it in the

12   other, but so I -- but I don't think that's important.

13        Q.   The mar- -- excuse me.  The marijuana is not

14   important, right?

15        A.   Right.  That's -- That was my opinion, so -- I

16   mean, he discussed it a lot, but I didn't really

17   think -- I wasn't going to even bring it up.  I just

18   mention it in passing in my report.

19             Now --

20        Q.   Okay.

21        A.   -- the thing that he talks about is he says,

22   well, the alcohol level of the blood may not be accurate

23   due to decomposition.  But there is no decomposition of

24   the body.  The body is picked up, it's taken to the

25   morgue.  It's autopsied the next day.  The alcohol



ESQUIRE
an Alexander Gallo company

Toll Free: 800.977.1415
Facsimile: 559.222.7922

Suite 201
155 East Shaw Avenue
Fresno, CA 93710
www.esquiresolutions.com

Vincent Di Maio, M.D.                                    June 10, 2011

77

1   analysis of the blood is on that same day.  The blood

2   was put into a test tube with preservatives so it

3   wouldn't degenerate.  We know that the body is not

4   decomposed.  For one, it's -- there's no decomposition

5   described at autopsy.  And the other fact is that at the

6   same time that they took the blood out, they took

7   vitreous, the fluid from his eye, and they analyzed the

8   vitreous, not only for alcohol, but they analyzed it for

9   potassium.  And potassium is a -- reflects the

10  decomposition in the body.  And you don't -- and you

11  only see -- okay.

12          If a body begins to decompose, you will

13  see elevated levels of potassium, like 14, 15, 16, and

14  going up.  The potassium level in the vitreous at this

15  time is ten, which is normal for a dead person.  And

16  this level is in agreement with the autopsy that there's

17  no decomposition.  So you have a scientific test that

18  confirms an observation that the body is not decomposed.

19          Based on this, then the alcohol level is

20  legitimate in the blood.  And you can't ascribe any of

21  the alcohol to decomposition.

22          MR. WEAKLEY:  Skip, are you getting some

23  sort of feedback?

24          MR. WALKER:  What I'm getting is bubbling.

25  I'm getting like every other word of his testimony.  But



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.977.1415
Facsimile: 559.222.7922

Suite 201
155 East Shaw Avenue
Fresno, CA 93710
www.esquiresolutions.com

Vincent Di Maio, M.D.                          June 10, 2011

78

1    that's just in this last answer, really.

2                    THE WITNESS:  Okay.  You want me --

3                    MR. WEAKLEY:  Right.  It just seems like

4    there's something going on.

5                    THE WITNESS:  It's going on at your end,

6    because we're getting you perfectly.

7                    MR. WALKER:  All right.  And Jim, I think

8    I've got -- and I know the court reporter will have

9    heard him perfectly.  I think I'm okay because I've got

10   the gist of what he's saying.

11                   MR. WEAKLEY:  Okay.

12        Q.  (BY MR. WALKER) But are you -- Are you saying

13   that you're going to testify as to the accuracy of the

14   blood alcohol level that was found?

15        A.   I'm going to testify that if the test was done

16   correctly, which I'm sure someone will testify to, then

17   that level was the level of blood alcohol at the time of

18   death.

19        Q.   Are you going to testify that Mr. Willis had a

20   blood alcohol level of .29?

21        A.   Yes, sir.

22        Q.   And your basis, your foundation for that

23   testimony will be what?

24        A.   The blood was removed from a peripheral source,

25   it was put in a tube with a preservative, taken to the


ESQUIRE
an Alexander Gallo Company

Toll Free: 800.977.1415
Facsimile: 559.222.7922

Suite 201
155 East Shaw Avenue
Fresno, CA 93710
www.esquiresolutions.com

Vincent Di Maio, M.D.                              June 10, 2011

79

1   laboratory and analyzed the same day.  Okay?

2       Q.   Does it make a difference -- Does it make a

3   difference to you what peripheral source?

4       A.   No, it doesn't.  It doesn't really.

5            Then --

6       Q.   Okay.

7       A.   Let's see, what was I -- Let me -- And that the

8   objections somebody raised, it was suggested that the

9   blood alcohol may not be legitimate due to formation of

10  alcohol due to postmortem decomposition.  And I will

11  testify that the body is not decomposed as described in

12  the autopsy, which it would be.  In addition, the

13  vitreous potassium level confirms that the body was not

14  decomposed at the time of autopsy at the time the

15  alcohol was obtained -- the blood was obtained for

16  analysis.

17           And then I'll tell -- you know, testify

18  about the vitreous, you know, which indicates that he

19  had a blood -- a high blood alcohol level two hours

20  prior.

21      Q.   The -- Are you going to take issue with

22  Dr. Barbour's conclusion that perforation of the

23  internal organs contaminated the blood alcohol result?

24      A.   Yes, because that's why you take it

25  peripherally.  And it should be pointed out that he had



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.977.1415
Facsimile: 559.222.7922

Suite 201
155 East Shaw Avenue
Fresno, CA 93710
www.esquiresolutions.com

Vincent Di Maio, M.D.                                    June 10, 2011

80

1    a vitreous alcohol level of .21, which indicates one to

2    two hours prior to death he had an alcohol level of

3    .175.  And on the -- even if you challenged the blood,

4    his -- and you say he didn't have a drink for the -- for

5    the last two hours, then his blood alcohol level would

6    still be in the order of about, oh, .15.  So -- so he

7    was intoxicated.

8         Q.   Okay.  So would it be fair to say that you

9    could be certain that Mr. Willis had a blood alcohol

10   level of about .15, but you're not certain that he had a

11   blood alcohol of .29?

12        A.   No, I am certain that he had.  But if you still

13   want to challenge it, the worst you can -- all you can

14   argue is that he had .15.  He's still drunk.  But --

15        Q.   Right.

16        A.   -- in my opinion, the way it was taken, the

17   blood was taken from the peripheral source, it was taken

18   to the -- it was put in a preservative tube, was taken

19   to laboratory, was analyzed the same day.  And

20   therefore, one has to accept the fact that he had a

21   blood alcohol level of .29.

22        Q.   And do you, in your practice, coordinate the

23   vitreous --

24        A.   Oh, yeah.

25        Q.   -- level with the peripheral level?


ESQUIRE
an Alexander Gallo Company

Toll Free: 800.977.1415
Facsimile: 559.222.7922

Suite 201
155 East Shaw Avenue
Fresno, CA 93711
www.esquiresolutions.com

Vincent Di Maio, M.D.                              June 10, 2011

81

1    A.   Yeah.  In every case --

2    Q.   What --

3    A.   Okay.  Yes, sir.  In every case I have done

4  since 1972, the blood alcohol and the vitreous alcohol

5  were -- the blood and vitreous were collected and

6  subjected to alcohol analysis, because you owe it -- the

7  vitreous is a check on your blood.

8    Q.   And what formula do you use for coordinating

9  the vitreous level with the peripheral level?

10   A.   Okay.  Well, what you do is -- well, the first

11  thing you do is you have to convert vitreous alcohol to

12  blood alcohol.  And you divide by 1.2.  Because vitreous

13  has more -- has fewer cells, it will hold more alcohol.

14  And the ratio of blood to vitreous is essentially one to

15  1.2.  So you divide by 1.2, and that gives you the blood

16  level equivalent to that vitreous level.  So a .21 is

17  equivalent to a .175.  If you have a vitreous of .21 it

18  means that one to two hours prior you had a vitreous --

19  you had a blood level of .175.

20   Q.   What do you understand Dr. Barbour has

21  determined his blood alcohol was at the time of --

22  Willis' blood alcohol was at the time of his death?

23   A.   Well, my understanding, he says that you can't

24  determine it because there can be postmortem production

25  of alcohol in something, that's his challenge, and that



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.977.1415
Facsimile: 559.222.7922

Suite 201
155 East Shaw Avenue
Fresno, CA 93710
www.esquiresolutions.com

Vincent Di Maio, M.D.                                    June 10, 2011

                                                                    89

1                   IN THE UNITED STATES DISTRICT COURT
2                  FOR THE EASTERN DISTRICT OF CALIFORNIA
3                            FRESNO DIVISION
4

    CHRIS WILLIS, MARY WILLIS,    §
5   INDIVIDUALLY AND SUCCESSORS   §
    IN THE INTEREST TO STEPHEN    §
6   WILLIS; JENNAFER URIBE        §
                                  §
7   VS.                           §  NO. 1:09-CV-01766-LJO-DLB
                                  §
8   CITY OF FRESNO, OFFICER       §
    GREG CATTON, OFFICER DANIEL   §
9   ASTACIO, CHIEF JERRY DYER,    §
    AND DOES 1 THROUGH 50         §
10  INCLUSIVE                     §
11  ----------------------------------------------------------
12                     CERTIFICATE FROM THE
13     VIDEO TELECONFERENCE DEPOSITION OF VINCENT DI MAIO, M.D.
14                        JUNE 10, 2011
15  ----------------------------------------------------------
16            I, DANDY ELLIS, a Certified Shorthand Reporter
17     in and for the State of Texas, do hereby certify that
18     the foregoing deposition is a full, true and correct
19     transcript;
20            That the foregoing deposition of
21     VINCENT DI MAIO, M.D., the Witness hereinbefore named,
22     was at the time named, taken by me in stenograph, on
23     June 10, 2011, the said Witness having been by me first
24     duly cautioned and sworn to tell the truth, the whole
25     truth, and nothing but the truth, and the same were


ESQUIRE
an Alexander Gallo Company

Toll Free: 800.977.1415
Facsimile: 559.222.7922

Suite 201
155 East Shaw Avenue
Fresno, CA 93710
www.esquiresolutions.com

Vincent Di Maio, M.D.                                    June 10, 2011

90

1    thereafter reduced to typewriting by me or under my
2    direction.  The charge for the completed deposition is
3    $_____ due from MR. WALTER H. WALKER, III
4    (Plaintiffs);
5            That the amount of time used by each party at
6    the deposition is as follows:
7
        MR. WALTER H. WALKER, III- 02:01
8        MR. JAMES DARVIN WEAKLEY- 00:01
9            I further certify that before the completion of
10   the deposition, the Deponent and/or the
11   Plaintiff/Defendant ( ) did (X) did not request to
12   review the transcript.
13           That the original deposition was delivered to
14   Mr. Walter H. Walker, III;
15           Certified to by me this 20th day of June, 2011.
16
17                          _Dandy Ellis_
                            

18                          _____
                            DANDY ELLIS, Texas CSR 4702
                            Expiration Date:  12/31/12
19                          Esquire Deposition Services
                            Firm Registration No. 77
20                          9901 IH-10 West, Suite 800
                            San Antonio, Texas  78230
21                          (210)331-2280
22
23
24
25

Toll Free: 800.977.1415
Facsimile: 559.222.7922

ESQUIRE
an Alexander Gallo Company

Suite 201
155 East Shaw Avenue
Fresno, CA 93710
www.esquiresolutions.com

# <u>EXHIBIT F</u>

*Deposition of Chris Zimmerman*

```
 1              IN THE UNITED STATES DISTRICT COURT

 2           FOR THE EASTERN DISTRICT OF CALIFORNIA

 3                          -oOo-

 4    CHRIS WILLIS, MARY WILLIS,   )
      INDIVIDUALLY AND SUCCESSORS  )
 5    IN INTEREST TO STEPHEN       )
      WILLIS; JENNAFER URIBE,      )
 6                                 )
           Plaintiffs,             )
 7                                 )
        vs.                        )No. 1:09-CV-01766-LJO-DLB
 8                                 )
      CITY OF FRESNO, OFFICER      )
 9    GREG CATTON, OFFICER DANIEL  )
      ASTACIO, CHIEF JERRY DYER,   )
10    and DOES 1 through 50,       )
      inclusive,                   )
11                                 )
           Defendants.             )
12    _____)

13

14    Fresno, California              January 27, 2011

15                          -oOo-

16        The deposition of CHRIS ZIMMERMAN was taken in

17    the above-entitled matter pursuant to all of the

18    provisions of law pertaining to the taking and use of

19    depositions before Stacy Banks, CSR, with offices at

20    Fresno, California, commencing at the hour of 10:03

21    a.m., at the law offices of Richard P. Berman, 2333

22    Merced Street, Fresno, California.

23                          -oOo-

24

25
```

*Deposition of Chris Zimmerman*

1      Q.   And how is it you first became aware of his

2    existence?

