1
2
3
4
5
6

**UNITED STATES DISTRICT COURT**

7

**FOR THE EASTERN DISTRICT OF CALIFORNIA**

8

9   CHRIS WILLIS, MARY WILLIS,                )  CASE NO. 1:09-CV-01766-BAM
    INDIVIDUALLY AND SUCCESSORS IN            )
10  INTEREST TO STEPHEN WILLIS,               )  **ORDER ON POST TRIAL MOTIONS:**
                                              )
11              Plaintiffs,                   )  **PLAINTIFFS' MOTION FOR A NEW**
                                              )  **TRIAL (DOC. 259);**
12              vs.                           )
                                              )  **DEFENDANTS' RENEWED MOTION**
13  CITY OF FRESNO, OFFICER GREG              )  **FOR JUDGMENT AS A MATTER OF**
    CATTON, and OFFICER DANIEL                )  **LAW PURSUANT TO RULE 50(B) (DOC.**
14  ASTACIO,                                  )  **244, 245, 252, 265);**
                                              )
15                                            )  **DEFENDANTS' MOTION FOR RELIEF**
                Defendants.                   )  **FROM THE JUDGMENT OF THIS**
16                                            )  **COURT PURSUANT TO RULE 60(B)**
                                              )  **(DOC. 244, 245, 252, 265);**
17                                            )
                                              )  **DEFENDANTS' MOTION FOR A NEW**
18                                            )  **TRIAL (DOC. 265)**
                                              )
19  _____

20
                    **I.      INTRODUCTION**
21
            Several post-trial motions are currently before the Court.  Plaintiffs Chris and Mary
22
    Willis, individually and as successors in interest to Stephen Willis, move for a new trial
23
    pursuant to Fed. R. Civ. P. 59. (Doc. 259.)  Defendants City of Fresno, Officers Greg Catton
24
    and Daniel Astacio have filed three post-trial motions: (1) a renewed motion for judgment as a
25
    matter of law pursuant to Fed. R. Civ. P. 50(b) (Doc. 244, 245, 252, 265); (2) a motion for relief
26
    from the judgment of this Court pursuant to Fed. R. Civ. P. 60(b) (Doc. 244, 245, 252, 265); and
27
    (3) a motion for a new trial pursuant to Fed. R. Civ. P. 59. (Doc. 265.)
28

The Court heard oral arguments on the above-noticed motions on April 2, 2014.  (Doc. 290.)  Counsel Walter Walker and Beau Burbidge appeared in person on behalf of Plaintiffs. Counsel James Weakley and Roy Santos appeared in person on behalf of Defendants. Having thoroughly considered the parties' briefs, oral arguments, and the entire record in this case, this Court issues the following Order.

## II.    BACKGROUND

### A.    The Trial

Trial was conducted over a ten day period. Numerous percipient and expert witnesses testified.   Much, if not all, of the facts are disputed. To the extent that some facts are undisputed, the inferences to be drawn from those facts are disputed. The following summary of the trial is not intended to be a comprehensive statement of the evidence presented, but rather, is offered as context for Court's rulings on the parties' post-trial motions.[1]

On March 28, 2009, Stephen Willis was fatally shot by Defendants Greg Catton and Daniel Astacio, who were Officers with the Fresno Police Department. Stephen Willis's parents, Chris and Mary Willis ("Plaintiffs"), allege that Stephen's Fourth Amendment rights were violated as a result of the shooting. Plaintiffs further allege that Officer Catton and Officer Astacio were negligent in causing the death of Stephen Willis.[2]

The facts underlying Plaintiffs' claims are multi-faceted and heavily disputed. Late in the night of Stephen's death, Officers Catton and Astacio and several other City Police Department officers responded to a call regarding a possible gang disturbance near Stephen's apartment complex. While on the scene for this unrelated investigation, officers perceived what they believed was a vehicle colliding with the entrance gate to Stephen's apartment complex. Officers Catton and Astacio walked into the apartment complex to investigate.

Officers Catton and Astacio observed a person, later identified to be Stephen Willis, standing at the rear of his vehicle, which they believed was the car that had just hit the gate.

---

[1] The Court has considered all the evidence in light of the applicable legal standards for each post-trial motion before the Court.

[2] During trial, Plaintiffs voluntarily dismissed their Fourteenth Amendment claim.

Officers Catton and Astacio began to approach Stephen and shined their flashlights upon him. Officers Catton and Astacio testified they identified themselves as police officers. Plaintiffs dispute Officers Catton and Astacio ever identified themselves as police officers.

When Stephen turned to face Officers Catton and Astacio, he was holding a holstered .38 caliber revolver in his left hand, which he had just retrieved from the trunk of his car.[3] Officers Catton and Astacio testified they ordered Stephen to drop his weapon. Officers Catton and Astacio testified that Stephen then proceeded to draw his revolver from the holster, point and fire at them. At this time, Officers Catton and Astacio fired upon Stephen Willis.

Plaintiffs dispute Defendants' factual account of the initial shooting. Plaintiffs dispute Officers Catton and Astacio provided a warning before shooting. Plaintiffs dispute Stephen attempted to remove his revolver from its holster or fired upon Officers Catton and Astacio before the officers began to shoot him. Plaintiffs offered evidence, in light of the officers' testimony concerning how Stephen was holding the revolver, that Stephen did not remove his revolver from its holster. Plaintiffs also rely, in part, upon a statement Officer Catton provided to Officer Rafeal Villalvazo shortly after the shooting, where Officer Catton stated that by the time Stephen attempted to remove his revolver from its holster, Officers Catton and Astacio had already fired and proceeded to move. Plaintiffs also rely, in part, on the fact that Stephen's revolver was later found to be fully loaded, save for one empty chamber that was two chambers away from the firing pin. Plaintiffs also note that no bullet casing from Stephen's revolver was ever found at the scene.

After the initial shooting, Stephen retreated between his vehicle and a mini-van. Officer Catton moved in a westerly direction and assumed a firing position behind another vehicle. Officer Astacio moved in an easterly direction and took cover behind a different vehicle. Officer Catton testified Stephen was pointing his gun at him, so Officer Catton continued to shoot at Stephen. Officer Astacio testified that after the first burst of shots, he thought Stephen was hit and falling to the ground. Later, Officer Astacio testified he observed Stephen kneeling

---

[3] Stephen and his friends were target shooting earlier in the day. It is disputed whether Stephen had left the gun in his trunk after target shooting, or if he intentionally brought the gun with him as he and his girlfriend subsequently engaged in various social activities.

behind the mini-van and pointing his gun in a westerly direction.[4]   Officer Astacio then proceeded to fire several rounds at Stephen.   Both officers testified they observed "muzzle flashes" coming from Stephen's gun while Stephen was positioned behind the mini-van. During this main volley of gunfire, both officers fired a sufficient number of rounds such that they both were required to reload at least once.

Plaintiffs dispute Defendants' factual account of the main volley of gunfire.   Plaintiffs surmise that when Officer Astacio initially shot Stephen, Stephen was seriously wounded and tried to crawl to protection from further gunfire.   Plaintiffs also claim Stephen was neither pointing nor firing his gun at either officer.   Plaintiffs again rely on the fact that Stephen's revolver was found to be fully loaded, save for one empty chamber that was away from the firing pin, and that no bullet casing from Stephen's revolver was ever found at the scene. Plaintiffs also introduced evidence that the firing positions assumed by Officers Catton and Astacio resulted in Stephen being caught in the middle of a cross-fire, whereby Officers Catton and Astacio were essentially firing at each other.   This cross-fire, Plaintiffs argue, was the reason the officers continued to feel endangered and shoot Stephen, as opposed to any actions Stephen took.

The main volley of gunfire subsided when the officers perceived Stephen was on the ground.   Officer Catton left his firing position to join Officer Astacio at his easterly position. Officer Astacio holstered his revolver and called for back-up. Officer Catton trained his weapon on Stephen, who was still on the ground on his left side in a propped up position.   Officer Catton testified he observed Stephen attempt to get up and reach for his revolver.   Officer Catton then fired one or two more shots into Stephen's back.

Plaintiffs dispute Defendants' factual account of Officer Catton's final shot(s).   Plaintiffs cite the testimony of several officers who were on the scene either within the final moments of the main volley of gunfire or shortly thereafter.   Plaintiffs also refer to the fact that before Officer Catton fired the final shot(s), Stephen had already been shot twelve to thirteen times,

---

[4]  At this time, Officer Astacio was not aware of Officer Catton's position.  Officer Astacio was not certain who or what Stephen had trained his gun upon, but Officer Astacio testified he observed a silhouette of a person, which he thought may have been Officer Catton.

1  which Plaintiffs submit demonstrates Stephen was not moving when Officer Catton fired the

2  final shot(s).  As the evidence at trial showed, throughout the entirely of the encounter, Officers

3  Catton and Astacio fired 41 shots at Stephen Willis, striking him 14 times.

4  **B.    The Jury's Verdict**

5         After a ten-day jury trial, the jury returned a verdict finding that: Officer Catton used

6  excessive force in violation of Stephen's Fourth Amendment rights; Officer Catton was

7  negligent in causing Stephen's death. However, Officer Astacio was not liable on Plaintiffs'

8  Fourth Amendment and negligence claims.  The jury awarded funeral and burial expenses, and

9  further awarded Plaintiffs one million, five hundred thousand dollars ($1,500,000.00).  The jury

10 also made a finding of comparative negligence and determined that Stephen Willis was eighty

11 percent responsible for his injuries.

12 **C.    The Parties' Post-Trial Motions**

13         Several post-trial motions are currently before the Court. Defendants renew their motion

14 for judgment as a matter of law pursuant to Fed. R. Civ. P. 50(b).  Defendants argue the Fourth

15 Amendment violation could not have been predicated on Officer Catton's conduct before the

16 final shot(s); otherwise, Officer Astacio would have been found liable as well. However,

17 Defendants argue there can be no Fourth Amendment violation, or in the alternative, Officer

18 Catton is entitled to qualified immunity, because the evidence demonstrates Stephen was

19 reaching for his gun prior to the final shot(s).  Defendants further contend the jury's findings on

20 comparative negligence and punitive damages demonstrate the jury believed Stephen was

21 reaching for his gun prior to the final shot(s).[5]

22         Defendants additionally move for a new trial pursuant to Fed. R. Civ. P. 59.  In support

23 of this motion, Defendants argue that the Court's failure to submit special interrogatories to the

24 jury which would distill all the factual findings relevant to Defendants' qualified immunity

25 defense was clear error.  Defendants also argue the Court's post-trial qualified immunity

26 determination constitutes an error of fact.