3      A.   One night Del had called me or -- yeah, Del

4    and I believe security, too, because I was very

5    friendly with them just so I'd know what was going on

6    in the neighborhood.  And one night he was, I guess

7    Mr. Steven was apparently belligerently drunk and was

8    trying to start a fight, or something had happened

9    between either him and Del or security and him while

10   they were walking.  So that's when I had went down,

11   you know, just give a hand.  Like I said, he wanted to

12   fight the guy.  He had to pull out his, I forget if he

13   pulled out his stick or a flashlight, security did.

14   And so I started to walk over there because they

15   had -- just to go help them out, but then I backed off

16   because there was two of them already.  So it's none

17   of my concern, so I just kind of watched from that

18   point.

19     Q.   How did you first become aware that there was

20   some confrontation involving Mr. Willis and Del and

21   security people?

22     A.   We had actually overheard it because it

23   happened by the trash can not too far, just to the

24   east of my apartment.

25     Q.   If you look on Exhibit 1 you see something

*Deposition of Chris Zimmerman*

1    a speed bump right about in between, somewhere maybe

2    in between our apartments.

3        Q.   All right.  Using the red pen put three dots

4    to where you think there is a speed bump.

5        A.   Okay.

6        Q.   I'm sorry, it would have to be a little bit

7    more than that.  Dashes I should say.

8        A.   (Witness complies.)

9        Q.   Okay.  That's fine.  That's good.  You put

10   three dots and it's perfect.  Thank you.

11           And so what about the speed bump?

12       A.   Kind of hit it and I guess he was driving a

13   stick shift because he missed it and went back again

14   and then I think the third chance he like got over it.

15   I mean me not being too good to drive a stick shift I

16   know exactly the noise it makes and what he was going

17   through.

18       Q.   Okay.

19       A.   So after that I have to say we assumed he was

20   drunk.

21       Q.   And you assumed he was drunk because of the

22   difficulty he had getting over the speed bump?

23       A.   Yes, and the speed that he was going.

24       Q.   Okay.

25       A.   And the rate of speed that he was going.

*Deposition of Chris Zimmerman*

1      A.   Because we were interested in seeing what this

2   guy was doing because I was actually going to call the

3   police myself.

4      Q.   And why were you going to call the police?

5      A.   Just because I assumed that he was drunk and

6   that's why I wanted to continue to see what was going

7   on, if, you know, anything happened after that.   Like

8   I said, I'll be the first one to, if I think somebody

9   is drunk driving or whatever I'd rather call than not

10   to.   I didn't know if he was going to continue to

11   drive or whatnot, you know.   So I guess I was nosy.

12      Q.   So you watched -- I'm sorry, you watched the

13   vehicle go into the space.   What's the next thing you

14   observed?

15      A.   I see the lady jump out of the car and run

16   inside.

17      Q.   Okay.   And did the car nose into the space or

18   back into the space?

19      A.   Nose into the space.

20      Q.   So the lady was getting out of the car, the

21   side of the car that was furthest away from you?

22      A.   Yes.

23      Q.   Okay.   And you saw her run into the apartment

24   complex.

25      A.   Yeah, jump out.   And I thought okay, you know,

# <u>EXHIBIT G</u>

*Deposition of Dorothy Hoskins*

```
 1              IN THE UNITED STATES DISTRICT COURT

 2            FOR THE EASTERN DISTRICT OF CALIFORNIA

 3                       -o0o-

 4   CHRIS WILLIS, MARY WILLIS,   )
     INDIVIDUALLY AND SUCCESSORS )
 5   IN INTEREST TO STEPHEN       )
     WILLIS; JENNAFER URIBE,      )
 6                                )
            Plaintiffs,           )
 7                                )
        vs.                       )No. 1:09-CV-01766-LJO-DLB
 8                                )
     CITY OF FRESNO, OFFICER      )
 9   GREG CATTON, OFFICER DANIEL )
     ASTACIO, CHIEF JERRY DYER,   )
10   and DOES 1 through 50,       )
     inclusive,                   )
11                                )
            Defendants.           )
12   _____)

13

14   Fresno, California                  January 26, 2011

15                       -o0o-

16       The deposition of DOROTHY HOSKINS was taken in

17   the above-entitled matter pursuant to all of the

18   provisions of law pertaining to the taking and use of

19   depositions before Stacy Banks, CSR, with offices at

20   Fresno, California, commencing at the hour of 2:29

21   p.m., at the law offices of Richard P. Berman, 2333

22   Merced Street, Fresno, California.

23                       -o0o-

24

25
```

1    told me you were over here picking on her."

2            I says, "I wasn't picking on your girlfriend."

3    I says, "I asked her to lower her music."

4            "Well, we noticed nobody else had flyers, just

5    our door."

6            I said, "Well, you're new over here."  I says,

7    "So I brought the flyers back so that she could, you

8    know, see the rules."

9            So he goes, "Well, I'll play my music as loud

10   as I want to."  And he went, he turned around and he

11   was wearing this black jacket with a big marijuana

12   plant in the back.  I'm going like oh, no.

13           And he says, "Well, I'll play my music as loud

14   as I want to."

15           I said, "No, you won't."

16           "You don't tell me what I."

17           I said, "I'll call the police on you if I come

18   back and catch your music up."

19           "I don't care nothing about the police.  Call

20   the police.  They don't scare me."

21           I says, "It's not about being scared.  You

22   need to go with the rules."

23           "I don't have to go with nothing."

24           So I noticed one of the Neighborhood Watch

25   signs was on, still on the window from one of the

*Deposition of Dorothy Hoskins*

```
 1   other tenants and they, when they cleaned the

 2   apartment they didn't take it off.  I says, "Oh, my

 3   God.  We've got to get that moved" like that, just

 4   lower to myself.

 5           And he says, "Nobody's going to go in my house

 6   without me saying that they can."

 7           I says, "Nobody is going in your house."  I

 8   says, "That's the Neighborhood Watch sticker and

 9   you're not a Neighborhood Watch."

10           "So what?  It's going to stay on there and if

11   you bring your ass back over here again, I'll show

12   you."  And he goes to me like this.  He was drunk.

13   That day he was drunk.  And I didn't move.  I just let

14   him just do like this.

15           I go, "I'm not scared of you."  I said, "Okay.

16   You know what, I'm through with you."

17           "Yeah.  Well, you better be through.  And

18   don't you be messing with my girl."

19           I didn't say anything else to him.

20           So the next time I saw him --

21      Q.   Let me stop there and just ask about the first

22   time.

23      A.   Okay.

24      Q.   And I know after a while your voice gets

25   tired.
```

*Deposition of Dorothy Hoskins*

1        Q.   What was the next time you recall encountering

2    him?

3        A.   One night I was on the property with security.

4    I often go on the property at night and I, I just have

5    a tendency to walk with the security guards.   And I

6    normally watch to see if the property lights are all

7    on or off and I make a note of them and let the office

8    know that they're out.   So we had walked the whole

9    property until we got back around to the side where I

10   live.

11             And he was coming in the gate and he was

12   drunk.   And so he, I understand he almost hit me, but

13   I didn't, I didn't see, I wasn't paying any attention

14   to his car.   I must have been looking away.   So the

15   security guard flashed the light on him to tell him to

16   watch me.   I understand he was pretty close to me.

17   And he flashed the light.   And he didn't even park the

18   car.   He jumped out of that car and he went at him,

19   "you don't flash the light on me."   He just was

20   hysterical about him flashing the light on him.

21             And he says, "You almost hit her."

22             He's still saying, "You don't flash a light on

23   me."

24             So he got in the car and then he parked it in

25   the stall and then he got back at him again about that

*Deposition of Dorothy Hoskins*

1   light.  And then he, he just kept going round and

2   round with him about that light.

3        So I told him, "You can't talk to the security

4   guards like that.  That's not nice for you to do."  I

5   says, "He has to flash the light on you."  And then he

6   was trying to explain that he almost hit me, but he

7   didn't hear him.  He was just, he was just totally

8   crazy about him flashing the light on him.

9        So then his girlfriend was with him.  So

10  anyway she said, she tried to talk to him and it

11  didn't work.  And she said to me, "It's something

12  about the badge."

13       I said, "What do you mean?"

14       She said, "It's something about the badge.  He

15  don't like people with the badge."

16       I'm going, "Well, that's not good enough."  I

17  says, you know, "They are the security here."

18       And so anyway he just kept on with one of the

19  security guards.  Then he, he brought his fists up and

20  he did like this at him, like jumped at him to provoke

21  him.  I said, "That's not necessary."  He did it

22  twice.  I said, "Go inside."

23       So then the security said, "Yeah, go inside."

24       He said, "Oh, now you're telling me to go in

25  the house."

*Deposition of Dorothy Hoskins*

```
1              I says, "No, I told you to go in the house,
2    too."
3              And so he goes, "Make me" or whatever.
4              And so then his girlfriend tried to pull him
5    in the house and he started to fight her.  So I told
6    the other security guard, I said, "Okay.  Now is the
7    time you call the police."  So they called the police.
8              He did go inside and he was ripping and
9    raising in there.  You could hear him outside.  And it
10   sounded like he was breaking things.  I'm not sure it
11   was him, but I'm thinking it was him because I heard
12   his mouth going.
13             So the police came and they asked us what
14   happened.  So I told them and he cooly gave him his,
15   his, what happened with him.  So the police went
16   inside and they brought him out, handcuffed him and
17   they sat him in the car.  And I guess they talked to
18   him, let him cool off for a while and then they taken
19   the cuffs off him and let him go back inside.
20             So after they left security was still around
21   the area.  And so I could hear him, just he was still
22   raising in there for a long time.  So I don't know
23   what happened later because it was like already 1:00
24   o'clock and I think I went inside my apartment.
25        Q.   All right.  1:00 o'clock in the morning; is
```

*Deposition of Dorothy Hoskins*

```
1    far as you were concerned when he drank he was a crazy
2    person?
3         A.   Yes, he did.
4         Q.   What the aunt was telling you was nice things
5    about Stephen?
6         A.   Yeah.  That he was very sweet and but she
7    knew, that the girlfriend knew that he would get crazy
8    like this because he'd fight her, you know, stuff like
9    that so.
10        Q.   That's what you say the aunt told you the
11   girlfriend told her?
12        A.   Yeah.
13        Q.   Okay.  You never saw any indication of that,
14   did you?
15        A.   I don't know what they did inside.  Now, I
16   just know that night that he was about to fight her
17   instead of just going inside.  And so then that's when
18   I had the security guard call the police.
19        Q.   Well, you never saw him hit her, did you?
20        A.   No.  He just to did her -- she was, she was
21   trying to pull him to go inside and just forget the
22   whole thing and he wouldn't do that.
23        Q.   Okay.
24        A.   And so then, then she -- and then he just hit
25   her like that.  I mean he --
```

*Deposition of Dorothy Hoskins*

```
1        Q.    Did he hit her?

2        A.    Yeah.  I says, "Okay.  Now it's just time for

3   you to call the police."

4        Q.    Did he hit her in terms of trying to, in your

5   opinion, inflict harm upon her?

6        A.    Yeah.

7        Q.    Because what you just demonstrated at first,

8   correct me if I'm wrong, was he pushed her away when

9   she was trying to grab him?

10       A.    Yeah.  That's when I told him to call the

11  police because he was fighting her.

12       Q.    So that was the contact that you saw between

13  him and her was she was trying to pull his arm and he

14  pushed her away?

15       A.    Yeah.

16       Q.    Okay.  He didn't take a swing at her?

17       A.    He took a swing at her.

18       Q.    He did?

19       A.    Yeah.

20       Q.    And did the swing land anywhere?

21       A.    I don't know where it landed, but he was --

22  because I wasn't, you know, my back was, my shoulder

23  was sideways.  So then he punched her.

24       Q.    He punched her?  You say he hit her with a

25  punch?
```