27
28 [5] Defendants also move for relief from the judgment of this court pursuant to Fed. R. Civ. P. 60(b).  However, Defendants combined their motions under Rule 50(b) and Rule 60(b), and Defendants fail to tether any argument to its request for relief under Rule 60(b).  Giving Defendants every benefit of the doubt, the Court will assume Defendants makes the same arguments under Rule 60(b) as it does under Rule 50(b).

Plaintiffs also move for a new trial pursuant to Rule 59.  First, Plaintiffs argue a new trial is warranted because the jury's verdict demonstrates Officer Astacio should have been found liable for Stephen's death.  Plaintiffs argue that Officer Catton's liability was not limited to the final shot(s), but rather, the totality of his conduct throughout the entire incident.  Plaintiffs conclude that because there was no meaningful distinction between the conduct of Officer Astacio and Officer Catton prior to the final shot(s), Officer Astacio also should have been found liable.

Next, Plaintiffs argue a new trial is warranted because there is no factual basis for the jury's 80% comparative negligence finding against Stephen.  Specifically, Plaintiffs argue that, even assuming Officer Catton's liability was limited to the final shot(s), because the jury necessarily determined Stephen's conduct did not warrant the use of deadly force, he could not have been negligent.

Finally, Plaintiffs argue a new trial is warranted due to two errors committed by the Court: (1) the Court erred in permitting Defendants to introduce evidence of Stephen's alcohol and marijuana use; and (2) there were errors in the juror selection process.

### III.    DISCUSSION

**A.    Evaluating the Jury's Verdict**

As seen above, the parties dispute the basis for the jury's verdict.  Thus, as a preliminary matter, the Court must attempt to interpret the jury's verdict in order to analyze the parties' post-trial motions.

### 1.    Legal Standard for Evaluating the Jury's Verdict

In harmonizing verdicts, the trial court "must search for a reasonable way to read the verdicts as expressing a coherent view of the case." *El–Hakem v. BJY, Inc.,* 415 F.3d 1068, 1073 (9th Cir. 2005), *cert. denied* at 547 U.S. 1004 (2006) (citing *Toner ex rel. Toner v. Lederle Labs.,* 828 F.2d 510, 512 (9th Cir. 1987), *cert. denied,* 485 U.S. 942 (1988). A Court has a duty "to reconcile the jury's special verdict responses on any reasonable theory consistent with the evidence." *Guy v. City of San Diego,* 608 F.3d 582, 586 (9th Cir. 2010) (citing, *Pierce v. S. Pacific Transp. Co*., 823 F.2d 1366, 1370 (9th Cir.1987)); *see also, Atl. & Gulf Stevedores, Inc. v. Ellerman Lines, Ltd.,* 369 U.S. 355, 364, 82 S.Ct. 780, 7 L.Ed.2d 798 (1962) (Emphasizing

this duty to reconcile the jury's responses when possible, the Supreme Court has held: "Where there is a view of the case that makes the jury's answers to special interrogatories consistent, they must be resolved that way.")

A Court is permitted to "dr[aw] inferences from the verdicts to determine the issues that the presumptively rational jurors must have determined, and then use those implicit findings of fact as the basis for judgment as to certain issues." *Westinghouse Elec. Corp., v. General Circuit Breaker & Elec. Supply. Inc.,* 106 F. 3d 894, 901 (9th Cir. 1997), *cert. denied* at 522 U.S. 857 (1997); *See also, Zhang v. Am. Gem Seafoods, Inc.*, 339 F.3d 1020, 1038 (9th Cir. 2003), *cert. denied* at 541 U.S. 902 (2004) (In deciding whether verdicts are inconsistent, the court must accept "any reasonable interpretation of the jury's actions, reconciling the jury's findings by exegesis if necessary") (internal quotation marks and citation omitted).   Where "it is possible to examine the pattern of jury verdicts and logically determine what facts a rational juror must have found in order to reach those verdicts," the Court "must assume the jury found certain facts . . . ." *Westinghouse,* 106 F. 3d at 901-902.

## 2.    The Court's Interpretation of the Jury's Verdict

Based upon the verdict and the evidence, this Court concludes the jury made three factual determinations: (1) Officer Catton's and Officer Astacio's use of deadly force was objectively reasonable when they initially fired upon Stephen Willis; (2) Officer Catton's and Officer Astacio's use of deadly force was objectively reasonable during the main volley of gunfire; and (3) Officer Catton's use of deadly force was not objectively reasonable when he fired the final shot(s). These findings of fact were necessarily determined by the jury and essential to their judgment. *See, Westinghouse Elec. Corp.,* 106 F. 3d at 902-03. The Court "can infer that the jury made this finding by viewing the jury's verdict in light of the jury instructions" and the evidence. *A.D. v. California Highway Patrol,* 712 F.3d 446, 457 fn. 5 (9th Cir. 2013), *cert. denied* at 134 S. Ct. 531 (2013).

Plaintiffs' interpretation of the jury's verdict -- Officer Catton's liability may have been predicated on conduct other than the final shot(s) -- cannot be squared with the jury's verdict. Prior to Officer Catton's final shot(s), the actions and conduct of Officer Astacio and Officer Catton were virtually indistinguishable for Fourth Amendment and negligence purposes.

Plaintiffs offered circumstantial evidence that both officers failed to identify themselves, while Officers Catton and Astacio testified they did identify themselves. However, identification by either officer would be sufficient to alert Stephen Willis to their presence; whereas a complete failure to identify themselves would apply to both officers equally. Whether a warning was provided or not, both officers fired upon Stephen Willis moments after Stephen Willis turned around with a holstered revolver in his left hand. Indeed, the evidence showed that Officer Astacio fired first. Both officers fired multiple shots at Stephen Willis such that both officers were required to reload at least once. Both officers assumed firing positions where neither knew where the other officer was, and both officers were firing shots that generally were in the other officer's direction. The only time the conduct of Officer Catton and Officer Astacio was qualitatively different was when Officer Catton moved to Officer Astacio's firing position, Officer Astacio holstered his weapon to call for back up, and Officer Catton subsequently fired one or two more shots at Stephen Willis. If the jury had determined Officer Catton's conduct prior to the final shot(s) violated Stephen Willis's Fourth Amendment rights, there is no logical basis for the jury's countenance of Officer Astacio's conduct.

If the jury had found a Fourth Amendment violation prior to the final shot(s), the Fourth Amendment violation would apply to Officers Catton and Astacio equally. Thus, if the jury had found a Fourth Amendment violation prior to the final shot(s), the jury would have had to find Officer Astacio used excessive force.  However, the jury did not find Officer Astacio used excessive force. The jury's finding on the negligence claim is consistent with its finding on the Fourth Amendment violation. *See, Guy v. City of San Diego,* 608 F.3d 582, 586 (9th Cir. 2010) (Court has a duty to reconcile the jury's verdict responses on any reasonable theory consistent with the evidence). To interpret the jury's verdict in a way that finds a Fourth Amendment violation prior to the final shot(s) would be inconsistent with the only reasonable interpretation of the jury's verdict in light of the evidence and the jury instructions.[6]

---

[6] Defendants agree the jury's Fourth Amendment verdict was based on Officer Catton's final shot(s).  However, Defendants also argue the jury's verdict on punitive damages and comparative negligence, in light of the evidence, demonstrates Stephen Willis was reaching for his weapon when Officer Catton fired the final shot(s).  The Court addresses this argument in greater detail below.  *See Supra,* Section III.B.3.

**B.      Defendants' Renewed Motion for Judgment As A Matter of Law**

       **1.      Legal Standard Under Fed. R. Civ. P. 50(b)**

In ruling on a motion for judgment as a matter of law, the Court may not make credibility determinations or weigh the evidence, and should view all inferences in the light most favorable to the non-moving party. *Reeves v. Sanderson Plumbing Prods., Inc*., 530 U.S. 133, 149–50, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000); *See also, Pavao v. Pagay,* 307 F.3d 915, 918 (9th Cir. 2002) (A renewed motion for judgment as a matter of law is properly granted "if the evidence, construed in the light most favorable to the nonmoving party, permits only one reasonable conclusion, and that conclusion is contrary to the jury's verdict"); *Costa v. Desert Palace,* 299 F.3d 838, 859 (9th Cir. 2002), *aff'd at* 539 U.S. 90 (2003) (In ruling on a motion for judgment as a matter of law, the trial court must disregard all evidence favorable to the moving party that the jury is not required to believe). The jury's verdict must be upheld if there is sufficient evidence for a reasonable jury to have found in the non-moving party's favor. *Johnson v. Paradise Valley Unified Sch. Dist.,* 251 F.3d 1222, 1227 (9th Cir. 2001), *cert. denied* at 534 U.S. 1055 (2001).

A party seeking judgment as a matter of law has a "very high" standard to meet. *Costa,* 299 F.3d at 859. The Ninth Circuit has held that parties seeking judgment as a matter of law must meet this high burden because courts generally should not impinge upon the province of the jury. *Id.* ("This high hurdle recognizes that credibility, inferences, and fact finding are the province of the jury, not this court.") The "jury's verdict must be upheld if it is supported by substantial evidence, which is evidence adequate to support the jury's conclusion, even if it is also possible to draw a contrary conclusion." *Pavao,* 307 F.3d at 918. The court may grant Defendants' renewed motion for judgment as a matter of law if "a reasonable jury would not have a legally sufficient evidentiary basis to find for the" Plaintiffs. Fed. R. Civ. P. 50(a) - (b).