# EXHIBIT H

# LAW ENFORCEMENT REPORT FORM
## FRESNO POLICE DEPARTMENT
2323 MARIPOSA MALL, FRESNO CA 93721
Phone: (559)621-7000
CA0100500

**Event: 08AF2307**                                                                 **Case: 08-011866**

## INCIDENT INFORMATION

Report #: 1 of 1     Report Type: PERS CRIME     District: SE  Sector: G     Zone: 2662
Definition and Class: Possible Crime PC417(A)(2) - EXHIBIT FIREARM - Lvl M
Occurred From: 02/09/08 21:30 Sat     Occurred To: 02/09/08 21:45 Sat     Received Date: 02/09/08 21:44 Sat
Business: STONEYBROOK APTS 23
Location: 4925 E BALCH AV #103 FRESNO
Cross Street: S WINERY AV
How Rcv:: T

## CASE FACTORS

**EVIDENCE**
    SERIALIZED PROPERTY
**INVESTIGATION**
    SURROUNDING AREA CANVASSED, SCENE PROCESSED BY OFFICER
**SOLVABILITY FACTORS**
    WITNESSES CONT
**SPECIAL FACTORS**
    ELECTRONIC REPORT

## APPROVALS AND ROUTING

Close Class: 4D1 - AGGRAVATED ASSAULT Open Class:: 1E3
Premise: R   # of Premises: 1     CAS Code: WEAP
Printed: 1/12/2010 1:11:46 PM     Printed By: VILLALVAZO (V2407), RAFAEL(P972)     Printed From: A67674HO
Rpt #: 1     Type: FIRST     Officer: SHIPMAN (V3570), TREVOR #P1344     Clerk: PRICE, MARY ANN #T536
Created: 02/09/08 21:44     Filed Date: 02/09/08 23:02     Assigned Date: 02/09/08 23:02     Typed By: T536
Date Typed: 2/10/2008
Approved By: MCKNIGHT (V3319), CARL #S165                         Date Approved: 2/11/2008 8:45:45 PM
Reviewed By: SMITH XF 12.31.09, JAMILA #X0014                     Date Reviewed: 2/12/2008 7:17:35 AM
Routing: None

## NAMES

Inv: Other # 1     Adult/Juvenile: J     Type: PERSON
Name: ████████████████
Race: H     Sex: M     DOB: ████████     Age: 17     Height: 504  Weight: 120  Hair: BLK     Eyes: BRO
Occupation: STUDENT
School: CRESCENT VIEW     Grade in School: 11     Comments: HAD "XIV" WRITTEN ON HIS LEFT HAD IN INK.
Language: ENGLISH     Clothing: WHITE SHORTS AND NO SHIRT

| Physical Desc: | Category | Type |
|---|---|---|
| | BODY BUILD | THIN |
| | COMPLEXION | LIGHT/FAIR |
| | EMOTIONAL STATE | CALM |
| | FACIAL SHAPE | ROUND |
| | GENERAL APPEARANCE | CASUAL |
| | HAIR LENGTH | SHORT |
| | HAIR STYLE | STRAIGHT |
| | HAIR TYPE | FINE |
| | INJURY | NONE |

Home: ████████████
Phone: ████
SIBLING: VASQUEZ, JOSEPH

---

Officer: SHIPMAN (V3570), TREVOR #P1344                                             Page 1 of 5
Supervisor: MCKNIGHT (V3319), CARL #S165

# FRESNO POLICE DEPARTMENT

Event: 08AF2307

CA0100500

Case: 08-011866

## NAMES

Inv: SUSPECT # 1    Adult/Juvenile: A   Type: PERSON
Name: WILLIS, STEPHEN
Race: W      Sex: M      DOB: 01/03/1986   Age: 22      Height: 508   Weight: 150  Hair: BLN      Eyes: BLU
Occupation: MAINTANCE      Employer: SAINT AGNES
Language: ENGLISH      Clothing: BLK SHIRT AND JEAN PANTS      Crime Type: PC 417A2      Suspect Status: OTHER

| Physical Desc: | Category | Type |
|---|---|---|
| | BODY BUILD | MEDIUM |
| | COMPLEXION | LIGHT/FAIR |
| | EMOTIONAL STATE | CALM |
| | FACIAL SHAPE | ROUND |
| | GENERAL APPEARANCE | WELL GROOMED |
| | HAIR LENGTH | SHORT |
| | HAIR STYLE | STRAIGHT |
| | HAIR TYPE | FINE |
| | INJURY | STAB WOUND |
| | WEAPON | SHOTGUN |
| | GUN FEATURE | PUMP |

Identification: DL - D3253860 - CA
Home: 4925 E BALCH AV #103, FRESNO, CA 93722
Phone: (559)840-5457
OTHER CONTACT: VASQUEZ, JOSEPH
VICTIM: UNKNOWN

Inv: VICTIM # 1      Adult/Juvenile: A      Type: PERSON
Name: UNKNOWN
Race: H      Sex: M      Age: 16 to 18      Height: 506 to 508  Hair: XXX   Eyes: XXX   Occupation: UNKNOWN
Comments: WAS YELLING "BULLDOGS"
Language: ENGLISH      Clothing: UNK CLOTHING
Unknown
Address: , FRESNO, CA
SUSPECT: WILLIS, STEPHEN
OTHER CONTACT: VASQUEZ, JOSEPH

Inv: WITNESS # 1   Adult/Juvenile: A   Type: PERSON
Name: VASQUEZ, JOSEPH
Race: H      Sex: M      DOB: 04/11/1988   Age: 19      Height: 506  Weight: 130  Hair: BRO      Eyes: BRO
Occupation: UNKNOWN
Language: ENGLISH      Clothing: GRAY JACKET AND JEAN PANTS

| Physical Desc: | Category | Type |
|---|---|---|
| | BODY BUILD | MEDIUM |
| | COMPLEXION | LIGHT/FAIR |
| | EMOTIONAL STATE | CALM |
| | FACIAL HAIR | MUSTACHE |
| | FACIAL SHAPE | ROUND |
| | GENERAL APPEARANCE | CASUAL |
| | HAIR LENGTH | SHORT |
| | HAIR STYLE | STRAIGHT |
| | HAIR TYPE | FINE |
| | INJURY | NONE |

AKA Name: VASQUEZ JR      First: JOSEPH      Aka DOB: 4/11/1988
AKA Name: VASQUEZ, JR      First: JOSEPH

Officer: SHIPMAN (V3570), TREVOR #P1344
Supervisor: MCKNIGHT (V3319), CARL #S165

Page 2 of 5

# FRESNO POLICE DEPARTMENT

| Event: 08AF2307 | | CA0100500 | | Case: 08-011866 |
|---|---|---|---|---|

**Scars, Marks and Tattoos:**

| Location | Feature | Description |
|---|---|---|
| L ARM | DISC | BIRTHMARK |
| L HND | TAT | DOT ON WEB |
| LF ARM | TAT | "FRESNO" |
| LF ARM | TAT | "ANGELINA" |

Identification: DL - D9786111 - CA
Home: 4933 E BALCH AV #103, FRESNO, CA 93722
Phone: (559)255-4349
OTHER CONTACT: WILLIS, STEPHEN
OTHER CONTACT: UNKNOWN
SIBLING: ███████████████

## PROPERTY

Inv: Involved # 1      Date: 2/9/2008 9:44:00 PM
Category: FIREARMS  (NO BB-GUNS OR PELLET GUNS)Article: SHOTGU  Brand: MOSSBERG
Model: 12 GAUGE  Color: BLK  Disposition: RETURN      Officer ID: P1344  Quantity: 1  Value: $ 100
Serial #: R584091
Dispo: RETURN      County Code: 10
Description: BLK 12 GAUGE PUMP SHOTGUN WHICH HAD FOUR "BUCK SHOT" ROUNDS IN IT.      Condition: GD
Status: REL   Zone: 2662
Firearm Type: SHOTGUN Firearm Category: PUMP ACTION      Caliber: 12
OWNER: WILLIS, STEPHEN
POSSESSED: WILLIS, STEPHEN
Total Involved: $100

## MO

PLACE OF ATTACK
   OTHER
SURROUNDING AREA
   RESIDENTIAL
STRUCT-RESIDENCE
   APARTMENT
SUSPECT ACTIONS
   SUSPECT ARMED
VICTIM ACTIVITY
   HAD BEEN DRINKING
EXIT-STRUCTURE
   FRONT, DOOR

## OTHER FACTORS

ATTACK METHOD
   WEAPON

## NARRATIVE

**\*\*\*\*\* NARRATIVE DICTATED \*\*\*\*\***

**CASE #08-11866.E1**
**OFFICER SHIPMAN, BADGE #1344**

**OFFICERS WHO CAN TESTIFY:**
Officer D. Gonzalez, Badge #1455

Officer: SHIPMAN (V3570), TREVOR #P1344
Supervisor: MCKNIGHT (V3319), CARL #S165

Event: 08-AF2307

Case: 08-011866

## SOURCE OF ACTIVITY:

On Saturday, 02/09/08, Officer Gonzalez and I were working uniformed patrol as a double unit in the Southeast Policing District. We were dispatched at 2218 hours, to 4925 E. Balch #103, regarding a verbal disturbance with possible Bulldog gang members. We arrived at 2218 hours.

## INVESTIGATION:

Upon arrival, I contacted a white male adult living in the above listed location. This male was later identified by his own admission and his valid California Driver's License as Suspect Willis. Upon contacting Willis, he advised me that on today's date, approximately 15 to 20 minutes prior to arrival, he was hanging out in front of his apartment with some "possible Bulldog gang members." Willis stated that he was outside drinking a beer with these unknown people. Willis advised me that he believed the subjects lived at a nearby apartment.

While Willis was hanging out with the unknown people, a couple of Willis' friends arrived. Willis' friends and the unknown possible Bulldog gang members got into a verbal altercation. Willis then advised the males that they could not be arguing with his friends and that they needed to leave the location. The two unknown males began yelling at Willis saying that it was not private property, and that they would stay if they wanted to. Willis felt threatened by these males and thought that they may possibly try to assault him.

As a result, Willis went into his apartment and retrieved his 12 gauge Mossberg pump action shotgun. Once Willis retrieved the shotgun, he then opened the front door holding it to his right side, pointing it down towards the ground. Willis stated at no time did he ever point the shotgun towards any of the males. Willis stated that at this time, he held the shotgun to his side and somewhat behind him in an attempt to conceal it. The males then looked at Willis and stated that they would leave.

I then went to the nearby apartment which the security guards directed me towards. At this apartment, I contacted Witness Joseph Vasquez and Other-1 ▇▇▇▇▇▇▇. Joseph stated that on today's date, he was approached by two unknown males who advised him that the person inside of 4925 E. Balch, #103, approached them with a shotgun. Joseph stated that the unknown males pointed out Willis' apartment to him and stated that it was not right for him to come outside with a shotgun. Joseph advised the males to just leave it alone and to not go back to Willis' apartment.

I then contacted Joseph's younger brother, ▇▇▇▇▇▇▇. ▇▇▇ was found to be on active felony juvenile probation. I then conducted a probation search of ▇▇▇▇▇▇▇ room. Upon conducting a search, I located no illegal items inside of his room. ▇▇▇ stated that he did not know what was going on and was not outside when all the events occurred. ▇▇▇ did state the two unknown males were acquaintances of his, but he did not know their names. ▇▇▇ stated that the two males were outside and later came into his apartment.

The males advised ▇▇▇ that his neighbor, Willis, approached them with a shotgun. ▇▇▇ stated that neither of the two males ever advised him that they were threatened with a shotgun or that it was pointed at them.

I attempted numerous times to obtain the location and/or name and date of birth of the males who were possibly brandished with the shotgun. I was unable to locate any location or name or date of birth for the two unknown males.