Defendants argue they are entitled to judgment as a matter of law primarily for two reasons: (1) the evidence does not permit a finding that Officer Catton committed a Fourth Amendment violation; and (2) Officer Catton is entitled to qualified immunity.[7]

---

[7] Defendants present other arguments in their Rule 50(b) Motion. However, all of Defendants' remaining

2.      **The Fourth Amendment Violation**

The Court examines allegations of excessive force under the Fourth Amendment's prohibition on unreasonable seizures. *Bryan v. MacPherson,* 630 F.3d 805, 823 (9th Cir. 2010). The Court inquires "whether the officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them." *Id.* (quoting *Graham v. Connor,* 490 U.S. 386, 397, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989)). The Court "must balance the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake." *Id.* (internal quotation marks omitted); s*ee also Deorle v. Rutherford*, 272 F.3d 1272, 1280 (9th Cir. 2001), *cert. denied* at 536 U.S. 958. "Stated another way, [the Court] must 'balance the amount of force applied against the need for that force.'" *Bryan*, 630 F.3d at 823–24 (quoting *Meredith v. Erath*, 342 F.3d 1057, 1061 (9th Cir. 2003)). "This balance must be 'judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight.'" *Boyd v. Benton Cnty.,* 374 F.3d 773, 779 (9th Cir. 2004) (quoting *Graham,* 490 U.S. at 396, 109 S.Ct. 1865).

Viewing the facts in the light most favorable to Plaintiffs, and disregarding all evidence favorable to the Defendants that the jury was not required to believe, this Court finds that there is sufficient evidence for a reasonable jury to conclude that Officer Catton's final shot(s) at Stephen were "objectively [un]reasonable" in light of the facts and circumstances confronting [him]." *Bryan,* 630 F.3d at 823. Evidence was presented at trial that Stephen Willis did not present a threat to officers or others just prior to the final shot(s). The other officer involved in the shooting, Officer Astacio, testified that he believed the threat had "diminished" and that "the immediate threat [was] not there because he's [sic] on the ground." Trial Tr., Dec. 5, 2013, Doc. 276, 397: 17-18; 426: 5-6. Officer Cerda testified that he saw Stephen Willis's body prior to the final shots, and Stephen Willis was on the ground, not moving, not reaching for a weapon, and

arguments rest on Defendants' argument that Officer Catton is not liable on Plaintiffs' Fourth Amendment claim. For example, Defendants also argue that Office Catton is not liable for Plaintiffs' negligence claims, Office Catton is immune under California Penal Code 196, and that there is no vicarious liability for the County of Fresno.  Each of these arguments rests on the proposition that Officer Catton is not liable for the Fourth Amendment violation. These dependent arguments fail because the Court finds the evidence supports the jury's Fourth Amendment verdict. Additionally, Defendants argue the Court erred on refusing to submit Defendants' special interrogatories to the jury.  This argument is discussed in Defendants' Motion for a New Trial pursuant to Fed. R. Civ. P. 59. *See, supra,* Section III.D.1.a.

1    twitching. Trial Tr., Dec. 11, 2013, Doc. 280, 1528: 6 – 1530: 7. A reasonable juror may have

2    received this testimony to support a conclusion that Stephen Willis was not moving, not

3    reaching for a weapon, or otherwise imposing a dangerous threat when Officer Catton fired the

4    final shot(s).

5           Officer Jacobo testified that, after the final shot(s), he heard Officer Catton shout "I can

6    see the gun. I can see the gun." Trial Tr., Dec. 6, 2013, Doc. 277, 575: 15-21. Viewing this

7    evidence in the light most favorable to Plaintiffs indicates that Officer Catton did not, in fact,

8    see Stephen Willis reaching for the gun before the final shot(s). Officer Jacobo also testified

9    that, after the final shot(s), he heard Officer Catton exclaim in a "raised," "excited" voice, that

10   he put a bullet hole in Stephen's back. Trial Tr., Dec. 6, 2013, Doc. 277, 575: 8-15. Officer

11   Reyes testified that Officer Catton was "smirking" after the shooting. Trial Tr., Dec. 5, 2013,

12   Doc. 276, 289: 16-17. Viewing this evidence in the light most favorable to Plaintiffs, the

13   evidence is sufficient that Officer Catton's use of force in those final moments was not the

14   result of any threat presented by Stephen.

15          Evidence was presented to the jury that Stephen Willis was incapacitated by the time

16   Office Catton fired the final shot(s). Prior to the final shot(s), the evidence showed Stephen had

17   already been shot twelve-to-thirteen times. These shots were dispersed throughout his body.

18   Having been shot at least a dozen times, Stephen's condition would permit a reasonable juror to

19   conclude that Stephen lacked both the physical capacity and situational awareness to have been

20   reaching for his gun.

21          Defendants argue the evidence produced at trial – Officer Catton's "uncontroverted"

22   testimony – demonstrates deadly force was necessary at the time Officer Catton fired the final

23   shot(s) because Stephen Willis was reaching for his gun. Defendants also argue that the Court is

24   misstating these various officers' testimony.

25          As the above discussion demonstrates, Officer Catton's testimony is far from

26   uncontroverted.[8] Moreover, the Court disagrees with Defendants' characterization of the other

27   ───────────────
     [8] Regardless, the jury is permitted to disregard even "uncontradicted" testimony. *White Glove Bldg., Maintenance,*

28   *Inc. v. Brennan,* 518 F.2d 1271 (9th Cir. 1975) ("This court has on numerous occasions held that the trier of fact
     need not accept uncontradicted testimony when good reasons appear for rejecting it, such as the interest of the
     witness, and improbabilities and important discrepancies in the testimony"); *See also,* Jury Instruction No. 9 ("In

officers' testimony.  For example, Defendants argue that Officer Cerda's testimony that Stephen Willis was not moving, not reaching, and twitching concerned his observations *after* Officer Catton fired his final shot(s).  However, this was Officer Cerda's testimony on redirect.  Trial Tr., Dec. 12, 2013, Doc. 281, 1548: 12-14. On cross-examination, Officer Cerda testified he observed Stephen Willis not moving, not reaching and twitching *before* Officer Catton fired his final shot(s).  Trial Tr., Dec. 11, 2013, Doc. 280, 1528: 6 – 1530: 7. Additionally, during Officer Cerda's direct and cross-examination, Officer Cerda never testified he heard Officer Catton provide a warning prior to the final shot(s), nor did Officer Cerda "hear anything else" "before the shots fired."  Trial Tr., Dec. 11, 2013, Doc. 280, 1513: 1-6. The following day, on redirect, Officer Cerda testified that his observations took place after Officer Catton shot Stephen Willis. Trial Tr., Dec. 12, 2013, Doc. 281, 1548: 12-14. Also on redirect, Officer Cerda testified that Officer Catton shouted a warning before firing the final shot(s). Trial Tr., Dec. 12, 2013, Doc. 281, 1547: 15 – 1548: 3.

Officer Cerda's testimony was not "uncontradicted," as Defendants suggest. In fact, Officer Cerda contradicted his own testimony.  The jury, not the Defendants or this Court, was responsible for resolving the discrepancies in Officer Cerda's testimony.  The jury was free to believe the testimony Officer Cerda provided on direct and cross-examination, as opposed to the testimony he provided on redirect a day later.

Defendants also argue the Court is misstating the testimony of Officers Jacobo and Reyes, and speculating as to the meaning their testimony. For instance, Defendants argue the Court misstates the testimony of Officer Jacobo when he said Officer Catton exclaimed in a "raised," "excited" voice, that he put a bullet hole in Stephen's back. But Officer Jacobo did provide that precise testimony.  Trial Tr., Dec. 6, 2013, Doc. 277, 575: 8-15. Defendants' complaint is that the Court is not affording full credence to Defendants' harmless explanation for that statement. *See,* Def.'s Sup. Brief, Doc. 264, 5: 6-8 (Officer Jacobo testified that Officer Catton's statement was made in the context of "Officer Catton was on the verge of tears, breaking down and in disbelief that the incident just happened . . .") The Court does not

deciding the facts in this case, you may have to decide which testimony to believe and which testimony not to believe.  You may believe everything a witness says, or part of it, or none of it.")  Quite simply, the jury was free to disbelieve Officer Catton's testimony.

1    consider Defendants' harmless explanation for this statement, but rather, considers this evidence

2    in the light most favorable to Plaintiffs.

3            Similarly, Defendants argue the Court is misstating testimony or "speculating" as to

4    Officer Reyes' testimony when the Court recalls that Officer Reyes testified Officer Catton was

5    "smirking."  Officer Reyes did, in fact, testify Officer Catton was smirking. Trial Tr., Dec. 5,

6    2013, Doc. 276, 289: 16-17. Defendants' real complaint is that the Court does not give full

7    credence to Defendants' innocent explanation for that testimony.   Defendants point to

8    subsequent testimony where Officer Reyes speculated that Officer Catton's smirk was not a

9    malevolent smirk, but rather, a "look of thank God I'm alive and was not injured during the

10   incident" type of smirk. Def.'s Supp. Brief, Doc. 264, 5: 9-12; Trial Tr., Dec. 5, 2013, Doc. 276,

11   310: 3-14. The Court is not required to consider evidence most favorable to Defendants. On the

12   contrary, the Court is required to construe this testimony in a light most favorable to Plaintiffs

13   and the jury's verdict.  *Costa*, 299 F.3d at 859.

14           Defendants' remaining arguments attempt to discount unfavorable evidence by recasting

15   it in a different light or offering other evidence that tends to support Officer Catton's testimony.

16   The Court is not in a position to dictate which evidence is more persuasive. Rather, the Court

17   views all the evidence in the light most favorable to Plaintiffs, and decides if there is sufficient

18   evidence to support the jury's conclusion, even if it is also possible to draw a contrary

19   conclusion. This Court concludes there is sufficient evidence to uphold the jury's verdict.