Joseph Vasquez was a self-admitted Bulldog gang member. Joseph was found to have a tattoo of "Fresno" on his left forearm. His younger brother, ▇▇▇▇▇▇▇, did not admit to being a Bulldog gang member, although he had written the Roman numeral XIV on his left wrist with an ink pen. I questioned ▇▇▇ as to the meaning

Officer: SHIPMAN (V3570), TREVOR #P1344

Supervisor: MCKNIGHT (V3319), CARL #S165

Case: 08-011866

Event: 08-AF2307

behind the Roman numeral XIV. ▓▓▓▓ stated that he just like the number 14 and not associated with Bulldogs.

I then responded back to Willis' apartment in which I located the 12 gauge shotgun. The shotgun was placed inside of a closet near the front door of the apartment. Upon checking the shotgun, I found it to be loaded with four rounds of 12 gauge buckshot ammunition. I then ran the serial number on the shotgun to determine its status, if it was possibly reported stolen. My inquiry resulted in no matching record. Willis was advised of his actions. Willis stated that he would place the shotgun in his locked safe and not take it out anymore.

Due to my inability to locate the unknown males who had the shotgun brandished at them, this report is being completed as a possible PC 417(a)(2) report.

## CONCLUSIONS/DEDUCTIONS:

On 02/09/08, Suspect Willis and his friends were in a verbal altercation with   possible Bulldog gang members. Due to Willis feeling threatened for his own personal safety, he went inside his apartment and retrieved a 12 gauge shotgun. Willis stated that he never exited his apartment with the shotgun and merely stood near the threshold of his apartment with the shotgun pointed to the ground near his right side. Willis stated he never pointed the shotgun at anybody and only had it for his own protection. Willis stated that the unknown possible Bulldog gang members then fled the location. Witness Joseph Vasquez stated two unknown males advised him that Willis brandished the shotgun at them. Due to my inability to locate the unknown males who had the shotgun brandished at them, this report is being completed as a possible PC 417(a)(2) report. Sgt. Brown was advised of this call.

## DISPOSITIONAL INFORMATION:

1.     The 12 gauge shotgun was found to have no record on file.

2.     I later ran Willis' criminal history and found that he had not been convicted of any prior felonies.

3.     Sergeant Brown was advised of this call for service.

---

Officer: SHIPMAN (V3570), TREVOR #P1344
Supervisor: MCKNIGHT (V3319), CARL #S165

| Address | Interviewee | Result of Contact |
|---|---|---|
| **4909 E. Balch** | | |
| #104 | | No Answer at Door |
| #105 | Chris Zimmerman | Interview Summary |
| #106 | Martin Hernandez | Interview Summary |
| #107 | New Tenant as of 4/2/2009 | |
| #108 | Non-English speaker | No interview |
| #203 | Mario Cardenas | Wasn't aware of incident until the next day w van missing; his aunt is Martha Arias, 540 N. |
| #204 | Jose Manzilla | Interview Summary |
| #204 | Diana Gutierrez | Interview Summary |
| #205 | Non-English Speaker | No interview |
| #206 | Non-English Speaker | No interview |
| #207 | Non-English Speaker | No interview |
| #208 | | No Answer at Door |
| **4917 E. Balch** | | |
| #101 | | No Answer at Door |
| #102 | Dario Gonzalez | Interview Summary |
| | Anna Gonzalez | Awakened by gunfire; did not look outside; d |
| #104 | Gloria Trevino | Interview Summary |
| #108 | Sharon Eastman | Works nights; left for work prior to the incide |
| #103 | Rafael Chavez | Interview Summary |
| #107 | | No Answer at Door |
| **4918 E. Balch** | | |
| #203 | Mirna Valle | Interview Summary |
| **4925 E. Balch** | | |
| #101 | Csee Mychann | Interview Summary |

| #102 | Non-English speaker | No interview |
|---|---|---|
| #103 | Jennafer Uribe | Interview Summary |
| #103 | Cathy Hadel | Interview Summary |
| #104 | Jose & Lucy Villa | Employee of apartment complex; referred us t 229-6905 |
| **4933 E. Balch** | | |
| #101 | Rosalia Heredia | Interview Summary |
| #102 | Herminia Ochoa<br>Samuel Ochoa | Interview Summary<br>Interview Summary |
| #103 | No Answer at Door | Neighbor Garza in #104 states this couple wo home the night of the incident |
| #104 | Valentino Garza | Interview Summary |
| **4934 E. Balch** | | |
| #101 | Maria Vargas | Interview summary |
| #102 | Vacant | |
| #103 | Vacant due to fire | |
| #104 | Vacant due to fire | |
| #201 | Yer Her | Uncooperative Asian male; states he saw and |
| #202 | Josefina Bustos | Interview Summary |
| #203 | Vacant due to fire | |
| #204 | Vacant due to fire | |
| **4941 E. Balch** | | |
| #101 | Bolanos (Non-English) | |
| #102 | No Answer at Door | |
| #105 | Karmen Smith<br>Morgan Smith | Interview Summary<br>Interview Summary |
| #106 | Vacant | |
| #107 | Naicia Johnson | Not home at the time of the incident |

| #108 | Christy Queen | Interview Summary |
|------|---------------|-------------------|
| #205 | Juan Sanchez<br>Manuel Alonzo<br>Ninfa Solis | Interview Summary<br>Interview Summary<br>Interview Summary |
| #206 | Maria Perez | Sound asleep; didn't see or hear anything at al |
| #207 | Mary Ann Trujillo | Awakened by gunfire; looked out window and<br>of police officers; did not see anyone else; did<br>not tell what happened |
| #208 | No Answer at Door | |
| **4957 E. Balch** | | |
| #105 | Steve Hicks | Awakened by gunfire; did not hear voices; did |
| #106 | Joyce (refused last name) | Moved into the complex on 4/1/2009 |
| #107 | Liliana Tapia | Awakened by gunfire; did not hear voices; did |
| #108 | No Answer at Door | |
| #205 | Non-English Speaker | No interview |
| #206 | No Answer at Door | |
| #207 | No Answer at Door | |
| #208 | No Answer at Door | |
| **4973 E. Balch** | | |
| #103 | Ubaldo Marquez | Awake at the time of the incident; did not hea<br>clusters of shots; heard someone yell, "Get in<br>anything else |
| **4987 E. Balch** | | |
| #101 | Jeselle Adams | Awakened by gunfire; did not get out of bed; |
| #102 | Ivy Carrizais | Awakened by gunfire; did not see anything; d |
| #103 | Almyra Esteban | Awake at the time of the incident; heard abou<br>lone shot; did not hear voices; looked out and |
| #201 | Non-English Speaker | No interview |
| #202 | James (refused last name) | Asleep at the time of the incident; denies hear |

| | | |
|---|---|---|
| #203 | Nana Saiz | Denies hearing or seeing anything; her sister, heard the police everywhere but she d: happened |
| **540 N. Winery** | | |
| #103 | Clementine Craig | Interview Summary |
| #104 | Edubiges Martinez<br>Alex Bejar | Interview Summary<br>Stated he was at work at the time of the incide |
| #108 | Vacant | |
| #203 | Ivan Ramirez | Interview Summary |
| #203 | Martha Arias | Interview Summary |
| #204 | Vacant | |
| #208 | Mary Beth Zamora | Was asleep and did not awaken during the inc |

# **EXHIBIT I**

IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

-oOo-

CHRIS WILLIS, MARY WILLIS,          )
INDIVIDUALLY AND SUCCESSORS         )
IN INTEREST TO STEPHEN              )
WILLIS; JENNAFER URIBE,             )
                                    )
            Plaintiffs,             )   Case No.
                                    )   1:09CV01766LJO-DLB
vs.                                 )
                                    )
CITY OF FRESNO, OFFICER GREG        )
CATTON, OFFICER DANIEL              )
ASTACIO, CHIEF JERRY DYER,          )
and DOES 1 through 50               )
inclusive,                          )
                                    )
            Defendants.             )
_____)

```
┌─────────────────────────────────┐
│          RECEIVED               │
│                                 │
│        MAR 16 2011              │
│                                 │
│   WALKER, HAMILTON & KOENIG     │
└─────────────────────────────────┘
```

Fresno, California                    March 2, 2011

-oOo-

DEPOSITION OF HUGO CRUZ

-oOo-

Reported By:
Robin C. Hice, CSR
License No. 13203



1320 EAST SHAW AVENUE, SUITE 168
FRESNO, CALIFORNIA 93710
(559) 224-5511 or 1-800-248-6611

Central Valley REPORTERS

1      Q.   And can you elaborate on the reason why you

2   say no, it didn't -- his behavior wasn't --

3      A.   The way I seen other people drunk, like,

4   buzzing, just can't coordinate yourself; you start

5   swerving to the side.

6      Q.   So he didn't appear to you to be of that level

7   of --

8      A.   Not at that level, but the way he was, like,

9   approaching us, he was moving to the sides too, but I

10   can't really tell if he was really drunk or something

11   just the way he was approaching us.

12      Q.   So based on your opinion or in your opinion,

13   did this individual appear intoxicated?

14      A.   I could smell it, yes.

15      Q.   Okay.  And you stated that there was a woman

16   present with this individual, correct?

17      A.   Yes.

18      Q.   And did she make statements to you during this

19   incident?

20      A.   She did.  She said that eventually her

21   boyfriend always gets aggressive when -- I guess he just

22   don't like any police officers or security guards, I

23   guess, over something when he was young.  I guess a

24   security guard did something to him or something.

25   That's what she said.

1    more than buzzed, right?  Or did...

2        A.   Can repeat that again?

3        Q.   You said that he was -- he was not acting the

4    way normal people --

5        A.   Well, everybody has different ways.  No one is

6    the same.

7        Q.   Right.

8        A.   So everybody has different effects on alcohol.

9        Q.   So the effect of alcohol on Stephen would

10   be --

11       A.   Just aggressive.

12       Q.   Okay.  Okay.  Anything else?

13       A.   The thing I forgot to mention -- it's

14   something I think or -- I remember his wife said he gets

15   aggressive when he drinks alcohol.  I don't know if it

16   was his wife or girlfriend.  I forgot to mention that.

17       Q.   Okay.  She said he gets aggressive when he

18   drinks too much or --

19       A.   Drinks alcohol.

20       Q.   -- drinks alcohol?  Okay.  And then you said

21   he stopped advancing on you when you withdrew your

22   baton?

23       A.   Yeah.

24       Q.   So you didn't actually feel the need to use

25   it --

# EXHIBIT J

IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

-oOo-

CHRIS WILLIS, MARY WILLIS,     )
INDIVIDUALLY AND SUCCESSORS IN)
INTEREST TO STEPHEN WILLIS;    )
JENNAFER URIBE,                )
                               )
        Plaintiffs,            )
                               )
    vs.                        )     No.  1:09-CV-01766
                               )
CITY OF FRESNO, OFFICER GREG   )
CATTON, OFFICER DANIEL         )
ASTACIO, CHIEF JERRY DYER, and)
DOES 1 through 50, inclusive, )
                               )
        Defendants.            )
                               )

DEPOSITION OF MARY WILLIS
FRESNO, CALIFORNIA
THURSDAY, OCTOBER 28, 2010

Reported by:

Kara C. Gentry

C.S.R. 12431

1    drinking alcohol, that maybe he drank too much?

2         A.    Um, I didn't think that he was -- I didn't

3    think it was out of control.  I did have one

4    conversation with him about what he spent his money on

5    when he was unemployed.  Of course, again, I'm his mom,

6    and I wouldn't be his mom if I didn't.  But we just had

7    one conversation about it.  If I thought that he was an

8    alcoholic, I certainly would have said something to him

9    about it.

10        Q.    So if I understand your testimony, you had

11   concerns that maybe he was spending money on alcohol

12   when it could have been better spent on other things?

13        A.    At one time when he let his insurance lapse

14   and his vehicle registration expire, yes, I said

15   something to him that maybe you should be spending your

16   money on that instead of, you know, buying booze.

17        Q.    Were you aware of any law enforcement contacts

18   that he may have had that were alcohol related, maybe a

19   DUI --

20        A.    No.

21        Q.    -- or anything like that?

22              I know your husband explained it, but I just

23   want to go through it with you.

24              When was the last time you had a conversation

25   with your son prior to his death?