20           **3.**      **Qualified Immunity**

21           The jury found Officer Catton violated Stephen Willis's Fourth Amendment rights

22   because his use of deadly force with the final shot(s) was objectively unreasonable. Defendants

23   argue Officer Catton is entitled to qualified immunity because the evidence, as well as the jury's

24   verdict with respect to comparative negligence and punitive damages, demonstrates the jury

25   determined Stephen Willis was reaching for his revolver before Officer Catton fired the final

26   shot(s).  Defendants argue that a reasonable police officer would not have known it was a

27   constitutional violation to use deadly force on an individual who was reaching for his weapon.

28           "Qualified immunity protects government officials from liability for civil damages

     insofar as their conduct does not violate clearly established statutory or constitutional rights of

     ───────────────────────────────────────────────

which a reasonable person would have known." *Sheehan v. City and County of San Francisco,* 743 F.3d 1211, 1221 (9th Cir. 2014) (citing, *Pearson v. Callahan*, 555 U.S. 223, 231, 129 S.Ct. 808, 172 L.Ed.2d 565 (2009)).  "[T]he Supreme Court set forth a two-part test for qualified immunity in excessive force cases. First, we examine whether a Fourth Amendment violation occurred; second, we look to see whether the officers violated clearly established law." *Cameron v. Craig*, 713 F.3d 1012, 1021-22 (9th Cir. 2013) (quoting, *Santos v. Gates,* 287 F.3d 846, 855 n. 12 (9th Cir. 2002)) (accord *Saucier v. Katz,* 533 U.S. 194, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001)). For the second step in the qualified immunity analysis—whether the constitutional right was clearly established at the time of the conduct—we ask whether its contours were "'sufficiently clear' that every 'reasonable official would have understood that what he is doing violates that right.' " *Ashcroft v. al-Kidd*, —— U.S. ——, 131 S.Ct. 2074, 2083, 179 L.Ed.2d 1149 (2011) (quoting *Anderson v. Creighton*, 483 U.S. 635, 640, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987)). While "[w]e do not require a case directly on point . . . existing precedent must have placed the statutory or constitutional question beyond debate." *Id.*

The Court has already discussed the first prong of the qualified immunity analysis.  *See infra*, Section III.B.2.  The jury properly found that Officer Catton violated Stephen Willis's Constitutional right. The remainder of this qualified immunity analysis focuses on the second prong.

In determining whether Officer Catton is entitled to qualified immunity under *Saucier's* second prong, after construing the disputed facts in Plaintiffs' favor, the Court assumes Officer Catton "correctly perceived all of the relevant facts and ask[s] whether an officer could have reasonably believed at the time that the force actually used was lawful under the circumstances." *Torres v. City of Madera,* 648 F.3d 1119, 1127 (9th Cir. 2011) *cert. denied,* 132 S. Ct. 1032 (2012) (internal quotations omitted.)  In an order issued on January 31, 2014, this Court previously held that the jury necessarily determined Stephen Willis was not reaching for his revolver, and this determination was the jury's predicate factual finding to imposing Fourth Amendment liability on Officer Catton. Doc. 250, 7:25-27.  Having considered the matter further, and viewing the jury's verdict in the light most favorable to Plaintiffs, the Court concedes it cannot conclusively say one way or the other whether the jury determined Stephen

1    Willis was reaching for his revolver prior to the final shot(s).  Indeed, all the evidence presented

2    at trial, including expert testimony offered by both Plaintiffs and Defendants, dictated that *if*

3    Stephen Willis had been reaching for his gun, Officer Catton was justified in using deadly force.

4    The jury, however, determined Officer Catton was not justified in using deadly force.

5    The jury's Fourth Amendment verdict against Officer Catton can be reduced to a finding that

6    Officer Catton's final shot(s) were an objectively unreasonable use of force.  Since the jury

7    determined Officer Catton was not justified in using deadly force, the most reasonable inference

8    to be taken from the verdict and the evidence is that the jury determined Stephen Willis was not

9    an immediate threat of harm during the final shot(s).  Therefore, the jury found that Stephen

10   Willis was not an immediate threat of harm at the final shot(s).  *See, Sheehan v. City and*

11   *County of San Francisco,* 743 F.3d 1211, 1230 (9th Cir. 2014) (qualified immunity granted

12   because it was "undisputed" the plaintiff was threatening police officers with a weapon). This

13   determination by the jury sets the factual contours of the right which was "clearly established"

14   for the second prong.

15   Viewing the factual contours of the Fourth Amendment violation in the light most

16   favorable to Plaintiffs, the Fourth Amendment right at issue here is the right to be free from the

17   use of deadly force absent an immediate threat of harm to officers or others.  This right is

18   clearly established. *See, Wilkinson v. Torres*, 610 F.3d 546, 550 (9th Cir. 2010), *cert. denied,*

19   131 S. Ct. 1492 (2011) ("Case law has clearly established that an officer may not use deadly

20   force to apprehend a suspect where the suspect poses no immediate threat to the officer or

21   others") (citing, *Tennessee v. Garner,* 471 U.S. 1, 11, 105 S.Ct. 1694, 85 L.Ed.2d 1 (1985)); *see*

22   *also, Torres,* 648 F.3d at 1128 ("While locating the outer contours of the Fourth Amendment

23   may at times be a murky business, few things in our case law are as clearly established as the

24   principle that an officer may not seize an unarmed, nondangerous suspect by shooting him dead

25   in the absence of probable cause to believe that the [fleeing] suspect poses a threat of serious

26   physical harm, either to the officer or to others.") (Internal quotations omitted.) Thus, the

27   question to be answered for the second prong of the qualified immunity analysis is this: would a

28   reasonable police officer have known it was a constitutional violation to use deadly force on an

individual who poses no immediate threat to the officer or others? It is axiomatic that the

1  answer to this question is "yes." *See, Wilkinson,* 610 F.3d at 550.  Accordingly, Officer Catton

2  is not entitled to qualified immunity.[9]

3        Defendants argue that Officer Catton is entitled to qualified immunity under the second

4  prong of the analysis if he made a mistake of fact that Stephen Willis was reaching for his

5  weapon.  Mistakes of fact, however, do not provide qualified immunity under the second prong

6  of the analysis.  *Torres,* 648 F.3d at 1128 (9th Cir. 2011) ("While the constitutional violation

7  prong concerns the reasonableness of the officer's mistake of fact, the clearly established prong

8  concerns the reasonableness of the officer's mistake of law").

9        Regardless, this is not a case in which the ultimate facts are undisputed, and the open

10 question is whether an officer's mistaken perception of a later undisputed fact was reasonable.

11 *See, Jensen v. City of Oxnard,* 145 F.3d 1078, 1086 (9th Cir. 1998), *cert. denied,* 525 U.S. 1016

12 (1998) (mistaken shooting of fellow police officer was unreasonable if it occurred in conditions

13 in which the officer should have been able to recognize the figure before him); *Wilkins,* 350

14 F.3d at 955 (same). The factual circumstances underlying Officer Catton's final shot(s) are

15 disputed.  In *Torres,* the Ninth Circuit explicitly rejected the notion that qualified immunity

16 would apply "where the objective reasonableness of the officer's conduct turned on material

17 disputes of fact." *Torres,* 648 F.3d at 1129; *see also, Pierce v. Mulnomah County, Or.,* 76 F.3d

18 1032 (9th Cir. 1996), *cert. denied,* 519 U.S. 1006 (1996) (post-verdict, "disputes of fact preclude

19 a directed verdict on Duncan's qualified immunity claim"); *Corcoran v. Fletcher,* 160 F. Supp.

20 1085, 1090 (C.D. Cal. 2001) (denying post-verdict assertion of qualified immunity because "the

21 jury apparently believed [the plaintiff's] version of the facts.")

22        Defendants also argue the jury's verdict finding no punitive damages demonstrates

23 ─────────────────────────
   [9]  Defendants argue that Officer Catton is entitled to qualified immunity if he was not "plainly incompetent."
24 "Plainly incompetent" is not a legal standard separate from the well-established standard announced in *Tennessee
   v. Garner.*  Defendants confuse the distinction between a legal standard and a descriptive phrase.  "Plainly
25 incompetent" does not create a new standard for qualified immunity.  The second prong focuses on whether the
   officer violated a clearly established right of which all but the plainly incompetent would have been aware.
26 *Sheehan,* 743 F.3d at 1228; *see also, Saucier,* 533 U.S. at 206 (Officials can have a reasonable, but mistaken belief
   about what the law requires in a given situation.)  "While the constitutional violation prong concerns the
27 reasonableness of the officer's *mistake of fact,* the clearly established prong concerns the reasonableness of the
   officer's *mistake of law.*" *Torres,* 648 F.3d 1127 (Emphasis in original). "Qualified immunity gives government
28 officials breathing room to make reasonable but mistaken judgments about open legal questions. When properly
   applied, it protects 'all but the plainly incompetent or those who knowingly violate the law.'" *Ascroft,* 131 S.Ct. at
   285.

1   Stephen Willis was reaching for his gun. Specifically, Defendants argue that if Stephen Willis

2   was not moving toward his revolver when Officer Catton fired his final shot(s), "such actions by

3   definition would reflect complete indifference to Willis' safety or rights, be unnecessarily harsh

4   and severe, and abuse of authority and take advantage of Willis' weakness, disability or

5   misfortune."[10]   Def.'s Supp. Brief, Doc. 264, 3: 18-21. Thus, Defendants suggest a lack of

6   punitive damages necessarily shows Stephen Willis was moving towards his gun.

7          The Court is not persuaded that a lack of punitive damages indicates Plaintiff was

8   reaching for his weapon. Speculative scenarios in which the jury could have found Officer

9   Catton's use of deadly force objectively unreasonable, but not malicious, oppressive or in

10   reckless disregard of Stephen's constitutional rights, abound.  There is no conflict between these

11   two findings. Simply put, the jury did not believe Plaintiffs carried their burden to demonstrate

12   entitlement to punitive damages. This circumstance does not suggest Stephen Willis was

13   reaching for his gun.