# EXHIBIT K

*Deposition of Officer Steve Taylor*

```
 1              UNITED STATES DISTRICT COURT

 2      EASTERN DISTRICT OF CALIFORNIA - FRESNO DIVISION

 3                        -oOo-

 4
        Chris Willis, Mary Willis,        )
 5      individually and successors in    )
        interest to Stephen Willis;       )
 6      Jennafer Uribe,                    )
                                          )  No.
 7                   Plaintiffs,          )  1:09-cv-01766-
                                          )  LJO-DLB
 8              vs.                        )
                                          )
 9      City of Fresno, Officer Greg      )
        Catton, Officer Daniel            )
10      Astacio, Chief Jerry Dyer, and    )
        DOES 1 through 50 inclusive,      )
11                                        )
                     Defendants.          )
12                                        )

13                        -oOo-
14      Fresno, California          January 11, 2011

15                        -oOo-

16           The deposition of OFFICER STEVE TAYLOR was

17      taken in the above-entitled matter pursuant to all of

18      the provisions of law pertaining to the taking and use

19      of depositions before Karla M. Rocha, CSR, with offices

20      at Fresno, California, commencing at the hour of 11:42

21      a.m., at the law offices of Weakley, Arendt & McGuire,

22      1630 East Shaw Avenue, Suite 176, Fresno, California.

23

24

25
```

*Deposition of Officer Steve Taylor*

```
1       Q    At the top of Page 3 of your statement

2   Detective Villaluazo said, "Was there something

3   additional that made you look towards that area for

4   that vehicle?"  And you answered, "Uh, there was a call

5   that had come out about a reckless driver earlier."

6   Did you receive a call about a reckless driver?

7       A    I did not receive a call, there was just a

8   broadcast that went out to be on the lookout.

9       Q    According to the transcript I have of the

10  police dispatch records, a female operator said, "I'm

11  going to start you toward last location for this

12  vehicle was southbound Chestnut toward Butler.  The

13  vehicle is going to be hitting cars, driving

14  erratically, and the RP is still following them.  It's

15  going to be a black Nissan sedan, two-door, 3XY3747,"

16  does that sound like the call that you had heard?

17      A    Could have been, yes.  I don't recall.

18      Q    But when this vehicle came in and hit the

19  gate, or you felt it hit the gate, did you think this

20  must be the car that we heard the radio call about

21  earlier?

22      A    I thought that it could be a good possibility.

23      Q    When Officers Astacio and Catton left you to

24  go check out the car that had gone into the apartment

25  complex, were they running?
```

# **EXHIBIT L**

*Deposition of Officer Greg Jouroyan*

```
1              UNITED STATES DISTRICT COURT

2      EASTERN DISTRICT OF CALIFORNIA - FRESNO DIVISION

3                        -oOo-

4
       Chris Willis, Mary Willis,          )
5      individually and successors in      )
       interest to Stephen Willis;         )
6      Jennafer Uribe,                      )
                                            )   No.
7                    Plaintiffs,            )   1:09-cv-01766-
                                            )   LJO-DLB
8                    vs.                    )
                                            )
9      City of Fresno, Officer Greg         )
       Catton, Officer Daniel              )
10     Astacio, Chief Jerry Dyer, and       )
       DOES 1 through 50 inclusive,         )
11                                          )
                     Defendants.            )
12                                          )

13
                         -oOo-
14     Fresno, California            January 11, 2011

15                       -oOo-

16          The deposition of OFFICER GREG JOUROYAN was

17     taken in the above-entitled matter pursuant to all of

18     the provisions of law pertaining to the taking and use

19     of depositions before Karla M. Rocha, CSR, with offices

20     at Fresno, California, commencing at the hour of 10:10

21     a.m., at the law offices of Weakley, Arendt & McGuire,

22     1630 East Shaw Avenue, Suite 176, Fresno, California.

23

24

25
```

*Deposition of Officer Greg Jouroyan*

1      Q     And one minute 34 seconds into the recording

2    the female operator said, "I'm going to start you

3    toward -- last location for this vehicle was southbound

4    Chestnut towards Butler.  Vehicle is going to be

5    hitting cars, driving erratically, and the RP is still

6    following them."  Do you recall getting a call along

7    those lines?

8      A     Not in those specific terms, but I know I was

9    dispatched to the scene.

10      Q     What does the initials RP in this context mean

11    to you?

12      A     Reporting party.

13      Q     Okay, does that indicate to you that there was

14    some citizen who was following this vehicle that was

15    hitting cars and driving erratically?

16      A     Correct.

17      Q     Not a police officer?

18      A     No.

19      Q     The female operator went on to say, "It's

20    going to be a black Nissan sedan, two-door," and then

21    gave a license plate number of 3XYM747.  Did you ever

22    see that black Nissan, two-door sedan?

23      A     Yes, I did.

24      Q     Where did you see it?

25      A     It was in the parking lot of the apartment

*Deposition of Officer Greg Jouroyan*

```
 1    complex.

 2        Q    Did anybody ever tell you to whom that black

 3    Nissan, two-door sedan, license plate number 3XYM747

 4    belonged?

 5        A    I later learned that it was when I spoke to

 6    Jennafer Uribe, she indicated that she was in that

 7    vehicle.

 8        Q    Are you aware that the vehicle that was being

 9    driven that night by Mr. Willis was a four-door

10    Infinity?

11        A    Yes.

12        Q    With a different license plate?

13        A    The question once more, I'm sorry?

14        Q    Were you aware that the vehicle that

15    Mr. Willis was driving that night has been identified

16    as a four-door Infinity with a different license plate

17    number than what was identified to you by this

18    operator?

19        A    No.

20        Q    Did you ever see any indication in Mr. Willis'

21    vehicle that it had struck any other vehicle?

22        A    I did not look at his vehicle and observe any

23    type of damage in that aspect.

24        Q    Where did you first see the black Nissan

25    sedan, two-door with license plate number 3XYM747?
```

*Deposition of Officer Greg Jouroyan*

1    talking about something that took place almost two

2    years ago, do you have a memory that someone told you

3    that the vehicle that was driving erratically and

4    hitting cars was actually going into the apartment

5    complex at Balch and Winery?

6        A    I don't recall that.

7        Q    Would it be fair to say that you have a memory

8    that you received some dispatch assignment that you

9    intended to carry out and then you received another

10   notice that there was a problem at Balch and Winery

11   that caused you to change your original plan of trying

12   to find this black Nissan sedan?

13       A    Correct.

14       Q    So you're not sure that the car that you were

15   originally told to look for, the black Nissan sedan,

16   actually was the car that you saw in the apartment

17   complex at Balch and Winery, would that be fair to say?

18       A    Yes.

19       Q    What's the first thing you recall happening

20   when you arrived at Balch and Winery?

21       A    Crime scene tape was being strung around the

22   complex to maintain the integrity of the scene.  I

23   entered and was directed by a sergeant to go to the

24   complex.

25       Q    Before you ever arrived at Balch and Winery

# EXHIBIT M

*Deposition of Ronnie Rackley*

```
 1              UNITED STATES DISTRICT COURT

 2      EASTERN DISTRICT OF CALIFORNIA - FRESNO DIVISION

 3                        -oOo-

 4
        Chris Willis, Mary Willis,        )
 5      individually and successors in    )
        interest to Stephen Willis;       )
 6      Jennafer Uribe,                    )
                                           )  No.
 7                    Plaintiffs,          )  1:09-cv-01766-
                                           )  LJO-DLB
 8                    vs.                  )
                                           )
 9      City of Fresno, Officer Greg       )
        Catton, Officer Daniel            )
10      Astacio, Chief Jerry Dyer, and     )
        DOES 1 through 50 inclusive,       )
11                                         )
                      Defendants.          )
12                                         )

13                        -oOo-

14   Fresno, California              June 7, 2011

15                        -oOo-

16        The deposition of RONNIE E. RACKLEY was taken

17   in the above-entitled matter pursuant to all of the

18   provisions of law pertaining to the taking and use of

19   depositions before Karla M. Rocha, CSR, with offices at

20   Fresno, California, commencing at the hour of 3:05

21   p.m., at the law offices of Weakley & Arendt, 1630 East

22   Shaw Avenue, Suite 176, Fresno, California.

23

24

25
```

*Deposition of Ronnie Rackley*

```
1    contact with Mr. Willis, officers shined a light on
2    Mr. Willis, Mr. Willis was observed to have a holster
3    revolver in his left hand.
4          As Mr. Willis began to draw his weapon, the
5    officer's reportedly drew their weapons and gave him
6    instructions and the engagement continued from there.
7    Q    Let me just ask it this way:  When did the
8    initial engagement end?
9    A    After Mr. Willis fled, I would assume.
10   Q    Fled where?
11   A    Fled down between the cars.
12   Q    So the initial engagement is the engagement
13   that's at the rear of the vehicle in the parking lot?
14   A    Yes, sir.
15   Q    And your opinion is that a short stroked --
16   short-stroke process whereby the trigger is pulled back
17   just so much that the weapon is not -- the hammer
18   doesn't actually come down, but that the cylinder
19   rotates, is that the short stroke, generally speaking?
20   A    That's a very general description, yes.
21   Q    Thank you.  And in this instance that had --
22   just to even go with this theory, that would have to
23   occur twice, true?
24   A    Yes, sir, possibly a third.
25   Q    Were you able to replicate two short strokes
```

1    in your controlled setting with this weapon?

2         A    Yes, sir.

3         Q    Did you document it?

4         A    No, I believe I only described it.

5         Q    You described in your --

6         A    A short stroke.

7         Q    You described the process of a short stroke?

8         A    Yes, sir.

9         Q    Where in your report do you say that you

10   successfully were able to cause a short stroke?

11        A    I don't believe it's in there.

12        Q    Were you able to cause it twice in your

13   controlled environment?

14        A    Yes, sir.

15        Q    Did you document it twice or document it in

16   your report here?

17        A    No, sir.

18        Q    Did you film it?

19        A    No, sir.

20        Q    How many tries did it take for you to get a

21   short-stroke event to occur?

22        A    I can usually do it on the first try.

23        Q    Were you running at the time?

24        A    No, sir.

25        Q    Had you been shot at the time?

*Deposition of Ronnie Rackley*

```
 1    STATE OF CALIFORNIA        )
                                 )    ss.
 2    COUNTY OF FRESNO           )

 3              I, Karla M. Rocha, a Certified Shorthand

 4    Reporter in the State of California, residing in

 5    Clovis, do hereby certify:

 6              THAT the witness in the foregoing deposition

 7    named RONNIE E. RACKLEY was by me duly sworn to testify

 8    to the truth, the whole truth and nothing but the truth

 9    for the taking of the testimony herein;

10              THAT said deposition was reported in shorthand

11    by me at the time and place above stated, that I am a

12    Certified Shorthand Reporter, and thereafter

13    transcribed under my direction and control.

14              I FURTHER CERTIFY that I am not interested in

15    the outcome of said action, nor connected with, nor

16    related to any of the parties in said action or to

17    their respective counsel.

18

19

20                              _____

21                              Karla M. Rocha
                                CSR #8982
22

23

24

25
```

# **<u>EXHIBIT N</u>**

*Deposition of Ray Villalvazo*

```
 1            IN THE UNITED STATES DISTRICT COURT

 2         FOR THE EASTERN DISTRICT OF CALIFORNIA

 3                     -oOo-

 4   CHRIS WILLIS, MARY WILLIS,  )
     INDIVIDUALLY AND SUCCESSORS )
 5   IN INTEREST TO STEPHEN      )
     WILLIS; JENNAFER URIBE,     )
 6                               )
            Plaintiffs,          )
 7                               )
        vs.                      )No. 1:09-CV-01766-LJO-DLB
 8                               )
     CITY OF FRESNO, OFFICER     )
 9   GREG CATTON, OFFICER DANIEL )
     ASTACIO, CHIEF JERRY DYER,  )
10   and DOES 1 through 50,      )
     inclusive,                  )
11                               )
            Defendants.          )
12   _____)

13

14   Fresno, California          November 17, 2010

15                     -oOo-

16       The video-taped deposition of RAY VILLALVAZO

17   was taken in the above-entitled matter pursuant to all

18   of the provisions of law pertaining to the taking and

19   use of depositions before Stacy Banks, CSR, with

20   offices at Fresno, California, commencing at the hour

21   of 10:53 a.m., at the law offices of Weakley, Arendt &

22   McGuire, 1630 E. Shaw Avenue, Suite 176, Fresno,

23   California.

24                     -oOo-

25
```

*Deposition of Ray Villalvazo*

1     A.   I can say he fired it.

2     Q.   Okay.  You can say he fired how many times?

3     A.   Once.

4     Q.   Are you able to tell when he fired it at one

5 time?