14          Defendants also argue the jury's finding that Stephen Willis was 80% responsible for his

15   injuries indicates the jury found he was reaching for his revolver when Officer Catton fired the

16   final shot(s).  Specifically, Defendants argue that:

17          Willis['s] percentage of fault can only be for the time period that the jury found
           Officer Catton liable.  The fact that the jury found Willis was 80% responsible
18          for his death further establishes that he was moving towards his revolver when
           Officer Catton fired his final shot(s) or at a minimum Willis was doing
19          something that the jury found caused Officer Catton to believe he needed to fire.
           If Willis was not moving he would have no fault at all compare to Officer
20          Catton.

21   Def.s' Supp. Brief, Doc. 264, 4: 1-5.

22          Defendants' misapply the concept of comparative negligence to the facts of this case.

23

24   [10] The Court's Jury Instruction on punitive damages provided as follows:
           **Jury Instruction No. 30 - 5.5 PUNITIVE DAMAGES**
25   You will be asked to make a determination if the Defendants' conduct was malicious, oppressive or in reckless
     disregard of the Plaintiffs' rights.  Conduct is malicious if it is accompanied by ill will, or spite, or if it is for the
26   purpose of injuring the Plaintiffs.  Conduct is in reckless disregard of the Plaintiffs' rights if, under the
     circumstances, it reflects complete indifference to the Plaintiffs' safety or rights, or if the Defendants act in the face
27   of a perceived risk that its actions will violate the Plaintiffs' rights under federal law.  An act or omission is
     oppressive if the Defendants injure or damage or otherwise violate the rights of the Plaintiffs with unnecessarily
28   harshness or severity, such as by the misuse or abuse of authority or power or by taking advantage of some
     weakness or disability or misfortune of the Plaintiffs. (Doc. 237.)

Comparative negligence refers to the "negligence on the part of the plaintiff contributing causally to plaintiff's injury." *U.S. v. Sierra Pacific Indus.,* 879 F. Supp. 2d 1128, 1134, fn. 5 (E.D. Cal. 2012) (citing, *Wittenbach v. Ryan,* 63 Cal.App.3d 712, 718, 134 Cal. Rptr. 47 (1976)). "Contributory negligence is the conduct on the part of the plaintiff which falls below the standard to which he should conform for his own protection, and is a legally contributing cause co-operating with the negligence of the defendant in bringing about the plaintiff's harm." *Sierra Pacific Indus.,* 879 F.Supp.2d at 1134. (Citations and quotations omitted.) "Under comparative fault, 'liability for damage will be borne by those whose negligence caused it in direct proportion to their respective fault." *Bourland v. City of Redding,* 2013 WL 4653195 (E.D. Cal. 2013) (citing, *Aidan Ming–Ho Leung v. Verdugo Hills Hosp.,* 55 Cal.4th 291, 303, 145 Cal.Rptr.3d 553, 282 P.3d 1250 (2012).

The Court's jury instruction on comparative negligence, mutually agreed to by the parties, states Stephen Willis can be found to have negligently contributed to his own death if he was negligent, and that negligence was a substantial factor in causing his death, regardless of whether Stephen's negligence was separate from Officer Catton's negligence:

### Jury Instruction No. 26
### CACI 407 & CACI 401 NEGLIGENCE (WRONGFUL DEATH) - COMPARATIVE NEGLIGENCE

Officer Catton and Officer Astacio claim that Stephen Willis's death was caused in whole or in part by Stephen Willis's own negligence.

To succeed on this claim, Officer Catton and Officer Astacio must prove both of the following:

1.      That Stephen Willis was negligent; and

2.      That Stephen Willis's negligence was as substantial factor in causing his death.

If Officer Catton and Officer Astacio prove the above, Plaintiffs' damages are reduced by your determination of the percentage of Stephen Willis's responsibility.  I will calculate the actual reduction.

Negligence is the failure to use reasonable care to prevent harm to oneself or to others.

Negligence is the doing of something which a reasonably prudent person would not do or the failure to do something which a reasonably prudent person would do under the circumstances similar to those shown by the evidence. It is the failure to use ordinary or reasonable care. Ordinary or reasonable care is that care which persons of ordinary prudence would use in order to avoid injury to themselves or others under circumstances similar to those shown by the evidence.

Jury Instruction No. 26, Doc. 237; *See also,* Jury Instruction No. 24, Causation ("Plaintiffs allege that Officer Catton and/or Officer Astacio negligently caused the death of Stephen Willis. To establish this claim, Plaintiffs must prove all of the following: (1) That Officer Catton and/or Officer Astacio was negligent; (2) That Stephen Willis was harmed; and (3) That Officer Catton and/or Officer Astacio's negligence was a substantial factor in causing Stephen Willis's harm. A substantial factor in causing harm is a factor that a reasonable person would consider to have contributed to the harm. It must be more than a remote or trivial factor. *It does not have to be the only cause of the harm.*") (Emphasis added.)

Defendants mistakenly assume Stephen Willis's negligence must directly relate to Officer Catton's negligence. In other words, Defendants' argument that "Willis's percentage of fault can only be for the time period that the jury found Officer Catton liable" is an incorrect statement of comparative negligence law. Comparative negligence does not center on a defendant's conduct. Rather, comparative negligence focuses on the relationship between a plaintiff's conduct and a plaintiff's injury. *Sierra Pacific Indus.,* 879 F. Supp. 2d at 1134, fn. 5. Therefore, there is no requirement that Stephen Willis's negligence be directly related to Officer Catton's negligence.

Defendants also confuse the relevant "injury." Defendants suggest that because Officer Catton was liable only for the last two shots, Plaintiffs' "injury" was Stephen Willis being shot those two times. Plaintiffs' injury is not Officer Catton's final shot(s), or the fourteen total gunshot wounds he sustained. Of course, these gunshot wounds are what caused Stephen Willis's death. However, Stephen Willis's injury is his death. Thus, the relevant inquiry in evaluating Stephen Willis's comparative negligence is not whether his negligence contributed to the final shot(s); rather, the relevant inquiry is whether Stephen Willis's negligence contributed to his death.

As discussed above, the jury found that Officer Catton and Astacio did not act negligently when they initially fired upon Stephen Willis, nor were these defendant officers negligent during the main volley of gunfire.  During the initial shooting and the main volley of gunfire, the jury must have determined Stephen Willis acted in a manner warranting the application of deadly force.  Stephen Willis's conduct, which warranted the application of deadly force, is Stephen Willis's negligent conduct.  During the time that application of deadly force was warranted, Stephen Willis was shot twelve-to-thirteen times.  In other words, the jury found that Stephen Willis's negligence caused him to be shot. The jury naturally concluded that these gunshot wounds contributed to his death.  Moreover, the jury reasonably concluded that these twelve-to-thirteen (of fourteen total) gunshot wounds represented eighty percent of the cause of Stephen Willis's death.  The jury's comparative negligence finding fully supports the Court's interpretation of the jury's verdict.

For all the foregoing reasons, Defendants' Renewed Motion for Judgment as a Matter of Law is DENIED.

## C.   Defendants' Motion For Relief From the Final Judgment of This Court, Fed. R. Civ. P. 60(b)(6)

Defendants move for relief from the final judgment of this Court pursuant to Fed. R. Civ. P. 60(b).  Rule 60(b) sets forth the specific limited grounds upon which a court may relieve a party from a final judgment. Fed. R. Civ. P. 60(b). Rule 60(b) provides that the court may relieve a party from a final judgment for the following reasons: (1) mistake, inadvertence, surprise, or excusable neglect; (2) newly discovered evidence that, with reasonable diligence, could not have been discovered in time to move for a new trial under Rule 59(b); (3) fraud (whether previously called intrinsic or extrinsic), misrepresentation, or misconduct by an opposing party; (4) the judgment is void; (5) the judgment has been satisfied, released, or discharged; it is based on an earlier judgment that has been reversed or vacated; or applying it prospectively is no longer equitable; or (6) any other reason that justifies relief. Defendants seek relief under Rule 60(b)(6).

A party seeking relief from the judgment has the burden of demonstrating such relief is appropriate. *TCI Group Life Insurance Plan v. Knoebber,* 244 F.3d 691, 697 (9th Cir. 2001).

Rule 60(b)(6) is a provision the Ninth Circuit Court of Appeals uses "sparingly and as an equitable remedy to prevent manifest injustice." *United States v. Alpine Land & Reservoir Co.*, 984 F.2d 1047, 1049 (9th Cir. 1993), *cert. denied,* 510 U.S. 813 (1993). Under Rule 60(b)(6), relief is granted when "extraordinary circumstances prevented [petitioner(s) ] from taking timely action to prevent or correct an erroneous judgment." *Greenawalt v. Stewart,* 105 F.3d 1268, 1273 (9th Cir. 1997), *cert. denied,* 519 U.S. 1103 (1997) (citations and quotation marks omitted)

Defendants do not argue they are entitled to relief from this Court for any of the enumerated reasons under Rule 60(b).  Rather, Defendants argue they are entitled to relief under Rule 60(b)(6)'s catch all – "any other reason that justifies relief."

Defendants, however, do not state what that reason would be. Defendants consolidated their Rule 50(b) and 60(b) Motions, provided the legal standard for Rule 60(b) in the beginning of the Motion, and requested relief under Rule 60(b)(6) in the conclusion without ever tethering any argument to Rule 60(b), or explaining how any of Defendants' arguments were proper under Rule 60(b).  This Court will not scour the record and attempt to infer what arguments Defendants intended to argue under Rule 60(b)(6).  However, to the extent Defendants offer the same arguments the Court has addressed in denying Defendants' motion for judgment as a matter of law, those arguments are rejected for the same reasons stated therein.  To the extent Defendants submit relief is proper for any other reason under Rule 60(b)(6), Defendants have waived those arguments.

Defendants' motion relief from the final judgment of this Court pursuant to Fed. R. Civ. P. 60(b) is DENIED.