6     A.   Based on what I know of this investigation

7 currently right now?

8     Q.   Yes, sir.

9     A.   Yes, I can tell you.

10    Q.   Okay.  What can you tell us in that regard?

11    A.   When he shot at the officers.

12    Q.   What's the basis for your conclusion that he

13 fired a shot at the officers?

14    A.   I have two officers I interviewed who said

15 that he fired at them.

16    Q.   Anything else?

17    A.   And the weapon itself had an empty casing

18 showing that it had been fired.

19    Q.   That weapon is a revolver, correct?

20    A.   Correct.

21    Q.   And so that means it has a rotating cylinder,

22 correct?

23    A.   Correct.

24    Q.   And that rotating cylinder when fully loaded

25 contains six bullets?

*Deposition of Ray Villalvazo*

1    I don't want to misanswer you.

2        Q.   Did you have anything in your final report

3    that indicated which way the cylinder in a .38 Smith &

4    Wesson rotates?

5        A.   No, sir.

6        Q.   Was it significant to you that the expended

7    cartridge, or would you say the expended bullet or

8    expended cartridge?

9        A.   Cartridge as I understand it.

10       Q.   The expended cartridge was two slots

11   counter-clockwise from the firing slot?

12      A.   Yeah, there was some significance in that.

13      Q.   Okay.

14      A.   Because I as the investigator will never know

15  what truly Mr. Willis did with the weapon after he

16  fired it, what he -- how he manipulated it or what he

17  did with it when he retreated and hid behind that

18  vehicle.  So there could be many factors, it could be

19  that, in which I could never truly answer what

20  occurred and why that cylinder moved over two

21  positions.  It could tell me that he attempted to fire

22  and didn't fire, he could have taken that cylinder and

23  rotated it.  I don't know because he's not here to

24  tell me.

25      Q.   And you're starting from the presumption that

*Deposition of Ray Villalvazo*

1  the officers Astacio and Catton were correct in saying

2  that he fired at them?

3      A.  That's not a presumption.  It's a fact.

4      Q.  All right.  Well, that's one of the things

5  we're here to determine is what a jury is ultimately

6  going to determine.  What is your basis for saying

7  that it is a fact?

8      A.  Because the officers told me that he fired at

9  them and when I recovered the weapon it had a fired

10  round in it.

11      Q.  Now, did you gain information that the weapon

12  had been fired at a shooting range during the course

13  of the day March 27, 2009?

14      A.  I did have information that Mr. Willis was at

15  a range firing weapons, yes.

16      Q.  Did that influence your determination in any

17  way as to what you called a fact that Mr. Willis fired

18  at the officers?

19      A.  No.

20      Q.  Did you learn from any source that prior to

21  your arrival one or more officers had picked up that

22  .38 Smith & Wesson and opened the cylinder?

23      A.  No, sir.

24      Q.  Did you gain any information at any time from

25  any source that prior to your arrival on scene one or

*Deposition of Ray Villalvazo*

1  Willis fired the gun at him?

2      A.   I'd have to go back.  I don't have a

3  recollection of how many times.

4      Q.   Did Officer Catton tell you that when Mr.

5  Willis fired the gun at him he had his arms straight

6  out in front of him in a classic firing position?

7      A.   Not describing that manner, other than what

8  I've said pointing the gun at him.

9      Q.   All you can recall him saying is that Willis

10 was pointing the gun at Catton?

11     A.   Correct.

12     Q.   You don't know if Willis had his arms

13 extended?

14     A.   I do know his arms were extended.

15     Q.   And how do you know that?

16     A.   I know it by what the officer described and

17 what the forensic pathologist, Dr. Gopal, described

18 during the autopsy, what his opinion was on the bullet

19 wounds of Mr. Willis.

20     Q.   And what did Dr. Gopal tell you in that

21 regard?

22     A.   Gopal told me based on what he examined,

23 observed, that Mr. Willis' right arm was struck while

24 being extended out.  He took a round, I believe, in

25 the outer portion of his right forearm and exited the

# **<u>EXHIBIT O</u>**

1 | URIBE, Jennafer – IME
  | USDC #1:09-CV-01766-LJO-DLB

# Harold L. Seymour, Ph.D.
## Clinical and Forensic Psychology
### 5740 N. Palm, Suite 105
### Fresno, CA 93704
### (559) 431-1900
### (FAX) 431-1951

## Independent Psychological Evaluation

Identifying Information:

**Name:  URIBE, Jennafer**
**DOB:  11/2/75**
**Case:  Chris Willis, et al. v. City of Fresno, et al.**
       **US District Court Case No.:  1:09-CV-01766-LJO-DLB**

**Date of Evaluation:  12/1/10**
**Date of Report:  12/7/10**

Reason for Referral:  Respondent's counsel has requested an Independent
Psychological Evaluation of Ms. Uribe following her Complaint for
Damages (Doc. #1, pg. 12).  She alleges "severe to extreme emotional
distress" and describes the distress as continuing.  Ms. Uribe's live-in
boyfriend, Stephen Willis, was shot and killed in a confrontation with Fresno
Police Department officers (docs. #5 – 7).

In her deposition taken on 11/4/10 (doc. #11), Ms. Uribe stated she has been
unable to be successful in school (pg. 33), has panic attacks (pg. 35, pp. 37-
38), trust issues with authorities and specific paranoia regarding the police
(pg. 133), and she said she now barricades herself in her house.  She said she
requires medication for anxiety and panic (Xanax, pg. 5) and medication to
enable her to sleep (Seroquel, pg. 6).

Procedures:

1) Review of documents (see Document Appendix);
2) Personality Assessment Inventory (PAI);
3) Clinical Interview;

2 │ URIBE, Jennafer – IMb
  │ USDC #1:09-CV-01766-LJO-DLB

4) Psychosocial History;
5) Medical History;
6) Psychological and Substance Use History;
7) Informal Mental Status Exam.

<u>Chief Complaints:</u>

Ms. Uribe said she developed emotional distress symptoms following the
death of her boyfriend, Stephen Willis on or about 3/27/09. Ms. Uribe stated
that she and her boyfriend had consumed alcohol on that evening. She said
they were returning to their apartment, and she was hurrying to get into the
apartment because she felt she was going to throw up.

She said Stephen was not directly behind her. She said she heard what
sounded like fireworks and she looked up. She said she then looked to the
side and saw police officers. She said one officer pushed her into the
apartment of a neighbor.

Ms. Uribe said she later found out that police shot Stephen and that he was
deceased. Ms. Uribe has provided what appear to be differing accounts of
what she witnessed. When interviewed by the investigating detective she
said she did not witness what happened (doc. #6, pg. 14). She also stated
that she did not hear anything being said (doc. #7, pg. 6) In the records of
her current treating psychiatrist, Dr. Middleton, she is documented as saying
that she witnessed the shooting of her boyfriend (doc. #9, Bates 0001), and
that Stephen was shot dead in front of her (Bates 0015-16). In her
deposition she stated, "All I saw was gunfire" (doc. #11, pg. 104). She told
the interviewing detective that she heard yelling, but could not tell what was
being yelled (doc. #5, pp. 5-6). She told this examiner that statement is not
correct. She also said she was unsure if the second round of gunfire
occurred when she was outside or inside the apartment (doc. #11, pg. 107).

Her specific emotional complaints include panic attacks, post-traumatic
stress disorder, and short-term memory loss. She said she also has
depression, paranoia, and she is distrustful of others. She said she began a
pattern of "passing out" a couple of weeks after the DOI. She said she
suffered for a while from nightmares, but she said these are not occurring on
her current medication.

3 | URIBE, Jennafer – IME
USDC #1:09-CV-01766-LJO-DLB

She had an incidence of psychosis that began on 5/11/09 (doc. #10, Bates 0018). She was delusional and was having hallucinations. She was stabilized at St. Agnes Hospital and was transferred to a psychiatric hospital.

Ms. Uribe told this examiner that the psychotic episode happened after she had been unable to sleep for a couple of days. She said she was prescribed Ambien for her sleep difficulties, and she took extra. She also used cannabis and her drug toxicology screen was also positive for tricyclic antidepressants (doc. #10, 0036). Ms. Uribe said she believes the psychosis episode was linked to the Ambien.

Ms. Uribe also stated she is unable to work because she cannot function in a job interview. She said her attempt at medical assistant training was unsuccessful because she kept passing out when she would see the anatomical mannequins. She said she has applied for disability.

Summary of Event:

On the day of 3/27/09, Stephen Willis, Ms. Uribe, and others, went to a ranch to engage in practice shooting (doc. #5, pp. 5-6). Stephen Willis brought along his own shotgun, as well as weapons owned by his father. One of these included a pistol. According to Ms. Uribe, the weapons were put away when she and Stephen returned to their apartment.

Ms. Uribe said that she and Stephen drank tequila from 7 PM to 10 PM at their apartment (doc. #5, pg. 12). In Ms. Uribe's handwritten summary of events, she said they drank shots of tequila at the apartment, then a couple more shots, then a couple more shots (doc. #4, pg.3). Ms. Uribe denied that she and Stephen were drunk (doc. #6, pg. 2) when they were at a night club later that evening. Ms. Uribe denied that the two of them had used drugs on that day (doc. #5, pg. 9). The Toxicology Report for Stephen Willis indicates that he had a blood alcohol level of 0.29 at the time of his death, and he also tested positive for cannabinoids (doc. #14, Bates 0552-0553).

Officers were at the apartment complex on an unrelated call (doc. #7, pg. 2), and they noticed a vehicle traveling at a high rate of speed. They thought the vehicle might have struck the apartment entrance gate, and this was confirmed at a later time (pg. 6). Sgt. Reyes believed the vehicle was likely being driven by someone who was drunk and trying to get home (pg. 6).

3

4 | URIBE, Jennafer – IME
  | USDC #1:09-CV-01766-LJO-DLB

Officers sought to contact the driver on a reckless vehicle call (doc. #6, pg. 3). The driver was Stephen Willis. When officers confronted Mr. Willis, they state that he pointed a gun at them (doc. #7, pg. 2). Officer Cerda reported he heard Officer Astacio give a "drop the gun" command (pg. 11). Shots were fired by the officers and Stephen Willis was killed.

Psychosocial History:

Ms. Uribe said she was born in Los Angeles, CA. She came to Fresno in 2004. She was divorced from a 5-year marriage in 2006. She has custody of her 6-year-old daughter from that marriage. She has a 13-year-old daughter from a prior relationship, and this daughter resides with her father in southern California. Ms. Uribe said she does visit with her 13-year-old daughter when she can arrange it.

Ms. Uribe said she has always had a difficult relationship with her mother. On the DOI, her mother was living with her and Stephen, and she was caring for Ms. Uribe's daughter at the time of the shooting. Ms. Uribe said she has little contact with her mother currently. She said she does have contact with her biological father, who lives in Montana.

Ms. Uribe said she completed education through to becoming a Registered Dental Assistant. She said she graduated in 1999. She said she worked until December of 2008. She said she has worked as an instructor, which she especially liked, and she managed the back office for a dental practice. She acknowledged this job was stressful and she was prescribed Ativan to help her cope with the stress. She said she lost her last job due to the economy. She said she has tried to get a job in the past year, but she becomes anxious during the interview and she is unable to remember basic information she should know.

Ms. Uribe said she mostly keeps to herself at her residence. She said she gets her daughter ready for school in the morning. She gets her daughter to school and she cleans up the house. She said she may watch television or surf the internet. She said most of her day involves sitting at home watching television. She said that when her daughter comes home she gives her a snack, and later fixes dinner. She said she later puts her daughter to bed, and she tries to get herself to bed before midnight.