**D.    The Parties' Motions For A New Trial**

Both Plaintiffs and Defendants have moved for a new trial pursuant to Fed. R. Civ. P. 59. Rule 59 of the Federal Rules of Civil Procedure provides that a new trial may be granted "any reason for which a new trial has heretofore been granted in an action at law in federal court." "Rule 59 does not specify the grounds on which a motion for a new trial may be granted." *Molski v. M.J. Cable, Inc.,* 481 F.3d 724, 729 (9th Cir. 2007) (*quoting Zhang v. Am. Gem Seafoods, Inc.*, 339 F.3d 1020, 1035 (9th Cir. 2003). Rather, the court is "bound by those

1   grounds that have been historically recognized." *Id.*

2       Historically recognized grounds include, but are not limited to, claims "that the verdict

3   is against the weight of the evidence, that the damages are excessive, or that, for other reasons,

4   the trial was not fair to the party moving." *Molski,* 481 F.3d at 729 (quoting *Montgomery Ward*

5   *& Co. v. Duncan*, 311 U.S. 243, 251, 61 S.Ct. 189, 85 L.Ed. 147 (1940)). Where a movant

6   claims that a verdict is against the clear weight of the evidence, a new trial should be granted

7   where, after giving full respect to the jury's findings, the judge "is left with the definite and firm

8   conviction that a mistake has been committed" by the jury. *Landes Const. Co., Inc. v. Royal*

9   *Bank of Canada*, 833 F.2d 1365, 1371–72 (9th Cir. 1987). With respect to arguments of error or

10  fairness, "the burden of showing harmful error rests on the party seeking the new trial." *Randle*

11  *v. Franklin*, No. 08–cv–0845–JAT, 2011 WL 2064850 at *1 (E.D. Cal., May 25, 2011).

12      **1.      Defendants' Motion for a New Trial**

13      Defendants move for a new trial on the following grounds: (1) the Court erred as a

14  matter of law by refusing to submit special interrogatories to the jury; (2) the Court erred in its

15  qualified immunity determination; and (3) the evidence and jury verdict demonstrates Officer

16  Catton is entitled to qualified immunity because Stephen Willis was reaching for his gun.[11]

17          **a.      Lack of Special Interrogatories Does Not Warrant a New Trial**

18      "Whether to submit special interrogatories to the jury is a matter committed to the

19  discretion of the district court." *Ruvalcaba v. City of Los Angeles,* 167 F.3d 514, 522 (9th Cir.

20  1999), *cert. denied,* 528 U.S. 1003 (1999) (quoting, *Acosta v. City & County of San Francisco*,

21  83 F.3d 1143, 1149 (9th Cir.), *cert. denied*, 519 U.S. 1009, 117 S.Ct. 514, 136 L.Ed.2d 403

22  (1996)).

23      At the very end of the eighth day of trial, just before the close of Defendants' case-in-

24  chief and the beginning of closing arguments, Defendants raised the issue of using special

25  interrogatories for a post-trial determination of qualified immunity.  The Court expressed its

26  ---
    [11] Defendants' final argument is identical to the one advanced in Defendants' motion for judgment as a matter of
27  law, and the Court rejects those arguments for the same reasons stated therein.  *See, infra,* Section III.B.3.
    Additionally, at oral argument, Defendants argued the jury was not properly instructed on Plaintiffs' Fourth
    Amendment claim.  However, this argument was never raised in Defendants' motion for a new trial, and the issue
28  is therefore waived.  *See Zamani v. Carnes*, 491 F.3d 990, 997 (9th Cir.2007) (A district court need not consider
    arguments raised for the first time in a reply brief.)

1   displeasure that the issue was being brought up so late in the proceedings, and cautioned

2   Defendants that "[y]ou can craft what you want.  Whether I give it or not is a different story."

3   Trial Tr., Dec. 13, 2013, Doc. 282, 1864: 7-8.

4        On the ninth day of trial, just before closing arguments were about to commence,

5   Defendants proposed a set of special interrogatories.  However, the Court believed the proposed

6   interrogatories were vague, argumentative, and misstated the law. Moreover, the Court again

7   voiced its displeasure that Defendants were raising this issue at the "12th" hour.  Nevertheless,

8   the Court entertained the possibility and even proposed its own special interrogatories.  That

9   same day, after the parties had made their closing arguments, the parties and the Court struggled

10  with what issues needed to be determined for qualified immunity, and how to properly go about

11  resolving those issues by way of special interrogatories.  Indeed, even Defendants' counsel

12  admitted that parsing out the relevant facts for qualified immunity "is kind of a shot in the

13  dark," and acknowledged that "it's hard to put together all of the facts that a court would need

14  to determine for qualified immunity if a jury were to find a Fourth Amendment violation." Trial

15  Tr., Dec. 16, 2013, Doc. 283, 2072: 5-11. Defendants ultimately requested to take the Court's

16  proposed special interrogatories home for the evening to consider them.

17       On the 10th and final day of trial, and as the jury was deliberating, Defendants proposed

18  two new sets of special interrogatories.  Plaintiffs did not agree with the form and substance of

19  the questions.  The Court did not agree the proposed interrogatories were appropriate, especially

20  when "the jury is deliberating, when it should have been presented weeks ago for us to really

21  vet out how this would be approached."  Trial Tr., Dec. 17, 2013, Doc. 284, 2087: 8-14.

22  Ultimately, the Court declined to send any special interrogatories to the jury.

23       The Court's reluctance to send the proposed special interrogatories to the jury, in part,

24  was because this excessive force case involved a variety of moving parts and factual

25  determinations that, individually or in combination, could have resulted in a finding of

26  liability.[12]  For instance, did the jury believe the officers identified themselves?  Did the jury

27  _____

28  [12] These numerous scenarios could include that both Officer Catton and Officer Astacio were found to have used
    excessive force.  If the jury had made such a finding, it would have been difficult, if not impossible, to identify all
    the relevant facts to make a qualified immunity determination.  In hindsight, because only Officer Catton was

1   believe Stephen Willis attempted to remove, or removed his revolver from the holster?  Once

2   shots were fired, did the jury believe Stephen Willis was pointing his weapon at either officer?

3   Was the officers' cross-fire the reason officers believed Stephen Willis remained a threat?  The

4   potentially relevant factual determinations were too numerous to define a workable set of

5   special interrogatories that would properly frame the issues and avoid confusion – particularly

6   at the 12th hour.  *Frank Briscoe Co. v. Clark County*, 857 F.2d 606, 614-15 (9th Cir. 1988), *cert.*

7   *denied*, 490 U.S. 1048 (1989) (a court may abuse its discretion by submitting special

8   interrogatories that are likely to mislead or confuse the jury or inaccurately state the issues.)

9        The Court's refusal to submit special interrogatories was not legal error.  Defendants

10  have provided no authority for the proposition that special interrogatories are required for the

11  purpose of evaluating a post-verdict qualified immunity defense. On the contrary, qualified

12  immunity is "an immunity from suit rather than a mere defense to liability; and like absolute

13  immunity, it is effectively lost if a case is . . . permitted to go to trial." *Nelson v. Giurbino*, 395

14  F. Supp. 2d 946, 653 (S.D. Cal. 2006) (quoting, *Mitchell v. Forsyth*, 472 U.S. 511, 526, 105

15  S.Ct. 2806, 86 L.Ed.2d 411 (1985)). Moreover, the Ninth Circuit has held a trial court that does

16  not use a special verdict or special interrogatories to distill every relevant fact for post-trial

17  purposes does not abuse its discretion.  *See, Canceller v. Federated Dept. Stores*, 672 F.2d

18  1312, 1316-7 (9th Cir. 1982), *cert. denied*, 459 U.S. 859 (1982) (even where special

19  interrogatories or special verdict forms are "strongly preferred" for appellate review purposes,

20  the "failure to submit special interrogatories [is] not an abuse of discretion."); *see also, Landes*

21  *Const. Co., Inc. v. Royal Bank of Canada*, 833 F.2d 1365, 1374 (9th Cir. 1987) ("Although a

22  special verdict would have been appropriate in this case[,]" a trial court does not abuse its

23  discretion when refusing to do so.)

24       The timing of Defendants' request for special interrogatories supports the Court's denial

25  of the same.  The Court's Pretrial Order ordered the parties to serve an agreed-upon verdict

26  form no later than November 22, 2013. Doc. 172. Defendants proposed their own "special

27  verdict" form which was substantially similar to the one ultimately provided to the jury.

28

---

found to have used excessive force, the analysis is much more streamlined.  Discussed above, the Court can infer
the jury imposed liability for the final shot(s).

---

24

*Compare,* Doc. 172 *with* Doc. 201. Defendants never mentioned their desire for special interrogatories before the trial began.

Defendants' delay was sufficient reason for the Court to refuse special interrogatories. *Landes,* 833 F.2d at 1374.   In *Landes*, the Ninth Circuit confronted substantially similar circumstances in the context of an 11th hour request for a special verdict form that identified certain factual determinations:

> Here we find no abuse of discretion in the trial court's decision on the form of the verdict. The court had ordered that special verdicts must be submitted seven days before trial; Local Rule 13.4.1 of the Central District of California requires requests for special verdicts be filed five days before trial. Although use of a special verdict was mentioned several times in response to concerns about the speculative nature of the evidence on lost profits, RBOC did not submit a request until after the jury had retired. At this time, the trial court did suggest that it might consider using a special verdict because it appreciated the problem we might face in reviewing a general verdict for LCCO. But when counsel failed to agree on the form, the court decided against it because "at this point is probably also not an appropriate time to be ringing [sic] our hands over it. I guess the general verdict problem—the special interrogatory problem ought to have been raised before.... So I'll just send in the general verdict form and we'll let the chips fall where they may.