5 | URIBE, Jennafer – IME
  | USDC #1:09-CV-01766-LJO-DLB

Ms. Uribe said she has a history of trust issues.  She said Stephen helped her
with these.  She related her own trust issues to being raised in the Los
Angeles area where she had to deal with a lot of inappropriate "perverted"
behavior by men.  At the age of 16, she was shot in the ankle as a bystander
in a drive-by shooting.  She denied any psychological distress as a result of
this, saying only that it taught her she needed to keep away from the wrong
crowd and guns.

Ms. Uribe said she really doesn't socialize much since Stephen's death, and
she tries to avoid people.  She said if she has to go out, such as to the store,
she tries to make sure there is someone with her.  There are documents from
MySpace (doc. #15) that appear to show Ms. Uribe participating in
celebration activities with others following the DOI, however.

Medical History:

Ms. Uribe presented for this evaluation with what she said was a "sinus
infection."  She sneezed, coughed and used an inhaler with some frequency.
She said she has an existing prescription for Albuterol from her former
physician, Dr. Apa.  She said she does have problems with shortness of
breath.

She denied any history of closed head injury or motor vehicle accidents.  As
mentioned, she was shot in the ankle when she was 16.

Ms. Uribe said she has had 3 pregnancies, one of which she terminated.  She
has a history of being prescribed narcotic pain medication for tooth pain.
She was also prescribed Trazadone in November of 2005 (doc. #10, Bates
0047).  Ms. Uribe could not recall the reason she was prescribed this.
Trazadone is an antidepressant that is also frequently used as a sleep
inducing medication.

Ms. Uribe said she currently has no primary care physician.  She said the
only exercise she currently gets is when she walks her daughter to and from
school.

Psychological and Substance Use History:  Ms. Uribe acknowledged a
history of some difficulties with trust in relationships going back to her time

in southern California. Interestingly, she reported no negative emotional sequelae after being shot when she was 16 years old, other than saying she did not like guns.

Ms. Uribe also acknowledged a history of sleeping difficulties that pre-dated the DOI. She also was treated for anxiety related to work stress prior to the DOI. She said she was prescribed Ativan by doctors at Kaiser.

Ms. Uribe was initially treated for her post-DOI emotional symptoms by Dr. Apa (doc. #3, pp. 5-6; doc. #8). Dr. Apa prescribed various medications to include Xanax and Zoloft (doc. #8, Bates 0004), and also clonazepam (Klonopin), Seroquel, Soma & Vicodin (Bates 0005). The records from the Kings Winery Medical Clinic appear to indicate that Ms. Uribe was obtaining the same prescriptions from multiple providers at the same time (Bates 0009-0011). In a Clinical Note from 7/6/10 (Bates 0034) it states that Ms. Uribe was informed that she was being dropped from the clinic because she was jumping providers to obtain medications. Ms. Uribe told this examiner she was never told this.

Ms. Uribe has also been under the care of Dr. Middleton, and she continues to be. He recommended that she also participate in psychotherapy. Ms. Uribe said she got a referral to a counselor, but she went, citing transportation difficulties.

From Dr. Middleton's records (doc. #9) there is a Fresno County Mental Health Plan dated 7/17/09 (Bates 0001-0003). In the assessment it is noted that Ms. Uribe stated she witnessed the shooting of her boyfriend in March of 2009. She was reporting distress, flashbacks, paranoia, problems breathing, crying, "Heavy depression," and says she had auditory and visual hallucinations. It notes her May 2009 CBHC hospitalization. She denied any history of pre-DOI psychological problems. She was noted to have a history of treatment with Xanax and Ambien, and she was on Lunesta (soporific) at that time. She was also noted to have a history of drug and alcohol use. She was diagnosed with a Major Depressive Disorder with Psychotic Features and PTSD.

In a 9/15/10 Progress Note (Bates 0011), Ms Uribe stated she feels overwhelmed, that she was not sleeping, but the Xanax was helpful. The note indicates that she does not want an antidepressant even though she is

7 | URIBE, Jennafer – IME
  | USDC #1:09-CV-01766-LJO-DLB

depressed. It was decided that she would be started on Seroquel. It is also the case that on 6/24/10 (Bates 0015-16) Ms. Uribe stated she did not want an antidepressant. She was apparently prescribed an antidepressant previously, Wellbutrin is noted on 2/4/10 (Bates 0019-20), but it was noted in the following month that she had not been taking the Wellbutrin for several months (Bates 0017-18). Ms. Uribe was asked by this examiner about her objection to taking antidepressant medication. She expressed concern about being dependent or having other problems. It was pointed out to her that medications like Xanax are very addictive, while antidepressants are not. She said she understood this, but did not appear to provide a clear rationale for the choice.

In the Comprehensive Assessment Questionnaire given to Ms. Uribe that she appears to have dated 2/17/09, but this is most likely an error. In this self-report document (Bates 0031-35), Ms. Uribe identifies her main problems as being a victim of a violent crime and that her boyfriend was murdered. She described multiple problems already listed, and she also said she had problems with loud noises and when seeing police cars. She denied any alcohol use.

In Dr. Middleton's records there is also an 8/4/09 Non-Preferred Medication Request for Lunesta to treat "chronic insomnia" (Bates 0046).

Ms. Uribe minimized her drug and alcohol use during this interview. She asserted that "in her profession" she could not use these substances. When asked by this examiner what drugs she has used she replied that she has only used marijuana, and she said she really doesn't like it. She was non-specific when asked when she first used, but indicated it was during her adolescence. As previously mentioned, she has a documented history of marijuana use (doc #8, Bates 0043; doc. #10, Bates 0036). She stated her alcohol use is minimal. She does smoke cigarettes.

Personality Testing:

Ms. Uribe completed the Personality Assessment Inventory (PAI) prior to being interviewed. The PAI is a 344 item objective measure of personality and psychopathology. The PAI typically takes no more than 40 minutes to complete. In Ms. Uribe's case, however, she took over twice as long as is normally required.

8 | URIBE, Jennafer – IME
| USDC #1:09-CV-01766-LJO-DLB

Ms. Uribe's responses to the PAI indicate a high level of defensiveness and an impaired ability to admit to even the simplest common faults. The general take away is that she does not have insight into how her own behavior may cause a negative impact on herself or others.

The Full Scale Profile shows clinically significant elevations on the Anxiety scales, as well as the Depression, Schizophrenia and Paranoia scales. She also has a clinically significant elevation on the Stress scale. Of interest, one of her lowest scales (RXR) addresses the motivation of the person to pursue appropriate treatment to address identified distress. The T-Score of 44 is particularly low in a profile with so many elevations and it reflects an unwillingness to pursue appropriate treatment.

Given Ms. Uribe's approach to the PAI, it is not possible to interpret it as an accurate reflection of her own personal experiences. Rather, it reflects a desired self-description. She does endorse items that reflect traumatic stress, psychotic symptoms and depressive symptoms. She does present as suspicious of others, even to the point of experiencing hostility. Interpersonal relationships may have always been challenging for her. Despite her positive self presentation, she does appear to have very low self esteem, with fragile ego defenses.

Mental Status Exam: Ms. Uribe's mental status was informally assessed during the course of the evaluation. She presented as a physically calm and generally cooperative woman who appears younger than her stated age. She was dressed casually, but appropriately, and her hygiene was adequate. She appeared in no acute physical distress. She occasionally appeared drowsy, but not to an extent that she could not cooperate with the evaluation.

Her baseline mood appeared depressed and her affect was occasionally tearful. Her attention was focused and her concentration was fair. She did display some limits in her ability to recall certain information.

Her speech was a bit slowed, but otherwise was unremarkable. Her vocabulary was consistent with her age and stated level of education. She was fully oriented. Her abstraction skills were fair. She appears to be of average intelligence.

9 | URIBE, Jennafer – IME
| USDC #1:09-CV-01766-LJO-DLB

Her thought processes were linear, with tight associations. There was no evidence of frank delusions, though she did state she experiences anxiety around police officers. She denied current hallucinations and she was not internally distracted during the exam.

Her insight was poor and her judgment was fair.

Diagnostic Impression:

Based on the information gathered in this evaluation, the following diagnostic impression is offered:

AXIS I:    1) Anxiety Disorder, not otherwise specified, with
              traumatic stress and panic features;
           2) Rule out Benzodiazepine Dependence;
           3) Cannabis Abuse;
           4) Rule out Alcohol Abuse;

AXIS II:   Personality Disorder, Not Otherwise Specified, with
           Borderline, Paranoid and Avoidant features
           (principal diagnosis).

Opinion:

Ms. Uribe presents as a woman who seems stuck in her late adolescence and early adulthood. The current cluster of symptoms appears to be, in part, a reaction to the obviously traumatic experience of having a loved one killed, but the intensity of some of the symptoms likely results from her underlying personality issues being exposed.

The combination of psychiatric medication she currently receives is unusual. Panic symptoms are often treated long-term through the use of antidepressants, rather than Xanax, which is highly prone to produce dependency when given over an extended period of time. The addition of Seroquel, which is a highly sedating antipsychotic that is sometimes sought for abuse because it can produce heroin-like symptoms, would also serve to intensify the effect of the Xanax. Ms. Uribe's reported problems with concentration, short-term memory, passing out, and general drowsiness are most likely secondary to her medication. It is unclear to what extent these

10 | URIBE, Jennafer – IME
     | USDC #1:09-CV-01766-LJO-DLB

problems may be further exacerbated by alcohol or marijuana. Ms. Uribe asserts that she is not a frequent user of either substance, but her history suggests that this may not be an accurate characterization.

Ms. Uribe's varying explanations of what she recalls from the night of the shooting appears to reflect confabulation rather that a deliberate attempt at lying. Ms. Uribe believes what she believes, even if there is evidence to the contrary.

It appears that she has not pursued any common treatments normally employed for post-traumatic stress. Her resistance to participating in a psychotherapeutic process appears to stem from a fragile self-perception of being without flaws, coupled with a fear of being confronted with realities about herself and her life she wishes to avoid.

It is easy to accept and understand that Ms. Uribe would experience grief at the sudden death of her boyfriend. It is not clear to this examiner, however, that her symptoms of continuing distress, memory and concentration problems, and avoidance are the result of the death. These appear related to pre-existing personality issues and likely medication side effects. Ms. Uribe expressed the belief that her psychotic episode was likely secondary to a lack of sleep combined with a double dosing of sleep medication. She does not appear to accept that the use of marijuana in combination with the Ambien and tricyclic antidepressant may have also played a role. The sleep problems, by her own admission, have been with her essentially all of her life.

As is usual in such cases, we would expect some of Ms. Uribe's anxiety and mood symptoms to diminish when this case is resolved. Her personality based symptoms and apparent drug dependency issues will likely persist absent appropriate treatment.

Harold L. Seymour, Ph.D.
CA Lic. #PSY10400

# **<u>EXHIBIT P</u>**



**VINCENT J.M. DI MAIO, M.D.**
**CONSULTANT IN FORENSIC PATHOLOGY**
**10 CARRIAGE HILLS**
**SAN ANTONIO, TEXAS 78257**
(210) 698-1400
FAX (210) 698-3809
Email: vincent_dimaio@yahoo.com

March 23, 2011

James D. Weakley
Weakley & Arendt
1630 East Shaw Avenue
Suite 176
Fresno, California 93710

Re:    Chris Willis et al v. City of Fresno

Dear Mr. Weakley:

As requested, I have reviewed the following materials in regard to this case:

1. The Fresno Police Department Reports regarding the incident including statements of the officers at the scene and involved in the shooting
2. The coroner's file including the autopsy and autopsy file notes
3. Photos of the scene and body
4. Diagrams of the scene
5. Police Property and Evidence Reports
6. Report of the firearms examiners
7. Statements of neighbors and Jennifer Uribe
8. Deposition of the Forensic Pathologist (Dr. Gopal)
9. Depositions of:   Jennafer Uribe
                    Daniel Astacio
                    Gregory Catton
                    Israel Reyes
                    Jesus Cerda
                    Derek Jacobo
                    Ray Villalvazo
                    Spring Langston

At approximately 0016 hrs on 3/28/09, the Fresno Police Department received a report of a gang disturbance at Winery Avenue and E. Balch Avenue. Several Officers responded including Sgt.