*Id.*

*Landes* supports the Court's decision to refuse special interrogatories.   Plaintiffs, Defendants and this Court all proposed a verdict form that did not distill specific factual occurrences.   As the jury was about to get the case, Defendants, for the first time, requested special interrogatories for qualified immunity purposes.   While the Court seriously considered some kind of special interrogatory, the Court ultimately concluded that "the special interrogatory problem ought to have been raised before." *Landes,* 833 F.2d at 1374 ("Although a special verdict would have been appropriate in this case, we conclude that the trial court did not abuse its discretion in light of the lateness of the request.")[13]

Ultimately, Defendants argue the special interrogatories were necessary because if

---

[13] Additionally, because there was not an agreed upon or workable set of special interrogatories before closing argument, it would have been reversible error for the Court to provide the requested interrogatories.  *Ruvalcaba,* 167 F.3d at 522 ("We now expressly hold that a district court shall disclose at least the substance of special interrogatories before closing arguments have been completed."); *Landes,* 833 F.2d at 1374 (The form of the verdict should be decided before closing argument so that counsel may structure their arguments, and the court its instructions, accordingly. . . . The failure to follow this practice may constitute reversible error.") (Citations and quotations omitted.)

certain disputed facts are not crystalized, the Court cannot determine whether Officer Catton is entitled to qualified immunity. However, when disputed facts preclude qualified immunity from operating as a bar to lawsuit, "[q]ualified immunity is an affirmative defense and the burden of proving the defense lies with the official asserting it." *Houghton v. South*, 965 F.2d 1532, 1536 (9th Cir. 1992). By failing to seek special interrogatories timely, Defendants have not carried their burden. If Defendants wished to have the jury articulate all the facts that could potentially affect qualified immunity, they could have taken appropriate measures to obtain this information. *See, McCord v. Maguire,* 873 F.2d 1271 (9th Cir. 1989) ("[L]itigants have the responsibility to request or submit special verdict forms . . . ") "Any other rule would unnecessarily jeopardize jury verdicts that are otherwise fully supported by the record on the mere theoretical possibility that the jury based its decision on unsupported specifications. We will not allow litigants to play procedural brinkmanship with the jury system and take advantage of uncertainties they could well have avoided." *Id.* (internal citations omitted)

Accordingly, the Court's refusal to provide special interrogatories to the jury does not warrant a new trial.

> **b.      The Court's Ruling on Qualified Immunity Does Not Warrant a New Trial**

Defendants argue a new trial is warranted due to the Court's errors of law and fact in its post-verdict qualified immunity determination. However, the issue of qualified immunity cannot appropriately be considered on a motion for a new trial. *See Tortu v. Las Vegas Metropolitan Police Dept.,* 556 F.3d 1075 (9th Cir. 2009) ("[Qualified immunity] cannot be appropriately considered on a motion for a new trial, where the issue is whether the jury's verdict is against the clear weight of the evidence."); *See also, Id.* at fn. 9 ("The dissent contends that a new trial can properly be granted on the independent ground of qualified immunity. The determination of qualified immunity at step two is strictly a legal question of whether, even though the facts alleged by the plaintiff make out a constitutional violation, that constitutional right was not clearly established. . . . There is no authority that this legal issue could be revived as a ground for a new trial under Rule 59.")

1    Based on the foregoing, Defendants' Motion for a New Trial is DENIED.[14]

2        **2.      Plaintiffs' Motion for a New Trial**

3        Plaintiffs move for a new trial on the following grounds: (1) the jury's verdict

4    demonstrates that Officer Astacio should have been found liable; (2) there is no factual basis for

5    the jury's finding of 80% comparative negligence on Stephen Willis's part; (3) the Court erred

6    in permitting Defendants to introduce evidence of Stephen Willis's Alcohol and Marijuana use;

7    and (4) there were errors in the juror selection process.

8        **a.      The Jury's Verdict in Favor of Officer Astacio is Not Contrary to the**

9                **Clear Weight of Evidence**

10       Unlike a motion for judgment as a matter of law, in ruling for a motion for a new trial,

11   "[t]he existence of substantial evidence does not ... prevent the court from granting a motion for

12   a new trial pursuant to Fed. R. Civ. P. 59 if the verdict is against the clear weight of the

13   evidence." *Landes,* 833 F.2d at 1371. Thus, a verdict may be supported by substantial evidence,

14   yet still be against the clear weight of evidence.  In addressing a motion for a new trial, "[t]he

15   judge can weigh the evidence and assess the credibility of witnesses, and need not view the

16   evidence from the perspective most favorable to the prevailing party." *Id.* (Internal citations and

17   quotations omitted). Instead, if, "having given full respect to the jury's findings, the judge is left

18   with the definite and firm conviction that a mistake has been committed," then the motion

19   should be granted. *Id.* at 1371–72. However, a motion for new trial should not be granted

20   "simply because the court would have arrived at a different verdict." *Pavao,* 307 F.3d at 918.

21       Plaintiffs argue the clear weight of evidence demonstrates that both Officer Catton and

22

23       [14] A fair reading of Defendants' Motion for a New Trial does not reveal an argument that the jury's
     verdict is "against the clear weight of evidence."  Aside from a request for a new trial for failure to give special
24   interrogatories, Defendants' motion for a new trial concerns the Court's post-verdict qualified immunity
     determination only.  Thus, any argument that the jury's verdict is against the clear weight of evidence is waived.
25   However, out of abundance of caution and to create a clear record, this Court finds that the jury's verdict against
     Officer Catton is not against the clear weight of evidence. Discussed above, there was sufficient evidence for the
     jury to conclude Officer Catton's final shot(s) violated Plaintiffs' Fourth Amendment rights.  Defendants rely
26   heavily on the testimony of Officer Catton, however, this Court is mindful that "cases in which the victim of
     alleged excessive force has died 'pose a particularly difficult problem' in assessing whether the police acted
27   reasonably, because 'the witness most likely to contradict [the officers'] story ... is unable to testify.'" *Gregory v.
     County of Maui,* 523 F.3d 1103, 1107 (9th Cir. 2008) (citing, *Scott v. Henrich,* 39 F.3d 912, 915 (9th Cir.1994).
28   This Court is not "left with the definite and firm conviction that a mistake has been committed."

Officer Astacio should have been found liable for Fourth Amendment violations that occurred prior to Officer Catton's final shot(s).   In support of this argument, Plaintiffs' rely on the Court's previous consideration of the evidence, where the Court found that Officer Catton and Officer Astacio's conduct was "virtually indistinguishable" prior to the final shot(s).

The clear weight of evidence does not dictate that Officer Astacio should have been found liable for excessive force.   Both officers testified they identified themselves before confronting Stephen Willis.  Both officers testified that when Stephen Willis turned around with a holstered revolver, Stephen Willis, at a minimum, began to pull his revolver from the holster. When Stephen Willis retreated to the back of the van, both officers testified they believed Stephen Willis continued to possess the gun he had used to threaten them, and that Stephen Willis was pointing his gun at Officer Catton. It is also uncontradicted that Stephen Willis was in possession of a firearm, which ultimately was found to have one bullet missing from the chamber.

The Court is mindful that cases in which the victim of alleged excessive force has died may require the Court to be skeptical of the officers' testimony. *See Gregory,* 523 F.3d at 1107 (citing, *Scott v. Henrich*, 39 F.3d 912, 915 (9th Cir. 1994), *cert. denied,* 515 U.S. 1159 (1995). The Court also recognizes there was some inconsistency in the officers' testimony, and the circumstances of the shooting itself could have led a reasonable person to disbelieve the officers' testimony. Ultimately, however, there is very little evidence that tends to contradict Officer Catton's and Officer Astacio's testimony with respect to the initial encounter and the main volley of gunfire.   Accordingly, the verdict in favor of Officer Astacio is not against the clear weight of evidence.

      **b.**      **The Jury's Comparative Negligence Finding is Not Inconsistent with the Verdict**

Plaintiffs argue the jury's comparative negligence finding is against the clear weight of evidence for two reasons.  First, Plaintiffs argue that even if the jury's verdict was based on the final shot(s), because deadly force was not justified, Stephen Willis could not have negligently contributed to Officer Catton's final shot(s). Second, at oral argument, Plaintiffs argued that

even if Stephen Willis's negligence preceded Officer Catton's negligence, the clear weight of evidence demonstrates Stephen Willis was not negligent.

As to Plaintiffs' first argument, like Defendants, Plaintiffs argue Stephen Willis's negligence must be tethered to Officer Catton's negligence, i.e., Stephen Willis's negligence must have related to the final shot(s). As already explained, Stephen Willis's negligence concerns the relationship between Stephen Willis's conduct and Plaintiffs' injuries – it need not relate directly to Officer Catton's negligence. *See, Sierra Pacific Indus.,* 879 F. Supp. at 1134. ("Contributory negligence is the conduct on the part of the plaintiff which falls below the standard to which he should conform for his own protection, and is a legally contributing cause co-operating with the negligence of the defendant in bringing about the plaintiff's harm.")

Also like Defendants, Plaintiffs' argument confuses the relevant "injury." As explained earlier, Plaintiffs' injury is not being shot two times or fourteen times; Plaintiffs' injury is Stephen Willis's death. Thus, the relevant inquiry in evaluating Stephen Willis's comparative negligence is not whether his negligence contributed to the final shot(s); rather, the relevant inquiry is whether Stephen Willis's negligence contributed to his death.

Turning to Plaintiffs' second argument, and "having given full respect to the jury's findings," this Court is not left with the "definite and firm conviction" that the jury erred in finding Stephen Willis negligently contributed to his death. At oral argument, Plaintiffs' counsel thoroughly recounted the evidence and his theory of the case, ultimately concluding that no reasonable juror could find Stephen Willis acted negligently at the initial encounter or during the main volley of gunfire.

Like most aspects of this case, however, there was conflicting evidence on most of Plaintiffs' theories. While Officer Catton's and Astacio's testimony concerning the initial encounter may not have been uniform, both officers testified that (1) they identified themselves as police officers, (2) they warned Stephen Willis to drop his revolver, and (3) Stephen Willis, at a minimum, removed his revolver from the holster. Indeed, this testimony was supported by the testimony of Stephen Willis's former girlfriend, Jennafer Uribe, who testified she heard yelling prior to the gunfire. Trial Tr., Dec. 10, 2013, Doc. 279, 1252: 8-10. Other than the specific inconsistencies in the officers' testimony, no evidence was presented to contradict the

29

overarching theme of the officers' testimony: Stephen Willis removed his revolver from the holster and threatened Officers Catton and Astacio.

Subsequent to the initial shooting, it is undisputed that Stephen Willis took cover behind a van and continued to possess his revolver.  Plaintiffs argue that Stephen Willis was already shot, crawled to the back of the van out of desperation and was "cowering" behind the van. Plaintiffs also argue the implausibility of the officers' testimony that Stephen Willis was pointing his weapon at Officer Catton, because Stephen's revolver was never fired.