1

Israel Reyes, Officer Astacio and Officer Catton. Approximately 20 minutes later, the officers and the sergeant observed a vehicle traveling west on Balch Avenue at a high rate of speed. The vehicle turned into the gated opening of Stoneybrook Apartments. As the gate opened and the vehicle passed through, it struck an object. Sgt. Reyes subsequently heard a noise which he thought came from the vehicle striking something in the complex. Sgt. Reyes thought the driver may have been intoxicated and requested a vehicle be sent to investigate. The responding Officer was Officer Cerda.

Officer Catton was at the scene of the disturbance when he saw the vehicle being driven by Mr. Willis strike the entrance to Stoneybrook Apartments. Officers Astacio and Catton then walked into the parking lot of the garage and located the vehicle as an individual, subsequently identified as Mr. Willis, was adjacent to the trunk of his vehicle. The officers who were in uniform identified themselves to Mr. Willis. Officer Catton illuminated Mr. Willis with his flashlight. They noticed that Mr. Willis was holding a handgun in a holster. Mr. Willis drew the gun from the holster with his right hand and began to point it at the officers. The officers ordered him to drop the gun. He did not and they commenced firing at him. Mr. Willis fired at them. At this time, Mr. Willis was north of the officers. Officer Catton moved west and Astacio east. Mr. Willis took cover behind a vehicle. At one point Mr. Willis was facing Officer Catton with his back to Officer Astacio. Mr. Willis was on his knees during part of the encounter. The Officer was also kneeling during the latter portion of the encounter.

Officer Cerda drove into the complex and was turning right when he heard shots. He backed up his vehicle outside what he thought was the line of fire and exited his vehicle. He then took cover behind a van. He noticed Sgt. Reyes behind him. He began to make his way to the source of the shooting moving from car to car. He heard a voice he recognized as Officer Astacio saying "Drop the gun". The shooting had stopped and he began to make his way to Officer Astacio. He then heard more shots and saw muzzle flashes. He ran to the location of the shooting. Officer Cerda saw the suspect on the ground and the body moving due to twitching. The officers advanced to the suspect telling him not to move. They rolled him on his back and found him to be without respiration or pulse. Officer Jacobo who had arrived at the scene also observed Mr. Willis slowly moving. Immediately prior to this, he saw Officer Catton fire a single shot

On arrival at the scene, EMS found Mr. Willis on his back, unconscious, without respiration or pulse. He was placed on a cardiac monitor that showed pulseless electrical activity with a rate of 13 per minute. He was pronounced dead at 0053 hrs.

Expended .40 caliber casings were present east, west and south of the body in a semi-circular pattern. The pattern of the ejected cartridge cases indicates that Officer Astacio was approximately in line with the position of Mr. Willis while Officer Catton was to Officer Astacio's left in line with the vehicle adjacent to the trash enclosure. 41 cartridge cases were recovered, 14 from Officer Astacio's gun and 24 from Officer Catton's. Three could not be positively linked to a specific gun. Officer Catton had a hole in his pants which he thought was due to a bullet.

2

At the scene a holster was found just south of Mr. Willis' head and a 6 inch barreled .38 Special Smith & Wesson revolver at his feet. Subsequent investigation revealed that the Smith & Wesson revolver had been purchased by the deceased's father who had lent it to Mr. Willis. When Detective Villalvazo opened the cylinder of the revolver he noted the cylinder to contain five live rounds and one expended round.

The autopsy was performed at 0900 hrs on 3/29/09. At autopsy, Steven Willis was a 23 year old white male 69 inches tall and weighing 171 lbs. There were some minor lacerations and abrasions of the body consistent with impact from glass and bullet fragments.

External examination of the body revealed a total of 12 primary entrance wounds, two graze wounds and two re-entry wounds of the left side of the chest and the scrotum. There was no evidence of close range firing around any of these wounds.

Of the two graze wounds, one (G) involved the lateral (outer) aspect of the right hip. It was horizontal in orientation and the bullet had traveled from back to front. The second graze wound (N) was vertical in orientation and located on the outer aspect of the left leg just below the knee. The bullet had traveled straight upward. To have incurred this wound, Mr. Willis would have had to have been on the ground or kneeling with his lower leg extended horizontal.

Wound "M" was on the inner aspect of the left lower leg. The bullet had traveled upward and laterally through the left calf emerging on the lateral aspect of the calf 3 ½ inches above the entrance. Mr. Willis would have had to have been down on the ground or kneeling with his leg extended toward the shooter to incur this wound.

Two bullets (A and L) entered the front of the body and traveled straight backward. Mr. Willis would have been facing the shooter when he incurred these wound. "A" entered the front of the neck on the left side and perforated the clavicle, apex of the left lung and 3rd rib.

"L" entered the front of the right leg below the knee and traveled upward fracturing epicondyles of the femur and tibia. The path of the bullet suggests that Mr. Willis was either falling backward or was on the ground with his leg extended when this wound was incurred.

"J" was on the anterior lateral aspect of the left thigh. The bullet traveled backward and medially. When he was shot the shooter would have been in front of Mr. Willis but slightly to his left. The wound was very shallow suggesting that the bullet had lost velocity due to perforating an intermediary target.

Wound "D" while in the front of the body was inflicted from the left side as was demonstrated by its path through the anterior wall of the abdomen. Two other bullets entered the left side of the body. These were bullets "B" and "I".

Bullet (B) passed through the left upper arm and entered the lateral aspect of the left chest. It was traveling from left to right and slightly downward.

3

Wound "I" was on the lateral aspect of the left hip. Based on the nature of the entrance, the bullet causing this wound was either a ricochet or had passed through an intermediate target prior to entrance. This bullet impacted the head of the femur. It is not clear whether this would have caused interference in locomotion.

Three bullets entered the back. These were "O" in the left upper back; "C" in the right upper back and "F" in the lower midback. "O" demonstrated shallow penetration consistent with having passed through an intermediary target before entering the body. "F" penetrated into the sacrum.

"C" was the most lethal of the bullet wounds. The bullet perforated the posterior aspect of the right 6th rib and the right ventricle of the heart. Three other bullets were potentially lethal and contributed to some degree to the death due to exsanguination. They were "A" that perforated the left lung; "B" that perforated the spleen and "D" that perforated the right lobe of the liver.

Bullet "K" entered the back of the left thigh, emerged on the front of the thigh and penetrated the scrotum.

Wound "H" was in the right forearm and only injured muscle. The forearm had to be away from the body at the time the bullet perforated the arm. It could have been extended ahead of him pointing a gun. Because of the mobility of the arm, the shooter could have been in front of him, behind him or to his right. This wound may have prevented him from completely pulling the trigger of the gun.

There was 700 ml of blood in the right chest cavity; 300 ml in the left and approximately 100 ml of blood in the abdomen.

The internal examination was unremarkable except for the gunshot wounds. There was 8 ounces of tan-brown fluid in the stomach.

In regards to the bullet wounds in general, none of them would have been instantly incapacitating. After receiving the wound of the right ventricle of the heart, Mr. Willis would have been capable of movement and actions for a minimum of 15 seconds if not longer. Mr. Willis was moving about as he was shot. He was struck by bullets in the front, back and sides and was upright for some of the time he was shot, standing or kneeling and on the ground or falling for others. The shooting was a dynamic situation with multiple variables: the positions of the two offices (standing, kneeling); the position of Mr. Willis (standing, kneeling and on the ground) and the positions of the guns. Because of this, there are multiple possibilities in the relationship between the officers and Mr. Willis when he is shot.

Toxicological examination of the blood was positive for alcohol and marijuana. The peripheral blood had a blood alcohol level of 0.29%. The vitreous alcohol level was 0.21 %. Analysis of the blood by GC/MS showed a Delta-9-THC level of 16 ng/ml and a THC-COOH level of 216 ng/ml. Delta-9-THC is the principle active ingredient of marijuana. It rapidly leaves the blood falling below detectable levels within several hours. Peak levels in serum after smoking 1.75%

4

or 3.55% THC cigarettes are 50-270 ng/ml after smoking falling to less than 5 ng/ml by 2 hrs. THC levels in blood are approximately half those in serum.

The peripheral blood had a blood alcohol level of 0.29%. This is equivalent to 13-14 drinks of 1 ½ oz of 80 proof alcohol in the blood. The vitreous alcohol level was 0.21 %. This is equivalent to a blood alcohol level of 0.175 % one to two hours prior to death.

Ethyl alcohol is the most abused drug in American society and probably the world. Alcohol is rapidly absorbed from all the mucosal surfaces of the gastrointestinal tract. Food delays the absorption of alcohol. Following ingestion of alcohol on an empty stomach, peak blood alcohol concentration occurs within one half to 2 h (average 0.75–1.35 h), whereas with food in the stomach, peak levels are reached within 1–6 h (average 1.06–2.12 h).

Alcohol, being a drug, has measurable effect on many of the physiological activities of the body. Alcohol impairs visual acuity, adaption to both light and darkness, discrimination of colors, persistence or speed of response to visual stimulation, focusing, etc. Decrease in driving skills is measurable with blood alcohol concentrations as low as 30 mg/dL. The individual psychological reaction to acute alcohol intoxication is variable. In all individuals, however, there is impairment of judgment by 10 mg/dL. In regard to alcohol's effect on the personality, some people become sleepy, placid, and friendly, whereas others become antagonistic, hostile, and violent. There is no way to say how individuals will react by blood alcohol level alone. The best indication of reaction would be an account of how they have reacted at prior times when intoxicated. Of all the organ systems in the body, the most affected by alcohol is the central nervous system. Young individuals, inexperienced with alcohol, are more susceptible to the physiological actions of acute alcohol intoxication.

At blood alcohol levels between 0.10-0.20%, there is increasing impairment of sensory-motor activities, reaction times, attention, visual acuity, and judgment with progressive increase in drowsiness, disorientation, and emotional lability. By 0.20 g/100 mL, there is loss of coordination, staggering gait, and slurred speech. At levels between 0.20-0.30% as in this case, the individual is grossly impaired and may be lethargic and sleepy or hostile and aggressive.

After blood, vitreous humor is next in value to blood. Alcohol disperses throughout the body in proportion to the water content of the tissue. Vitreous, with a high water content, has proportionally more alcohol than blood when at equilibrium. Thus, at equilibrium, for every unit of alcohol in blood, there are 1.2 units of alcohol in vitreous. A vitreous level of 0.120 g/dL is equivalent to a level of 0.100 g/dL of ethyl alcohol in blood. Allowing for appropriate distribution ratios, vitreous reflects the alcohol level in the blood 1–2 h prior to death. In the absorptive phase of alcohol, vitreous alcohol levels are lower than in the blood. If the individuals stop drinking, their blood alcohol will continue to rise for a short time as absorption continues, plateaus, and then begins to go down. Vitreous alcohol, which lags behind blood alcohol, will continue to rise as the blood alcohol plateaus. The vitreous alcohol then plateaus and begins to decline. The fact that Mr. Willis' vitreous alcohol level was significantly lower than his blood alcohol indicates that he had been consuming a significant amount of alcohol in the hour prior to death. His blood alcohol level was rising over the past hour of his life not decreasing. It has been

5

known since 1919 that the effects of acute alcohol intoxication are more pronounced when the blood level is rising than falling (the Mellanby effect).

As noted, no wound was instantaneously incapacitating. Any pain from the wounds may or may not have influenced Mr. Willis' actions. In highly stressful situations such as this, an individual may be shot and not realize it. The high alcohol level in Mr. Willis would have impaired his judgment and caused him to do engage in foolish actions.

I am a physician Board Certified in Anatomical, Clinical and Forensic Pathology. I have testified in state and federal courts throughout the United States as well as in Courts in Canada, Columbia and South Africa. Attached is my Curriculum Vitae which gives details of my education, qualifications, professional experience and publications, as well as a list of cases that I have testified in and a fee schedule. I reserve the right to amend this report should additional information be presented for my review.

Sincerely,

VINCENT J.M. DI MAIO, M.D.