Once again, Plaintiffs' theories on this aspect of the case are disputed. While no bullet casing was ever found, it is undisputed that Stephen's revolver had one empty chamber.  The officers testified that during the encounter, they repeatedly shouted orders to Stephen to drop his weapon and get on the ground. Plaintiffs speculate that some or all of this testimony is inaccurate or that the noise of gun battle drowned the commands.  However, while Plaintiffs may regard the officers' testimony as implausible, the jury was no more required to accept Plaintiffs' interpretation of the evidence than they were required to accept the officers' testimony.  Ultimately, both officers testified Stephen Willis was pointing his weapon when he crouched behind the van.

In this case, virtually all the material facts are disputed and conflicting evidence in support of competing theories were presented.  This Court cannot conclude the jury's verdict was against the clear weight of evidence.

       **c.**      **Evidence of Stephen Willis's Alcohol and Marijuana Use Does Not Warrant a New Trial**

Plaintiffs argue the Court erred in permitting evidence of Stephen Willis's alcohol intoxication and marijuana use. Plaintiffs argue that because Defendant Officers did not suspect Stephen Willis was intoxicated, this evidence was irrelevant and prejudicial. In support of this argument, Plaintiffs cite to the Ninth Circuit's recent decision in *Hayes v. County of San Diego,* 736 F.3d 1233 (9th Cir. 2013).

In *Hayes,* police officers responded to a domestic disturbance call. *Hayes*, 736 F.3d at 1227. Hayes's wife explained that Hayes had attempted suicide and was concerned that he would harm himself. *See Id.* The officers entered the residence, saw Hayes, and told him to

show them his hands. *See Id.* Hayes took steps towards the officers, raised his hands to shoulder level, and revealed a large knife in his hands. *Id.* at 1227–28. The officers believed that Hayes was a threat and almost immediately shot and killed Hayes. *Id.* at 1228. Hayes apparently had been intoxicated, but the officers neither knew nor suspected intoxication. *Id.* at 1232–33. The Ninth Circuit stated that trial courts "can only consider the circumstances of which [the officers] were aware when they employed deadly force. Accordingly, when analyzing the objective reasonableness of the officers' conduct under Graham, we cannot consider the fact that Hayes was intoxicated or that he had previously used a knife in harming himself." *Id.* Hayes makes clear that only information that is known by the offices is relevant to assessing the totality of the circumstances under *Graham.*

Here, officers testified that upon hearing a car hit the gate to Stephen Willis's apartment complex, they suspected a possible DUI.  However, it is also undisputed that Officers Catton and Astacio did not see signs that Stephen Willis was under the influence of drugs or alcohol when they encountered him.  Thus, under *Hayes,* evidence of Stephen Willis's drug or alcohol use could not be considered in determining whether Officer Catton or Officer Astacio acted reasonably.  However, what *Hayes* does not answer is whether this evidence can be offered with respect to Stephen Willis's conduct.

The Ninth Circuit's decision in *Boyd v. City & Cnty. of San Francisco,* 576 F.3d 938, 948–49 (9th Cir. 2009) is instructive. In *Boyd*, the Ninth Circuit upheld a ruling allowing evidence that a decedent had been on drugs at the time of a police shooting because the evidence "was highly probative of the decedent's conduct, particularly in light of [the decedent's] alleged erratic behavior ...." *Id.* at 949.  *Boyd* concluded that "[i]n a case ... where what the officer perceived just prior to the use of force is in dispute, evidence that may support one version of events over another is relevant and admissible." *Id.*

In a recent case from this Court, the Honorable Anthony W. Ishii evaluated whether evidence of drug and alcohol use could be admitted for other purposes post-*Hayes.  See Turner v. County of Kern,* 2014 WL 560834 (E.D. Cal. 2014).  At issue in *Turner* was whether evidence that plaintiff had alcohol and methamphetamine in his system was relevant to the

plaintiff's actions, but not the reasonableness of the officer's conduct. *Turner* summarized several cases that generally stand for the following proposition: "It is not uncommon for courts to permit evidence that a plaintiff/decedent was under the influence of drugs or alcohol in order to explain unusual behavior or to corroborate the officers' version of how a decedent acted." *Turner,* 2014 WL 560834 *2 (collecting cases).

> *Turner* found that *Boyd* controlled over *Hayes*. Specifically, *Turner* opined that:

> if an officer does not know or believe someone to be intoxicated, evidence of intoxication may not be considered under the totality of the circumstances in assessing whether an officer acted reasonably/used excessive force. However, Hayes does not say that evidence of intoxication is inadmissible for all purposes. Hayes neither discussed nor cited to Boyd. This is likely because in Hayes, there was no dispute about what Hayes was doing before he was shot, and there was no argument that the evidence of alcohol consumption was relevant to explain Hayes's actions. That is different from this case. . . "[b]ecause Turner's actions and conduct are in dispute, *Boyd,* and not *Hayes,* controls."

*Id.* at *3.

> *Turner's* reasoning confirms this Court's approach and supports this Court's decision to admit this evidence. Here, there is a dispute as to how Stephen Willis acted when he was approached by the officers. Evidence of intoxication and drug use is relevant to explain Stephen Willis's conduct and may tend to corroborate the officers' version of events, even if this same evidence is not admissible towards the objective reasonableness of the officers' conduct. Moreover, both Officers Catton and Astacio admitted on cross-examination that they had no knowledge of Stephen Willis's intoxication. Further, the evidence was relevant and probative of Defendants' defense of comparative negligence. Thus, Plaintiffs were able to explain to the jury that these officers had no knowledge of Stephen Willis's intoxication, and that his intoxication was irrelevant to the reasonableness of the officers' conduct. Under *Boyd,* this evidence was admissible.[15]   Therefore, admission of this evidence does not warrant a new trial.

---

[15] With respect to the photographs of the marijuana plants, Patron tequila bottle and "bong," these were joint exhibits whose admissibility was stipulated to by Plaintiffs through their counsel. (Joint Exhibits J1299- J1307, J1338) The Court does not find a new trial is warranted based upon a joint exhibit.

1
2

    **d.**        **The Court's Refusal to Discharge Ms. Berkabile Does Not Warrant a New Trial**

3
4
5
6

     Plaintiffs argue the Court made several errors during the juror selection process; namely, that the Court forced Plaintiffs to use their preemptory challenges when the Court should have excused certain jurors for cause.  Plaintiffs present a thorough account of the comments made by the relevant jurors at issue, and why those jurors should have been excused.

7
8
9
10
11
12
13
14

     Ultimately, Plaintiffs' argument comes down to the fact that the Court improperly forced them to use a preemptive challenge on two jurors who should have been removed for cause. Plaintiffs used a preemptive challenge on one of those jurors, which meant they could not challenge Ms. Berkabile, who ultimately sat on the jury.  Plaintiffs argue that if the Court excused the two subject jurors, they would have challenged Mr. Olivera, who also sat on the jury.  Plaintiffs admit Mr. Olivera never said anything indicating he would be biased, but Plaintiffs nonetheless had the sense that Mr. Olivera had "a profound lack of appreciation for plaintiffs' case."

15
16
17
18
19
20

     The Court does not reach the merits of Plaintiffs' argument because even if the Court should have excused Ms. Berkabile, such error was harmless. Ms. Berkabile was subsequently excused due to illness well before the jury had the case. *See Nevius, v. Sumner,* 852 F.2d 463, 468 (9th Cir. 1988), *cert. denied,* 527 U.S. 1006 (1999) (holding race-based peremptory challenge of alternate juror was harmless error because the alternate juror was not called upon to serve).

21
22
23
24
25
26
27
28

     At oral argument, the parties discussed the recent California Supreme Court case, *People v. Black.* Mr. Black was convicted of two counts of "cruelty to animals" following a jury selection.  *Black,* 2014 WL 1257099 at *2. During voir dire, Mr. Black moved the court to remove two jurors for cause which was denied. He utilized two peremptory challenges to remove the prospective jurors.  Additionally, he asked the court to grant him two additional peremptory challenges to replace the two used on the on the jurors challenged for cause. He stated that there were two people that he wanted to use the additional challenges on.  The court denied his motion.  The defendant appealed arguing that he was denied a fair trial because he

1  did not have his full complement of peremptory challenges to utilize during voir dire.  *Id.*

2          The California Supreme Court concluded that although the trial court erred in its failure

3  to remove the two prospective jurors for cause, the defendant had effectively cured the error by

4  removing them with peremptory challenges.   The Court stated that "erroneous denial of a

5  challenge for cause to one juror is not reversible error when it deprives a defendant only of a

6  peremptory challenge to another juror."  *Id.* at *3.  "If no biased or legally incompetent juror has

7  served on defendant's jury, the judgment against him does not suffer from a federal

8  constitutional infirmity, even if he had to exercise one or more peremptory challenges to excuse

9  prospective jurors whom the court should have excused for cause."

10          As applied to the facts of this case, the Court is persuaded by *Black's* reasoning. If any

11  error existed, it was remedied by the peremptory challenge.  Ultimately, Plaintiffs' arguments

12  boil down to the presence of Mr. Olivera.  However, as Plaintiffs admit, Mr. Olivera said

13  nothing that would indicate he was biased or otherwise incompetent to serve on the jury. Thus,

14  the Court's refusal to excuse Ms. Berkabile for cause, even if error, was harmless.

15          Based on the foregoing, Plaintiffs' motion for a new trial is DENIED.

16                                          **CONCLUSION**

17          Based on the foregoing, the Court ORDERS as follows:

18          1.      Defendants' Motion for judgment as a matter of law is DENIED;

19          2.      Defendants' Motion for relief from the judgment of this Court is DENIED;

20          3.      Defendants' Motion for a new trial is DENIED;

21          4.      Plaintiffs' Motion for a new trial is DENIED.

22

23  IT IS SO ORDERED.

24      Dated:   __April 14, 2014__              ___/s/ *Barbara A. McAuliffe*___

25                                          UNITED STATES MAGISTRATE JUDGE

26

27

28

34